# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| Steve Wildman and Jon Borcherding, individually and as representatives of a class of similarly situated persons, and on behalf of the American Century Retirement Plan, | Case No. 4:16-cv-737-DGK |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | **CLASS ACTION** |
| American Century Services, LLC, the American Century Retirement Plan Retirement Committee, American Century Investment Management, Inc., American Century Companies, Inc., Christopher Bouffard, Bradley C. Cloverdyke, John A. Leis, Tina S. Ussery-Franklin, Margaret E. Van Wagoner, Gudrun S. Neumann, Julie A. Smith, Margie A. Morrison, Chat Cowherd, Diane Gallagher, and John Does 1–20, | |
| Defendants. | |

## NATURE OF THE ACTION

1.      Plaintiffs Steve Wildman and Jon Borcherding ("Plaintiffs"), individually and as representatives of the Class described herein, and on behalf of the American Century Retirement Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against American Century Services, LLC ("ACS"), the American Century Retirement Plan Retirement Committee (the "Committee"), American Century Investment Management, Inc. ("ACIM"), American Century Companies, Inc. ("ACC") (collectively, the "American Century entities" or "American Century"), Christopher Bouffard, Bradley C. Cloverdyke, John A. Leis, Tina S. Ussery-Franklin, Margaret E. Van Wagoner, Gudrun S. Neumann, Julie A. Smith, Margie A. Morrison, Chat Cowherd, Diane

Gallagher, and John Does 1–20 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2. As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), *available at* https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), *available at* http://www.plansponsor.com/2015-Recordkeeping-Survey/. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plans Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

3. The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every

2

incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the employee. In fact, employers often benefit from retaining higher-cost investments in the plan, because such investments often offer a kickback, known as "revenue sharing," to subsidize the plan's administrative costs. For financial service companies, the potential for imprudent and disloyal conduct is even greater, because the plan's fiduciaries are in a position to benefit the company through the plan's investment decisions by, for example, filling the plan with higher-cost proprietary investment products that a disinterested fiduciary would not choose.

4.      The real life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. *See* Melanie Hicken, *Your Employer May Cost You $100K in Retirement Savings*, CNN MONEY (Mar. 27, 2013), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees/. Put another way, excess fees can force a worker to work an extra five to six years to make up for the excess fees that were paid. *Id.*

5.      To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir.

2009). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

6. Defendants do not act in the best interest of the Plan and its participants. Instead, Defendants have used the Plan as an opportunity to promote American Century's mutual fund business and maximize profits at the expense of the Plan and its participants. Defendants loaded the Plan exclusively with American Century's investment offerings, without investigating whether Plan participants would be better served by investments managed by unaffiliated companies. The retention of these proprietary mutual funds has cost Plan participants millions of dollars in excess fees. For example, in 2013, the Plan's total expenses were 48% higher than the average retirement plan with between $500 million and $1 billion in assets (the Plan had $577 million in assets as of the end of 2013). The Plan's high costs can be attributed almost entirely to Defendants' selection and retention of high-cost proprietary mutual funds as investment options within the Plan, their failure to select the least expensive share class available for the Plan's designated investment alternatives, and their failure to monitor and control recordkeeping expenses.

7. Defendants' mismanagement of the Plan extends beyond their failure to adequately control Plan costs. Defendants also have failed to remove poorly performing investments from the Plan, in breach of their fiduciary duties.

8. Defendants' prioritization of American Century's profits over prudent management of Plan assets constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

9. These imprudent investment decisions were not the result of mere negligence or oversight. To the contrary, Defendants consistently included proprietary American Century-

4

affiliated mutual funds in the Plan, and failed to timely remove those funds even after it was clear that they were imprudent, because American Century earned millions of dollars in investment management fees by retaining them in the Plan. By managing the Plan in this fashion, Defendants have breached their duty of loyalty, as well as their duty of prudence, in violation of 29 U.S.C. § 1104.

10.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), failure to monitor fiduciaries (Count Two), prohibited transactions with a party-in-interest (Count Three), prohibited transactions with a fiduciary (Count Four), and for equitable restitution of ill-gotten proceeds (Count Five).

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

12.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

13.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found. In addition, Plaintiff Steve Wildman resides in this District.

## THE PARTIES

### PLAINTIFFS

14.     Plaintiff Steve Wildman ("Wildman") resides in Shawnee Mission, Missouri and

5

is a participant in the Plan. From 2005 to the present, Wildman has been invested in several different funds offered within the Plan, including several of the examples of imprudent investments identified herein. All of these funds were managed by ACIM. Wildman has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Furthermore, the American Century entities have been unjustly enriched from the various fees and expenses generated as a result of Wildman's Plan investments.

15.     Plaintiff Jon Borcherding ("Borcherding") resides in Prairie Village, Kansas and was a participant in the Plan from 1996 to 2012. Borcherding is entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not violated ERISA as described herein. While a participant, Borcherding was invested in several different funds offered within the Plan, including several of the examples of imprudent investments identified herein. All of these funds were managed by ACIM. Borcherding has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Furthermore, the American Century entities have been unjustly enriched from the various fees and expenses generated as a result of Borcherding's Plan investments.

## THE PLAN

16.     The Plan was established on December 31, 1966. The Plan is governed by a written instrument commonly referred to as the "Plan Document." The Plan Document was recently amended and restated effective January 1, 2008, and again on January 1, 2014.

17.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

18.     The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to

6

as a "401(k) plan."

19.     The Plan covers eligible employees and former employees of ACS and other participating employers, who are American Century affiliates.

20.     The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis. The employer often matches those contributions up to a certain percentage of the compensation contributed by the employee each pay period. Within the Plan, employees may defer up to 80% of their compensation on a pre-tax basis (subject to annual contribution limits), and those contributions are eligible for an employer match up to 4% of the employee's salary.[1] Participating employers may also make a discretionary profit sharing contribution, some of which may be made in the form of American Century Companies, Inc. common stock.

21.     Participants in the Plan are responsible for directing the investment of contributions, choosing from among a lineup of options offered by the Plan.[2] Because the Plan's Committee determines the investment options available, the investment lineup maintained by the

---

[1] Employer contributions, along with the opportunity to participate in a defined contribution plan in the first instance, are part of a standard benefits package offered by many large employers to attract and retain talented employees. *See* 401K SPECIALIST, *Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016) (highlighting survey findings that, among large defined contribution plan sponsors, attracting and retaining talented employees is a top priority), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors; Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 Indus. Rel. L.J. 183, 216 (1987) (noting that employers offer retirement benefits to attract and retain "reliable, productive employees"). ERISA is concerned with what happens next, the disposition of assets contributed. *See In re RCN Litig*., 2006 WL 753149, at *6, n.4 (D.N.J. Mar. 21, 2006) (observing that employer contributions occur before ERISA's fiduciary duties kick in).

[2] Participants in a defined-contribution plan are limited in their investment choices to the lineup of options offered by their plan. *See* INVESTMENT COMPANY INSTITUTE, *A Close Look at 401(k) Plans*, at 9 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").

7

Committee is critical to participants' investment results and, ultimately, the retirement benefits they receive.

22.     According to a summary description of the Plan published by ACS effective January 1, 2014, the Plan's investment options "are limited to a selection of American Century mutual funds, American Century collective investment trusts, and shares of American Century Companies, Inc. Class C common stock." ACS amended this summary plan description effective January 1, 2016, to say the Plan's investment options "are ***generally*** limited to a selection of American Century mutual funds, American Century collective investment trusts, and American Century Companies Inc. Class C common stock." (emphasis added to highlight change). This change in thesis did not correspond to any actual change in plan composition. Between 2010 and the filing of this First Amended Complaint, all of the Plan's designated investment alternatives have been propriety to American Century.

## DEFENDANTS

### *ACS*

23.     Defendant American Century Services, LLC is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). ACS is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) because it is identified in the Plan Document as having authority to control and manage the operation and administration of the Plan. ACS is located in Kansas City, Missouri and is a subsidiary of ACC. According to the Plan's Form 5500s and Notes to Financial Statements attached thereto, ACS is also the Plan Administrator, controlling and managing the operation and administration of the Plan with authority to appoint and delegate discretionary authority to an advisory committee. To the extent that these representations are accurate, ACS exercises discretionary authority or discretionary control respecting management of the Plan, as well as

8

discretionary authority and responsibility with respect to the administration of the Plan, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

24.     ACS is also a fiduciary because it has authority to appoint and remove members to the Committee. It is well-accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). 29 C.F.R. § 2509.75-8 (D-4); *Liss v. Smith*, 991 F. Supp. 278, 310-11 (S.D.N.Y. 1998); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). The responsibility for appointing and removing members of the Committee carries with it an accompanying duty to monitor the appointed fiduciaries, to ensure that they were complying with the terms of the Plan and ERISA's statutory standards. *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005); 29 C.F.R. § 2509.75-8 (FR-17). Furthermore, that monitoring duty carries with it a responsibility "to take action upon discovery that the appointed fiduciaries [were] not performing properly." *Liss*, 991 F. Supp. At 311. The Plan Document acknowledges this duty and expressly requires ACS to periodically review the conduct of the Committee and other fiduciaries.

