IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| STEVE WILDMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-00737-DGK |
| | ) | |
| AMERICAN CENTURY SERVICES, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case involves claims for breach of fiduciary duty and prohibited transactions pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Plaintiffs Steve Wildman ("Wildman") and Jon Borcherding ("Borcherding"), participants in the American Century Retirement Plan (the "Plan") established by American Century Investment Management, Inc. ("ACIM"), bring this suit, on their own behalf, and on behalf of a class of participants in the Plan, against Defendants American Century Services, LLC ("ACS"), ACIM, American Century Companies, Inc. ("ACC") (ACIM, ACS, and ACC collectively "American Century"), the American Century Retirement Plan Retirement Committee (the "Committee"), and past and present members of the Committee,[1] seeking damages and declaratory and injunctive relief.

---

[1] The members named are: Christopher Bouffard, Bradley C. Cloverdyke, John A. Leis, Tina S. Ussery-Franklin, Margaret E. Van Wagoner, Gudrun S. Neumann, Julie A. Smith, Margie A. Morrison, Chat Cowherd, Diane Gallagher, and unknown fiduciary defendants 1-10 (collectively "Committee Members").

Now before the Court is Defendants' motion for summary judgment (Doc. 145).[2] For the following reasons, the motion is GRANTED in part and DENIED in part.

## Undisputed Material Facts[3]

American Century is a financial services company primarily offering mutual funds and other investments to retirement plans and other investors. Plaintiffs Wildman and Borcherding are former employees of American Century and Plan participants.

The Plan is a defined contribution, "401k"[4] plan that allows participants to contribute a percentage of their earnings and invest those contributions in one or more investment options offered by the Plan. Additionally, American Century makes contributions into these accounts in the form of voluntary matching contributions and discretionary profit-sharing contributions.

ACS sponsors the Plan for current and former employees of American Century. As the Plan Sponsor, ACS appointed the Committee to assist in administering the Plan. ACIM manages American Century's investment products and to the extent the Plan offers American Century mutual funds, ACIM is the manager of those mutual funds. Both ACS and ACIM are subsidiaries of ACC. ACS and the Committee are Plan fiduciaries.

The Committee is responsible for supervising, monitoring, and evaluating the performance of the Plan. The Committee held regular meetings to discuss performance of the investment options offered in the Plan, the Plan's fees, investment options on the "watch list[5],"

---

[2] Defendants' request for oral argument is denied. The Court has determined oral argument would not be helpful in resolving the issues. The motion has been decided on the parties' written memoranda.

[3] The parties' briefs include over 500 facts, most of which are immaterial, irrelevant to the pending motion, or are argument couched as facts. The Court excluded these asserted facts.

[4] The Plan is a "employee pension benefit plan" and a "defined contribution plan" within the meaning of 29 U.S.C. §§ 1002(2)(A), (34).

[5] The watch list is a list of investments that failed to meet certain performance criteria.

and other relevant information. When the Committee sought to make changes to the Plan, they reviewed the proposed changes with American Century senior management.

During the relevant time, American Century offered 106 mutual funds to its customers; a subset of which were included in the Plan's lineup of investment options. During the class period, the Plan offered between 33 and 46 investment options.[6] Other than American Century mutual funds, the Plan included six American Century Collective Investment Trusts ("CIT"), and a self-directed brokerage account ("SDBA").[7] The SDBA includes American Century and non-American Century investment options including index mutual funds, exchange traded funds, and individual stocks and bonds.

Within the Plan, there are two categories of expenses, administrative expenses and investment management expenses. Administrative expenses are expenses used to pay for services such as recordkeeping and accounting. Investment management expenses are fees charged by the investment manager. ACIM, as the investment manager of the American Century mutual funds, charges a management fee for its services. This fee is paid from each mutual fund's assets. This fee can vary by mutual fund and by share class within each mutual fund. The Plan paid the same fee as other shareholders.