25.     ACS acts as transfer agent and dividend-paying agent for the proprietary funds in the Plan, and receives unreasonably high compensation from ACIM for providing these services to the Plan. As the sponsor and administrator of the Plan, a participating employer in the Plan, and a party that provides services to the investments held by the Plan, ACS is a "party in interest" under 29 U.S.C. § 1002(14). Further, many employees of ACS have dual roles whereby they also work for ACC and ACIM. For example, Jonathan S. Thomas is the current President and Chief Executive Officer of ACC, the Chief Executive Officer of ACS, the Executive Vice

9

President of ACIM, and a director for each such entity and for other American Century subsidiaries. Given the interconnected nature of ACS and its affiliates, ACS possessed all actual and constructive knowledge possessed by ACIM and ACC. Pursuant to this knowledge, and the knowledge it gained through its role in the administration and monitoring of the Plan, ACS had actual and constructive knowledge of the conduct of the other Defendants and of their breaches of fiduciary duties, and the fact that the revenues received by ACS from Plan assets were the product of Defendants' fiduciary breaches. As a result, regardless of whether ACS is a fiduciary, ACS is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments made in breach of other Defendants' fiduciary duties.

### The Committee

26. ACS delegated its fiduciary responsibilities for investing Plan assets to the Committee. The Committee is responsible for maintaining the Plan's investment lineup, including monitoring the Plan's designated investment alternatives and making changes, as appropriate. The Committee is a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(a) given this discretionary authority. The Committee is also a named fiduciary pursuant to 29 U.S.C. § 1102(a) because it is identified in the Plan Document as having responsibility for selecting, monitoring, and changing the Plan's investment lineup. The following individuals have been or are members of the Committee: Christopher Bouffard, Bradley C. Cloverdyke, John A. Leis, Tina S. Ussery-Franklin, Margaret E. Van Wagoner, Gudrun S. Neumann, Julie A. Smith, Margie A. Morrison, Chat Cowherd, and Diane Gallagher. Because Plaintiffs do not know the identity of all of the current and former members of the Committee, they are collectively identified as John Does 1-10.

10

*Committee Members*

27. Defendant Christopher Bouffard was Vice President, Director of Portfolio Research at ACIM. As disclosed in Notes to Financial Statements attached to the Plan's Form 5500s, Mr. Bouffard was a member of the Committee from 2010 at the latest until at least 2013.

28. Defendant Bradley Cloverdyke is a Senior Vice President at American Century. As disclosed in Notes to Financial Statements attached to the Plan's Form 5500s, Mr. Cloverdyke was a member of the Committee from 2010 at the latest until at least 2012.

29. Defendant John Leis is a Vice President at American Century. As disclosed in Notes to Financial Statements attached to the Plan's Form 5500s, Mr. Leis was a member of the Committee starting in 2010 at the latest.

30. Defendant Tina S. Ussery-Franklin is a broker at American Century Investment Services Inc. As disclosed in Notes to Financial Statements attached to the Plan's Form 5500s, Ms. Ussery-Franklin was a member of the Committee from 2010 at the latest until at least 2012.

31. Defendant Margaret E. Van Wagoner was a broker at American Century Investment Services Inc. Ms. Van Wagoner was a member of the Committee from 2010 at the latest until at least 2013.

32. Defendant Gudrun S. Neumann is Chief Technology Officer at American Century. As disclosed in Notes to Financial Statements attached to the Plan's Form 5500s, Neumann was a member of the Committee starting in 2012 and served until 2013 at the latest.

33. Defendant Julie A. Smith is Vice President, Human Resources at American Century. As disclosed in Notes to Financial Statements attached to the Plan's Form 5500s, Ms. Smith was a member of the Committee starting in 2012 at the latest.

11

34.     Defendant Margie A. Morrison is a Senior Vice President at ACIM. As disclosed in Notes to Financial Statements attached to the Plan's Form 5500s, Ms. Morrison was a member of the Committee starting in 2013 at the latest.

35.     Defendant Chat Cowherd is Vice President of Industrial Relationship Management at ACIM. Mr. Cowherd was a member of the Committee starting in 2014 at the latest.

36.     Defendant Diane Gallagher is a Vice President at ACIM. Ms. Gallagher was a member of the Committee starting in 2014 at the latest.

*ACIM*

37.     Defendant American Century Investment Management, Inc. is a subsidiary of ACC and a Plan employer. ACIM acts as the investment advisor to all of the American Century investments within the Plan. At all relevant times, ACIM has collected fees on a monthly basis from Plan assets invested in American Century investment products. These fees are unreasonably high and come at the expense of the Plan and its participants. By virtue of its role as a provider of investment management services, ACIM exercises authority or control respecting management or disposition of Plan assets and renders advice for a fee or other compensation with respect to monies of the Plan. ACIM is therefore a functional fiduciary under 29 U.S.C. § 1002(21)(A).

38.     Because ACIM provides services to the Plan and is a Plan employer, ACIM is a "party in interest" pursuant to 29 U.S.C. § 1002(14). ACIM possesses any actual or constructive knowledge possessed by ACS and ACC. As disclosed in Statements of Additional Information for the American Century Funds family, numerous directors of the American Century Funds are also officers and/or directors of ACS and ACC. For example, Jonathan S. Thomas is the current

12

President and Chief Executive Officer of American Century Companies, Inc., the Chief Executive Officer of ACS, the Executive Vice President of ACIM, and a director for each entity and for other ACC subsidiaries. Likewise, Barry Fink is a current director of the American Century Funds and previously served simultaneously as Executive Vice President and Chief Operating Officer of ACC, and as President of ACS. Further, ACIM engages ACS as a transfer agent and dividend-paying agent, for which ACIM compensates it from the management fees it earns on the funds. Given the interconnected nature of ACIM and other American Century subsidiaries, ACIM had actual and constructive knowledge that the revenues it was receiving from Plan assets were the product of fiduciary breaches by Defendants. Further, because executive managers of ACIM have consistently served on the Committee, ACIM likewise had actual and constructive knowledge of the Committee's actions and omissions respecting Plan investments, including the fact that revenues received by ACIM from Plan assets were the result of fiduciary breaches by Committee. As a result, regardless of whether ACIM is a fiduciary, ACIM is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from other Defendants' breaches of their fiduciary duties.

*ACC*

39.     American Century Companies, Inc. directly owns ACS and ACIM, and is a Plan employer. As a Plan employer and owner of fiduciary entities, ACC is a "party in interest" pursuant to 29 U.S.C. § 1002(14). ACC has profited from the Plan's retention of mutual funds within the American Century Funds family, and more specifically, the payments made from Plan assets to ACC's subsidiary, ACIM. Given the interconnected nature of the American Century entities and the overlapping personnel of ACC, ACIM and ACS, as discussed in paragraph 24

13

and 35, ACC possesses all actual and constructive knowledge possessed by ACIM and ACS. ACC therefore had actual and constructive knowledge that the revenues it was receiving from Plan assets were the product of fiduciary breaches by the Defendants. As a result, ACC is subject to appropriate equitable relief under 29 U.S.C. § 1132(a)(3), including disgorgement of ill-gotten profits associated with its knowing receipt of payments that resulted from the other Defendants' breaches of their fiduciary duties.

40.    Any individuals or entities to whom Defendants delegated any fiduciary functions or responsibilities are also fiduciaries of the Plan pursuant to 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because the individuals and/or entities that have been delegated fiduciary responsibilities are not currently known to Plaintiffs, they are collectively named as John Does 11–20.

41.    Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

42.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A)    For the exclusive purpose of

(i)    Providing benefits to participants and their beneficiaries; and

14

(ii)     Defraying reasonable expenses of administering the plan;

(B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

43.     These ERISA fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

## DUTY OF LOYALTY

44.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . ." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

45.     While ERISA does not prohibit an employer's corporate officers from serving as plan fiduciaries—basically wearing two hats—it does require that the officer "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. In administering an ERISA plan, corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of the pension plan." *Donovan*, 680 F.2d at 271. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided

15

loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

46.     "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in intensive and scrupulous independent investigation of their options to insure that they act in the best interests of plan beneficiaries.'" *Howard v. Shay*, 100 F.3d 1484, 1488–89 (9th Cir. 1996) (quoting *Leigh v. Engle*, 727 F.2d 133, 125–26 (7th Cir. 1984)).

### DUTY OF PRUDENCE

47.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-02781, 2012 WL 5873825, at *14 (D. Minn. Nov. 20, 2012) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)).