Third party service providers like recordkeepers can be paid on a per-participant basis or through revenue sharing. In a revenue sharing compensation model, the fee for the recordkeeper is based on a percentage of the assets, resulting in a larger payment as asset levels increase. In some instances, the recordkeeper then "rebates" a portion of those fees back to the retirement

---

[6] Plaintiffs state the range is 38 to 46; Defendants state the range is 33 to 39.

[7] A CIT is a pooled investment product maintained by a bank or trust company and used exclusively for qualified retirement plans. A SDBA is an option offered in some qualified retirement plans that allows the participant to invest in a wider selection of investments other than what is provided for within the plan.

plan. Those rebates can be used to pay for services like third-party consultants, plan audits, or paid back to plan participants.

The Plan used a revenue sharing compensation model to pay its recordkeeper, J.P. Morgan Retirement Plan Services LLC ("J.P. Morgan RPS") until February 2012. After that time, American Century paid all of the Plan's recordkeeping fees on a per-participant basis. The fee paid to J.P. Morgan RPS was $125 per-participant per year. Even though J.P. Morgan RPS was not compensated through revenue sharing for shares held by the Plan, American Century did make revenue sharing payments in connection with shares held by other retirement plans.

On November 21, 2013, American Century replaced J.P. Morgan RPS with Schwab Retirement Plan Services, Inc. ("Schwab RPS"). As to the Plan, Schwab RPS was paid on a per-participant basis but as to shares held by other retirement plans, American Century compensated Schwab RPS through revenue sharing.

The Committee hired a consultant to review the Plan and produce a benchmarking report (the "Hewitt Report"), and in November 2010, the Hewitt Report was presented to the Committee. It made several findings: (1) the Plan offered 38 investment options and the average plan offered 14 options; (2) the Plan offered more proprietary funds than the plans of other financial services organizations; (3) the Plan did not offer a stable value fund, although 83% of plans did offer that type of fund; (4) the Plan offered two money market funds, although only 37% of plans include a money market fund; (5) the Plan's investment management fees were $963 per-participant, while the average investment management fee for similar sized plans was $172 per-participant; and (6) the Plan had a high percentage of active funds.

The Hewitt Report suggested the Committee review the use of passive options and assess overlapping funds within an asset class, noting there were ten large cap equity options within the

Plan. The report also suggested the Committee add a stable value fund to the Plan's core lineup. At that time, American Century did not offer a stable value fund. None of the Committee members could recall a discussion to offer a stable value fund after reviewing the recommendations made in the Hewitt Report.

Following the Hewitt Report presentation, the Committee decided to reduce the investment options in the Plan. Initially, the Committee proposed removing eleven funds. Ultimately, the Committee removed five funds, one fund was one of the ten large cap equity funds and one fund from the watch list. In 2011, the Committee replaced fifteen mutual funds with six CITs. Except for the five funds that were removed, no other investment options were removed from the Plan during the class period except for closures of an investment fund or the introduction of a CIT that matched the investment strategy as a mutual fund in the Plan.

During the class period, the Committee received ten requests from asset managers to add particular funds, all of which were declined except for one, the American Century Strategic Inflation Opportunities Fund, a newly launched fund. In particular, in 2011, an American Century asset manager contacted the Committee requesting it to add the Global Real Estate Fund. The Committee declined to add the fund because it was duplicative to another offering.

On July 8, 2015, Schwab RPS presented another benchmarking study to the Committee. The report stated that other plans of investment firms that offered non-proprietary funds had an average of 6.3 index funds in the plan's investment lineup, and that plans of investment firms that offered primarily proprietary funds had an average of 4.1 index funds in the plan's investment lineup. On September 12, 2016, the Committee added five Vanguard passively managed index funds to the Plan's core lineup.