16

48. Failing to closely monitor and subsequently minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting and retaining higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

### SOURCE AND CONSTRUCTION OF DUTIES

49. The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

50. Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, **this emphasis reflects the availability and continuing emergence of modern investment products**, not only with significantly varied characteristics but also **with similar products being offered with significantly differing costs**. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In

17

addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007) (emphasis added). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

51.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488 (quotation and citation marks omitted). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

## CO-FIDUCIARY LIABILITY

52.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

18

(3)     If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

53.     In a defined-contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Plan participants may invest in any of these "designated investment alternatives" that fiduciaries include within the Plan's menu of investment options.[3]

54.     Each investment alternative within a defined contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class. ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

55.     The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate. Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the default risk associated with the particular borrower. Equity, or stock, investments, obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company. Equity investments are generally defined by three

_____

[3] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants . . . may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

19

characteristics: (1) where the investment managers invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.* growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of growth stocks, value stocks, and companies in between). Balanced funds are a type of mutual fund that invests in a mix of stocks and bonds. Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

56.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis. For example, within each of the American Century funds within the Plan, monthly management fees are paid to Defendant ACIM. ACIM then uses a portion of this fee to pay ACS for its services as a transfer agent and dividend-paying agent for the funds.

57.     Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively

20

managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at* http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

58.     In addition to a core menu of designated investment alternatives, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds. Ayres & Curtis, *Beyond Diversification* at 1524; Ex. A § 5.02(c). However, SDBAs have significant drawbacks. Participants that choose to utilize an SDBA are typically assessed an account fee and a fee for each trade. These fees often make an SDBA a much more expensive option compared to investing in the designated investment alternatives available within the Plan.[4] Costs are also higher because employees investing in mutual funds within an SDBA must invest in retail mutual funds, rather than lower-cost institutional shares typically available as core investment options within the plan that are only available because of the retirement plan's ability to leverage the negotiating power of the plan's assets. DOL Field Assistance Bulletin 2012-02R (July 30, 2012), *available at* http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, *Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?*, FIDUCIARY NEWS (June 11, 2013), *available at* http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/ (last accessed Sept. 8, 2016). Furthermore, SDBA investors

---

[4] Investments available within a self-directed brokerage account are excluded from the definition of "designated investment alternative". 29 C.F.R. § 2550.404a-5(h)(4). Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA. *Id.* § 2550.404a-5(d).

often invest in imprudent investments, because there is no fiduciary selecting or monitoring the investments within an SDBA. 29 C.F.R. § 2550.404a-5(f), (h)(4).

59.     The existence of an SDBA option does not excuse plan fiduciaries from constructing and maintaining a prudent and appropriate menu of core investment options. For the reasons described above, "the performance is generally lower with self-directed accounts compared to managed portfolios. This translates into low real rates of return and higher retirement failure rates." Marijoyce Ryan, CPP, *Money Management: The Downside of Self-Directed Brokerage Accounts*, THE DAILY RECORD (June 26, 2012), *available at* http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/; Dr. Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success* (2004), at 1, 13–14, *available at* http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing results of study showing that self-directed brokerage accounts lagged the performance of a model portfolio of the plan's designated investment alternatives by an average of 4.70% per year).

60.     In addition to their high costs and poor investment outcomes, SDBAs are quite difficult to set up, requiring Plan participants to complete additional paperwork while also requiring a greater investment of time to choose among the hundreds or thousands of investment options. Due to their high costs and administrative complexity, SDBAs are seldom used by participants: only 2% of retirement plan assets are held in SDBAs. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 15 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_ fee_study.pdf (hereinafter "ICI/Deloitte Study"). And while usage of the SDBA is higher within the Plan, no

doubt due to Defendants' imprudence and self-dealing, as reported in its 2014 Form 5500, less than 7% of the Plan's assets are held in SDBAs.

**MINIMIZATION OF PLAN EXPENSES**

61.    At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[5] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

62.    There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. ICI/Deloitte Study at 17.

---

[5] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last accessed Sept. 8, 2016).

23

Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

63.     Administrative expenses (*e.g.*, recordkeeping, trustee and custodial services, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula. Though revenue sharing arrangements are not necessarily prohibited transactions under 29 U.S.C. § 1106(b), plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed plans." U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

64.     Fiduciaries exercising control over administration of the plan and the selection and monitoring of core investment options can minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower

24

fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at* http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.44% for plans with between $500 million and $1 billion in assets. ICI Study at 41.

65.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment management expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar

plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

<h3 style="text-align:center">MANAGEMENT OF THE PLAN'S INVESTMENT OPTIONS</h3>

66.    With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan and monitoring the plan's existing investments.

67.    The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001). Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio*

*Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years). For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

68.     The second critical insight provided by academic and financial industry literature is that in selecting prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

69.     While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future.

Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). Any sustainable ability to beat the market that managers might demonstrate is dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

### DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PLAN

**I.    DEFENDANTS USED A DISLOYAL AND IMPRUDENT PROCESS TO MANAGE THE PLAN.**

70.    To date, the only designated investment alternatives offered within the Plan have been investments managed by ACIM and ACC stock.[6]

---

[6] In 2010, Plan participants were offered 45 proprietary mutual funds, a JPMorgan money market

71.     Defendants were obligated to conduct a thorough investigation of each fund, and only include or retain funds in the Plan if the inclusion or retention of each fund was prudent and in the best interest of the Plan's participants. *See* Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (The "decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.") (emphasis added). A prudent and loyal process is objective and thorough; such a process considers investments from all investment companies in the process of both selecting designated investment alternatives and reviewing those investments. *Cf.* Restatement (Third) of Trusts § 78 cmt. c(8) (2007) (to select mutual fund affiliated with the trustee, trustee "must be sufficiently aware of overall costs associated with other mutual fund alternatives to enable the trustee to fulfill its important responsibility to be cost conscious"); DOL, Target Date Retirement Funds–Tips for ERISA Plan Fiduciaries (2013), http://www.dol.gov/ebsa/pdf/fsTDF.pdf (prudent target date fund selection process requires consideration of different service providers' products as well as "non-proprietary" options).

72.     As is apparent from the Plan's menu of designated investment alternatives, Defendants' process for managing the Plan was neither prudent nor loyal. At all stages, both in selecting the Plan's designated investment alternatives and in monitoring those investments, Defendants only considered investments affiliated with American Century, in furtherance of their

account (JPMorgan owned 45% of American Century before they sold their minority share of the company in 2011), ACC stock, and an SDBA. By the end of 2013, the Plan offered 41 designated investment alternatives, all of which (other than ACC stock) continued to be managed by ACIM. As of 2016, the designated investment alternatives in the Plan are still limited to proprietary investments managed by ACIM.

own financial interests, rather than the interests of Plan participants. In so doing, Defendants breached the fiduciary duties they owed to Plan participants.

## II. DEFENDANTS RETAINED HIGH COST PROPRIETARY FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS

73.     Because the Plan is laden with high-cost, proprietary mutual funds managed by American Century, and Defendants failed to investigate lower-cost, non-proprietary alternatives, the Plan's expenses are significantly higher than other comparable retirement plans.[7]

74.     Taking into account all administrative and investment expenses within the Plan, and using 2010 year-end balances (as reported on Form 5500 for 2010) and publicly available information regarding each investment's expenses, Plaintiffs estimate that total Plan costs for 2010 were approximately $3,162,000, or 0.73% of the $438 million in Plan assets. Using the same data sets, Plaintiffs estimate that total Plan costs for 2013 were approximately $3,645,000, or 0.65% of the $577 million in Plan assets.

75.     The Plan's total costs are extremely high for defined-contribution plans with a similar amount of assets. For example, in 2009 (the nearest year to 2010 for which data is available), the average total plan cost for plans with between $250 million and $500 million in assets was 0.53% (the plan had $438 million in assets in 2010), compared to total plan costs of 0.73% for the Plan in 2010. ICI Study at 41. In 2013, average total plan cost for plans with between $500 million and $1 billion in assets was 0.44% (the plan had $577 million in assets in 2013), compared to 0.65% for the Plan. *Id.* Thus, in 2010 the Plan was 38% more expensive than the average similarly sized plan, and in 2013 it was 48% more expensive.

---

[7] Compounding this problem, Defendants also failed to include the least expensive share class of certain proprietary funds in the Plan, and caused the Plan to pay excessive recordkeeping costs. *See infra* at ¶ 80-102.

76.     These average-based comparisons of overall Plan costs actually understate the excessiveness of the investment management fees paid by the Plan's participants. The fees charged by the American Century funds in the Plan were generally many times higher than the fees in comparable institutional mutual funds that were frequently used by other plans. As shown by the chart below, the fees for funds[8] within the Plan as of year-end 2013 (as disclosed in the Plan's 2013 Form 5500) were ***up to 15 times higher*** than alternatives in the same investment style. Indeed, for every fund in the Plan, there was a fund available from outside the American Century family with significantly lower expenses (typically, less expensive passively-managed *and* actively-managed funds were available):

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century Capital Preservation (CPFXX) | 48 bps | Oppenheimer Institutional Money Mkt E (IOEXX) | 11 bps | Money Market | 336% |
| American Century Premium Money Market Fund (TCRXX) | 45 bps | Oppenheimer Institutional Money Mkt E (IOEXX) | 11 bps | Money Market | 309% |
| American Century Diversified Bond Fund Institutional (ACBPX) | 40 bps | Vanguard Total Bond Market Index I (VBTIX)<br><br>Baird Core Plus Bond Inst (BCOIX) | 5 bps<br><br>30 bps | Intermediate-Term Bond | 700%<br><br>33% |

---

[8] Plaintiffs have omitted from the chart the four collective trusts that were designated investment alternatives in the Plan in 2013 given the difficulty of obtaining fee data for such trusts.