5

## Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. *Celotex Corp*, 477 U.S. at 323. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [t]hat party's favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## Discussion

The Amended Complaint alleges five counts under ERISA. Count I asserts ACS, ACIM, the Committee, and the Committee Members (collectively "Fiduciary Defendants"), breached their duties of loyalty and prudence, in violation of 29 U.S.C. § 1104(a)(1)(A)-(B). Count II alleges ACS breached its duty to monitor ACIM, the Committee, and Committee members who allegedly caused losses to the Plan.[8] Counts III and IV allege Defendants American Century, ACIM, and ACS engaged in prohibited transactions, in violation of 29 U.S.C. § 1106(a)(1) and (b). Count V is a claim for other equitable relief based on ill-gotten proceeds, 29 U.S.C. § 1132(a)(3).

---

[8] Count II is wholly derivative of Count I. Defendants do not move for summary judgment on Count II.

Defendants argue they are entitled to summary judgment on all of Plaintiffs' claims because Plaintiffs lack evidence to support their allegations. The Court discusses each claim below.

### I. There are disputes of material fact preventing summary judgment on Count I – Breach of Fiduciary Duty.

Count I, alleges Fiduciary Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plan's core lineup by: failing to consider investments from companies other than American Century; failing to promptly transfer to lower-cost R6 share classes of American Century Funds; and by allowing the Plan to pay excessive fees.

ERISA imposes the duties of loyalty and prudence on fiduciaries. *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014). To sustain a claim for breach of fiduciary duty, a plaintiff has the burden to show the defendant breached its fiduciary duties and a prima facie case of loss to the plan. *Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000); *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) (*Roth I*). "Once the plaintiff has satisfied these burdens, 'the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty.'" *Roth I*, 16 F.3d at 917 (quoting *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992)). In other words, the burden shifts to the defendant to show a prudent fiduciary would have made the same decision. *Id.* at 919 ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.").

Defendants argue Plaintiffs cannot establish the elements of a breach of fiduciary duty claim,[9] specifically that there is no evidence that Fiduciary Defendants acted disloyally, that the

---

[9] Defendants repeat throughout their reply brief that they do not seek summary judgment on Plaintiffs' allegations that Defendants used an imprudent *process* to select, retain, and remove investments from the Plan's core lineup. *See* (Doc. 173 at vii n.11).

investment options were imprudent, or that Fiduciary Defendants' conduct resulted in a loss to the Plan.

### A. There are material facts in dispute as to whether Defendants' conduct met the prudent person standard.

Under ERISA, fiduciaries are required "to act 'solely in the interest of [plan] participants and beneficiaries' and to carry out their duties with 'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Braden v. Wal-Mart Stores Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (alterations in original) (quoting 29 U.S.C. § 1104(a)(1)). "Section [1104]'s prudent person standard is an objective standard that focuses on the fiduciary's conduct preceding the challenged decision"—not the results of that decision. *Roth I*, 16 F.3d at 917–18 (8th Cir. 1994) (internal citation omitted).

Plaintiffs allege it was disloyal and imprudent for the Fiduciary Defendants to: only offer actively managed funds, only offer proprietary funds, and to cause the Plan to pay high fees. For Defendants to be successful at summary judgment, they must show that given the undisputed material facts, no reasonable fact finder could find the Fiduciary Defendants acted disloyally or imprudently in selecting and retaining the chosen funds in the Plan.

The parties dispute many of the facts necessary to resolve this issue. For example, Defendants assert as employees of an investment firm, American Century employees preferred actively managed funds, which come at a higher cost, than passively managed funds, a fact Plaintiffs dispute. Plaintiffs, on the other hand, state the Committee largely ignored the recommendations from the Hewitt report in favor of American Century's product offerings, and that the Fiduciary Defendants were in a conflict of interest, facts Defendants dispute. As such, the Court cannot find as a matter of law that Defendants did not act in violation of § 1104(a)(1).

Defendant' arguments on this issue are unavailing. First, Defendants argue offering affiliated investment products is not a breach of ERISA's duty of loyalty, *Brotherston v. Putnam Investments, LLC*, No. CV 15-13825-WGY, 2017 WL 1196648, at *8 (D. Mass. Mar. 30, 2017) ("Brotherston I"), and that it is common practice for financial service companies to offer their own investment funds in their retirement plans, *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007). Defendants' authority on this argument is not binding on this Court. Even so, their argument fails because Plaintiffs argue Defendants breached their duties through an array of conduct, not by merely offering affiliated funds.