[9] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second). The listed expenses figures are taken from each fund's 2013 prospectus.

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century Emerging Markets Institutional (AMKIX) | 130 bps | Vanguard Emerging Markets Stock Index I (VEMIX)<br><br>American Funds New World R6 (RNWGX) | 12 bps<br><br>66 bps | Diversified Emerging Market | 983%<br><br>97% |
| American Century Equity Market Neutral Institutional (ALISX) | 146 bps | Vanguard Market Neutral Institutional (VMNFX) | 25 bps | Market Neutral | 484% |
| American Century Global Gold Institutional (AGGNX) | 48 bps | Vanguard Precious Metals And Mining Fund Investor Shares (VGPMX) | 26 bps | Equity Precious Metals | 85% |
| American Century Global Growth Institutional (AGGIX) | 90 bps | Vanguard Total World Stock Index I (VTWIX)<br><br>American Funds New Perspective Fund Class R6 (RNPGX) | 17 bps<br><br>45 bps | World Stock | 429%<br><br>100% |
| American Century Heritage Institutional (ATHIX) | 81 bps | Vanguard Mid-Cap Growth Index Adm (VMGMX)<br><br>T. Rowe Price Institutional Mid-Cap Growth (PMEGX) | 10 bps<br><br>62 bps | Mid-Cap Growth | 710%<br><br>31% |
| American Century High-Yield Institutional (ACYIX) | 67 bps | Vanguard High-Yield Corporate Adm (VWEAX) | 13 bps | High-Yield Bond | 415% |

Case 4:16-cv-00737-DGK   Document 28   Filed 09/08/16   Page 32 of 67

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century International Bond Institutional (AIDIX) | 60 bps | Vanguard Total Intl Bd Idx Institutional (VTIFX)<br><br>DFA World ex US Government Fxd Inc I (DWFIX) | 12 bps<br><br>20 bps | World Bond | 400%<br><br>200% |
| American Century International Discovery Institutional (TIDIX) | 130 bps | Oppenheimer Int'l Small-Mid Co I (OSCIX) | 81 bps | Foreign Small/Mid Growth | 60% |
| American Century One Choice 2015 Institutional (ARNIX) | 59 bps | Vanguard Target Retirement 2015 Investor (VTXVX)<br><br>American Funds 2015 Target Date Retire R6 (RFJTX) | 16 bps<br><br>37 bps | Target-Date 2015 | 269%<br><br>59% |
| American Century One Choice 2020 Institutional (ARBSX) | 62 bps | Vanguard Target Retirement 2020 Investor (VTWNX)<br><br>American Funds 2020 Target Date Retire R6 (RRCTX) | 16 bps<br><br>39 bps | Target-Date 2020 | 288%<br><br>59% |
| American Century One Choice 2025 Institutional (ARWFX) | 65 bps | Vanguard Target Retirement 2025 Fund Investor (VTTVX)<br><br>American Funds 2025 Target Date Retire R6 (RFDTX) | 17 bps<br><br>42 bps | Target-Date 2025 | 282%<br><br>55% |

33

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century One Choice 2030 Institutional (ARCSX) | 67 bps | Vanguard Target Retirement 2030 Fund Investor (VTHRX)<br><br>American Funds 2030 Target Date Retire R6 (RFETX) | 17 bps<br><br>43 bps | Target-Date 2030 | 294%<br><br>56% |
| American Century One Choice 2035 Institutional (ARLIX) | 70 bps | Vanguard Target Retirement 2035 Fund Investor (VTTHX)<br><br>American Funds 2035 Target Date Retire R6 (RFFTX) | 18 bps<br><br>43 bps | Target-Date 2035 | 289%<br><br>63% |
| American Century One Choice 2040 Institutional (ARDSX) | 73 bps | Vanguard Target Retirement 2040 Fund Inv. (VFORX)<br><br>American Funds 2040 Target Date Retire R6 (RFGTX) | 18 bps<br><br>44 bps | Target-Date 2040 | 306%<br><br>66% |
| American Century One Choice 2045 Institutional (AOOIX) | 77 bps | Vanguard Target Retirement 2045 Fund Inv. (VTIVX)<br><br>American Funds 2045 Target Date Retire R6 (RFHTX) | 18 bps<br><br>45 bps | Target-Date 2045 | 328%<br><br>71% |
| American Century One Choice 2050 Institutional (ARFSX) | 78 bps | Vanguard Target Retirement 2050 Fund Inv. (VFIFX)<br><br>American Funds 2050 Target Date Retire R6 (RFITX) | 18 bps<br><br>45 bps | Target-Date 2050 | 333%<br><br>73% |

34

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century One Choice 2055 Institutional (ARENX) | 79 bps | Vanguard Target Retirement 2055 Fund Inv. (VFFVX)<br><br>American Funds 2055 Target Date Retire R6 (RFKTX) | 18 bps<br><br>48 bps | Target-Date 2055 | 339%<br><br>65% |
| American Century One Choice Income Retirement Institutional (ATTIX) | 57 bps | BlackRock LifePath Index Retirement Fund Class K Shares (LIRKX)<br><br>TIAA-CREF Lifecycle Retirement Income Fund Instl (TLRIX) | 17 bps<br><br>38 bps | Target-Date Retirement | 235%<br><br>33% |
| American Century Short-Term Government Institutional (TWUOX) | 35 bps | Vanguard Short-Term Govt Bd Idx I (VSBIX)<br><br>DFA Short-Term Government I (DFFGX) | 7 bps<br><br>20 bps | Short-Term Government | 400%<br><br>75% |
| American Century Select Institutional (TWSIX) | 80 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>American Funds Growth Fund of America R6 (RGAGX) | 7 bps<br><br>34 bps | Large Growth | 1043%<br><br>135% |
| American Century Small Company Institutional (ASCQX) | 68 bps | Vanguard Small Cap Index I (VSCIX)<br><br>DFA U.S. Small Cap Portfolio Institutional (DFSTX) | 8 bps<br><br>37 bps | Small Blend | 750%<br><br>84% |

Case 4:16-cv-00737-DGK   Document 28   Filed 09/08/16   Page 35 of 67

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century Strategic Inflation Opportunities Institutional (ASINX) | 80 bps | Vanguard LifeStrategy Income Fund Investor Shares (VASIX)<br><br>Vanguard Inflation-Protected Secs Adm (VAIPX)<br><br>DFA Real Estate Securities I (DFREX) | 14 bps<br><br>10 bps<br><br>18 bps | Asset Allocation – 15 to 30% Equity[10] | 471%<br><br>700%<br><br>344% |
| American Century Ultra Institutional (TWUIX) | 79 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>Vanguard PRIMECAP Adm (VPMAX) | 7 bps<br><br>36 bps | Large Growth | 1029%<br><br>119% |
| American Century Value Institutional (AVLIX) | 80 bps | TIAA-CREF Large-Cap Value Idx I (TILVX)<br><br>American Funds American Mutual Fund R6 (RMFGX) | 8 bps<br><br>31 bps | Large Value | 900%<br><br>158% |

[10] The American Century Strategic Inflation Opportunities Fund consists largely of Real Estate Securities and Treasury Inflation Protected Securities. Therefore, as actively-managed alternatives, Plaintiffs have identified one Real Estate fund and one Treasury Inflation-Protected Securities fund.