Defendants also argue the Plan's lineup was prudent because ERISA imposes no duty to offer, much less consider, more than one investment company's funds. *Hecker v. Deere & Co.*, 556 F.3d 575, 586-87 (7th Cir. 2009) (limiting plan to funds from one management company did not violate ERISA; the court "f[ound] no statute or regulation prohibiting a fiduciary from selecting funds from one management company"). While a fiduciary may not be prohibited from selecting funds from a single investment management company, it is a question for a fact finder to decide whether it is prudent to restrict a retirement plan's lineup to funds from one investment management company.

The Court finds that material facts are in dispute as to whether Fiduciary Defendants' conduct violated the provisions of § 1104(a)(1).

### B. Plaintiffs have established a prima facie loss to the plan.

Defendants may still be entitled to summary judgment on this claim if the undisputed facts do not state a prima facie case of loss to the Plan.

A prima facie loss may be demonstrated "by comparing the [Plan's] actual profit to potential profit that could have been realized in the absence of breach." *Roth v. Sawyer-Cleater Lumber Co.*, 61 F.3d 599, 604 (8th Cir. 1995) ("Roth II"). A plaintiff, who demonstrates the defendant-fiduciary breached its duty and a prima facie loss, "prevails unless the defendant-fiduciary can show by a preponderance of the evidence, that a prudent fiduciary would have made the same decision." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 364 (4th Cir. 2014); *see Roth I*, 16 F.3d at 919 (stating a defendant can prevail only by showing that it is beyond dispute that "a hypothetical prudent fiduciary would have made the same decision.").

To state a prima facie loss to the Plan, Plaintiffs put forth an expert report from Dr. Pomerantz. Dr. Pomerantz provides four models of loss to the Plan based on alternative Plan lineups correcting for certain alleged imprudent or disloyal conduct. Defendants attack the methods Dr. Pomerantz used in his report[10] however, a prima facie case only requires creating a "rebuttable presumption." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n.7 (1981). Thus, Plaintiffs have established a prima facie loss to the Plan, and the burden shifts to Defendants to show a prudent fiduciary would have chosen the same lineup of American Century funds as that of the Plan's core lineup.

Defendants do not put forth undisputed facts that would allow the Court to determine as a matter of law that a hypothetical prudent fiduciary would have made the same decisions as the Committee. Defendants state only that selecting American Century Funds was not imprudent because the fees charged were reasonable. Defendants also assert that Plan participants actually profited from the lineup of American Century funds, a fact Plaintiffs dispute.

Defendants' motion for summary judgment on Count I is denied.

---

[10] Defendants have separately moved to exclude Dr. Pomerantz Report and Testimony (Doc. 139).

## II. Summary judgment on Counts III & IV is granted in part.

Plaintiffs claim certain payments from the Plan to ACIM and ACS for services provided to the Plan constitute prohibited transactions under 29 U.S.C. § 1106. Count III is brought under subsections (a)(1)(C) and (a)(1)(D) which state:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect
> . . .
> (C) furnishing of goods, services, or facilities between the plan and party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

Count IV is brought under section 1106(b), which provides:

> A fiduciary with respect to the plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account
> . . .
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

Defendants advance three arguments for summary judgment: (1) the challenged transactions do not involve "assets of the plan," as required by §§ 1106(a)(1)(D) and (b)(1); (2) the challenged transactions do not involve payments for plan services, as required by § 1106(a)(1)(C); and (3) Prohibited Transaction Exemption 77-3 ("PTE 77-3") exempts these transactions.