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century Zero Coupon 2020 Investor (BTTTX) | 55 bps | Vanguard Intermediate-Term Gov't Bond Index I (VIIGX)<br><br>Vanguard GNMA Fund Admiral Shares (VFIJX) | 9 bps<br><br><br>11 bps | Intermediate-Term Government | 511%<br><br><br><br>400% |
| American Century Equity Growth Institutional (AMEIX) | 48 bps | Vanguard Institutional Index I (VINIX)<br><br>American Funds Fundamental Investors R6 (RFNGX) | 4 bps<br><br><br>31 bps | Large Blend | 1100%<br><br><br><br>55% |
| American Century Small Cap Growth Institutional (ANONX) | 126 bps | Vanguard Small Cap Growth Index I (VSGIX)<br><br>T. Rowe Price Inst'l Small-Cap Stock (TRSSX) | 8 bps<br><br><br>67 bps | Small Growth | 1475%<br><br><br><br>88% |
| American Century Real Estate Institutional (REAIX) | 95 bps | Vanguard REIT Index I (VGSNX)<br><br>DFA Real Estate Securities I (DFREX) | 10 bps<br><br>18 bps | Real Estate | 850%<br><br>428% |
| American Century Ginnie Mae Instl (AGMNX) | 35 bps | Vanguard Intermediate-Term Gov't Bond Index I (VIIGX)<br><br>Vanguard GNMA Fund Admiral Shares (VFIJX) | 9 bps<br><br><br>11 bps | Intermediate-Term Government | 289%<br><br><br><br>218% |

Case 4:16-cv-00737-DGK   Document 28   Filed 09/08/16   Page 37 of 67

| Fund in Plan | Expense ratio | Passive/Active Lower Cost Alternative[9] | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| American Century Income & Growth Inst (AMGIX) | 48 bps | TIAA-CREF Large-Cap Value Idx I (TILVX)<br><br>American Funds Washington Mutual R6 (RWMGX) | 8 bps<br><br>30 bps | Large Value | 500%<br><br>60% |
| American Century Inflation-Adjusted Bond Instl (AIANX) | 27 bps | Fidelity Inflation-Protected Bond Index Inst'l Premium (FIPDX)<br><br>Vanguard Inflation-Protected Secs I (VIPIX) | 5 bps<br><br><br>7 bps | Inflation-Protected Bond | 440%<br><br><br><br>286% |
| American Century Large Company Value Instl (ALVSX) | 67 bps | TIAA-CREF Large-Cap Value Idx I (TILVX)<br><br>Vanguard Equity-Income Adm (VEIRX) | 8 bps<br><br>17 bps | Large Value | 738%<br><br>294% |
| American Century Small Cap Value Instl (ACVIX) | 122 bps | Vanguard Small-Cap Value Index Fund Institutional Shares (VSIIX)<br><br>Perkins Small Cap Value Fund Class N (JDSNX) | 8 bps<br><br><br>60 bps | Small Value | 1425%<br><br><br>103% |

77.     Despite the high cost of the proprietary investments within the Plan, Defendants failed to consider removing these proprietary mutual funds from the Plan in favor of lower-cost non-proprietary investments (*i.e.*, investment products not affiliated with American Century)

Case 4:16-cv-00737-DGK   Document 28   Filed 09/08/16   Page 38 of 67

because this would have reduced the revenue received by the American Century entities. Although ACS recently amended its summary description of the Plan to state that the Plan will only "generally" be limited to proprietary investments, this change in thesis did not alter the operational reality that ACS and the Committee have only considered proprietary investments as designated investment alternatives, acting in their own interests to the detriment of the Plan.[11] This constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA, and cost Plan participants millions of dollars in excess fees.

78. Had Defendants prudently monitored the investments within the Plan to ensure that such investments did not have excessive fees, in a process that was not tainted by self-interest, Defendants would have removed the Plan's investments in favor of investments such as the funds listed above that offered similar or superior performance at significantly less expense.

79. Given the excessive fees charged by American Century mutual funds and the availability of comparable or superior funds with significantly lower expenses, the compensation paid to ACIM and ACS for their services to the Plan was unreasonably high.

---

[11] A reasonable inference drawn from ACS's change to the summary description of the Plan between January 2014 and January 2016 is that ACS recognized potential liability for its slanted investment process that only considered proprietary investments. *See* ¶ 22, *supra*. During this time, the Supreme Court issued opinions favorable to plan participants, and a number of lawsuits asserting claims against plan fiduciaries for imprudent and disloyal management of a defined contribution plan's investment lineup settled for substantial sums. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (recognizing continuing duty to monitor plan investments and remove imprudent ones); *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467–71 (2014) (abrogating "presumption of prudence" in matters of employer securities); *Spano v. Boeing Co.*, 2015 WL 11144499, at *1 (S.D. Ill. Nov. 18, 2015) (granting preliminary approval to $57 million settlement of claims of imprudence and disloyalty in management of plan's investment lineup); Robert Steyer, *Novant Health Settles with DC Participants on Fiduciary Breach Allegations*, Pensions & Investments (Nov. 10, 2015) (announcing $32 million settlement in *Kruger v. Novant Health* case involving claims of imprudence and disloyalty in plan management); *Krueger v. Ameriprise Fin., Inc.*, 2015 WL 7596926, at *1–*2 (D. Minn. Apr. 6, 2015) (granting preliminary approval to $27.5 million settlement of claims of imprudence and disloyalty arising primarily from defendants' almost exclusive use of proprietary mutual funds in the plan's investment lineup).

### III. DEFENDANTS FAILED TO PROCURE THE LEAST EXPENSIVE AVAILABLE SHARE CLASS OF NUMEROUS FUNDS

80.    Defendants also failed to procure the lowest-cost share class of numerous mutual funds in the Plan. By way of background, most mutual funds offer multiple classes of shares that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets (generally $1 million or more) and therefore greater bargaining power. There is no difference between share classes other than the costs. Thus, utilizing the cheapest share class provides an identical—but less expensive—version of the same investment, including the identical manager and an identical mix of investments within each fund. Given the Plan's size, and its uniquely intimate relationship with the investment manager ACIM (its Committee members being ACIM executives), the Plan had sufficient bargaining power and access to the most up-to-date information to obtain the lowest cost share class available at any given time for the Plan's investment lineup of proprietary American Century mutual funds. However, Defendants did not do this for the Plan.

81.    In July of 2013, ACIM began offering "R6" shares for 22 of the funds offered by the Plan. Contemporaneously, ACIM published an updated prospectus for its investors for each fund offering the new R6 shares. According to each fund's updated prospectus, the R6 shares were created for use by employer-sponsored retirement plans (like the Plan). Each fund's updated prospectus further identified that investment management fees for the R6 class would be less than for other available share classes. Likewise, each updated prospectus announced that the R6 shares were open and available for investment. Although the R6 shares were about 5 to 15 basis points less expensive than the shares held by the Plan, Defendants failed to move the Plan's

40

investments out of a higher cost share class until the third quarter of 2014.[12] Defendants' delay of more than one year in taking advantage of lower investment management fees for identical investments cost Plan participants more than a quarter million dollars, enriching ACIM in a like amount.

82.     There is no justification for Defendants' failure to timely transition out of the higher-cost share classes. In November 2013, ACS hired a new directed trustee responsible for holding and executing the Plan's investments. As part of the transaction, on November 6, 2013, ACS prepared a schedule of the Plan's investments for the new directed trustee. In this schedule, ACS specifically instructed the directed trustee to hold the higher-cost share class of each fund, even though the less expensive R6 shares were then available.

83.     The Committee's failure to timely move Plan assets from the higher-cost shares was particularly beneficial to ACIM, which collected the excess fees the Plan paid. By way of example, ACIM received an annual fee of 80 basis points for performing investment advisory and management services for the Plan's investment in the American Century Heritage Fund between July 26, 2013 and the third quarter of 2014. ACIM performed the exact same functions for holders of R6 shares, but charged them an annual fee of only 65 basis points. *Id.* For the Plan's more than $35 million invested in the American Century Heritage Fund over the year the Committee delayed in making the necessary change, the Plan lost, and ACIM gained, approximately $55,000 in investment management fees.

84.     As a result of the Committee's failures, ACIM dealt with Plan participants on a

---

[12] On August 15, 2014, the Committee moved most of the investments at issue to the appropriate R6 class and moved target retirement date investments to analogous collective trusts managed by ACIM.

basis less favorable than other shareholders.

85.     A prudent fiduciary would have taken advantage of the R6 shares of the Plan's American Century investments as soon as the R6 shares became available. Many fiduciaries did just this, as ACIM processed transactions for other plans moving tens of millions of dollars to the new R6 shares within the first six months the R6 shares were available. For example, in just the first six months after ACIM started offering R6 shares, ACIM moved more than $14 million worth of investments (from other plans) in the American Century One Choice 2035 Fund to R6 shares. Meanwhile, the Plan remained invested in higher-cost shares of the same fund, paying an excess of 7 bps compared to R6 shareholders. Because ACS and the Committee did not timely transition Plan assets into available R6 shares as other fiduciaries did for their plans, ACIM was able to collect excessive investment management fees from Plan assets for a full year. Through these actions and omissions, Defendants breached their duty of loyalty, and their duty of prudence, owed to the Plan.

## IV.    DEFENDANTS CAUSED THE PLAN TO PAY EXCESSIVE RECORDKEEPING COSTS

86.     The Plan's high costs are also due in part to the excessive recordkeeping fees Defendants have caused it to pay.

87.     Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is therefore highly competitive, with many vendors equally capable of providing high-level services. As a result of such competition, vendors vigorously compete for business by offering the best price.

88.     The cost of providing recordkeeping services depends on the number of participants in a plan. Given that it costs the same to provide recordkeeping to a participant with $1,000 in his retirement account as a participant with $100,000, the amount of money in

42

participants' accounts is generally not relevant. Thus, fiduciaries of plans with a large amount of assets but a relatively small number of participants would not pay recordkeeping fees based on account size, which could cause recordkeeping fees to be far higher than would be the case for per-participant pricing.