### A. Defendants' motion as to claims under § 1106(a)(1)(D) & (b)(1) is granted.

Section 1106(a)(1)(D) and (b)(1) define certain prohibited transactions involving ERISA retirement plan assets. Defendants argue the challenged transactions do not involve plan assets and thus, do not violate ERISA. ERISA does not provide a definition of plan assets, but 29 U.S.C. § 1101(b)(1) provides the following:

> In the case of a plan which invests in any security issued by an investment company registered under the Investment Company Act of 1940, the assets of such plan shall be deemed to include such security but shall not, solely by reason of such investment, be deemed to include any assets of such investment company.

Similarly, 29 C.F.R. § 2510.3-101(a)(2) states that "[g]enerally, when a plan invests in another entity, the plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity."

It is undisputed that the challenged management fees are paid from mutual fund assets. However, the parties disagree if the those mutual fund assets should be considered plan assets because American Century is both the mutual fund company and the Plan sponsor. There is no decision from the Eighth Circuit on whether plan assets encompasses mutual fund assets when a mutual fund company is also the plan sponsor.

Plaintiffs argue the Court should adopt a broad reading of plan assets adopted by some district courts in the Ninth Circuit. *See, e.g.*, *Perez v. City Nat'l Corp.*, 176 F. Supp. 3d 945, 948 (C.D. Cal. 2016) (finding because the mutual fund company was also the plan sponsor, assets of the plan encompassed the mutual fund assets). Defendants respond by relying on the First Circuit's narrow definition of plan assets and argue that the fees at issue do not become plan assets merely because the mutual fund company sponsors its own plan. *Brotherston I*, 2017 WL 1196648, at *4–6 (D. Mass. Mar. 30, 2017) (citing *Merrimon v. Unum Life Ins. Co. of Am.*, 758

F.3d 46, 56 (1st Cir. 2014) (finding "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.")).

After considering both interpretations of plan assets, the Court finds more persuasive a narrow definition of plan assets because it is more aligned with the regulation's definition. The Court finds the fees paid from mutual fund assets are not fees paid out of plan assets and consequently, Plaintiffs' prohibited transaction claims under §§ 1106(a)(1)(D) and (b)(1) fail as matter of law.

### B. Defendants' motion as to the claim under § 1106(a)(1)(C) is denied.

Section 1106(a)(1)(C) prohibits "a direct or indirect . . . furnishing of goods, services, or facilities between the plan and party in interest." Defendants argue Plaintiffs' claim under this subsection fails because the management fees paid by the mutual funds to ACIM were for services performed by ACIM for the funds, not for the Plan.[11]

Plaintiffs focus on the broad language of § 1106(a)(1)(C) that prohibits directly or *indirectly* providing services. Plaintiffs do not dispute that the services were provided for the funds but dispute whether the management fees could be considered an indirect service because American Century managed the investment of shares held by the Plan. There are no facts proposed by Defendants countering this proposition. Accordingly, the Court cannot find that as a matter of law Plaintiffs' claim under 1106(a)(1)(C) fails.

### C. PTE 77-3 applies to one of Plaintiffs' § 1106(b)(3) claims.

Section 1106(b)(3) prohibits a fiduciary from "receive[ing] any consideration for his own personal account from any party dealing with such plan in connection with a transaction

---

[11] In a footnote, Defendants argue the challenged fees were reasonable, and thus § 1106(a)(1)(C) does not apply. Arguments raised in a footnote are not properly before the Court and will not be considered. *Falco Lime, Inc. v. Tide Towing Co.*, 29 F.3d 362, 367 n.7 (8th Cir. 1994). Even if the Court did consider the argument, the reasonableness of the fees is a disputed fact.

13
Case 4:16-cv-00737-DGK    Document 185    Filed 05/22/18    Page 13 of 18

involving the assets of the plan." Section 1106(b)(3) is not limited to transactions involving assets of the plan, but extends to transactions made "in connection with" assets of the plan.

Defendants do not challenge that the transactions at issue are prohibited under § 1106(b)(3), but rather that PTE 77-3 applies.