89.     Some mutual funds engage in a practice known as "revenue sharing" where the mutual fund takes a portion of the expense ratio it charges investors and pays it to the plan's recordkeeper. While this can provide an alternate source to pay recordkeeping fees, the amounts being paid to the recordkeepers increase as the Plan grows larger. Thus, left unmonitored, a revenue sharing scheme can result in increasingly excessive payments to recordkeepers.

90.     In order to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the services provided to a plan, a responsible fiduciary must identify all fees, including recordkeeping fees and other sources of compensation, paid to the service provider. To the extent that a plan's investment options pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

91.     Defendants could have, and should have, requested information from the Plan's recordkeeper as an integral part of satisfying their fiduciary duties. If Defendants had asked for such information, they could have received (among other things) documents that summarized and contextualized the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

43

92.     As part and parcel of a reasonable fiduciary's monitoring of a plan's recordkeeping expenses, prudent fiduciaries submit requests for proposal (RFPs) to potential recordkeeping service providers to obtain cost information regarding a plan's recordkeeping options. The RFP process allows prudent fiduciaries to determine if their recordkeeping arrangement is competitive, and if it is not, make an appropriate change.

93.     Based on Plaintiffs' investigation and analysis, a normal range of recordkeeping fees for a plan like the Plan would have been between $55 and $70 per participant from 2009 to 2012, and between $50 and $65 per participant from 2013 to the present.

94.     The recordkeeping fees paid by the Plan greatly exceeded the normal range.  For example, based upon the fee disclosures in the Plan's 2011 Form 5500s, the Plan's recordkeeper at the time, JPMorgan Retirement Plan Services (hereinafter "JPMorgan RPS"), received approximately $625,000 for recordkeeping services, and all but about $10,000 of that fee was paid in revenue sharing dollars. The Plan thus paid more than $280 per participant in 2011 for recordkeeping, about five times what the Plan should have been paying (and would have been paying if Defendants had diligently monitored the Plan's recordkeeping costs).

95.     Defendants did not have an arm-length relationship with JPMorgan RPS. American Century formerly owned JPMorgan RPS, which was then called "American Century Retirement Plan Services".  American Century transferred control of that recordkeeping entity to JPMorgan Chase & Co. (hereinafter "JPMorgan") in 2003, expecting that JPMorgan RPS would continue to promote ACIM funds to recordkeeping clients.[13]

_____

[13] Some details of the relationship between JPMorgan RPS and ACIM, specifically American Century's expectation that JPMorgan RPS would promote ACIM's funds pursuant to a "revenue agreement," were made public following the conclusion of an arbitration dispute between

96.     The transfer of this recordkeeping entity from American Century to JPMorgan was just one piece of a larger relationship between American Century and JPMorgan, with JPMorgan acquiring a 45 percent stake in ACIM in 1997 (and holding it until the end of 2011). Based on the relationship between American Century and JPMorgan, Defendants had a financial disincentive to utilize an alternate recordkeeping provider.  As a result, Defendants did not question JPMorgan RPS's fees or investigate or consider alternative recordkeeping vendors who could have provided the same services at substantially less cost.

97.     The Plan continued to pay excessive fees to JPMorgan RPS through November 2013, when Defendants finally made a change in recordkeeping service providers after JPMorgan sold its stake in American Century.  In November 2013, the Plan's recordkeeper became Schwab Retirement Services, Inc. ("Schwab RS").[14]

98.     American Century has a broad relationship with Charles Schwab & Co. ("Schwab"), the parent company of Schwab RS. Schwab is the custodian for over $2 trillion in assets held in brokerage accounts that offer investors stocks, bonds, and mutual funds, in addition to other investments. Schwab makes American Century mutual funds available to its clients through this platform, in exchange for remuneration from American Century.

99.     American Century pays a higher level of remuneration to Schwab than many other mutual fund companies, and in return is included among Schwab's "No Transaction Fee (NTF)" and "OneSource" mutual fund lists. Inclusion on the NTF and OneSource platforms

JPMorgan and American Century in late 2011.  *See* Dawn Kopecki, Christopher Condon, and Andrew Harris, *JPMorgan Loses $373 Million Arbitration to American Century* (Mar. 22, 2012), available at http://www.bloomberg.com/news/articles/2012-03-22/jpmorgan-told-to-pay-373-million-in-american-century-funds-case.

[14] Before hiring Schwab for recordkeeping, the Plan was already utilizing Schwab to provide services for the Plan's SDBA.

requires American Century to pay a kickback to Schwab of approximately 0.40% per year of all assets held in American Century funds acquired through these platforms.[15] These amounts are lower in defined-contribution plans, but nevertheless American Century also makes revenue sharing payments to Schwab RS for all American Century mutual funds held in defined-contribution plans for which Schwab RS is the recordkeeper.

100.    The relationship with Schwab is important to American Century, as Schwab brokerage accounts are one of the primary ways in which American Century funds are sold to the general public.  As a result, Defendants have not questioned the fees or revenue sharing paid to Schwab RS, and have not investigated or considered alternative recordkeeping vendors since Schwab RS became the Plan's recordkeeper.

101.    Following the switch to Schwab RS, considerably less information has been made available concerning the recordkeeping expenses of the Plan.  For purposes of a plan's annual report, revenue sharing payments are classified as "indirect compensation," as distinguished from "direct" payments from the plan. In the Plan's annual reports, Defendants reported in 2014 that Schwab received indirect compensation in a "[r]ange of 0.05 – 0.35% of average daily balance of assets" from American Century funds within the Plan.[16]  Although this broad range renders it impossible to determine the exact amount of revenue sharing payments made to Schwab RS, this range of payment amounts is consistent with the payments that were made to

---

[15] *See* Charles Schwab, *Schwab's Financial and Other Relationships with Mutual Funds*, http://www.schwab.com/public/schwab/nn/no_transaction_fee_funds.html (last viewed Sept. 7, 2016).

[16] In contrast, in its Form 5500 for 2013, the Plan listed the exact amount of revenue sharing paid to JPMorgan RPS (in bps) for every designated investment alternative in the Plan.

JPMorgan RPS, which also ranged from 5 to 35 basis points. From this, it is reasonable to infer that the Plan has continued to pay grossly excessive recordkeeping fees to Schwab RS.

102. Rather than engaging in a prudent search of recordkeepers and hiring the recordkeeper that would best meet the needs and financial interests of the Plan's participants, Defendants have simply moved from one imprudent and self-serving recordkeeping relationship (with JPMorgan RPS) to a another (with Schwab RS). Defendants have persistently failed to conduct a thorough and impartial investigation of available recordkeeping providers to ensure that the Plan is not paying excessive recordkeeping fees, causing millions of dollars in damage to the Plan.

V. **DEFENDANTS FAILED TO ADEQUATELY MONITOR PLAN INVESTMENTS AND REMOVE POORLY PERFORMING INVESTMENTS**

103. Defendants also failed to monitor the Plan's investments, and failed to remove numerous funds that had a history of underperformance, in violation of their fiduciary duties under ERISA. This cost Plan participants millions of dollars due to these funds' underperformance compared with prudent investment alternatives. Though numerous funds within the Plan were imprudent and should have been removed from the Plan, the following examples highlight Defendants' failure to remove imprudent investments from the Plan.

*Defendants Included Short-Term, Minimal Return Money Market Funds While Failing to Consider a Stable Value Fund*

104. During the statutory period, the Plan has included two money market or "capital preservation" funds as short-term investment options designed to protect investors' principal and provide income: the American Century Capital Preservation Fund and the American Century

Premium Money Market Fund.[17] As of year-end 2013, the Plan had over $10 million in the Capital Preservation Fund and over $32 million in the Premium Money Market Fund.

105.    During the six years preceding the filing of this lawsuit, the Plan's money market funds returned 0.01% or less per year. During the same period, the funds both had expense ratios of over 0.45%—over forty-five times higher than the income paid to investors.

106.    For the last six years, the money market funds in the Plan have not come close to keeping up with the rate of inflation. This was predictable because these funds, in contrast to stable value funds, use very short-duration investment vehicles, such as short-term U.S. Treasury notes, which provide minimal returns. Given the expected returns of money market funds and similar short-term investments, a prudent fiduciary would have known that the American Century Capital Preservation Fund and the American Century Premium Money Market Fund would not provide participants any meaningful retirement benefits. Indeed, accounting for inflation, participants invested in these options actually lost money. Accordingly, a prudent and loyal fiduciary would have removed these options and instead offered a stable value fund, which would have provided significantly higher returns while still offering protection of principal.

107.    Stable value funds are a common investment in 401(k) plans. Like money market funds, stable value funds provide preservation of principal. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of*

---

[17] On December 1, 2015, the Premium Money Market Fund changed its name to the U.S. Government Money Market Fund. For purposes of clarity, Plaintiffs shall refer to the fund as the American Century Premium Money Market Fund.

*Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006). Indeed, even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), *available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf. Thus, many large 401(k) plans have stable value funds.