PTE 77-3 states that § 1106 does not apply to plans investing in mutual funds offered by the plan sponsor when four conditions are met. Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18, 734 (Apr. 8, 1977). The parties agree that the only condition in contention is subsection (d), which requires "[a]ll other dealings between the plan and the investment company . . . are on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company." *Id.* at 18, 735.

Defendants make three arguments as to PTE 77-3: (1) that PTE 77-3 applies to all of Plaintiff's prohibited transaction claims; (2) PTE 77-3's provision that "all other shareholders of the investment company" applies on a per share class basis; and (3) the decision to pay the Plan's recordkeeper on a per-participant basis was not a dealing with the Plan on a basis less favorable than other shareholders.

### 1. Defendants' profit sharing contributions are compensation, not a benefit to plan participants.

Defendants argue PTE 77-3 applies to all claims by Plaintiffs because Defendants actually treated the Plan *more favorably* than other investors by making profit sharing contributions to individual employees' Plan accounts. Defendants argue these contributions offset any loss that may have been sustained to the Plan by Defendants' conduct. Defendants rely on a single district court decision in the First Circuit that applied a "totality of the economic relationship" test to determine whether an investment manager treated plan participants less

favorably. *Brotherston v. Putnam Investments, LLC*, No. CV 15-13825-WGY, 2017 WL 2634361, at *8 (D. Mass. June 19, 2017) ("Brotherston II") (considering the voluntary contributions made to participants' accounts based on their status as employees and finding the investment manager did not treat plan participants less favorably because those contributions were a benefit not conferred to other shareholders).

Defendants' authority is unpersuasive. The Court finds Defendants made profit sharing contributions in their role as employer and not as a plan fiduciary. *See* 1 ERISA Practice and Litigation § 3:32 ("In the case of an established, ongoing plan, . . . some decisions are fiduciary in nature and others are not[;] . . . decisions relating to the timing and amount of contributions are generally not thought of as being fiduciary in nature."). Thus, these profit sharing contributions are not considered as a benefit conferred to Plan participants in determining whether Defendants dealt with Plan participants on a basis no less favorable than other shareholders of the company.

### 2. PTE 77-3 does not apply to Plaintiffs' claims of the timing to convert the Plan to the R6 share class.

Plaintiffs argue that American Century dealt with the Plan on a less favorable basis because it waited a year to convert 23 funds in the Plan to lower-cost R6 shares, while at the same time offering the R6 share class to other investors. Defendants counter that the language "other shareholders of the investment company" applies on a per-security basis and argue that each share class is a different security. Defendants assert all shareholders of a particular share class paid the same fees and therefore they did not deal with the Plan on a less favorable basis.[12]

---

[12] In a footnote Defendants argue 29 U.S.C. § 1108(b)(8) provides an exemption for the challenged transactions. Again, the Court assumes if Defendants believed this was a winning argument, it would not have relegated it to a footnote. Accordingly, the Court does not consider whether § 1108 applies. *See supra* note 7. For the same reason, the Court also does not consider Defendants' footnote-based argument that PTE 77-2 applies to all other claims under § 1106.

Plaintiffs argue numerous courts have rejected the argument that PTE 77-3 applies on a per share class basis. *See Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at *7 (S.D.N.Y. Oct. 13, 2016) (maintaining a prohibited transactions claim over defendants' motion to dismiss because the plaintiff alleged the defendants failed to select the lowest-cost share class of a fund, treating the retirement plan on a less favorable basis as other similarly situated institutional shareholders who could have invested in the lower cost shares); *Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-02781 SRN/JSM, 2012 WL 5873825, at *17 (D. Minn. Nov. 20, 2012) (same); *Gipson v. Wells Fargo & Co.*, No. CIV. 08-4546 PAM/FLN, 2009 WL 702004, at *4 (D. Minn. Mar. 13, 2009) (denying a motion to dismiss after finding that the defendants did not comply with PTE 77-3 based on the plaintiff's allegation that the plan was invested in a higher-cost category of stock, rather than a lower-cost category of stock). Although Plaintiffs' authority is postured in a motion to dismiss, the theme is that different classes of stock are not separate securities for purposes of applying the PTE 77-3 exemption.