108.     A 2011 study from Wharton Business School analyzed money market and stable-value fund returns from the previous two decades and concluded that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011), available at http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf (last accessed June 24, 2016). Given the superior yields offered by stable value funds at comparable levels of risk, large 401(k) plans overwhelmingly choose stable value funds over money market funds. Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), available at http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30   (last accessed June 24, 2016). "With yields hovering around 0%, money-market funds aren't a prudent choice for a 401(k)." *Id.*

109.     Defendants offered two proprietary money market funds as fixed investment options, even though prudent fiduciaries of plans similar in size to the Plan would have used a stable value fund. Defendants imprudently and disloyally disregarded stable value funds, not based upon a prudent assessment of the pros and cons of stable value funds versus money market

49

funds as fixed options in the Plan, but because American Century does not offer a stable value fund product.

110.    This fiduciary breach was very costly for Plan participants. Hueler Analytics and its Hueler Index is the industry standard for reporting and measuring returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds nationwide with assets totaling over $105 billion." *See* http://hueler.com (last visited Oct. 8, 2015). Hueler data therefore represents a reasonable estimate of the returns of a typical stable value fund. The returns of the funds in the Hueler universe on average have far exceeded the returns of the American Century Capital Preservation Fund and the American Century Premium Money Market Fund.

| Year | Capital Preservation Fund (CPFXX) | Premium Money Market Fund (TCRXX) | Hueler Index |
|------|-----------------------------------|-----------------------------------|--------------|
| 2010 | 1 bp | 1 bp | 312 bps |
| 2011 | 1 bp | 1 bp | 269 bps |
| 2012 | 1 bp | 1 bp | 226 bps |
| 2013 | 1 bp | 1 bp | 184 bps |
| 2014 | 1 bp | 1 bp | 169 bps |
| 2015 | 1 bp | 1 bp | 177 bps |

111.    Based on the amounts held by each fund, and the returns that would have been earned in an average stable value fund, Defendants' failure to replace the American Century Premium Money Market Fund and Capital Preservation Fund with a stable value fund has cost participants over $4 million in lost earnings in the six years prior to the filing of this lawsuit.

112.    Defendants failed to adequately investigate the possibility of including a stable value fund, and subsequently failed to offer a stable value option in the Plan, due to the fact that

50

American Century does not offer a stable value fund product. By failing to offer a stable value fund and retaining these other fixed income investments, Defendants caused at least $4 million in losses to the Plan.

### Defendants Included and Retained the Underperforming Vista Fund in the Plan until ACIM Was Forced to Merge it with Another Fund

113.     As another example of Defendants' failure to remove imprudent investment options from the Plan, for years the Plan offered the American Century Vista Fund, a mid-cap growth fund, as a designated investment alternative. The Vista Fund held $13.6 million in Plan assets as of the end of 2010 and $11 million as of the end of 2012. Defendants retained the chronically underperforming Vista Fund in the Plan until ACIM was forced to merge it into the Heritage Fund in 2013. By that time, the Vista Fund had abysmal five-year annualized returns of 7.55% compared to 13.92% for its benchmark index, the Russell Mid Cap Growth Index. Over the prior 10 years, annualized returns were 7.85% for the Vista Fund, compared to 10.16% for its benchmark.

114.     At the time the Vista Fund merged into the Heritage Fund, a prominent investment research firm (Morningstar) noted that (1) the Vista Fund had "experienced both underperformance and manager turnover since 2008"; and (2) since the lead manager left the fund in 2009, "the new management team has not been able to right the ship." *See* MORNINGSTAR, *American Century to Merge Vista Fund Into Heritage Fund* (Sept. 26, 2013), *available at* http://www.morningstar.com/advisor/t/81414161/american-century-to-merge-vista-fund-into-heritage-fund.htm. The article further noted that the fund's trailing five-year returns through September 25, 2013 were in the bottom 10% of mid-cap growth funds. *Id.*

51

115.     In light of the Vista Fund's long-term poor performance and manager turnover, a prudent fiduciary monitoring the Plan's investments on an ongoing basis would have removed the fund from the Plan no later than 2010. Defendants' failure to remove the fund before it was merged into another fund due to poor performance reflects that Defendants lacked a prudent process by which to evaluate funds within the Plan and remove those that were performing poorly.

### Defendants Retained the International Bond Fund in the Plan despite Chronic Underperformance

116.     During the statutory period, Defendants also caused the Plan to hold and retain the American Century International Bond Fund despite its continually poor performance.

117.     In its 2010 prospectus, the Fund disclosed that it had significantly underperformed its benchmark over the previous five years: As of the end of June 2010, the fund had average annualized returns of 5.96% for the previous year, compared to 9.05% for its benchmark, and average annualized returns of 4.21% for the previous 3 years, compared to 7.66% for its benchmark.[18] Nonetheless, Defendants continued to retain this fund in the Plan, reflecting a failure to properly evaluate the Plan's investments on a regular basis without giving preferential treatment to American Century funds.

118.     This pattern of underperformance has continued to the present. As of May 31, 2016, the American Century International Bond Fund had experienced a 1-year return of 5.96% compared to 7.25% for its benchmark, 3-year annualized returns of -0.42% compared to 0.31% for its benchmark, and 10-year annualized returns of 2.55% compared to 3.3% for its benchmark.

---

[18] The American Century International Bond Fund had new managers installed in January 2009, so performance history for the prior one- and three-year periods was particularly relevant in evaluating the Fund as of the end of June 2010.

Yet, Defendants continued to retain this fund in the Plan, despite the Fund's poor returns and the availability of lower-cost, better-performing alternatives.

119.    Given its continually poor performance, a prudent fiduciary monitoring the Plan's investments on an ongoing basis would have removed the International Bond Fund from the Plan no later than 2010, given the new management in place since early 2009 and the poor performance of the fund since the new managers took over. Defendants' failure to do so reflects that Defendants lacked a prudent and/or loyal process by which to evaluate funds within the Plan and replace them with lower-cost options that offered superior performance.

## VI.    PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

120.    Plaintiffs did not have knowledge of all material facts (including, among other things, availability of less expensive alternative investments, the costs of the Plan's investments compared to those in similarly-sized plans, investment performance versus other available alternatives, the excessiveness of the Plan's recordkeeping costs compared to alternative service providers, the availability of less expensive share classes of investments held by the Plan, and comparisons of the Plan's overall costs to the costs of other similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes and motivations for selecting, monitoring, evaluating and removing Plan investments, and Defendants' processes for selecting and monitoring the Plan's recordkeeper), because this information is solely within the possession of Defendants prior to discovery. For purposes of this First Amended Complaint, Plaintiffs have drawn

53

reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## **CLASS ACTION ALLEGATIONS**

121.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

122.     Plaintiffs assert their claims in Counts I–V on behalf of a class of participants and beneficiaries of the Plan defined as follows:[19]

> All participants and beneficiaries of the American Century Retirement Plan at any time on or after June 30, 2010, excluding Defendants, employees with responsibility for the Plan's investment or administrative functions, and members of the American Century Services, LLC Board of Directors.

123.     Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plan has had approximately 2,000 to 2,250 participants during the applicable period.

124.     Typicality:     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs have participated in the Plan and suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

---

[19] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

125.    Adequacy:    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

126.    Commonality:    Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.    Which Defendants are fiduciaries of the Plan;

    b.    Whether the Plan's fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

    c.    Whether the Plan's fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

    d.    Whether ACS breached its duty to monitor other Plan fiduciaries;

    e.    Whether the Plan engaged in prohibited transactions in violation of 29 U.S.C. § 1105;

    f.    Whether the American Century entities are liable under 29 U.S.C. § 1132(a)(3) to disgorge the revenues they earned as a result of the fiduciary breaches and prohibited transactions that occurred;

    g.    The proper form of equitable and injunctive relief;

    h.    The proper measure of monetary relief.

127.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

55

128.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

129.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this First Amended Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
## Breach of Duties of Loyalty and Prudence
## 29 U.S.C. § 1104(a)(1)(A)–(B)

130. Defendants ACS, ACIM, the Committee, Christopher Bouffard, Bradley C. Cloverdyke, John A. Leis, Tina S. Ussery-Franklin, Margaret E. Van Wagoner, Gudrun S. Neumann, Julie A. Smith, Margie A. Morrison, Chat Cowherd, Diane Gallagher, and John Does 1–20 (the "Fiduciary Defendants") are or were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

131. 29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Fiduciary Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

132. The scope of the fiduciary duties and responsibilities of the Fiduciary Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. The Fiduciary Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

133. As described throughout this First Amended Complaint, the Fiduciary Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's designated investment alternatives, by failing to consider investments from companies other than American Century when selecting investments, when evaluating the cost and performance of the

Plan's investments, and when considering whether to replace a designated investment alternative with an alternative. The Fiduciary Defendants imprudently and disloyally retained higher-cost American Century mutual funds despite the availability of lower-cost investments that offered comparable or superior investment management services. The Fiduciary Defendants also failed to promptly transfer into lower-cost share classes of American Century Funds when American Century introduced the R6 share class for many of the Plan's designated investment alternatives in 2013. Additionally, the Fiduciary Defendants allowed the Plan to pay excessive recordkeeping fees by failing to monitor the Plan's service providers and all revenue sharing arrangements to ensure that total recordkeeping fees were reasonable. Further, the Fiduciary Defendants failed to monitor the Plan's investments and remove those that were imprudent. For example, the Fiduciary Defendants failed to remove the American Century Vista Fund and the American Century International Bond Fund from the Plan in 2010 despite chronic underperformance and the availability of lower-cost, better-performing alternatives.