Considering the persuasive authority cited, the Court finds "other shareholders of the investment company" does not mean shareholders of each class of stock are examined separately. With this finding, the Court finds PTE 77-3 does not apply to Plaintiffs' claims regarding the timing of converting the Plan to the R6 shares.

### 3. PTE 77-3 applies to Plaintiffs' claims relating to the decision to pay the Plan's recordkeeper on a per-participant basis.

Plaintiffs state American Century ended its arrangement to pay Plan's recordkeeper through revenue sharing after 2012, despite having that arrangement for other retirement plans holding American Century mutual funds. Plaintiffs contend that in 5%-10% of situations where revenue sharing payments are made, a portion is rebated to plan participants, offsetting some of

the fees. The thrust of this argument is that American Century's failure pay the recordkeeper through revenue sharing deprived the Plan participants of a potential revenue sharing rebate causing the Plan participants to effectively pay more for the funds relative to other non-Plan holders whose recordkeeper was paid through revenue sharing and offered a rebate.

Defendants argue Plaintiffs assert no facts showing that even if the Plan's recordkeeper was paid through revenue sharing, that those payments would have been rebated to participants. Plaintiffs respond that because Defendants are both the investment company and the Plan sponsor, it would be in the unique position to negotiate for those rebate payments.

The Court finds the undisputed facts relating to Defendants' decision to end revenue sharing payments to the Plan's recordkeeper does not establish Defendants dealt with the Plan on a less favorable basis than other shareholders. Hence, PTE 77-3 applies to claims under this theory and summary judgment is granted.

### III. Defendants' motion for summary judgment on Count V is denied.

In Count V, Plaintiffs seek equitable relief under 29 U.S.C. § 1132(a)(3). Initially Plaintiffs allege that the Defendants should be required to "disgorge *all monies* they received during the relevant class period as a result of the Plan's investments in American Century-affiliated mutual funds" but now limit their request to only profits. *See* Pls' Sugg in Opp. at 24, n.21 (Doc. 161) (emphasis added).

Defendants argue the Court should grant summary judgment because the Plaintiffs cannot show: (1) the profits they seek to disgorge are traceable to particular funds; and (2) that Defendants had actual knowledge the challenged funds were unlawful.

Under § 1132(a)(3), equitable relief permits a plaintiff to seek restitution, "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to

17
Case 4:16-cv-00737-DGK    Document 185    Filed 05/22/18    Page 17 of 18

particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). One "limited exception" to the requirement that money be clearly traceable occurs when a party seeks an "accounting for profits." *Id.* at 214 n.2.

The Court finds the traceability exception applies because Plaintiffs are seeking only profits. Defendants argue Plaintiffs are attempting to amend their complaint by narrowing their claim to profits only, but Plaintiffs aren't asserting new allegations against Defendants, they are limiting their relief to the relief they believe they can prove with the evidence produced during discovery.

As to whether Defendants had actual or constructive knowledge that the challenged conduct was unlawful, the Court finds there are disputes of material fact preventing summary judgment. Defendants point to a shareholder lawsuit against American Century that concluded the management fees were reasonable. Plaintiffs point to the interconnectedness between ACIM, ACS, and ACC, to argue this creates a reasonable inference of actual or constructive knowledge. *See Heritage Equity Grp. 401(k) Sav. Plan v. Crosslin Supply Co.*, 638 F. Supp. 2d 869, 876-77 (M.D. Tenn. 2009) (noting that "knowledge of the breach can be inferred from surrounding circumstances raising a reasonable inference of knowledge."). Thus, summary judgment on this count is denied.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 145) is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Date:  May 22, 2018            /s/ Greg Kays
                                                                             GREG KAYS, CHIEF JUDGE
                                                                             UNITED STATES DISTRICT COURT