134.    Each of the above-mentioned actions and failures to act described in paragraph 133 and throughout the First Amended Complaint demonstrate the Fiduciary Defendants' failure to make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Fiduciary Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to the American Century entities. Through these actions and omissions, the Fiduciary Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

58

135.    Each of the above actions and omissions described in paragraph 133 and elsewhere in this First Amended Complaint demonstrate that the Fiduciary Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

136.    Each Fiduciary Defendant is personally liable, and the Fiduciary Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

137.    Each Fiduciary Defendant knowingly participated in each breach of the other Fiduciary Defendants, knowing that such acts were a breach, enabled the other Fiduciary Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Fiduciary Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Fiduciary Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

138.    As alleged throughout the First Amended Complaint, the Fiduciary Defendants (including the Committee and the members of the Committee) are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

59

139.    ACS is responsible for appointing and removing members of the Committee.

140.    Given that ACS had overall oversight responsibility for the Plan, and the explicit fiduciary duty to appoint and remove members of the Committee, ACS had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Committee and its members, as well as ACIM.

141.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

142.    To the extent that ACS's fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

143.    ACS breached its fiduciary monitoring duties by, among other things:

    a.  Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

    b.  Failing to monitor the process by which the Plan's investments were selected, evaluated, and potentially replaced, and in particular the preferential treatment the Fiduciary Defendants were giving to American Century Funds;[20] and

---

[20] Reviewing these processes would have alerted a prudent fiduciary to the breaches of fiduciary duties taking place and the need for remedial action.

Case 4:16-cv-00737-DGK   Document 28   Filed 09/08/16   Page 60 of 67

c.  Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

144.  As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses per year due to excessive fees and investment underperformance.

145.  Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), ACS is liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor the Plan's fiduciaries, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

**COUNT III**
**Prohibited Transactions with a Party in Interest**
**29 U.S.C. § 1106(a)(1)**

146.  As a Plan employer, the Plan sponsor, and a service provider for the Plan, ACS is a party in interest under 29 U.S.C. § 1002(14). As a Plan employer and service provider for the Plan, ACIM is also a party in interest. Finally, as a Plan employer and the corporate parent of service providers for the Plan, ACC is also a party in interest.

147.  As described throughout the First Amended Complaint, Defendants caused the Plan to utilize proprietary investments that generated revenue for the American Century entities.

148.  On a monthly basis throughout the relevant period, ACIM deducted fees and expenses from the assets being held for the Plan that were invested in American Century-affiliated mutual funds and collective trusts in return for the investment management services

61

provided by ACIM. ACIM then used a portion of these fees to compensate ACS for its services as a transfer agent and dividend-paying agent for the funds.

149.     These transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation, and a transfer of assets of the Plan to a party in interest, in violation of 29 U.S.C. § 1106(a)(1).

150.     As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars in fees in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

151.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions and disgorge all revenues received and/or earned by ACIM, ACS, and/or ACC in connection with the management of Plan assets or other services performed for the Plan for more than reasonable compensation.

**COUNT IV**
**Prohibited Transactions with a Fiduciary**
**29 U.S.C. § 1106(b)**

152.     As described throughout the First Amended Complaint, ACIM and ACS are fiduciaries of the Plan as that term is used in 29 U.S.C. §§ 1002(21) and 1106(b)(1).

153.     ACIM and ACIS dealt with the assets of the Plan in their own interest and for their own accounts when they caused the Plan to pay investment management fees and other fees to ACIM and ACS out of Plan assets, in violation of 29 U.S.C. § 1106(b)(1).

154.     ACIM and ACS received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan. These transactions took place on a monthly basis when fees and expenses were deducted from

assets being held for Plan participants in exchange for services performed by ACIM and ACS. Accordingly, the payments to ACIM and ACS constituted prohibited transactions in violation of 29 U.S.C. § 1106(b)(3).

155.    Based on the foregoing facts and other facts set forth in the First Amended Complaint, the Fiduciary Defendants are liable for violations of 29 U.S.C. § 1106(b) because they knowingly participated in these prohibited transactions, and made no efforts to prevent these transactions despite having knowledge that the prohibited transactions were taking place.

156.    Based on the foregoing facts and the other facts set forth in this First Amended Complaint, the Fiduciary Defendants knowingly caused the Plan to engage in prohibited transactions with ACIM, ACS, both fiduciaries of the Plan, in violation of 29 U.S.C. § 1106(b).

157.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid excessive investment management and other fees to ACIM and ACS, in transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants.

158.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by ACIM and ACS resulting directly or indirectly from the above-mentioned prohibited transactions. Plaintiffs also are entitled to appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

### COUNT V
### Other Equitable Relief Based on Ill-Gotten Proceeds
### 29 U.S.C. § 1132(a)(3)

159.    Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under this

Case 4:16-cv-00737-DGK   Document 28   Filed 09/08/16   Page 63 of 67

section regardless of whether it is a fiduciary. A non-fiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

160. The American Century entities profited from the Plan's investments in American Century-affiliated mutual funds.

161. All payments to the American Century entities made in connection with Plan assets are in the current possession of one or more of the American Century entities, and are traceable to specific transactions that have taken place on specific dates.

162. Pursuant to 29 U.S.C. § 1132(a)(3), the American Century entities should be required to disgorge all monies they have received during the relevant class period as a result of the Plan's investments in American Century-affiliated mutual funds. The selection and retention of these proprietary mutual funds was imprudent and violated ERISA based on the facts set forth in the First Amended Complaint, and also constituted prohibited transactions with a party-in-interest and a fiduciary. Moreover, the American Century entities had actual or constructive knowledge of circumstances rendering the selection and retention of these proprietary funds (and the payments that the American Century entities received from these proprietary funds) unlawful, by virtue of:

(a) the Committee members with executive positions at multiple American Century entities;

(b) other dual-hatted employees;

(c) the American Century entities' affiliation with a common parent and one another;

(d) the American Century entities' participation in the Plan as employers with employees in the Plan; and

(e) The American Century entities' general operational interconnectedness.

64

163.     In light of the above facts and other facts likely to be revealed through discovery, the American Century entities had actual or constructive knowledge of the process for selecting and monitoring the investments in the Plan, and knew that this process was designed to enrich the American Century entities at the expense of Plan participants. The American Century entities knew that the proprietary investments in the Plan were excessively costly and performed poorly in comparison to other investment alternatives. The American Century entities also had knowledge of each entity's fiduciary and/or party-in-interest status, and the circumstances that rendered the payment of fees to these entities prohibited transactions.

164.     Given their knowledge of these fiduciary breaches and prohibited transactions, the American Century entities had actual or constructive knowledge that the monies they were receiving from or in connection with Plan assets were being received as a result of violations of ERISA by the Fiduciary Defendants.

165.     Therefore, to the extent any ill-gotten revenues and profits are not disgorged under the relief provisions of 29 U.S.C. § 1109(a), the Court should order appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to disgorge these monies from the American Century entities under principles of unjust enrichment and equitable restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Wildman and Borcherding, individually and as representatives of the Class defined herein, and on behalf of the American Century Retirement Plan, pray for relief as follows:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that the Fiduciary Defendants have breached their fiduciary duties under ERISA;

D.     A declaration that Defendant ACS breached its fiduciary duty to monitor the Committee and its members as well as ACIM;

E.     A declaration that Defendants violated 29 U.S.C. § 1106 by allowing the Plan to engage in prohibited transactions;

F.     An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

G.     An order requiring ACS, ACIM, and ACC to disgorge all revenues received from, or in respect of, the Plan;

H.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

I.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

J.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; transfer of Plan assets out of imprudent investments into prudent alternatives; and removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions;

K.     An award of pre-judgment interest;

L.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

M.     An award of such other and further relief as the Court deems equitable and just.

Dated: September 8, 2016                    **NICHOLS KASTER, PLLP**

                                            /s/ *Kai H. Richter*
                                            Kai H. Richter, MN Bar No. 0296545*

Carl F. Engstrom, MN Bar No. 0396298*
Jacob T. Schutz, MN Bar No. 0395648*
　　　　* admitted *pro hac vice*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
cengstrom@nka.com
jschutz@nka.com
**BRADY & ASSOCIATES**
Michael F. Brady, KS Bar No. 18630
Mark Kistler, KS Bar No. 17171
10985 Cody Street
Suite 135
Overland Park, KS 66210
brady@mbradylaw.com
mkistler@mbradylaw.com


ATTORNEYS FOR PLAINTIFFS