```
1                      UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF MISSOURI
2                           WESTERN DIVISION

3
   STEVE WILDMAN, et al.,        )  Case No. 4:16-CV-00737-DGK
4                                )
              Plaintiffs,        )
5                                )
   VS.                           )
6                                )
   AMERICAN CENTURY SERVICES,    )
7  LLC, et al.,                  )
                                 )  September 17, 2018
8             Defendants.        )  Kansas City, Missouri

9          *****************************************

10
                    VOL 9 (Pages 1988 - 2267)
11                  TRANSCRIPT OF BENCH TRIAL
                      BEFORE GREG KAYS
12            UNITED STATES CHIEF DISTRICT JUDGE

13         *****************************************

14 APPEARANCES:

15 For Plaintiffs:         Paul J. Lukas
                           Kai H. Richter
16                         Brock J. Specht
                           Carl Engstrom
17                         Nichols Kaster, PLLP
                           46000 IDS Center
18                         80 South 8th Street
                           Minneapolis, Minnesota  55402
19

20                    Regina A. Lambrecht, RDR, CRR
                      United States Court Reporter
21                    400 E. 9th Street, Suite 8652
                       Kansas City, MO  64106
22

23 Proceedings recorded by mechanical stenography, transcript
   produced by computer.
24

25
```

1    APPEARANCES (Continued):

2    For Defendants:          W. Perry Brandt
                              Bryan Cave Leighton Paisner, LLP
3                             1200 Main Street
                              Suite 3800
4                             Kansas City, Missouri  64105
                                   and
5                             James O. Fleckner
                              John J. Falvey, Jr.
6                             Alison V. Douglass
                              David Rosenberg
7                             Paul Nemser
                              Goodwin Procter, LLP
8                             100 Northern Avenue
                              Boston, Massachusetts  02210

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3   Defendants' Witnesses:                              Page

4   CHATTEN WILLIAM COWHERD
        Cross-Examination (Continued) By Mr. Lukas      1995
5       Redirect Examination By Mr. Fleckner            2031
    MARGARET ELIZABETH VANWAGONER
6       Direct Examination By Mr. Falvey                2035
        Cross-Examination By Mr. Specht                 2074
7       Redirect Examination By Mr. Falvey              2139
    DIANE MARY GALLAGHER
8       Direct Examination By Mr. Falvey                2140
        Cross-Examination By Mr. Lukas                  2186
9   KATHLEEN MARY MANN
        Direct Examination By Mr. Fleckner              2197

10

11                       E X H I B I T S

12

13    Defendants'
      Exhibits                              Received

14
      840 through 848                         1992
15           857                              2238
             858                              2253
16           859                              2255
             860                              2266
17           862                              2179
             863                              2198

18

19

20

21

22

23

24

25

1    (Begin proceedings in open court at 9:05 a.m.)

2         THE COURT:  Okay.  Mr. Fleckner, you have some

3    business for us today?

4         MR. FLECKNER:  Yeah.  Just two housekeeping matters,

5    Your Honor, this morning.

6         THE COURT:  Yes.

7         MR. FLECKNER:  I think during Mr. Falvey's exam on

8    Friday, we had started to change the way we were marking our

9    demonstratives to give them DX numbers, just to clear the

10   record.

11        THE COURT:  Okay.  Thank you.

12        MR. FLECKNER:  As so I understand Ms. Cunningham has

13   swapped out the demonstratives that we've been using so far

14   with yourself and the clerk with the DX numbers.

15        THE COURT:  Okay.

16        MR. FLECKNER:  But if you don't mind, if you'd just

17   indulge me a moment, I'd like to read nine DX numbers into the

18   record and --

19        THE COURT:  Yeah.  And, you know, it's my habit, for

20   the record, to interrupt when I'm a little bit confused about

21   maybe corresponding numbers, as you all have seen.  I -- part

22   of it is my notes that I have to come back to and making sure

23   that if there's any differences, you all, like -- like

24   Mr. Leis' notes -- I think, you know, Mr. Lukas, you did a

25   good job of saying these are the same as JX whatever, but

1  these have Mr. Leis' annotations attached to it.  That kind of

2  stuff really helps me.  And I'm really -- I want to make a

3  record, but I'm also trying to make good notes here too,

4  right?  So please be mindful of that.  Thank you.

5          MR. FLECKNER:  Understood.  And going forward, we'll

6  make sure to use the right convention.  We didn't realize

7  until midway through that sometimes there was a discrepancy.

8  So --

9          THE COURT:  Yes, sir.

10          MR. FLECKNER:  -- if I could just read for the

11  record what had previously been marked as Morrison 1 for

12  demonstrative is DX 840; Morrison 2 is DX 841; Bouffard 1 is

13  DX 842; Bouffard 3 is DX 843; Bouffard 4 is DX 844; Bouffard 5

14  is DX 845; opening slide 23, which was just the pictures of

15  the Committee members, is DX 846; Gilstrap 1 is DX 847; and

16  Gilstrap 2 is DX 848.

17          And we submitted those to plaintiffs.  I think they

18  were comfortable with those exchanges.  And we would just like

19  to move their introduction for demonstratives purposes only.

20          MR. LUKAS:  Your Honor, we assume Ms. Cunningham put

21  those together, not Mr. Fleckner, so we have no objection to

22  it.

23          THE COURT:  Thank you, Mr. Lukas.

24          (Defendants' Exhibits 840 through 848 admitted in

25  evidence.)

1    MR. FLECKNER:  And the second item of housekeeping,

2    Your Honor, just real quick, just to update you, you had asked

3    me on Friday what the rest of our case looked like.

4    THE COURT:  Yes, sir.

5    MR. FLECKNER:  And we were able to make accomodation

6    to the Court's schedule to try and winnow this down a little

7    bit.  So we wanted to alert the Court that after Mr. Cowherd,

8    we still intend to call two fact witnesses who are members of

9    the Committee and are defendants in this case, but we've

10   reduced the number of experts that we anticipate calling from

11   three to two.

12   And with that, defendants fully anticipate that

13   we'll be in a position to rest our case by Thursday, and maybe

14   even by Tuesday.  We've exchanged some time estimates --

15   THE COURT:  Okay.

16   MR. FLECKNER:  -- over the weekend with plaintiffs

17   and it could be that we're done by Tuesday, just depending how

18   the time goes.

19   THE COURT:  Very good.  Thank you.

20   MR. LUKAS:  And with regards to the expert that they

21   withdrew, Your Honor, they told us about this last night.  We

22   intend -- just as heads-up -- this is premature, but I'm just

23   going to tell you, as a heads-up --

24   THE COURT:  Yes, sir.

25   MR. LUKAS:  -- we intend to offer the relevant

1  portions of his deposition as rebuttal -- rebuttal to

2  testimony that's already been given and rebuttal to testimony

3  we believe will be given with their experts.  It's premature

4  because it would be rebuttal testimony.  But we just want to

5  give everybody a heads-up so I don't stand up tomorrow

6  afternoon when they close and spring it on everybody.  That's

7  all.

8           THE COURT:  Yes, sir.  I understand.

9           MR. LUKAS:  Okay.

10           THE COURT:  I understand.

11           MR. LUKAS:  And I'm ready to proceed if --

12           THE COURT:  And you're still doing a cross on --

13  on -- on Mr. Chattem -- or Mr. Cowherd.  I'm sorry.

14           THE WITNESS:  That's okay.

15           THE COURT:  Chattem is your first name?

16           THE WITNESS:  Chatten, yes.

17           THE COURT:  Chatten.  Okay.

18           THE WITNESS:  Yes.

19           THE COURT:  Mr. Cowherd, sir, I remind people

20  they're still under oath.  And would you please begin by

21  speaking your full name and spelling your last name for our

22  record --

23           THE WITNESS:  Okay.

24           THE COURT:  -- again?

25           THE WITNESS:  Chatten William Cowherd,

1    C-O-W-H-E-R-D.

2            THE COURT:  Thank you, Mr. Cowherd.

3            All right, Mr. Lukas.  Thank you, sir.  Please

4    proceed.

5            MR. LUKAS:  Thank you, Your Honor.

6    CHATTEN WILLIAM COWHERD, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

7                    CROSS-EXAMINATION (continued)

8    BY MR. LUKAS:

9    Q.  Good morning, Mr. Cowherd.

10   A.  Good morning.

11   Q.  Do you remember on Friday your testimony about independent

12   consultants where I believe you testified that you had used an

13   independent consultant to provide expertise?  Do you remember

14   that?

15   A.  Independent consultant for our Committee?

16   Q.  Right.

17   A.  Have we provided one?

18   Q.  No.  I was just -- I was just refreshing your recollection

19   of your testimony that since -- I believe your testimony was

20   that since you had house expertise -- or in-house expertise,

21   you thought it wasn't necessary to have an expert or an

22   outside consultant; is that right?

23   A.  Correct.

24   Q.  Okay.  And as a fiduciary, do you think it's important to

25   make a careful and impartial investigation of all your

1   investment decisions?

2   A.  I do.

3   Q.  And considering the fact that the Retirement Committee was

4   retaining and considering only American Century funds, don't

5   you think it would have been prudent to obtain the impartial

6   guidance of a disinterested outside advisor?

7           MR. FLECKNER:  Objection.  Misstates.  They used

8   Vanguard funds, and we know they didn't only consider American

9   Century funds.

10          THE REPORTER:  Could you speak up, please?

11          MR. FLECKNER:  I'm sorry.  I'll speak into the

12  microphone.  My objection -- do you need me to repeat it?

13          THE REPORTER:  If you could.

14          MR. FLECKNER:  Objection.  Misstates.  We know they

15  used Vanguard funds and didn't just consider American Century

16  funds.

17          THE COURT:  Just qualify that for us because --

18          MR. LUKAS:  Sure.

19          THE COURT:  -- it does presuppose certain facts.

20          MR. LUKAS:  Sure.

21  Q.  Let's set aside the 2016 addition of the Vanguard funds,

22  okay?

23  A.  Okay.

24  Q.  And considering the fact that the Retirement Committee was

25  routinely considering only American Century funds, other than

1    those Vanguard funds, don't you think it would have been

2    prudent to obtain the impartial guidance of a disinterested

3    outside advisor?

4    A.   No.

5    Q.   Did you -- you came on board in 2014.  Did you know about

6    the Hewitt report that was produced in 2010?

7    A.   Not at the time I came on.

8    Q.   Now, what time did you learn about the Hewitt report?

9    A.   When this litigation started.

10   Q.   Now, we've heard a lot of testimony about the participants

11   being -- in your Plan being more sophisticated investors.  And

12   I believe you said the same thing on Friday; is that right?

13   A.   Correct.

14   Q.   And one of the reasons why the Retirement Committee had

15   the number of investment options that it did in the lineup was

16   because of this belief that the participants were more

17   sophisticated, correct?

18   A.   We had an appropriate number of investments commensurate

19   with our population, correct.

20   Q.   Okay.  And one of the reasons the Committee thought that

21   it was the appropriate number was because of the

22   sophistication level of the participants?

23   A.   Many of the participants are sophisticated.

24   Q.   Okay.  And one of the reasons the Retirement Committee had

25   specialty funds and specter -- or, excuse me, sector funds was

1  because of the Committee's belief that the participants were

2  more sophisticated than the typical participant, correct?

3  A.  To the extent that we had specialty or sector funds, that

4  is correct.

5  Q.  Okay.  And I believe it was Ms. Smith who testified very

6  adamantly that the participants were not confused.  Do you

7  agree with her?

8  A.  I think generally, the participants are not confused.  You

9  can always find a population with some level of confusion,

10  which is why we're doing a re-enrollment.

11       THE COURT:  Which is why we're going to what?

12       THE WITNESS:  Why we're doing that investment

13  re-enrollment.

14       THE COURT:  Sure.

15  Q.  Okay.  But it is important to the Retirement Committee to

16  respect the participants' choices and not be paternalistic?

17  A.  We would absolutely respect their choices, correct.

18  Q.  And the Retirement Committee also had concerns about being

19  disruptive, such as making too many changes to the lineup; is

20  that right?

21  A.  That is correct.  We -- we monitor all Plan changes to the

22  investment lineup and other -- otherwise.

23  Q.  Okay.  And so it's March of 2018, you mentioned the

24  re-enrollment.  As a result of that re-enrollment, all

25  participants will automatically be enrolled in an American

1    Century TDF unless they opted out within -- unless they opt

2    out within 30 days.  Is that my understanding?

3    A.   That's correct.

4    Q.   And has that happened yet?

5    A.   It is the window -- the 30-day window is going on as we

6    speak.

7    Q.   Okay.  And this is true, this -- this moving, mapping

8    people from what they're already in to a -- a TDF, this

9    happens to -- this will happen if they don't opt out to

10   current employees, correct?

11   A.   Correct.

12   Q.   It will happen to past employees who are still in the

13   Plan?

14   A.   Correct.

15   Q.   It will even happen to relatively new participants, people

16   that have just enrolled, correct?

17   A.   Correct.

18   Q.   And there's no limit as to when they made their last

19   selections?  In other words, if somebody made a selection in

20   the last six months or a year, they're not excluded from this

21   re-enrollment, correct?

22   A.   Correct.

23   Q.   And, in fact, even people who have a scheduled

24   reallocation of their lineup are also included in this

25   re-enrollment program, correct?

1  A.  Correct.

2  Q.  That means that people have a plan and they have a set

3  plan where every so often they go in, look at their stuff, and

4  reallocate, even those people are part of this reallocation,

5  correct?

6  A.  They may have made that -- that's correct.  But they may

7  have made that decision years ago.

8  Q.  Right.  But they have a planned reallocation.  In other

9  words, they're going to sit -- they're planning to sit down

10  and look, right?

11  A.  They set up a reallocation, that's correct.

12  Q.  Okay.  So in order to keep their existing investment

13  elections that they chose, they have to affirmatively opt out,

14  right?

15  A.  Correct.

16  Q.  And they have 30 days to do so.  Was the Committee told

17  what to expect with respect to an opt out rate?

18  A.  Yes.

19  Q.  What was the Committee told with respect to what they

20  could expect with respect to response in a 30-day period?

21  A.  By the way, I've done this hundreds of times with my

22  clients, so I -- I know what the opt out rates are.  We will

23  be lower than average.  So an average opt out rate would be

24  about 70 -- 70 percent of the participants won't make a

25  decision, so 30 percent will opt out.  I would guess 40 to

1  50 -- we were told, and I would agree, 40 to 50 percent of the

2  participants will opt out, higher, more sophisticated

3  population.

4  Q.  Okay.  So somewhere between 60 and 40 percent or 60 and 50

5  percent will be automatically moved into this TD -- into these

6  TDFs, correct?

7  A.  That is correct.

8  Q.  How many former employees are in the Plan, currently?

9  A.  I do not have the demographic data with me.

10  Q.  Is it about -- how many participants are in the Plan?

11  A.  There's 1,200 employees.  I don't know.  I would guess

12  there's probably -- I don't know.  1,500 to 2,000 would be my

13  estimate.

14  Q.  And the -- with respect to the notice of this 30-day

15  window, current employees get email, but former employers

16  [sic] get regular mail, correct?

17  A.  The web- -- that's correct.  The website at Schwab

18  notifies them as well.

19  Q.  In fact, you had a presentation from Schwab on this

20  reallocation issue, correct?

21  A.  Correct.

22  Q.  Let's go to that.  Let's go to DX 514, page 11.  I believe

23  Mr. Fleckner showed you some pages from this document on

24  Friday.

25          And this is the cover page of that presentation,

1  correct?

2  A.  From 2015, that's correct.

3  Q.  Okay.  Let's go to page 19.  I have a quick question there

4  before I double back and ask some questions on the other

5  pages.

6        I was curious about this participant impact thing

7  where it talks about 85 percent.  Do you know what that means?

8  It says, Participant impact - 85 percent (1,000 plus 'core'

9  participants) reenrolled remain in default.

10        Do you know what that means?

11  A.  I do not know specifically where -- what those numbers

12  are.  It's -- it's not our Plan.

13  Q.  Okay.  Well, that's why -- I couldn't figure out either.

14  That's why I was asking.  So let's go back to page 15 of this

15  document.  And this is the scatter chart that I believe you

16  and Mr. Fleckner looked at.

17        And as I understand your testimony, what this

18  document reflects is that too many -- too much of the

19  participants' assets, or at least in the Committee's belief,

20  is in equity or stock; is that right?

21        MR. FLECKNER:  Objection.

22        THE COURT:  Well, you said too much.

23        MR. LUKAS:  Well --

24        THE COURT:  Would suggest that maybe that's a

25  critical thing.  He said that -- I think his earlier testimony

1    was, it appears that a lot of our participants are interested

2    in equity-type allocations, right?  That's what he testified

3    to, right?

4                MR. LUKAS:  Right.  And my question is, it's -- it's

5    in part because of this concern -- that this is actually a

6    concern.

7                THE COURT:  Okay.

8    Q.  And one of the reasons why they're doing the

9    re-enrollment, correct?

10               THE COURT:  So let me make sure.  You used -- you

11   used the phrase "too much."  Is that too much allocation to

12   equity?

13               THE WITNESS:  What we -- let me try to see if I can

14   answer this.  What we care about, which is what I stated on

15   Friday, is --

16               THE COURT:  And did you say it was too much on

17   Friday?

18               THE WITNESS:  No.  There -- we look at two extremes.

19   So if you -- if you look at the top right, up here, and if you

20   look down here, what we're trying to solve for primarily --

21               THE COURT:  This is an example of someone who's been

22   on the witness stand too long.  They understand our technology

23   already.

24               THE WITNESS:  I don't know how to clear it.

25               THE COURT:  You're the first guy who's really

1    taken -- okay.  Go ahead.

2         THE WITNESS:  So the people on the bottom left are

3    young.  So you're -- you've got a long time horizon for

4    retirement.  So what we care about are the people that are at

5    low equity because they don't have enough risk on the table

6    for the time horizon that they have.  The people on the top

7    right are older, and they're -- if they're high in equity,

8    they're -- they're too close to the end for the amount of risk

9    they're putting on the table.

10        So primarily -- and the glide path is this.  So

11   primarily, what we're trying to solve for are the people on

12   the top right and people on the bottom left.  But it solves

13   for everybody as well.

14        THE COURT:  So if the glide path is -- is what you

15   pointed out, everybody above that glide path has got to

16   allocate -- they're allocated to too much equity then, right?

17        THE WITNESS:  In general, they're allocated to too

18   much equity.  But if you're farther to the left, you have more

19   time, and you may have made a philosophical decision that

20   you're okay with the risk because your time horizon is still

21   pretty -- pretty long.

22        THE COURT:  Or I may have other investments out

23   there that you don't know about?

24        THE WITNESS:  Correct, correct.

25        THE COURT:  That doesn't -- this only considers what

1   was done at American Century?

2           THE WITNESS:  It does.

3           THE COURT:  Okay.

4           THE WITNESS:  It does.  And so what I -- I mentioned

5   that I had seen hundreds of these scatter graphs.  And what

6   you find is there are dots everywhere.  But the dots that we

7   tend to fix are the people that are younger, under -- under

8   equity allocated or older, over equity allocated, and we're

9   trying to just have them reset their expectations.  They can

10  stay there, we just want them to question it.

11          THE COURT:  I think you make a good point,

12  Mr. Lukas.  I apologize for -- but I didn't remember too much,

13  but I understand what you're saying.  You've studied this more

14  than I have.  So I apologize.

15          MR. LUKAS:  Yeah.

16  Q.  So you're putting -- you're going to basically move 50 to

17  60 percent of the group because you're worried about these two

18  circles?

19  A.  No.  Again, participants tend to not assess their

20  investment allocations decisions very often.  You know, by the

21  way, a high percentage of participants in any plan are

22  defaulted.  So our -- all -- our only ask -- and, quite

23  honestly, this is encouraged by regulators and legislatures,

24  is to have people reassess their decisions.  That's what this

25  effort does for everybody.  If they want to stay, they stay.

1           THE COURT:  And you think -- I think that's a very
2      true statement.  People don't pay attention to these things.
3      So -- and you -- you believe they should do that on an annual
4      basis, reallocate risk and consider where they're at?
5           THE WITNESS:  They should, but they won't.  People
6      that are doing what we're describing here, this re-enrollment,
7      academia would say actually behavioral, that you should do
8      this every three years.  This is our first time for ever doing
9      it.
10          THE COURT:  Okay.
11          THE WITNESS:  I joined the Plan in 2014.  I've never
12     made an investment election change, and that's what I do.  I'm
13     a typical participant.
14          THE COURT:  But you're a TDF guy?
15          THE WITNESS:  I am, so I don't have to worry about
16     it.
17          THE COURT:  Okay.  Very good.
18     Q.  Right.  And there's 50 or 60 percent that's going to be
19     moved to TDF.  And you just told the judge, they tend to stay.
20     So when you move these people to the TDFs, the choices they
21     previously made are gone, and they're going to be -- they're
22     going to be in an American Century TDF, correct?
23     A.  If they don't opt out.
24     Q.  So -- so earlier -- I should probably clear my question
25     for the record.  Last time when I said "these two circles," I

1   was talking about that bottom left that you talked about and

2   the upper right you talked about.

3           How about this -- this large mass here in the middle

4   top part, did that large mass have any impact on the

5   Committee's decision to do this reallocation?

6   A.  We think everybody in the Plan should be rechecking their

7   allocation decisions periodically, yes.  We care about

8   everybody equally.

9   Q.  Okay.  Let's go to the next page, page 16.  And this is

10  information with respect to how many participants hold funds

11  in different categories, correct?  Or asset categories I

12  should say, correct?

13  A.  Correct.

14  Q.  And was there anything about the information on this page

15  that impacted the Committee's decision to do the

16  re-enrollment?

17  A.  These numbers by themselves don't tell an amazing story

18  one way or the other in that, generally, people are trained

19  that more diverse -- diversification is better.  If you're in

20  all fixed income or all equities, this doesn't -- this doesn't

21  tell me enough.

22  Q.  Okay.  So the answer to my question is did this or did

23  this not impact the Retirement Committee's decision?

24  A.  It was a data input.  I don't think this drove our

25  decision.

1    Q.  Okay.  Thanks.

2            Let's go to the next page and look at four other

3    items that they give you.  They talk about core investment

4    behaviors, and they identify four different things that they

5    found in -- in your plan.  And I'm going to ask you the same

6    question about these four categories.  The first is

7    participants with three or less asset categories.  Did that

8    drive or impact the decision at all by the Retirement

9    Committee to do this re-enrollment?

10   A.  It would have had an impact.  I think it's very important

11   to me to say this is 2015 data.  We are doing this in 2018.

12   This is not representative of what we're looking at today.

13   Q.  Well, I -- I thought in the 2018 minutes it said that not

14   much had changed from the information that had been obtained

15   in 2015.  Isn't that true?

16   A.  We look at it every quarter.

17   Q.  Okay.  And not much had changed since this information was

18   given, correct?

19   A.  Generalizations.

20   Q.  So how about the second category, age 48 -- or 46 or

21   older, holding less than 10 percent in fixed income or money

22   market, did that impact the Committee's decision to do the

23   re-enrollment?

24   A.  That would -- it had input.

25   Q.  Okay.  And it would be -- same would be true for the next

1   two categories as well?

2   A.  It had input.

3   Q.  Okay.  And then on the next page, page 18, there's some

4   information about age-based investor behaviors.  Did these two

5   factors impact the Retirement Committee's decision?

6   A.  Absolutely.  I have -- I have an issue with this behavior.

7   Q.  Excuse me?

8   A.  I have an issue with this behavior.  We talked about this

9   on Friday, participants in multiple target date funds that are

10  not aligned.

11  Q.  Right.  Was there any discussion -- we can go off that

12  document.  Was there any discussion about any of these

13  concerns -- or, I'm sorry.  Was there any discussion about any

14  of these concerns that were being raised were actually being

15  caused by the core lineup itself or what the Retirement

16  Committee was offering in the core lineup?

17              MR. FLECKNER:  Objection.  I don't know that

18  anyone's considered these concerns.

19              THE COURT:  Yeah.

20              MR. LUKAS:  I don't know what else to call them.  He

21  said the things that impacted the decision.

22              THE COURT:  This information, did it cause you to

23  reevaluate the core lineup based on this information?

24              THE WITNESS:  The core lineup did not impact our

25  decision.

1  Q.  My question was a little different.  Did you consider

2  whether or not what was in the core lineup was driving some of

3  these behaviors?

4  A.  I've seen 200 of these.  This population behavior is very

5  similar to every one I ever see.  There is mis-utilization of

6  funds in every of the 200 clients I've seen this of.

7  Q.  But my question is a little different.  There wasn't any

8  discussion about whether or not the lineup was driving any of

9  those behaviors?

10  A.  We did not believe the lineup was driving the behaviors.

11  Q.  Well, you say --

12  A.  There was a discussion.

13  Q.  I'm sorry.  What did you say at the last part?  I missed

14  that.

15  A.  There was a discussion.

16  Q.  There was a discussion about whether the lineup was

17  driving some of these behaviors?

18  A.  There was a holistic discussion about the -- what was

19  causing the behaviors.

20  Q.  Now, on Friday, I believe your testimony with respect to

21  the Vanguard Index Funds was that there's not one Vanguard

22  fund that has more than 1 percent of the Plan's assets.  And I

23  think you double backed a little and said there might be one

24  that's right around 1 percent.  Do you remember that

25  testimony?

1  A.  I don't have the data, but, generally, that sounds

2  correct.

3  Q.  Okay.  Let's go to -- yeah, this is a demonstrative

4  exhibit that we shared with defendants.  Now, the next chart

5  I'll show you is the fancy one with the lines that you like,

6  Judge.  But this one, we broke down the assets from Exhibit A.

7  That's that stipulation, Your Honor.

8          And this shows, Mr. Cowherd, that the Vanguard 500

9  Index indeed has almost two and a half percent of the assets

10  in the Plan.  Does this refresh your recollection with respect

11  to how many -- or how popular with respect to assets are in

12  the Plan?

13  A.  I -- I see that there was one that is above 1 percent.

14  Q.  Uh-huh.  And, in fact, that one is already 15th most

15  popular out of 40 funds available in the lineup currently; is

16  that right?

17  A.  I don't have that data.

18  Q.  Uh-huh.  And this is in just two years, right?

19  A.  Approximately two years.

20  Q.  Right.  And these funds started from scratch.  These funds

21  started with zero dollars two years ago, right?

22  A.  They started with zero dollars.

23  Q.  Okay.  And then we have the other chart.  I think we have

24  an exhibit number on it.  The ones with the lines we flattened

25  out.

1          This one the Court has seen, but I'm going to show

2     it to you, Mr. Cowherd.  And this one's talking about

3     elections, not assets, but how many people live who are

4     putting money in now are electing Vanguard Index Funds.  And

5     it shows that four of the funds are above the median with

6     respect to elections.  And does that accurately describe what

7     your belief is today?

8     A.  I've not seen this chart before.

9     Q.  Okay.  Do you have any reason to dispute that four of the

10    five index funds are currently elected more than the median

11    fund or, in other words, the middle fund?

12    A.  I couldn't comment.

13    Q.  Okay.  Then you don't -- don't know whether or not the

14    Vanguard 500 Index Fund is currently the third most popular

15    one being elected, correct?

16    A.  I do not know that.

17    Q.  And this -- these people that have selected these index

18    funds, both asset-wise and the number of people doing it, that

19    is going to be disturbed by this re-enrollment, correct?

20    A.  They can opt out.

21    Q.  Yeah, they have -- but if they don't opt out in 30 days,

22    they're going to be pulled out of these index funds, the only

23    nonproprietary funds in the lineup, and they'll be put into an

24    American Century TDF, correct?

25    A.  Correct.

1          THE COURT:  But they'll be pulled out of all the

2     American Century funds too, right?

3          THE WITNESS:  It's all the same.  It's all the same.

4     Yes.

5          THE COURT:  Okay.  So we're clear, it's not just

6     going to be affecting the Vanguard funds, it's every fund on

7     the list, right?

8          THE WITNESS:  Every fund on the list.

9          THE COURT:  All right.

10    Q.   Right.  The only difference is, participants specifically

11    picked this nonproprietary fund, and now they're being put

12    into a proprietary fund, correct?

13    A.   If they pick the American Century funds, I don't see the

14    difference.

15         THE COURT:  Yeah.  We've got to move down the road

16    from this.  This is not going to get us out of here before

17    next -- next spring.

18         MR. LUKAS:  Okay.  I'll move on, Judge.  I'll move

19    on to the -- I'll move on to the next topic, Your Honor.

20         THE COURT:  All right.

21         MR. LUKAS:  In fact, this is my -- I only have two

22    more topics, Judge.

23         THE COURT:  All right.

24    Q.   Index funds.  I believe -- you testified to Morningstar

25    bubble charts, do you remember?  Let's show 43, JX 43, page

1    34, just to make sure we're -- we know what we're talking

2    about.

3           These bubble charts that you folks look at and

4    that -- that Mr. Fleckner showed you on Friday, right?

5    A.   Correct.

6    Q.   And this is driven by Morningstar data, correct?

7    A.   Correct.

8    Q.   And you also -- the Retirement Committee also relies on

9    Morningstar data with respect to the expense ratio peer

10   universe that you use, also, correct?

11   A.   Correct.

12   Q.   And I believe Mr. Bouffard and Ms. Morrison and others

13   discussed Morningstar as well.  So I take it Morningstar is a

14   trusted source for you and the Retirement Committee.  Would

15   that be a fair statement?

16   A.   It is one of the sources that we use.

17   Q.   Okay.  And do you recall testifying to the long-term

18   virtues of active management versus index funds on Friday?

19   A.   I believe there are benefits to active management.

20   Q.   Uh-huh.  And do you recall testifying as to active

21   management historically will perform better or predicting will

22   historically perform better, particularly -- or historically

23   will perform better particularly in a down market?  Do you

24   remember that?

25   A.   Active management shows its stripes during volatility and

1    down markets, correct.

2    Q.   Now, Mr. Cowherd, I'm showing you a document that's called

3    Morningstar's Active/Passive Barometer from August 2018.  Do

4    you see that?

5    A.   I do.

6    Q.   And in the executive summary, they describe what this is.

7    This says, The Morningstar Active/Passive Barometer is a

8    semiannual report that measures the performance of U.S. active

9    funds against passive peers in their respective Morningstar

10   categories.

11           Do you see that?

12   A.   I do.

13   Q.   And I'd like you to go to the key takeaways on the second

14   page, at the bottom.  There's three takeaways that I want to

15   talk to you about.  These three down here, Karla, if you could

16   blow those up.

17           In general, actively managed funds have failed to

18   survive and beat their benchmarks, especially over longer time

19   horizons.

20           The second one.  The average dollar in passively

21   managed funds has tended to outperform the average dollar

22   invested in actively managed funds.  With that said, there are

23   important exceptions.  Over longer time frames, investors in

24   actively managed foreign stock funds have generally

25   outperformed those in passive funds, as evidenced by their

1    higher asset weighed returns.

2              And there -- of the five Vanguard Index Funds that

3    are in the Plan, one of those is a foreign one, correct?  A

4    foreign --

5    A.   There is a foreign equity.

6    Q.   Right.  One of the five, correct?

7    A.   (Witness nodded head affirmatively.)

8    Q.   Okay.  And then the last one -- oops.  Sorry about that.

9              Investors would greatly improve their odds of

10   success by favoring low cost funds which succeeded far more

11   often than high cost funds over the long term.

12             And then I want to show you the actual chart of what

13   percentage of -- this is on page 4, the top chart.  If you

14   could blow this up.

15             This is what percentage of active funds actually

16   outperformed index funds over certain time horizons.  And I'll

17   talk to you about these four because I know these are in the

18   Plan.  U.S. Large Blend in the three-year category, only 17

19   percent of active funds outperformed index funds.  Do you see

20   that?

21   A.   I do.

22   Q.   And then the rest of the numbers, only 20 percent in 5

23   year, 10 percent in 10, 15 percent in 15, and only 16 percent

24   of the time or 17 percent of the time in a 20-year horizon do

25   actively managed funds outperform index funds.  Do you see

1    that?

2    A.   What column are you looking at?

3    Q.   This one right here.

4    A.   Okay.  Yes.

5    Q.   Okay.  And I'm not going to bore the Court with going

6    through these lines.  And they speak for themselves.  U.S. Mid

7    Blend, same thing, over the 20-year horizon is 9 percent.

8    Only 9 percent of the time does active fund outperform index.

9    U.S. Small Blend, over 20 years, 31 percent.  31.5.  And then

10   foreign is 33.3.  But I think they mention something about

11   foreign doing better, and that must be this 92.9 with respect

12   to the Foreign Small/Mid-Blend.  Do you see that?

13   A.   I do.

14   Q.   But the rest of these numbers, through U.S. Mid Blend,

15   U.S. Small Blend, are all significantly -- all under 25

16   percent of the time -- more than 25 percent of the time in all

17   of those categories, the index fund in each of those year

18   horizons outperforms the active funds, correct?  That's what

19   Morningstar is saying last month, right?

20   A.   This would be one of 50 reports I would read.  This would

21   not sway me.  By the way, we're coming off a 10-year bull

22   market.  All of these numbers are skewed based upon what the

23   markets are doing.

24   Q.   Well, wait a minute.  We have a 20-year time horizon here.

25   A.   You've got the longest bull market in the history of the

1    United States in that 20 years.  I mean --

2             THE COURT:  Okay.  So here's what we're going to do.

3    The question is do you -- do you agree with this?

4             THE WITNESS:  I do not completely agree with this

5    data.

6             THE COURT:  Okay.  Ask your next question.

7             MR. LUKAS:  I move for the admission of the

8    Morningstar Active/Passive Barometer.  It would be PX 494.

9             MR. FLECKNER:  Objection.

10            THE COURT:  What's your basis?

11            MR. FLECKNER:  I mean, this is just impeachment

12   material.  I don't know that this is evidence.  I don't

13   think they've laid a foundation --

14            THE REPORTER:  Excuse me.

15            MR. FLECKNER:  Yeah.  I'm sorry, Reggie.  This is

16   just impeachment material.  I don't think this has been

17   established as evidence.

18            THE COURT:  Sustained.

19   Q.  You also testified on Friday with respect to index funds

20   were something that's -- I believe the phrase was it's

21   something that's hot and in vogue.  Do you remember that

22   testimony?

23   A.  The trend in the bull market is to index, yes.

24   Q.  And I believe you had expressed a concern about people

25   tending to chase what's hot or what's in vogue.  Do you

1    remember that?

2    A.  Correct.

3    Q.  Let's go to JX 10 at page 18.  This is a document produced

4    by Hewitt for your Committee eight years ago.  And eight years

5    ago, Hewitt was telling your Committee that 95 -- 97 percent

6    of plans had at least the large cap equity index fund.  Do you

7    see that?

8                MR. FLECKNER:  Objection.

9    A.  I see that.

10               THE COURT:  Hold on.

11               MR. FLECKNER:  This is four years before he joined

12   the Committee.

13               THE COURT:  Well, I'm going to let him ask if this

14   witness knows so --

15   A.  I see that.

16   Q.  Okay.  And they talk about 42 percent for Intermediate

17   Bond, 32 for Premixed, 37 for Mid-Cap, 35 for Small-Cap, and

18   34 for International Equity.  Do you see that?

19   A.  I see that.

20   Q.  Does that seem to indicate that 2018 suddenly something is

21   new and hot and in vogue?

22   A.  There's two flaws in your logic.  One is it's eight years

23   old.  And, two, because I know this, Hewitt administers

24   Fortune 500 plans.  So we're talking about GE, American

25   Airlines, jumbo plans.  I know what their client base looks

1  like.  It's different than ours.

2  Q.  And we're talking about plans that have more than $250

3  million in them, right?

4  A.  It's -- it's fine.  This is not relevant information.

5  Q.  Okay.  Last thing.  I want to go through two funds with

6  you.  First, I want to go through International Discovery with

7  you.  If you could turn to JX 46 at page 36.

8       And this is that 2016 materials that Mr. Fleckner

9  was taking you through, so the judge has a frame.  This is

10  gross returns from September 2016.  Let's take a look at

11  International Discovery, which is down here.  I don't think

12  you should try to flag it because I'm going to need these

13  three-year and five-year scenarios.  Unless you can do it

14  split.  Yeah.  Check out.  Oh, yeah.  That -- that would be

15  good.  Okay.

16       So let's look at International Discovery.  It looks

17  like it beat the benchmark -- and I'm looking here.  It beat

18  the benchmark in the three-year, five-year, ten-year, and

19  since inception category, right?

20       MR. FLECKNER:  I'll just note the record, I didn't

21  take the witness through this document.  I don't have any

22  objection to him using it, I just --

23       THE COURT:  All right.  Thank you.

24  A.  I see the dots that you are showing me have excess return.

25  Q.  Right.  And so they beat the benchmark in three, five, ten

1    and since its inception.  They also have a positive

2    information ratio for the three, five, ten and since

3    inception, correct?

4    A.  They do.

5    Q.  Excellent performance, wouldn't you say?

6    A.  The numbers are what you said.

7    Q.  Okay.  And let's see if this was a flash in the pan.  This

8    is 2016.  Let's go to 2010.  Let's go back to 2016.  If we can

9    go to JX 6 at page 30.  And here, it's in the middle here.  So

10   we can maybe cheat a little bit.  Perfect.

11          Here we see the same thing.  We see -- this is back

12   in 2010, and the three year -- well, the three year was rough

13   for every one, but they still outperformed the benchmark.  And

14   they outperformed the benchmark in the three, five, ten and

15   since inception categories, correct?

16   A.  Correct.

17   Q.  And inception was 1994, according to this document,

18   correct?

19   A.  Correct.

20   Q.  And same here with respect to information ratios, very

21   positive information ratios for the three, five, and 10 years,

22   correct?

23   A.  Correct.

24   Q.  And this fund, this International Discovery was never on

25   the Watch List.  Actually, I'll just represent to the Court

1    that it was never on the Watch List based on PX 477.  In fact,

2    it was never close to being on the Watch List while you've

3    been on the Committee, correct?

4    A.   I don't have that data in front of me.

5    Q.   Okay.  And you -- do you know that Dr. Pomerantz -- that

6    there are no damages tied to this fund in any of the four

7    models that Dr. Pomerantz has put forward?

8             MR. FLECKNER:  Objection.

9             THE COURT:  Well, do you know about the damages?

10            THE WITNESS:  I don't know the -- no, I don't.

11            THE COURT:  Okay.  Sustained.

12   Q.   Okay.  Let's go to 46.  JX 46, at 87.

13   A.   By the way, you're showing investor share class.  We're

14   not an investor share class, so you've got to make sure you

15   have the right share class.

16   Q.   Uh-huh.  Did they -- did they perform poorly in the -- in

17   the --

18   A.   No.  I just --

19   Q.   Okay.

20   A.   You're just grabbing data that's not representative of

21   what's going on.

22            THE COURT:  Would it be a difference in how they

23   perform if you had -- if he had showed you the R6 or

24   institutional class?  Would it be --

25            THE WITNESS:  They're in a CI- -- it's a CIT.

1          THE COURT:  A CIT?

2          THE WITNESS:  Yeah.

3          THE COURT:  Would it be different?

4          THE WITNESS:  Performance would be moderately

5    different, but not significantly.

6          THE COURT:  Would it be better or worse?

7          THE WITNESS:  Generally, if fees are lower, the

8    performance will be a little bit better.

9          THE COURT:  Okay.

10   Q.   Right.  So it would be even better if I had showed you the

11   right share class, right?

12   A.   Probably.

13   Q.   And that was the share class it was in in 2010, though.

14   We were showing you 2010.

15   A.   I wasn't here.

16         MR. FLECKNER:  Objection.  Foundation.

17         MR. LUKAS:  Okay.  Okay.

18         THE COURT:  Okay.

19   Q.   But nothing that would take away from how outstanding that

20   particular fund has been over the course of over a decade,

21   correct?

22   A.   You picked a really good fund when you picked the fund.

23   Q.   Yeah.  And --

24         THE COURT:  Are you in that fund, Mr. Lukas?

25   Q.   So then when we go to this chart and we look at that box

1  that has Growth, Mid Growth, International Equity, and we see

2  Discovery there, what we know is that the Retirement Committee

3  has found a fund for that category that has consistently

4  performed well for over a decade, correct?

5  A.  It's a good fund.

6  Q.  Yeah.  And, in fact, we could do that with each of these

7  boxes and find a fund just as good as this one if we went

8  outside of American Century; isn't that true?

9  A.  No.  You could -- we can find the top performing fund and

10  chase that, if that's what you want us to do.  By the way, I

11  thought I said you wanted us to index -- didn't you say a

12  little while ago --

13        THE COURT:  Hold on.  Hold on.  Hold on.

14  Mr. Cowherd --

15        THE WITNESS:  I'm sorry.

16        THE COURT:  I've been fussing at him about arguing

17  with witnesses.

18        THE WITNESS:  Yeah, I won't argue back.

19        THE COURT:  I can't let witnesses argue with

20  attorneys either.

21        THE WITNESS:  Okay.  Okay.  I won't.

22        THE COURT:  But I understand.

23        THE WITNESS:  I apologize.

24        THE COURT:  You have passion about this, and that's

25  great.

1          THE WITNESS:  Okay.

2          THE COURT:  But try to listen to the question and

3     respond to the question.

4          THE WITNESS:  I will.  Sorry, Your Honor.

5          THE COURT:  You're fine.

6     Q.  But you could go on the open market and -- and find a fund

7     that performs this good for this long and this consistently in

8     every one of these boxes, couldn't you?

9     A.  It's impossible to predict that.

10    Q.  Are you saying that the Retirement Committee is chasing

11    performance when it left Discovery -- this Discovery Fund in

12    the lineup for all these years over a decade?

13    A.  It didn't go on -- we had it in the Plan.  It didn't go on

14    a Watch List.

15    Q.  Okay.  Let's do the flip side.  Let's look at the

16    International Bond Fund.  Let's go to JX 46 at page 38.

17    International Bond is way on the bottom, but you can still

18    blow us up a little bit.

19          This is the September 2016 gross returns.

20    International Bond, three year, five year, ten year, since

21    inception, below the benchmark, correct?

22    A.  That's what those numbers show.

23    Q.  Yep.  And these numbers also show an information ratio,

24    below -- in a negative for three, five, ten, and since

25    inception.  Do you see that?

1    A.   I see that.

2    Q.   Okay.  And let's see if this is a flash in the pan, maybe

3    just a short-term thing.  Let's go to 2010.  Which is JX 6,

4    page 33.  Yeah, it's right on top, so we've got to --

5         This is May 2010, gross returns.  And gross return

6    again means that the actual fee that was charged isn't part of

7    this consideration; is that right?

8    A.   Pardon me?  Can you say it again?

9    Q.   Sure.  Gross returns means that the fee that was actually

10   paid for the fund isn't considered in this information?

11        MR. FLECKNER:  Objection, foundation.  It's four

12   years before he joined the Committee.

13        THE COURT:  Well, I mean, he knows what gross return

14   is.

15        MR. LUKAS:  Yeah, we know.

16        THE COURT:  And we've -- my goodness, we've talked

17   about gross returns for how many days now we've been doing

18   this?

19        MR. LUKAS:  This is day nine.

20        THE COURT:  Day nine -- nine days.  So you -- even

21   you have educated the judge here.

22        MR. LUKAS:  Okay.  Well, I'll move on.

23        THE COURT:  I understand.

24        MR. LUKAS:  I'll move on --

25        THE COURT:  That's fine.

1          MR. LUKAS:  -- because you're right, it really

2     doesn't matter.

3     Q.  What matters is back in 2010, we see the same thing.

4     Three year, five year, ten year, since inception,

5     underperforming the benchmark, correct?

6     A.  That's what it says.

7     Q.  And same with information ratio, three year, five year,

8     ten year, under a negative information ratio, correct?

9     A.  Correct.

10    Q.  And this one did make the Watch List, but it took -- this

11    is 2010 with those numbers.  It took until twenty four -- 2014

12    to be in the bottom quartile for the three and one year.  So

13    these information ratios weren't bad enough until 2014 for it

14    to be on the Watch List; is that right?

15         MR. FLECKNER:  Foundation.

16    A.  I wasn't --

17         THE COURT:  Overruled.

18    A.  I don't have that history.

19    Q.  Okay.  Well, PX 477 shows that it went on the Watch List

20    in 2014.  So that's the year you joined the Committee, 2014,

21    right?

22    A.  Late 2014.

23    Q.  Uh-huh.  And it remains on the Watch List today; is that

24    correct?  Four years.  It's on its fourth year on the Watch

25    List.

1    A.  We talk about it, correct.

2    Q.  And you've talked about it for four years, right?

3    A.  We use broader information than what you're representing

4    here.

5    Q.  Okay.  What I'm representing here is from the Retirement

6    Committee's materials.

7              THE COURT:  I know.  But he said he's looked at this

8    and he says --

9              MR. LUKAS:  Okay.

10             THE COURT:  -- they've used broader information.

11   We're going to let him say that.

12             MR. LUKAS:  Okay.

13   Q.  And you would not be surprised that this particular fund

14   generates a damage in all four of Dr. Pomerantz's models,

15   would you?

16   A.  I have no idea.

17             MR. FLECKNER:  Objection.

18             THE COURT:  Sustained.  Let me clear this up.

19             THE WITNESS:  Okay.

20             THE COURT:  Have you reviewed Dr. Pomerantz's

21   models?

22             THE WITNESS:  I have not.

23             THE COURT:  So no further questions about

24   Dr. Pomerantz's models if this witness hasn't seen it.  I

25   think the first question of the witnesses that follow should

1  be, have you reviewed Dr. Pomerantz's models?  And then you

2  can ask questions.

3          MR. LUKAS:  Okay.

4          THE COURT:  But please don't ask any other questions

5  about his models with this witness.  Thank you.

6          MR. LUKAS:  Fair enough, Your Honor.

7  Q.  So let's go to the chart again, 46 at page 87.  And we're

8  here on this particular box, which is the Mid Cap Long Fixed

9  Income box.  Do you see that?

10  A.  I do.

11  Q.  So the Retirement Committee has had a fund in that

12  particular box that has consistently underperformed the

13  benchmark and has had negative investment ratios for the

14  three, five, and ten-year periods for well over a decade; is

15  that right?

16  A.  I -- I don't know.

17  Q.  There's been no effort to replace this fund with a fund

18  from the outside marketplace, correct?

19  A.  We've evaluated --

20          THE COURT:  Hold on.  Hold on.  This is another

21  question that comes up in about ten different forms.  Other

22  than the Vanguard -- Vanguard funds, have there been any

23  effort to replace any of the existing core lineup funds as

24  long as you've been on the Retirement Committee?

25          THE WITNESS:  We evaluate them and decide if they

1    should be replaced.

2              THE COURT:  Have you considered replacement from

3    outside of the -- the American Century funds?

4              THE WITNESS:  If we -- if we --

5              THE COURT:  Specifically on any of them?

6              THE WITNESS:  If we do not have -- like the

7    Vanguard, if we do not have capacity, if we were to do stable

8    value or something like that where we didn't have capacity, we

9    would -- we would consider that.

10             THE COURT:  Okay.  So I -- I guess I'm trying to

11   eliminate this question that manifests itself in different

12   forms.  If we could, maybe -- maybe find a broader question,

13   because, clearly -- I mean, the evidence has been pretty

14   clear.

15             MR. LUKAS:  Yeah.  I think so too, and I think Your

16   Honor -- I think Your Honor makes a good point.  And I believe

17   his answer to your question is what I was looking for.

18             THE COURT:  Okay.  Very good.

19             MR. LUKAS:  Thank you, Your Honor.  No more

20   questions.

21             THE COURT:  All right.  Mr. Fleckner, sir.

22             MR. FLECKNER:  Just a couple quick questions.

23             THE COURT:  Yes, sir.

24             MR. FLECKNER:  If we could pull up, Nancy, Exhibit

25   PX 476.  And maybe -- I don't if I can hand up a copy to

1    Mr. Cowherd.  And I don't know if the Court has copies of 476.

2    One for you and one for the judge.  If I can approach?

3            THE COURT:  Yes, sir.

4                    REDIRECT EXAMINATION

5    BY MR. FLECKNER:

6    Q.  Mr. Cowherd, you were asked some questions on

7    cross-examination about the current utilization of the

8    Vanguard funds.  I'm showing you a document that's been

9    identified PX 476.  Are you familiar generally with this

10   document?

11   A.  It looks like it's a Schwab report.

12   Q.  Okay.  And -- and this one purports to show the usage of

13   the funds in the core lineup as of June 30, 2018.

14           MR. FLECKNER:  Did we get you a copy?

15           MR. LUKAS:  No, you didn't.

16           MR. FLECKNER:  All right.  So let's pull up -- you

17   can have mine, Paul.

18   Q.  If we can pull up the second page, Chris.

19           And I'll direct your attention to the second page of

20   this document.  It identifies the utilization of as of June

21   30, 2018, of a number of the funds in the lineup, including

22   some of the Vanguard funds.  You'll see the Vanguard 500 Index

23   is identified on the third line, and some of the other

24   Vanguard funds are identified on other lines.  If you'd just

25   explain to the Court what does this utilization chart show?

1  A.  There's two factors.  I can't tell the shading, but one of

2  the factors is the participants with an account balance, and

3  the other factor is the participants that have a feature

4  investment election into that fund.

5       THE COURT:  Can you tell which is on top and which

6  is on the bottom?  Are balances on top and elections on the

7  bottom?  Can we tell that?

8       THE WITNESS:  I would -- I cannot tell the shading.

9       THE COURT:  Okay.

10  Q.  I think it is.  And the reason I get there, Your Honor, is

11  because the American Century Company's company stock has

12  only --

13  A.  Oh, there we go.

14  Q.  -- the top line in balances.  And participants cannot

15  elect that.

16  A.  That validates it.

17       THE COURT:  Thank you, Mr. Fleckner.

18  Q.  Okay.  And are these data that you review as part of your

19  role as a Committee member?

20  A.  This would be the format that we review.

21  Q.  Okay.  And just looking at this page, does anything about

22  the utilization in terms of balances or elections of the

23  Vanguard fund surprise you in any way?

24  A.  No.

25  Q.  Does it suggest that these funds are outliers in terms of

1    balances or elections as compared to other funds?

2    A.   No.

3    Q.   So, for example, you'll see the American Century Emerging

4    Markets Fund has higher balances and higher elections,

5    correct?

6    A.   Correct.

7    Q.   Okay.  You can pull that down, Chris.

8            You were asked questions about re-enrollment.  Was

9    the decision to implement re-enrollment designed to force

10   participants out of Vanguard funds?

11   A.   Not even considered, no.

12   Q.   Was the existence of Vanguard funds a driving factor or

13   any factor in the decision to do re-enrollment?

14   A.   Didn't think of them any different than any other

15   investment option.

16   Q.   And do you -- have you taken any steps on the Committee to

17   try to steer participants away from use of the Vanguard fund

18   options that you've included while you've been on the

19   Committee?

20   A.   Not at all.

21   Q.   Okay.  And Mr. Lukas finally asked some questions about

22   why -- well, he asked some questions about whether the

23   Committee has investigated alternative funds in some of the

24   different style boxes that he just showed you.  Why hasn't the

25   Committee investigated alternatives in some of those -- in

1    those style boxes?

2    A.   If -- if the -- if the funds meet the criteria and we have

3    faith in what's going on, we leave them.  The last endeavor

4    that we had was two years ago or whenever -- 18 months ago

5    when we eliminated six funds.  And that was what we were doing

6    at that time.

7              MR. FLECKNER:  Okay.  Thank you very much,

8    Mr. Cowherd.  I have no further questions.

9              MR. LUKAS:  I have nothing further, Your Honor.

10             THE COURT:  All right.  Thank you, Mr. Cowherd.

11   Have a good day.

12             THE WITNESS:  Thank you.

13             THE COURT:  Please call your next witness.

14             MR. FALVEY:  The defendants call Margaret

15   VanWagoner.

16             THE COURT:  Thank you, Ms. VanWagoner.  Would you

17   please face our clerk and raise your right hand and be sworn?

18     MARGARET ELIZABETH VANWAGONER, DEFENDANTS' WITNESS, SWORN

19             THE COURT:  And, Ms. VanWagoner, you're probably

20   familiar with the drill by now.

21             THE WITNESS:  I just -- I just haven't actively

22   participated yet.

23             THE COURT:  And I will -- I'll bet that

24   Ms. Cunningham has provided you the right binder.  Yeah.

25   Thank you for pulling that down.  And if you'll get close to

1   that for us.

2           THE WITNESS:  Okay.

3           THE COURT:  And begin, ma'am, by speaking your full

4   name and spelling your last name for us.

5           THE WITNESS:  Sure.  Margaret Elizabeth VanWagoner,

6   V-A-N-W-A-G-O-N-E-R.

7           THE COURT:  Thank you, ma'am.

8           All right.  Mr. Falvey, sir.

9           MR. FALVEY:  Thank you, Your Honor.

10                          DIRECT EXAMINATION

11  BY MR. FALVEY:

12  Q.  Good morning, Ms. VanWagoner.

13  A.  Good morning.

14  Q.  Your name is Margaret, and you go by Peg; is that correct?

15  A.  That's correct.

16  Q.  We're going to try to talk slowly and go fast this

17  morning.

18  A.  Okay.

19           THE COURT:  Thank you, Mr. Falvey.  I appreciate

20  that.

21  Q.  How are you -- thank you, Your Honor.

22           How are you now employed, Ms. VanWagoner?

23  A.  I'm a senior consultant at DeMarche Associates.

24  Q.  And for how long have you been at DeMarche?

25  A.  Since I've been back at DeMarche, it's been four years,

1　just about four years.  I worked with them for 14 years right

2　after college.

3　　　　　　THE COURT:  Just so my notes are more accurate,

4　would you spell -- spell DeMarche for me?

5　　　　　　THE WITNESS:  Sure.

6　　　　　　THE COURT:  Yeah.

7　　　　　　THE WITNESS:  D-E-M-A-R-C-H-E.

8　　　　　　THE COURT:  Thank you, ma'am.

9　Q.  And what do you do at DeMarche, and what kind of firm is

10　it?

11　A.  DeMarche is an institutional investment consulting firm.

12　The work we do is to advise -- and we have a discretionary

13　business, but to advise our institutional clients on behalf of

14　the investment funds that they have fiduciary responsibility

15　for.

16　Q.  And are you what's known as a consultant in the Retirement

17　Plan industry?

18　A.  Yes.

19　Q.  And we heard from Marjorie Morrison earlier.  Was Margie

20　Morrison a colleague of yours at DeMarche --

21　A.  Yes, she was.

22　Q.  -- at a point in time?  And then later a colleague at

23　American Century?

24　A.  Yes, she was.

25　Q.  So when did you come to American Century, Ms. VanWagoner?

1    A.   When?

2    Q.   When, right.

3    A.   I came in February of 2001.

4    Q.   And were you there until 2014?

5    A.   Yes.

6    Q.   In a -- in a sentence, what was your role during the

7    period you were at American Century?  And we'll come back to

8    it.

9    A.   My role at American Century was as a relationship manager

10   for Plan sponsors.  I also had a -- some work that I did with

11   investment consultants during that time, and I managed some of

12   the institutional team for a period of my tenure there.

13   Q.   And while at American Century, were you a member of this

14   Retirement Committee that is the subject of this lawsuit?

15   A.   Yes.

16   Q.   And were you on the Committee from 2008 until you left in

17   2014?

18   A.   Yes.

19   Q.   Are you a defendant in this case?

20   A.   Yes.

21   Q.   Have you ever been sued before, Ms. VanWagoner?

22   A.   No.

23   Q.   Tell us, please, about your educational background.

24   A.   My undergraduate degree is from the University of Kansas

25   in business.  And my graduate degree is from Rockhurst

1    University.  It's an MBA.  And then various FINRA testing

2    since then for the certifications that I have.

3    Q.  Do you hold securities licenses?

4    A.  Yes, I do.

5    Q.  And what securities licenses do you hold?

6    A.  So the 6, 7, 24, 66.

7    Q.  Do they -- sorry.

8    A.  65, I think, yeah.

9    Q.  Do they relate generally to this licensure enabling you to

10   sell various types of investment products?

11   A.  That is correct.

12   Q.  You talked earlier about your time at DeMarche.  And what

13   year did you start at DeMarche?

14   A.  I started at DeMarche in May of nineteen -- let's see,

15   '84.  I think that's right.  And -- yes.  So that's when I

16   started as a portfolio accountant.

17   Q.  Were you at DeMarche for about 14 years?

18   A.  I was.

19   Q.  Until the late '90s?

20   A.  Yes.

21   Q.  And trace, if you would, the arc of your experience at

22   DeMarche during those 14 years.

23   A.  Sure.  So I came to the firm as a portfolio accountant and

24   within months was provided to managing the portfolio

25   accounting department, and then ultimately the operations of

1    the portfolio accounting and report distribution function.

2    Then I became a production assistant working directly with

3    consulting teams.

4            Let's see.  After that, I became a -- an account

5    manager type of role, think of it like a junior consultant.

6    And then I moved to the consulting role in 1987, I believe it

7    was.  And left the first time after 14 years as a senior

8    consultant working directly with Plan sponsors.

9    Q.  And then you would roll back to DeMarche more recently

10   after leaving --

11   A.  Yes.

12   Q.  -- American Century?

13   A.  Yes.  I came back at the end of 2014 and have been a

14   senior consultant working with Plan sponsors.

15   Q.  And after your first stint at DeMarche ending in 1998, did

16   you then work at another firm in a consulting role before

17   coming to American Century?

18   A.  Yes.  I worked for Thomson Horstmann & Bryant,

19   T-H-O-M-S-O-N, H-O-R-S-T-M-A-N-N and your standard Bryant,

20   B-R-Y-A-N-T.

21   Q.  And were you there for a few years before joining American

22   Century?

23   A.  That is correct.  And I was in the relationship management

24   consultant relation roles for that firm.

25   Q.  All right.  So you had about 17 years or so in various

1  consulting capacities at those two firms before coming to

2  American Century?

3  A.  That sounds right, yes.

4  Q.  Can you describe broadly what you were doing as a

5  consultant to retirement plans during that period?

6  A.  Yes.  As a consultant, I was working with Plan sponsors to

7  help them with their asset allocation of their funds, the

8  performance measurement of their funds, helping them

9  understand what their managers were doing and why.  Also,

10  Investment Policy Statement creation and review.  I'm thinking

11  if I'm missing anything there.  I think that's pretty much all

12  of it.

13  Q.  You mentioned Investment Policy Statements.  Did you write

14  IPSs?

15  A.  Yes.

16  Q.  How many IPSs did you write during your period as a

17  consultant?

18  A.  Oh, gosh.  More than 10, less than 20.  Most of them were

19  already written, so my job was to review and amend.

20  Q.  Did you also attend Plan sponsor committee meetings?

21  A.  Yes.

22  Q.  And these would include sponsor committees for defined

23  contribution plans, like American Century's?

24  A.  Yes.

25  Q.  How many different -- how many times did you attend 401(k)

1    committee meetings before you joined American Century at the

2    time when you were in a consulting role?

3    A.   Probably hundreds.

4    Q.   And would you typically tend to provide information and

5    present on a consulting project?

6    A.   Yes.

7    Q.   What would the give and take be, consist of generally at

8    those sessions that you attended when you were a consultant?

9    A.   So outside of the standard reporting of performance in

10   capital markets and the laundry list of regular

11   investment-related activities of the Committee, we would be

12   charged with special projects at times.  That could include

13   just about anything, including the review of an asset lineup.

14   We would present the education to the committees, present our

15   recommendations, our suggestions, and -- and then wait for the

16   committee to make a decision as to whether they would accept

17   them or not.

18   Q.   We're going to talk relatively briefly about Hewitt a

19   little bit.  But were you a counterpart to -- to the Hewitt

20   consulting firm that American Century brought in for a

21   project?

22   A.   The HR department actually hired the Hewitt organization,

23   but I was aware of that process.

24   Q.   And what I -- what I'm trying to get at is is the

25   consulting role you performed the kind of consulting that

1    Hewitt does all the time?

2    A.  Yes.  I'm sorry.

3    Q.  And back to these sponsor committee meetings you attended

4    for 401(k) plans while a consultant, you said you attended

5    hundreds.  Would there be give and take in connection with

6    your -- these sessions?

7    A.  Yes.  Absolutely.

8    Q.  Just describe briefly kind of what that piece of it would

9    consist of.

10   A.  So as investment committees do, they would question the --

11   the information.  They would ask questions regarding the

12   education materials that were presented.  There would be give

13   and take back and forth on what's the next -- next thing to

14   do, what's the next step.  So it was -- it was an interactive

15   process.

16   Q.  And you engaged in hundreds of those kinds of sessions in

17   your consulting role?

18   A.  Yes.

19   Q.  So now let's get to American Century.  You joined in 2001,

20   correct?

21   A.  That is correct.

22   Q.  And we haven't done this yet.  Describe for the Court what

23   your role was while you were at American Century or what roles

24   you had.

25   A.  Okay.  So at American Century, I came in as a relationship

1  manager for the institutional business working directly with

2  Plan sponsors.  Over the time of my tenure at American

3  Century, I also visited with and had a responsibility for

4  consultant firms to distribute, market, sell to them as well.

5  I had cross-sell responsibilities to the Plan sponsors I

6  worked with on other American Century products.

7          THE COURT:  Could you slow down, please?

8          THE WITNESS:  Sure.

9          THE COURT:  Thank you.

10          THE WITNESS:  This is slow.

11          THE COURT:  Do your best.

12          THE WITNESS:  I will.  I will.

13          THE COURT:  Thank you.

14  A.  And I managed a portion of the institutional team, the

15  relationship management team for a period of time.  And all

16  throughout my tenure at American Century, I worked directly

17  with Plan sponsors.

18  Q.  So let's pull up DX 842, please, Chris.

19          We've referred to this org chart -- you might have

20  been in the courtroom -- with some other witnesses.  This

21  largely portrays the investment division of the firm, but I

22  just wanted to ask you to point out to the Court which --

23  which group you would have been reporting through during your

24  period as a client relationship manager?

25  A.  So I would have reported through the chief client officer

1    for sales and distribution.

2          THE COURT:  You can touch -- you can touch it if you

3    want to.

4          THE WITNESS:  (Indicating.)

5          THE COURT:  Okay.

6    Q.  So you were somewhere down in this chain, correct?

7    A.  Yes.  That's correct.

8    Q.  Thank you.  So -- all right.  So just tell us, if you

9    would, the titles that you held along the way.  You've sort of

10   described functionally what you did in the -- on the client

11   relationship side.

12   A.  So as I -- I was a vice president of the firm as a client

13   relationship manager.  And that involved working directly with

14   Plan sponsors and their committees in presenting the work that

15   American Century did for them, whichever investment strategies

16   they were invested in.  I also consultatively worked with the

17   main contacts that I had with my clients to understand what

18   they were looking at next and how we might be helpful to them

19   in that endeavor, other investment strategies type thing.

20   Q.  And so that was your full-time role during this period

21   that we'll be looking at.  And you joined the Retirement

22   Committee in about 2008 and were on it until you left in 2014?

23   A.  That is correct.

24   Q.  Before I focus now in on the Retirement Committee for the

25   rest of your testimony, I want to just ask, in addition to

1    work, you've also been raising a family, correct?

2    A.   That's correct.

3    Q.   And have you also found time for charitable and civic

4    work?

5    A.   That is correct.

6    Q.   And has your charitable and civic work been in the area of

7    being a fiduciary on committees that oversee investment?

8    A.   Yes.  That is correct.

9    Q.   Can you describe the various capacities in which you've

10   served on investment committees as a fiduciary?

11   A.   Yes.  So for the Women's Foundation here locally, I've

12   been on the investment committee for over 25 years.  I chaired

13   that committee for a period of time.  I couldn't tell you the

14   years, but way back.  And served on the advisory board for

15   that organization.  And was its board president for a period

16   of time.

17   Q.   What does the investment committee do for that group?

18   A.   The investment committee selects the asset allocation, the

19   manager lineup, and then makes decisions on shifts between the

20   different asset categories on a regular basis.

21   Q.   Have you served on any other boards?

22   A.   Yes.  I -- I serve on the board of the Healthcare

23   Foundation of Greater Kansas City.  I am also the current

24   chair of the investment committee for that organization and on

25   the executive committee for that organization.

1    Q.   What's the -- the Healthcare Foundation of Greater Kansas

2    City?

3    A.   It's a -- as it's named -- a healthcare foundation that

4    focuses the assets of the portfolio on granting to the local

5    community and statewide, depending on the programs, for -- at

6    the very high level, generally, the underinsured, medically

7    underinsured or uninsured and related issues surrounding

8    healthy living.

9    Q.   And what are the funds that -- that the -- that the

10   foundation has custody of, where do those come from?

11   A.   So the assets were a result of the sale of hospital

12   properties in various counties in Kansas and Missouri,

13   including Allen County, Kansas, so one pretty far away from

14   where we are here.  So the result of the sale of those

15   properties went into two portfolios and were split by the

16   Attorneys General of Kansas and Missouri into -- 80 percent of

17   those assets going to the Healthcare Foundation and 20 percent

18   of those assets going to the Reach Foundation.

19   Q.   How big is the -- is the endowment of this foundation that

20   you -- that you oversee on the Investment Committee?

21   A.   Right now, it's around $770 million.

22   Q.   So this is a fund that's considerably larger than the --

23   the 401(k) plan that's the subject of this case, correct?

24   A.   Yes.

25   Q.   Have you served as the chair of that investment committee?

1    A.   Yes.

2    Q.   Are you also on its board of directors?

3    A.   I am.

4    Q.   And you're on the Foundation's board of directors,

5    correct?

6    A.   Yes, yes.

7    Q.   Are you also on the executive committee of the board of

8    directors of that organization?

9    A.   Yes, I am.

10   Q.   So you've mentioned a couple of committee involvements

11   that you have on the charitable side.  Is there another one

12   that we've not touched on?

13   A.   Yes.  I -- I just finished my last term, nine years I

14   believe, as an investment committee member of the Diocese of

15   Kansas City and St. Joseph, investments, holistic investments.

16   It's retirement plans as well as operating assets.

17   Q.   Let's call up DX 846, please, Chris.

18        So now let's go to your time on the Retirement

19   Committee, Ms. VanWagoner.  I just wanted to --

20   A.   Can I -- can I add one real quick?

21   Q.   Oh, sure.

22   A.   I'm also on the advisory board for the School of Social

23   Welfare at the University of Kansas.

24        THE COURT:  Thank you.

25   Q.   And what does that advisory board do?

1    A.  Advises to the school on programs, curriculum, strategic

2    thinking for that particular school at the University of

3    Kansas going forward for both the undergraduate and the

4    graduate programs.

5    Q.  And not to load up here, but you're -- at DeMarche, are

6    you also on its investment committee?

7    A.  That's correct.  I am on the investment -- retirement

8    investment committee for the 401(k) plan at DeMarche.

9    Q.  So now I put up on the screen, the -- just pictures and

10   timeline of who sat on this committee.  Just to orient

11   yourself and the Court, the Court has met and you've been in

12   the courtroom for testimony of some of the folks on here.

13        But over on the left side, we can see the group that

14   you served with for a majority of your time on the Committee,

15   correct?

16   A.  That's correct.

17   Q.  They include Chris Bouffard and John Leis and Brad

18   Cloverdyke, right?

19   A.  Uh-huh.  That's correct.

20   Q.  And you remained on while there was some turnover, and you

21   also served with Margie Morrison and Julie Smith, correct?

22   And John Leis more or less throughout?

23   A.  That's correct.

24   Q.  You can pull that down, Chris.  Thank you.

25        So let me ask, with those folks in mind, about the

1  composition of this Committee.  You've dealt with lots of

2  committees.  What did you -- what did you believe about the --

3  the composition of this Committee and whether it had

4  appropriate representation for running this Plan?

5  A.  Sure.  I remember coming -- being asked to be on the

6  Committee and learning of those that were participating.  I

7  was happy to hear that none of the C-Suite, chief anything,

8  was part of that committee.  It was managers and middle

9  managers within the organization representing the various

10  channels but also different expertise as it related to

11  decision making.  I saw people representing their employee

12  base as well as the quantitative and qualitative aspects of

13  investment management.

14  Q.  And C-Suite is a buzz term that gets used sometimes in

15  corporate America.  It refers to what?

16  A.  Chief investment officers, presidents of firms, C -- chief

17  financial officers, just the Cs.

18  Q.  The chief executive officer, chief legal officer?

19  A.  Yeah.

20  Q.  The Cs?

21  A.  Yeah.  The only differences is I think Gudrun became chief

22  of technology at one point, but that was a different -- that

23  was a different --

24  Q.  And we haven't met Gudrun.  That's Gudrun Neumann, who was

25  chief of technology, top IT person at the firm?

1   A.  Yeah.

2   Q.  Right?

3   A.  That's correct.

4   Q.  So did you think it was appropriately composed?

5   A.  Yes.  Absolutely.

6   Q.  When you got on the Committee, did you receive a copy of

7   the Investment Policy Statement?

8   A.  Yes.

9   Q.  Okay.  If we can look at JX 054, Chris, just on its cover

10  page.

11              Did you read the IPS cover to cover?

12  A.  Yes.

13  Q.  You mentioned you had seen and indeed written many of

14  these, correct?

15  A.  That's correct.

16  Q.  Did you -- did you reference the Investment Policy

17  Statement during your period on the Committee?

18  A.  Yes, I did.  I believe I also asked that it be included on

19  a regular basis at some point in all of our materials so that

20  we could refer to it as we needed.

21  Q.  So for each meeting, you asked that it actually be in the

22  physical packet that came around --

23  A.  Yes.

24  Q.  -- just as a handy reference tool while -- while you all

25  discussed the matters on the agenda?

1              THE COURT:  Could I stop you for just a minute?  Is

2      that showing up on your screen?

3              THE WITNESS:  Yes.

4              THE COURT:  One moment.  Ms. Strodtman, my screen is

5      not working right now.  It has been working.  So would you let

6      IT know?  We're going to take a recess in about 10 minutes.

7              THE COURT CLERK:  Uh-huh.

8              THE COURT:  All right.  Thank you.

9              MR. FALVEY:  On this one, I think it won't matter so

10     much, Your Honor.

11             THE COURT:  That's fine.

12     Q.  You read it carefully?

13     A.  Yes.

14     Q.  Did the Committee use the various provisions of this

15     carefully as it evaluated and monitored the investments that

16     the -- that were in the Plan?

17     A.  Yes.  We were very thorough to look back at this document

18     as we were reviewing not only investment performance but any

19     changes to the people or the process involved in those

20     strategies.

21     Q.  And you'll recall that there's set forth in the Investment

22     Policy Statement some criteria by which the lineup should be

23     evaluated initially and on an ongoing basis?

24     A.  Yes.  Absolutely.  But also recognize that the document,

25     as it should, allowed the Investment Committee some

1    flexibility within those parameters to make decisions about

2    the lineup.

3    Q.  In your experience, did it have the appropriate degree of

4    direction and provide for an appropriate degree of

5    flexibility?

6    A.  Yes.

7    Q.  Let's -- and let me ask you broadly about the materials

8    that were used for each of the meetings.  We're not going to

9    go through them.  You received a packet in advance each time,

10   correct?

11   A.  We received a packet about a week in advance.  I would

12   take 30 to 45 minutes usually about three different times

13   during that week to make sure I went through it.  So that was

14   quite a bit of time.  But I tried not to digest it all in one

15   fell swoop.  And then again briefly before the meeting

16   started.

17   Q.  Did you believe you were receiving the appropriate

18   documents each time with respect to analytics on the

19   investments and with respect to Plan utilization by the

20   participants?

21   A.  Yes.

22   Q.  And in comparison to what you've seen elsewhere, how would

23   you evaluate these materials that you received?

24   A.  Well, from what I've seen in other investment committees,

25   this is like in the top 10 percent of -- of not only the

1    timeliness of receiving the documentation, but also the

2    thorough manner in which the information was shared with us

3    prior to the meeting, which made it much more helpful during

4    an investment meeting.

5    Q.   I'm going to show you a single page from one of the sets

6    of materials.  Chris, could you look at -- or bring up JX 16,

7    page 33, please?

8            This is -- do you recognize this as a report of the

9    fees being charged by funds in the Plan at a certain point in

10   time compared to a -- a median -- sorry, compared to a peer

11   group?

12   A.   Yes.

13   Q.   Do you recognize it?

14           THE COURT:  Hold on just a second.  Let me find that

15   again.

16           THE WITNESS:  Sure.

17           THE COURT:  That was JX 16.  Ms. Cunningham was kind

18   enough to provide me a paper copy.  She's already gave me

19   probably about four paper copies somewhere in this, but -- so

20   what page were you on again?

21           MR. FALVEY:  Page 33, Your Honor.

22           THE COURT:  Page 33.  Okay.

23           MR. FALVEY:  Sorry about that.

24           THE COURT:  Thank you.

25   Q.   But I'll just ask while --

1          THE COURT:  Sure.

2     Q.  -- the Court is looking, do you recognize the format?

3     A.  I do.

4     Q.  Are you familiar with it?

5     A.  I am familiar with this.

6          THE COURT:  I'm with you.

7     Q.  There's been quite a bit of questioning about this report

8     and some reports like it concerning whether the appropriate

9     peer group was being looked at in evaluating the fees of the

10    different funds.  You've probably been in the courtroom for

11    some of that?

12    A.  Yes.

13    Q.  And in your experience, is this the type of comparison

14    data that is typically provided to plan committees?

15    A.  Yes.

16    Q.  There's been a question about whether, given that the

17    funds were largely institutional class shares at the time,

18    whether the Committee should have had available to it

19    comparison data that looked only at institutional class shares

20    for comparison.  Have you heard some of that questioning?

21    A.  I have.

22    Q.  And in your experience, do retirement investment

23    committees typically have that sort of data available?

24    A.  Not back in 2011.  This was a very common practice to look

25    at multiple share class shares for different mutual funds as a

1    comparison within a peer group.  So back then, it was very,

2    very common.  In fact, it's pretty common today to look --

3    look at this the same way.

4    Q.  And were you comfortable using this data for comparative

5    purposes at the time?

6    A.  Yes.

7    Q.  Did you, as part of your -- your day job, your role as a

8    client relationship manager, have experience with how the fees

9    of American Century funds stacked up against the competition

10   in the marketplace?

11   A.  Yes.

12   Q.  And why would you have had familiar- -- familiarity with

13   that as a client relationship manager?

14   A.  I would have been aware of the competitive funds that my

15   client might be using for the various asset classes where they

16   held American Century funds.  And at time -- occasionally, we

17   would see the reporting in those investment committees that

18   was related to other peer groups.

19   Q.  And what did you know about how American Century funds

20   compared to its competitive funds on a -- on a same class

21   basis?  That is, invest -- you know, investment grade to

22   investment grade, institutional share class to institutional

23   share class?

24   A.  Yeah.  The American Century funds were generally at or

25   below median for the asset categories that I have with

1    clients, so they were competitive from a fee perspective.

2    Now, over time fees changed as the market evolved. So fees

3    would come down on the various assets as well. And then

4    there's obviously different share classes that have taken the

5    fee equation out of it.

6    Q. So we can take that down, Chris.

7         Let's -- before we break, let me just ask you

8    briefly about discussion at the meetings and discussion

9    quality at the meetings. Can you address that?

10   A. Yes. So as we would -- as topics would come up in the

11   investment meetings on the agenda that we had, it was a

12   really -- a really academic give and take of ideas between

13   different parts of the company as represented around the

14   table. And I felt it was very thorough. The -- the room was

15   a safe zone to say whatever you thought and bring big ideas

16   and little ideas into the room, strictly to the benefit of the

17   Plan participants. We were very aware of our role. If, for

18   whatever reason, someone might be straying in a direction, we

19   would self-correct each other to make sure that we were

20   wearing the right hat in the conversation. So the -- I felt

21   that things were discussed thoroughly, decisions were made

22   mindfully, and the consideration was for the benefit of the

23   Plan participants.

24   Q. There's been a lot of testimony in the case,

25   Ms. VanWagoner, about what the Committee did to monitor the

1   investments over time, including its use of the Watch List.

2   What's your -- what's your recollection about the quality of

3   those discussions and -- and the -- the use of the Watch List?

4   A.  So the Watch List was -- I think it's been testified by

5   numerous people -- a helpful --

6           THE COURT:  Numerous people.

7           THE WITNESS:  Numerous.

8           THE COURT:  Nine days.

9           THE WITNESS:  You're about ready to testify

10  yourself, right?

11          THE COURT:  Were you here all nine days?

12          THE WITNESS:  No.

13          THE COURT:  Oh, you've missed out, Ms. VanWagoner.

14          THE WITNESS:  I have -- I have a day job.

15  A.  So the Watch List was a really helpful tool for us to

16  focus effort on the different strategies that might be

17  struggling from a performance perspective.  But there were so

18  many more aspects to performance than just numbers.  There --

19  you know, the investment team, the process itself.  And

20  overarching all of this, the market at the time that the

21  investment might go on to that Watch List because funds can

22  underperform in a market environment, and will consider

23  index -- compared to its index, but it can underperform

24  against its peers for a period of time because its style of

25  investing might not be in favor in that particular period.

1  Q.  So I want to now turn to the Hewitt report at a high

2  level.  Do you recall the -- the Hewitt firm being engaged

3  in -- well, actually, before I do that, I do have one more

4  question about the Watch List.

5           There was testimony from one of plaintiffs' experts

6  that perhaps the Watch List should have been shared with

7  participants on some kind of regular basis.  Have you ever

8  heard of that being done?

9  A.  No.  I think that would be very counterproductive to the

10 behavior you wanted from participants.

11 Q.  And why is that?

12 A.  Because a fund might fall on to a Watch List for a period

13 of time, but with no change in the process, the people, the

14 philosophy of the investment, the market might shift and favor

15 that particular type of a fund going forward.  Since

16 participants tend to overreact to news as opposed to

17 underreact, although inertia is there, sharing a Watch List

18 would be very counterproductive.  I have never known a client

19 that has shared a Watch List from an Investment Committee

20 fiduciary's responsibility to plan participants.

21           THE COURT:  Hold on.  We're going to take a

22 15-minute recess, Mr. Falvey.

23           MR. FALVEY:  Thank you, Your Honor.

24      (Recess at 10:30 until 10:49 a.m.)

25           THE COURT:  It turns out the judge kicked the cord

1    out, which is what happens.

2              THE WITNESS:  I wondered.

3              MR. FALVEY:  Surprise, surprise.

4              THE COURT:  I need an IT person to help me figure

5    that out.

6              MR. FALVEY:  That's always the answer.  That's

7    always the answer.  Unplugged.

8              THE COURT:  Please proceed, sir.

9              MR. FALVEY:  Thank you, Your Honor.

10   Q.  Before we talk about Hewitt, Ms. VanWagoner, when you

11   joined the Retirement Committee, is one of the things that you

12   did to -- to pull out the list of the investment lineup and

13   study it?

14   A.  Yes.  I was aware of the investment lineup.

15   Q.  And what did you believe broadly about the appropriateness

16   of the investment lineup for the Plan?

17   A.  The investment lineup was well diversified within stocks,

18   bonds, cash, and some alternatives, both domestically and

19   overseas, gave the investment -- gave the participants good

20   choices to be able to diversify their core portfolio.  So I

21   was comfortable with the lineup, and it had a healthy Target

22   Date Fund.

23   Q.  So now let's go ahead to Hewitt and the report that they

24   did for the -- for the firm in 2010.

25   A.  Uh-huh.

1  Q.  Do you recall in about June 2010 the Retirement Committee

2  being advised that Hewitt had been retained?

3  A.  Yes.

4  Q.  Do you recall the -- the conversation at the Retirement

5  Committee level at that point in time?

6  A.  Not specifically if we're referring to specific minutes.

7  But a general comfort with Hewitt being retained in that

8  facet.  The scope of the project, as we understood it, was

9  recordkeeping initially.  And then Hewitt, as consultants will

10  do, offered to enlarge the scope of it to include some trend

11  and market information related to their trend survey, their

12  annual trend survey.  And being a consultant, I'm aware that

13  that's -- that was a smart thing to do.

14          THE COURT:  What's the difference between the work

15  that Hewitt does and DeMarche, for instance?  Are they

16  competitors in the marketplace?

17          THE WITNESS:  Yes.  We are competitors.

18          THE COURT:  And generally, what this means is Hewitt

19  makes more money if they can enlarge the scope, right?

20          THE WITNESS:  Right, right.

21          THE COURT:  They can enlarge their fee as well?

22          THE WITNESS:  That's correct.  And they had created

23  a DC trend survey, an annual survey based on their client

24  base, which is huge, but based on their client base, and it

25  became a sales tool for them.  So if they weren't coming in

1    and expanding the scope on projects, they should have been.

2             THE COURT:  Sure.

3             THE WITNESS:  And they did.

4             THE COURT:  Sure.  And when they asked to expand the

5    scope, that's something -- Retirement Committee said, sure,

6    let's give us more information?  Is that how that worked?

7             THE WITNESS:  Sure.  And being aware that it was

8    related to their survey information --

9             THE COURT:  Yes, ma'am.

10            THE WITNESS:  -- and not necessarily specific to the

11   underlying drivers of process and people and performance of

12   the American Century investments.  That's as far as they would

13   want to go because they would want a whole lot more money to

14   do that.

15            THE COURT:  Okay.  Very good.  I'm sorry,

16   Mr. Falvey.

17            MR. FALVEY:  Thank you, Your Honor.

18   A.  Hi.

19   Q.  So the report gets presented to the Committee later in the

20   year, correct?

21   A.  That's correct.

22   Q.  This has been done with a lot of other witnesses.  There

23   was a presentation by the Committee, do you recall, in -- I'm

24   sorry, to the Committee in November of 2010?

25   A.  Yes.

1    Q.   And discussion at that -- in connection with that

2    presentation at that meeting?

3    A.   Yes.

4    Q.   And then was there a separate meeting held in December

5    where the report and its -- its recommendations and

6    observations were discussed further?

7    A.   Yes.

8    Q.   Do you recall that there were three recommendations

9    that -- that the report contained that related to the

10   Retirement Committee?

11   A.   Generally, yes.

12   Q.   Do you recall that there -- that there was a

13   recommendation that the Committee investigate potential usage

14   of lower cost investment vehicles?

15   A.   Yes.

16   Q.   Was that done?

17   A.   Yes.  The Committee took that suggestion and had been

18   considering at the time looking at some lower fee options

19   within our core investment lineup related to commingled

20   trusts.

21   Q.   So we'll get to that in just a few moments.  Was there

22   also a recommendation that the Committee consider the

23   underutilized funds and consider whether the core lineup could

24   be reduced by eliminating some underutilized funds?

25   A.   Yes.  And the Committee took up that recommendation and

1  considered the elimination of underutilized funds.

2  Q.  And did it, in fact, go ahead and eliminate some

3  underutilized funds in a meeting the subsequent spring, in

4  spring of 2011?

5  A.  That is correct.

6  Q.  And thirdly, at the time, the Plan included one index

7  fund, correct?  The equity index fund?

8  A.  That is correct.

9  Q.  Did the report recommend that the Committee consider

10  acting -- adding passive funds in categories where they

11  weren't offered?

12  A.  Yes.

13  Q.  Did the Committee undertake that consideration?

14  A.  Yes.  There were discussions related to all of the

15  considerations that came out of the Hewitt report, that one

16  included.

17  Q.  And what was the determination of the Committee at that

18  time with respect to whether it should add additional passive

19  investment vehicles?

20  A.  Well, considering the period in time, there was a lot of

21  concern about risks in the market.  The -- the DC world had

22  been shaken pretty solidly on the decline in the market and

23  the great recession.  So there was consideration of active and

24  passive, but not to over -- overserve the participant base.

25  And so the Committee looked at the lineup and said, basically,

1    we're good with our core lineup with the adjustments we're

2    making, and the passive indexes are available through the

3    brokerage window.  And the company pays for the employee to be

4    able to access that window.  So we felt comfortable that they

5    had access if they wanted it.  But at this point in time, we

6    didn't want to make those changes.

7    Q.  So at a later point in time, jumping ahead to 2013, the

8    equity index fund comes out of the Plan because it was closed

9    by American Century, correct?

10   A.  Yes.  It was ultimately closed by the company.  It was

11   sub-advised by another organization, as I recall.

12   Q.  And did you remain on the Committee for about another year

13   after that during the period when the Committee did not --

14   when the Plan did not have any passive funds in its core

15   lineup?

16   A.  That is correct.  There was a lot of concern in the

17   marketplace about a drawback in the market given historical

18   bull and bear type periods.  The general feeling was that the

19   risk was still high in the market.

20   Q.  And what was your view as to whether the core lineup, as

21   it then existed, with the PCRA option on the side, whether

22   that lineup was sufficient, given that it did not have an

23   index fund included in the lineup?

24   A.  We -- I felt it was a well-diversified lineup.  It met the

25   criteria to be able to offer participants a diversified

1    portfolio.  So it was -- it was a -- it was comfortable to me

2    to stay as we were.  Did I answer all of your question?

3    Q.   I think you did.

4    A.   Okay.

5    Q.   Thank you, Ms. VanWagoner.

6         You talked -- I asked you about whether there was

7    consideration and follow through on the size of the lineup in

8    the wake of the Hewitt report.  And you kind of confirmed

9    that, yeah, there was a point in the spring where some funds

10   were removed from the lineup.

11        One of the issues that's come up in the trial

12   through testimony of a number of witnesses is that the

13   Committee considered the sophistication of the participant --

14   participants, broadly speaking, in deciding that this was a

15   good lineup length for this plan.  Would you agree with that?

16   A.   Yes.  I think I was actually quoted in a set of minutes

17   speaking to the sophistication level of the participants in

18   the Plan.  As I've seen in my career, the DC plans of asset

19   managers tends to have higher participation, pretty

20   well-diversified portfolios, and use of core options.  It's --

21   it's kind of a standalone group within the DC world because of

22   that, as opposed to a rank and file, maybe an organization

23   that has a manufacturing facility or grocery stores or

24   something like that where a good part of the participant base

25   is uncomfortable making investment decisions.

1    Q.  Did the Committee think about whether it was seeing

2    evidence of -- of investor participant confusion in

3    determining that the lineup length remained appropriate?

4    A.  I don't know that we saw any specific confusion.  There

5    were always bits and pieces of the Plan from a participant

6    base that might have been strangely invested, that Lisa Benson

7    kept us aware of outliers.  And we worked with her on

8    communication pieces and her with our recordkeeper to help

9    those folks understand whether they're taking on too much risk

10   for generally their generation or maybe not taking on quite

11   enough risk generally for their generation.

12   Q.  It's been suggested by one of the plaintiffs' experts

13   that -- excuse me, that the Committee should have undertaken a

14   survey of participants to try to measure levels of investment

15   sophistication.  Are you aware that that's a part of the

16   plaintiffs' allegations?

17   A.  I'm aware of that.

18   Q.  Have you ever seen that done?

19   A.  You know, working with as many plans as I have, I have

20   never seen a survey related to investment lineup.  I -- no,

21   it's just not -- those are fiduciary decisions that are made

22   on behalf of the participants by investment committees --

23   Q.  And more specifically, have you ever seen a survey

24   conducted in which a committee sought to determine how

25   sophisticated its participant base was?

1  A.  No.  That would be pretty condescending.

2  Q.  Did you believe that the Committee had a good read on the

3  range of sophistication of the -- of participants in the

4  fund -- in the Plan?

5  A.  Yes.  I felt we did because we had, you know, middle

6  management from throughout the organization around the table,

7  and we had a good feeling for whatever level of understanding

8  and work that they did with the investment strategies at

9  American Century.

10  Q.  There were a couple of statements made at the tail end of

11  the Hewitt report suggesting that additional consulting

12  services should be considered or could be considered, and

13  there were some proffered next steps.  Do you recall those

14  being part of the statements in the Hewitt report?

15  A.  Yes, I do.

16  Q.  What did you and what did the Committee think of those

17  suggestions?

18  A.  Well, personally, having been a consultant for a number of

19  years, I -- I expected to see next steps and some

20  recommendations that might bring them -- Hewitt some

21  additional business and a place on a retainer basis with our

22  organization.  We felt we had that skill set around the table,

23  so that really wasn't -- wasn't a concern.  So -- and the

24  Committee knew that.

25  Q.  Final topic, Ms. VanWagoner.  I want to just talk about

1  collective investment trusts a little bit more.  Did you play

2  a particular role with respect to the change from mutual funds

3  to collective investment trusts on many of the funds over time

4  while you were on the Committee?

5  A.  While I was on the Committee, yes.  We had -- in the

6  institutional business had started opening collective

7  investment trusts at the behest of our clients and then

8  proactively after that to help with fees.  And I think we've

9  been over enough on what a collective investment trust is.

10         My role within the organization was to work with our

11  trustee to set those up and work through the investment

12  guidelines and coordinate the funding of that with others in

13  the company.

14  Q.  And on the Committee, were you the person who was the most

15  closely familiar with what was being done on collective

16  investment trusts in the organization?

17  A.  Yes.  And then when Margie Morrison came on board, both of

18  us would have been equally knowledgeable there.

19  Q.  And did you effectively serve as the point person for

20  making sure the Committee became aware from meeting to meeting

21  of what mutual funds were eligible to be converted to

22  collective investment trust?

23  A.  Yes.  I would make them aware of the activity between the

24  mutual fund -- the strategies of mutual funds and the

25  collective investment trusts so that they were aware of what

1    was either coming available or was currently available.  And

2    then we would marry that against the guidelines we had about

3    asset level.

4    Q.  And did the Retirement Committee make sure that where the

5    collective investment trust was available that the Plan was

6    promptly moved into the collective investment trust vehicle?

7    A.  The -- yes.  The Committee was made aware, would decide,

8    and then the process of moving from the mutual fund to the

9    collective investment trust might take a little bit of time.

10   It wasn't an overnight type of an arrangement.  But -- but,

11   yes, I would make sure that they were aware.

12   Q.  And so now I want to just show you briefly,

13   Ms. VanWagoner, five sets of minutes where there's resolution

14   adopting the collective investment trust, just so we have

15   those in the record.

16   A.  Okay.

17   Q.  And let's start with JX 15, please, Chris at page 1.

18          This, as we can see, is the April 6, 2011, meeting,

19   correct?

20   A.  Correct.

21   Q.  And there's discussion at the bottom about the CIT options

22   available, correct?

23   A.  Correct.

24   Q.  And let's flip to the next page, Chris.

25          And we can see that among the resolutions on page

1  2 -- whoops, on page 2, are the resolutions to bring three

2  collective investment trusts in in place of their equivalent

3  mutual funds, correct?

4  A.  That's correct.

5  Q.  Let's go to JX 24, please, Chris.

6          This is the next year, June 2012.  Do you see that?

7  A.  I do.

8  Q.  And let's go to page 3, please, Chris.  Once again,

9  there's a discussion on -- at this meeting about your bringing

10  up again some of the availability of some collective

11  investment trusts.  Do you see that?

12  A.  I do.

13  Q.  And there's a resolution at the bottom that there's one

14  available collective investment trust, and the Plan moves into

15  it, correct?

16  A.  That's correct.

17  Q.  Thank you.  Let's bring up JX 29, please, Chris.

18          It's now a year later, June 2013.  Do you see that?

19  A.  Yes.

20  Q.  Let's go to page 2, please, Chris.

21          And once again, under -- in the Performance Reports

22  section, do we see that you're highlighting the criteria for

23  adding collective investment trusts to the lineup, a topic

24  that's been already discussed at this trial.  Do you see that?

25  A.  Yes, I do.

1    Q.  And let's go to the next page, Chris.  I'm not sure where

2    we're actually at.  And next page, Chris.  Let's go back to

3    page 3 for just a second.

4           All right.  So let's move on to the next one, JX 29,

5    please, Chris.

6           THE COURT:  We're on JX 29.

7           MR. FALVEY:  Oh, that was it.

8           THE COURT:  Yeah.

9           MR. FALVEY:  Sorry.  So JX 30.  Thank you, Your

10   Honor.

11          THE COURT:  Yes, sir.

12   Q.  So now we're out another year to July of 2013, correct?

13   A.  Correct.

14   Q.  Can we go to page 2, please, Chris?

15          And there's a discussion again of availability of

16   collective investment trusts.  Do you see that?

17   A.  Yes.

18   Q.  And there's a resolution to move one of the mutual funds

19   into a collective investment trust that had become available,

20   correct?

21   A.  That's correct.

22   Q.  And finally, let's go to DX 507, please, Chris.

23          MR. BOOTH:  507?

24          MR. FALVEY:  507, correct.  Page 1.

25   Q.  This is a -- an action by unanimous written consent by the

1    Committee, correct?

2    A.  Correct.

3    Q.  Probably toward the end of your tenure, correct?

4    A.  Yes.  I would say.

5    Q.  And is this the resolution that brings in all the target

6    date funds over to a CIT vehicle, correct?

7    A.  Yes.  That's correct.

8    Q.  Thanks, Chris.

9            And so that exercise that we just walked through,

10   does that show the ongoing effort by the Committee to look for

11   lower cost vehicles to move to while accomplishing the same

12   investment strategy?

13   A.  Yes.

14   Q.  Did you ever take direction from anyone outside of the

15   Retirement Committee, Ms. VanWagoner, in taking any action as

16   a member of the Retirement Committee for the Plan?

17   A.  No.

18   Q.  Were you or, in your observation, anybody else on the

19   Committee ever influenced by anyone outside the Retirement

20   Committee in decisions that you made on behalf of the Plan?

21   A.  No.

22   Q.  Did the Retirement Committee ever take into account the

23   financial interest of American Century in any way in making

24   decisions -- decisions on the Plan's behalf?

25   A.  No.

1    Q.   Whose interests did you act on in making all the decisions

2    that the Retirement Committee made?

3    A.   As I stated before, our fiduciary responsibility was to

4    the participants in this Plan.

5    Q.   Over the years that you've served on the many committees

6    that you've served on and advised committees as a consultant,

7    Ms. VanWagoner, have you had occasion from time to time to

8    compare the -- the Retirement Committee at American Century to

9    the various others that you've observed and worked with?

10   A.   Yes.

11   Q.   And what's the comparison that you have made?  What's the

12   observation that you've made?

13   A.   It's interesting because I -- I knew when I was on the

14   American Century Committee that it was a really good process.

15   We had incredible reporting preparing us for meetings.  We all

16   came to the meeting prepared to discuss the -- the topics on

17   the agenda.  There was good give and take in the Committee

18   itself.  There was -- there weren't situations where we were

19   having a push and pull by more senior people in the room.  And

20   we mindfully, thoughtfully considered the decisions that we

21   made as a group to the benefit of those participants.

22            I have used this Investment Committee process as an

23   example to other clients of mine over the years on things that

24   they might look to do better and consider going forward.  So

25   I've used it as a -- as a really good example of positive

1    process, good give and take discussion, thoughtful decision

2    making, and -- and wearing that fiduciary hat while in the

3    room.

4    Q.   Ms. VanWagoner, you've spent a number of days in the back

5    of this courtroom during this trial, haven't you?

6    A.   I have.

7    Q.   Why?

8    A.   It's been a long time since I served on this Investment

9    Committee.  And coming into this, I have to say I was a little

10   baffled because of what I just said.  I knew we had done well.

11   And I wanted to sit and listen to the testimony of others to

12   get a sense for what the real issues were here.  And it was

13   helpful for me to do that but to also reaffirm the work that

14   we did when I was on this committee from a process

15   perspective, keeping our minds on these participants, and

16   making good decisions to help them not make bad decisions.

17            MR. FALVEY:  That's all I have.  Thank you, Your

18   Honor.

19            THE COURT:  All right.  Thank you.  Mr. Specht, are

20   you up to bat?

21            MR. SPECHT:  I am, Your Honor.

22            THE COURT:  All right.  All right, sir.  Please

23   proceed.

24            MR. SPECHT:  Thank you, Your Honor.

25                         CROSS-EXAMINATION

1    BY MR. SPECHT:

2    Q.  Ms. VanWagoner, my name is Brock Specht.  We have not met

3    before, but good morning to you.  I'm going to ask you a few

4    questions to follow-up on what Mr. Falvey was talking with you

5    about.  I want to start with one of the last things that you

6    went through with him, which was the series of documents where

7    you were changing from -- I think it was mostly changing from

8    mutual fund vehicles to collective investment trust vehicles.

9    Do you recall that?

10   A.  I do.

11   Q.  Okay.  And every time you did that, you were going from an

12   American Century fund to an American Century fund, right?

13   A.  It was simply a change in vehicle for a lower cost for the

14   participants.

15   Q.  So you didn't, in any of those instances, look to see

16   whether there was a collective investment trust by T. Rowe

17   Price or some other manager that would fit in that asset class

18   and be even less expensive, correct?

19   A.  No, we did not.

20              MR. SPECHT:  Bring up DX 842, please.

21              MS. PATHMANN:  842?

22              MR. SPECHT:  Yes.

23   Q.  I think on your direct testimony, ma'am, you testified

24   that your role was in this line of authority at American

25   Century; is that right?

1    A.  As best I can fit it with this lineup, yes.

2    Q.  Okay.  So -- and not just your time on the Committee but

3    the entire time you worked there, did you always report up

4    through the chief client officer?

5    A.  I believe so, yes.

6    Q.  Okay.  And that's a -- that's a sales and distribution

7    role, right?

8    A.  Yes.

9    Q.  Or a channel, sales channel?

10   A.  Yes.

11   Q.  Okay.  I think you mentioned one of your real

12   responsibilities was cross-sell responsibilities?

13   A.  Uh-huh.  That's correct.

14   Q.  What does that mean?

15   A.  So where we had Plan sponsors in a given investment

16   strategy at American Century, I had a relationship with the

17   committees and the main person contact for these firms.  And I

18   would become aware of activities that they were doing as a

19   committee or considering going forward.  And having been a

20   consultant for a lot of years would work with them to see if

21   there was something that American Century had that might fit

22   that particular bucket.  So cross-selling is selling other

23   things into American Century.

24   Q.  Thank you.  For the various people that -- well, let me

25   ask you one question.  The chief client officer, did that

1  position change, the person that held that position change

2  during your time?

3  A.  Oh, I'm sure it did.

4  Q.  Okay.  For any of the folks that had that job, do you know

5  whether part of their compensation package depended on sales

6  goals?

7  A.  I don't know specifically.  I -- I would assume it did.

8  Q.  Okay.  Was that also true for you?

9  A.  I had -- yes.  I had compensation goals related to

10 cross-selling.

11 Q.  Okay.  And these are sales goals obviously for American

12 Century products, right?

13 A.  They hoped so.

14 Q.  All right.  DX 846, please.  So we've got the head shots

15 of all the Committee members, including yourself and everyone

16 else.  I think this is probably obvious, but I don't know that

17 we've been explicit about this in this record.  All of the

18 people that are shown here, their day job was as an employee

19 of American Century, correct?

20 A.  Yes.

21 Q.  Okay.  And so for everyone on the Committee, their

22 livelihood in some way turned on the success of the American

23 Century, right?

24 A.  Yes.

25 Q.  And that would be unusual for an investment committee of

1  any other type of retirement plan or foundation or other

2  entity, right?

3  A.  Generally, yes.

4  Q.  Okay.  None of the other boards or committees that you

5  serve on consists entirely of people whose day jobs depend on

6  the success of the investment manager that you're using, true?

7  A.  Investment committees or just boards overall?

8  Q.  Investment committees.

9  A.  Investment committees.  No, that's not true.  There are

10  investment -- there are investment committees that I sit on

11  that are made up of board members, so board members outside of

12  staff.

13  Q.  Sure.

14  A.  With staff support.

15  Q.  How did -- so -- I think I'm asking you maybe a slightly

16  different question.

17  A.  Okay.

18  Q.  Those committees have investments, right?

19  A.  Yes.

20  Q.  Okay.  None of the people that sit on those committees,

21  their livelihood for their day job, none of that turns on the

22  success of the underlying company that manages the

23  investments; is that correct?

24  A.  Well, let me be clear.  The committees that I'm talking

25  about are for foundations, so for charitable giving or church,

1    so charitable.  None of the ones I just described to you are

2    related to DC plans.  That -- because -- except for my own

3    company, DeMarche.

4    Q.  Sure.

5    A.  And we're all employees of DeMarche.

6    Q.  Sure.  You were comparing the process that the American

7    Century Committee used to some of the other committees you sit

8    on, do you recall that?

9    A.  Uh-huh.  Uh-huh.

10   Q.  And I'm simply trying to point out -- and I think you'll

11   agree with me -- that for all the other committees that you

12   sit on, there is no one on that committee whose day job

13   depends on the success of the investment manager you're using;

14   is that true?

15   A.  Not for the foundations and endowments.  That's a

16   different type of setup.  So not for those.  And for

17   DeMarche's 401(k) plan, DC plan, yes.  Those people all work

18   for the company.

19   Q.  Right.  I'm talking about the underlying investments.  Are

20   those DeMarche investments, or are you using other investment

21   managers?

22   A.  Oh, no.  We do use -- we do use a DeMarche investment, but

23   we also -- we're not an investment management firm.  We're a

24   consulting firm.  But we have a small discretionary business.

25   So our Global Tactical Asset Allocation Fund is made available

1   through our 401(k) plan to plan participants that meet the

2   criteria to invest.

3   Q.  Okay.

4   A.  That's probably more than you wanted.

5         THE COURT:  I think your point is well taken.  And

6   that's been the deal here, right, that the livelihood of

7   these -- the Retirement Committee members is all tied within

8   the success of American Century, right?

9         MR. SPECHT:  I think that's right.

10        THE COURT:  I think by now we can take -- I know

11   that everybody in the room knows that, right?  So I understand

12   what you're saying.

13        MR. SPECHT:  I'll move on, Your Honor.

14        THE COURT:  Yes, sir.

15        THE WITNESS:  Well, I would argue it's a good setup

16   because we were most familiar with the funds, the people who

17   invested the funds.

18        THE COURT:  Sure.  There's been a lot of evidence

19   that this is more advantageous in some respects --

20        THE WITNESS:  Absolutely.

21        THE COURT: -- because of your -- the understanding

22   of the Committee.

23        THE WITNESS:  Absolutely.

24        THE COURT:  But that's not what he's asking right

25   now.  Go ahead, ,Mr. Specht.

1          MR. SPECHT:  All right.  You can take those down,

2     Karla.

3     Q.  Occasionally during your time on the Committee, you'd have

4     representatives from out -- from the different funds that are

5     in the Plan come to give presentations to the Committee.  Do

6     you recall that?

7     A.  Yes,

8          MR. SPECHT:  Okay.  Bring up PX 462.  And maybe,

9     Karla, just blow up the top, the table on the top.

10         Your Honor, this -- this is a document that's in

11    evidence, but I think this is the first time we're seeing it

12    through the testimony here.  This is a chart that collects the

13    number of Lipper fund awards that were received by different

14    fund families.  This came to be because in the prior filings

15    in the case, American Century, in their filings to the Court

16    and also I believe one of their experts, relied on these

17    Lipper fund awards that had been given to American Century.

18    Some of the funds over the years have gotten some of these

19    awards.

20         THE COURT:  So this is already in evidence?

21         MR. SPECHT:  It is in evidence.  That's correct.

22         THE COURT:  Okay.

23         MR. SPECHT:  It's part of the stipulated set of

24    exhibits.

25         THE COURT:  But a witness hasn't testified about it?

1          MR. SPECHT:  Correct.

2          THE COURT:  Okay.

3          MR. SPECHT:  I was hoping I could get some brownie

4     points for something new.

5          THE COURT:  Thank you.  Mr. Specht, you've got --

6     you know, if I did a chart like this for that table and

7     brownie points, Karla's number one.  You're -- you're fighting

8     it out with Richter a little bit here.

9          MR. SPECHT:  All right.  Sounds good.

10          THE COURT:  But this is coming up, though.

11    Q.  So what this -- what this chart does it looks at

12    Dr. Pomerantz's Model Number 3, which is where he compares or

13    looks at the most highly utilized fund families in different

14    401(k) plans and collects the number of awards that those --

15          THE COURT:  So here's a question that I asked

16    Mr. Lukas to ask all future questions -- all future witnesses

17    related to the Pomerantz testimony.  You know that, right?

18          MR. SPECHT:  I do, Judge.

19          THE COURT:  Thank you.

20          MR. SPECHT:  And I think I'm not even going to go

21    where you're worried about.

22          THE COURT:  All right.  Thank you.

23    Q.  So, Ms. VanWagoner, now that I've kind of set the table on

24    all of this, you've never seen this chart before, right?

25    A.  I have not.

1  Q.  But you do -- I would assume, given your day job as an

2  investment consultant, you're familiar with the -- the names

3  that are on here.  These are other asset managers, right?

4  A.  Yes.

5  Q.  Okay.  Is it safe to say -- I'm not going to go through

6  the whole list one by one.  But is it safe to say that the

7  Committee never had representatives from any of these asset

8  managers come in and give presentations at any of your

9  meetings?

10  A.  During my tenure, no.

11  Q.  And if we're just looking at the number of awards given --

12  and I'm not asking you to testify about those awards, but it

13  looks like a number of the -- the names on this list, like

14  American Funds, Fidelity, PIMCO, T. Rowe Price, they seem to

15  be the ones that are getting most of the awards.  Do you see

16  that?

17  A.  I see that their numbers are higher than others.

18  Q.  Okay.  And would you, given your knowledge of these firms,

19  agree that those would be the ones that you would typically

20  expect to see winning awards from an organization like Lipper?

21  A.  I don't know what these awards are based on --

22  Q.  Sure.

23  A.  -- so I don't know how they're being categorized into this

24  table.  So, I mean, I would expect to see all these names,

25  including American Century --

1    Q.   Sure.

2    A.   -- listed -- listed here.  They all have standout

3    investment strategies that would -- if that's what the

4    criteria is.  I don't know if it's growth in the strategy or

5    perform- -- I'm not sure what the Lipper Awards -- this chart

6    is based on.

7    Q.   Okay.  But these are -- I think you said these are the

8    companies that have standout investment strategies.  Is that

9    what you said?

10   A.   I'd say that a number of these companies on this list have

11   competitive investment products, including American Century.

12   Q.   Fair enough.

13          Karla, you can take that one down too.  Let's go to

14   JX 12.  And, Karla, can you blow up -- well, before we go

15   there.

16          Just because we all have seen JX 12 a number of

17   times, I am not sure if you've seen it, ma'am.  This is the

18   minutes from the December 13, 2010, meeting of the Investment

19   Committee.  Do you see that?

20   A.   Yes.

21   Q.   And you are familiar with this document, right?

22   A.   From this page, yes.

23   Q.   Yeah.  And my assumption is you've reviewed this in

24   preparing to testify today; is that fair?

25   A.   That's fairly possible, yes.

1  Q.  Okay.  Now, Karla, can you blow up this?

2        So on your direct testimony, you talked about a

3  conversation that the Committee had in response to the Hewitt

4  report about passive and active funds.  Is this the

5  conversation you were talking about?

6  A.  Can I see the date again, please?

7  Q.  Sure.

8        Can you back it up, Karla?

9  A.  This date is after the presentation was made to us --

10 Q.  Okay.

11 A.  -- that year.

12 Q.  So is this --

13 A.  The Hewitt presentation was made -- the Hewitt

14 presentation was made to us prior to this meeting, as I

15 recall.

16 Q.  Okay.  The conversation that you testified about on

17 direct --

18 A.  Yeah.

19 Q.  -- is that a different conversation from the one that's

20 captured in these minutes?

21 A.  I don't remember the direct question, but I recall having

22 conversations about active and passive as part of the

23 follow-up with the Hewitt presentation.  But it was

24 considerations in other meetings as well.  I believe we had --

25 we did.  We had a S&P 500 Index Fund in the plan for a period

1    of time under my tenure.  I don't recall that it was very well

2    utilized, though.

3    Q.  Do you recall any conversation from your time on the

4    Committee other than the one captured in these minutes that

5    involved a discussion of adding passive funds to the Plan

6    lineup?

7    A.  Not specifically to adding passive funds, but we were

8    aware on a quarterly basis what passive funds were doing

9    because the indexes that the fund -- that American Century

10   funds were being compared to were passive funds ultimately.

11   So at a, you know, performance criteria level, but not

12   specifically about adding passive to the core lineup, being

13   very aware and talking amongst ourselves that the passive

14   allocations that participants felt they needed and wanted they

15   could get through the brokerage window.

16   Q.  So other than this, no other conversations about adding a

17   passive fund to the Plan lineup that you recall?

18   A.  Not specifically.  Not during my tenure.

19   Q.  All right.  All right.  We're going to blow that paragraph

20   up again, Karla.  Thank you.

21            So this set of minutes refers to having a discussion

22   about a philosophical position on active -- on passive and

23   active funds and then the Committee's views on Hewitt's

24   comments on passive and active funds.  Do you see that?

25   A.  I see that, yes.

1   Q.  Okay.  Now, the reason the Committee is having that

2   philosophical conversation is that active -- American Century

3   is an active management organization almost exclusively at

4   that time, right?

5   A.  I don't think that's the reason the conversation was being

6   had.  We were thoughtfully considering the Hewitt presentation

7   and the information and education that was brought to us by

8   them.  And that probably initiated the philosophical

9   discussion on active versus passive and the discussion that

10  you're referencing here.

11          To your direct question, yes, American Century is an

12  actively managed investment manager.

13  Q.  So are you saying that the -- the reason that the

14  Committee was having this conversation was not the fact that

15  American Century is an active management organization at this

16  time almost exclusively?

17          MR. FALVEY:  Objection.  Misstates, Your Honor.

18          THE COURT:  Sustained.

19  A.  What does that mean?

20  Q.  Do you have a copy of your deposition in front of you?

21  A.  I'm sure I do.

22  Q.  All right.  It should be attached to that binder there.

23  Can you turn to page 32 of the deposition?

24  A.  Sure.

25  Q.  Are you on page 32?

1    A.  Hang on.  Hang on.  Hang on.  It's page numbered

2    differently.  Okay.  Yes.

3    Q.  All right.  And just to orient you, do you see at the top

4    of the page, you're talking -- talking about the Hewitt

5    presentation on line 6?  Do you see that?

6    A.  Yes.

7    Q.  Okay.  And then if you go down to the bottom of the page

8    on line 23, you're asked the question:  And why did it -- why

9    did you have that conversation as it related to passive

10   investing?

11          And your answer was:  American Century is an active

12   management organization at that time, almost exclusively.

13          Did I read that correctly?

14   A.  You did read that -- you did read that correctly, but the

15   context of the conversation is shown on this page to be deeper

16   than that specific question.  The question prior included.

17   Q.  You're talking about the question that starts at line 10?

18   A.  Eighteen.

19   Q.  Okay.  Line 18:

20          "Q.  Sure.  Were there conversations then about this

21   issue about it being only American Century branded funds and

22   being offered in the core lineup?"

23          Your answer was:

24          "A.  As it related to passive investing, yes."

25          And then the question is:

1     "Q.  And why did -- why did you have that

2   conversation as it related to passive investing?"

3          And the answer was:

4          "A.  American Century is an active management

5   organization at the time almost exclusively."

6          Did I get that all right?

7   A.  That is correct.  It's not really an answer to the

8   question, though.

9          THE COURT:  Okay.  We're going to move on.  Move on,

10  Mr. Specht.  Thank you.

11         MR. SPECHT:  I'm done.

12  Q.  Safe to say that's one of the things you talked about as

13  part of this conversation, the fact that American Century is

14  an active management firm?  Would you agree with that?

15         MR. FALVEY:  Objection.  Asked and answered.

16         THE COURT:  I think -- well, I'm going to allow that

17  question, I think.  So safe to say that's one of the things

18  you talked about as part of this conversation, the fact that

19  American Century is an active management firm?  Was that part

20  of your conversation?

21         THE WITNESS:  I don't recall that it was

22  specifically part of the conversation.

23         THE COURT:  Everybody in that room knew you were an

24  active management firm?

25         THE WITNESS:  Yeah.  It was a known fact.

1          THE COURT:  Otherwise, they wouldn't be in that room

2     if they didn't understand what the work of American Century

3     is -- or this Committee wasn't comprised of anyone who didn't

4     understand what American Century did?

5          THE WITNESS:  That is correct.

6          THE COURT:  And your position is that's what made us

7     great --

8          THE WITNESS:  Yeah.

9          THE COURT:  -- because you understood not only the

10    funds but what went into the investments that made up these

11    funds, true?

12         THE WITNESS:  Absolutely.

13         THE COURT:  All right.  Please move on.

14    Q.  And to follow-up on what -- the point the judge just made,

15    one of the reasons that a passive option or additional passive

16    options weren't added at that time was because American

17    Century had a culture of active management; is that true?

18         THE COURT:  Yeah.  I'm going to answer that for her.

19    They had a culture of active management and -- and I've heard

20    nine days of evidence.  I'm sorry to be short with you,

21    Mr. Specht, but you have got -- let's go down the road.  They

22    were active management.  The defense -- there's no one

23    contesting that part.  And -- and I'm going to find, even if

24    they contest it, it's an active management firm.  So that's

25    going to be in my order, okay?  I promise you.  I'll put that

1    in the order.  Please -- please move on down the road so I can

2    write that order one day.

3             MR. SPECHT:  Believe it or not, I'm making quite a

4    bit of progress in my outline, Judge.

5             THE COURT:  Okay.  God bless you.

6    Q.  All right.  Let's move to the topic of stable value.

7    During your tenure on the Committee, do you recall there being

8    any discussion about adding stable value fund to the plan?

9    A.  I don't remember specific discussion about stable value

10   personally.  So -- sorry, I can't help you there.

11   Q.  Fair enough.

12   A.  I mean, I -- it's hard to separate what you know now with

13   what you knew then.

14   Q.  I understand.

15   A.  And the concerns about stable value at that time in the

16   industry itself --

17   Q.  All right.

18   A.  -- were very high.

19   Q.  Your understanding is that there was a stable value in the

20   Plan at one point in time, right?

21   A.  Yes.

22   Q.  Okay.  And that was an American Century stable value

23   product, right?

24   A.  I -- I think I remember that it was sub-advised by

25   JPMorgan --

1   Q.   It was branded?

2   A.   -- at one point in time and branded American Century, yes.

3   Q.   Branded American Century.

4   A.   We had a couple funds back there that were branded

5   American Century --

6   Q.   Sub-advised?

7   A.   -- and outsourced and sub-advised, yes, by JPMorgan.

8   Q.   Okay.

9   A.   And Northern Trust, yeah.

10  Q.   New topic.  Revenue sharing.  You're familiar with that

11  topic, correct, or that concept?

12  A.   I am.

13  Q.   Okay.  The Court's heard about revenue sharing, but just

14  to make sure we're all on the same page, revenue sharing

15  refers to the practice where the investment manager will share

16  a portion of the investment management fees that are charged

17  on a mutual fund with a service provider, correct?

18  A.   Yes.

19  Q.   Typically, the recordkeeper?

20  A.   That's generally what that -- what that means, yes.

21  Q.   Typically, with the recordkeeper, right?

22  A.   Well, it depends.  There are plans that rebate that back

23  to the plan participants, but it goes back through the

24  recordkeeper.  And at the end of the day, the recordkeeper is

25  going to be paid by somebody to do their job.

1  Q.  So sort of just from a mechanical standpoint, the -- the

2  participants pay a fee on the mutual funds in the Plan, right?

3  A.  They pay a fee -- well, we're going to get into a little

4  gray territory for me because my expertise is in different

5  spots.  This is more a Lisa Benson question.

6           THE COURT:  I don't want you -- I don't want you to

7  answer any questions you don't know the answer to.

8           THE WITNESS:  Okay.

9  A.  Ask the question again.

10  Q.  Do participants in a Retirement Plan who are invested in

11  American Century mutual fund, pay a fee on that mutual fund?

12  A.  Yes.  Participants of -- or investors in mutual funds pay

13  a fee --

14  Q.  Okay.

15  A.  -- on the mutual funds.

16  Q.  And when revenue sharing comes into play, revenue sharing

17  would be a portion of that fee that's paid by the participant

18  is shared by the fund manager with some other entity, right?

19  A.  I'm not -- help me understand where you're going with this

20  question because I'm not really sure where you're at.

21  Q.  Yeah.  Maybe it's easier to put a concrete example here.

22  A.  Okay.

23  Q.  So JPMorgan was the Plan's recordkeeper when you joined

24  the Committee, correct?

25  A.  That's correct.

1    Q.  And JPMorgan received revenue sharing payments from the

2    American Century mutual funds that were in the Plan, right?

3    A.  That's what I understood.

4    Q.  And that's what JPMorgan was paid for its recordkeeping

5    services?

6    A.  I don't know if it was entirely or partially, so I

7    couldn't -- I know there was -- like I said, the recordkeeper

8    is going to get paid somehow.

9    Q.  Okay.  For the time that you were on the Committee, do you

10   recall there ever being any discussion about revenue sharing?

11   A.  Insofar as we reviewed the dollar figures associated to

12   expenses of the Plan, yes.  But, again, we're getting a little

13   out of my wheelhouse.  I depended strongly on those that

14   worked directly with the recordkeeper direct -- you know, had

15   those relationships directly.

16   Q.  Let's talk a little bit about the Watch List.

17               Karla, could you bring up JX 001?

18               So these are the minutes from the May 7, 2009,

19   meeting of the Retirement Committee.  You were on the

20   Committee at that point in time, correct?

21   A.  Yes.

22   Q.  And I believe you were absent --

23   A.  But I was absent from this meeting, yes.

24   Q.  You anticipated where I was going to go.  You were absent

25   from this meeting, that's right.  Typically, you would have

1    reviewed these minutes at some point, correct?

2    A.  Yes.  At some point, I would have reviewed them.

3    Q.  And usually at the next meeting, the first order of

4    business, or one of the first orders of business is to review

5    and approve the minutes from the prior meeting, right?

6    A.  Yes.

7    Q.  Okay.  Karla, could you go to page 2?  We have a heading

8    here, Watch List.  And if we could just blow that up.

9            So there's a discussion here that says that

10   Mr. Bouffard led the group through a review of the Watch List.

11   And then it goes down a little bit and said -- says,

12   Mr. Bouffard noted that a prototype Watch List using

13   information ratio is being considered by American Century and

14   will be proposed to the mutual fund directors later this year.

15   He suggested the Retirement Committee consider following the

16   lead of the directors if and when the firm switches, which

17   would mostly be effective January 1st, 2010.

18           Do you recall finding out about this proposal?

19   A.  I recall -- well, I can't say I recall reading these

20   minutes, but I feel confident that I read the minutes.

21   Q.  Okay.  And is it your understanding that what is being

22   described here is that the mutual fund company is adopting a

23   new methodology for its Watch List?

24   A.  Yes.  That's what it says.

25   Q.  Okay.  And Mr. Bouffard's proposal is that if the mutual

1  fund company goes along with that change, we should follow

2  suit?

3  A.  Yes.  I believe -- I recall conversations -- not in this

4  meeting because I wasn't in this meeting -- about if we're

5  going to set the bar higher for our investment professionals

6  to be compensated on performance and measure them against this

7  type of a benchmark that it was probably a good idea for our

8  Investment Committee to raise the bar as well.

9  Q.  So you believed that this was going to set the bar higher,

10 this change?

11 A.  I think it makes the bar more specific --

12 Q.  Okay.

13 A.  -- in this measure only, one of many considerations when

14 looking at a fund.

15 Q.  But this is something that originated not with the

16 Retirement Committee but with the mutual fund company, right?

17 A.  You know, it was pretty common in Defined Contribution

18 Investment Committee policies for and -- and mutual fund

19 companies, for that matter, for investment -- for information

20 ratios to be a consideration of performance.  And consultants

21 were proposing the use of this measure as well, pretty

22 strongly.

23 Q.  I probably could have asked you a more specific question

24 there.  This notion of switching the Watch List methodology is

25 something that originated with the mutual fund company, not

1    the Retirement Committee, correct?

2    A.  I believe it was a --

3           MR. FALVEY:  Objection.  She testified she wasn't at

4    the meeting, and I -- I think it lacks foundation.

5           THE COURT:  If you know the answer.  I -- yeah.

6           THE WITNESS:  I can only go on what's written.

7           THE COURT:  She -- but she testified she read the

8    minutes, I think, Mr. Specht, and that that was part of her --

9    part of your responsibilities when you're serving on the

10   Retirement Committee is if you missed a meeting, you'd read

11   the minutes, right?

12          THE WITNESS:  Read the minutes.  Yeah.

13          THE COURT:  Okay.  I'm going to allow that question.

14   A.  Could you say it again?

15   Q.  Yeah.  So the -- the proposal to change the methodology

16   for the Watch List that we're discussing here, that originated

17   with the mutual fund company, not the Retirement Committee,

18   correct?

19   A.  Yes.

20   Q.  All right.  Let's go to PX 219.

21          So we were just in May 2010 -- 2009, and now we can

22   see here we have the July 1st, 2009, minutes?

23   A.  Yes.

24   Q.  And you were at this meeting, correct?

25   A.  That's correct.

1  Q.  And, Karla, if you could back out.

2          The next item here is approval of minutes.  And it

3  looks like they were reviewed and approved?

4  A.  Yes.

5  Q.  So that's the set of minutes we were just looking at,

6  right?

7  A.  I believe so, yes.

8  Q.  Okay.  And then -- could you go back out to the Watch

9  List, which is at -- you can do the whole -- yeah, that whole

10  thing.  Okay.  So under the Watch List here, we've got some

11  more discussion, I think, on this topic of changing the

12  methodology.  It says, Mr. Bouffard mentioned that discussions

13  are still going on within American Century regarding a

14  prototype Watch List, which uses information ratios.  If the

15  American Century boards move to the new criteria, Mr. Bouffard

16  will likely recommend that the Retirement Committee adopt this

17  approach, as well.

18          Do you see that?

19  A.  I do.

20  Q.  And then it goes on.  It looks like you had a question.

21          It says, In response to a question by Ms. VanWagoner

22  asking for a primer on the new Watch List criteria,

23  Mr. Bouffard indicated he will provide materials to the

24  Retirement Committee members and will provide training to the

25  members on the proposed approach at the next Retirement

1   Committee meeting.

2           Do you see that?

3   A.  I do.

4   Q.  And so it's possible that in connection with this meeting

5   that this is the first time that you're learning about that --

6   this new proposal; is that fair?

7   A.  No, because I would have read the minutes of the last

8   meeting.

9   Q.  Oh, sometime between the two meetings then?

10  A.  Most likely, yes.

11  Q.  Okay.  Do you happen to know whether this proposal to

12  change the methodology of the Watch List was something that

13  Mr. Bouffard was working on in his day job at American

14  Century?

15  A.  I don't know specifically.

16  Q.  Could we go to JX 6, Karla?

17          So now we've got the materials for the June 30,

18  2010, meeting.  And if we go to page 19.

19          Is this the primer that Mr. Bouffard said he was

20  going to give on how this new Watch List material -- criteria

21  would work?

22  A.  I see the document says page 1 of 2.  Is there another

23  page following it?

24  Q.  Oh, sure.  I'm not suggesting this is the entire thing.  I

25  guess my question is, is this part of it, if you recall?

1  A.  This looks familiar, yes --

2  Q.  Okay.

3  A.  -- for that purpose.

4  Q.  Okay.  Karla, can you blow up the top half?

5        So the -- the new proposed benchmark methodology

6  that's being described here, it says, The Investment Team

7  compensation was recently changed to be "benchmark oriented

8  and peer group aware" from previously being "peer group

9  oriented and benchmark aware".

10       Is that consistent with your recollection of how

11 this Watch List methodology was changing?

12 A.  I wasn't in the meetings for the changing of the company's

13 methodology, but as it relates to this being shared with us in

14 the Investment Committee, this is how it was shared, yes.

15 Q.  Okay.  Your understanding was that the proposal was to

16 switch the benchmark methodology that the Retirement Committee

17 uses to monitor the Plan so that it would align with the

18 methodology that the Investment Team compensation used; is

19 that fair?

20 A.  I don't know that I would go that far.  I knew that we

21 were changing from a -- changing it to include an information

22 ratio criteria.  How that ended up impacting Investment Team

23 compensation was just algebra.

24 Q.  Okay.  So your only knowledge of that is just what would

25 have been represented in this document?

1  A.  Yes.

2  Q.  Okay.  And earlier, you said that this was a heightened

3  standard or something along those lines.  Do you see the third

4  bullet point here says, The proposed methodology is similar in

5  construct and in its results to the current criteria?

6  A.  Yes.  I think I corrected my statement to say it was just

7  a more specific set of rails because of the breakdowns of the

8  information ratio, and the Watch List criteria associated to

9  it.

10  Q.  Karla, can you back out and go to the box below?

11          And we've talked about this, but the -- this is

12  the -- on the right-hand column here, this proposed Watch List

13  benchmark methodology --

14  A.  Uh-huh.

15  Q.  -- that's the methodology that was ultimately adopted by

16  the Committee, correct?

17  A.  Without having you drag out the documents, I'm going to

18  assume you're correct.

19  Q.  Okay.

20          MR. FALVEY:  Excuse me.  I'm sorry to interrupt,

21  Your Honor.  Can I just ask to see the full document, because

22  I'm just trying to follow the testimony.  Can I just go back

23  to what the full exhibit number is?

24          THE COURT:  Would you show the whole document?

25          MR. SPECHT:  Happy to do so, Your Honor.

1          THE COURT:  The other second page?

2          MR. FALVEY:  Thank you, Your Honor.

3          THE COURT:  All right.

4          MR. SPECHT:  Great.  Can we go back to page 19?  If

5     you could blow up the box.

6     Q.  And I think the record will show that this is the Watch

7     List methodology that was used by the Retirement Committee

8     subsequent to this time frame.  My question for you, ma'am, is

9     it consistent with your recollection that the Committee used a

10    Watch List methodology that calculated information ratio based

11    on gross performance?

12    A.  That's what this says.  I'd have to see the Investment

13    Policy Statement as it was amended to verify that.  But

14    that's -- it says proposed, so I don't know if that was the

15    final version or not.

16          THE COURT:  You've got about 13 minutes until lunch

17    recess.

18          MR. SPECHT:  Thank you, Your Honor.

19    Q.  Let's take a look at JX 54.  This is the Investment Policy

20    Statement as of -- or amended as of August 1, 2010.

21    A.  Uh-huh.

22    Q.  And can we have page 11, please?  And maybe you can just

23    blow up this top part.

24          Okay.  So the Investment Policy Statement says that

25    monitoring should utilize the criteria that were the basis of

1    the investment selection decision.  If a core investment

2    option meets the following criteria, it will be subject to

3    more frequent monitoring ("Watch List") by the Retirement

4    Committee.

5              And here, do you see information ratio is calculated

6    using gross performance?

7    A.  Yes.  That's correct.

8    Q.  Okay.

9              THE WITNESS:  Sorry, Judge.

10             MR. SPECHT:  That's okay.

11             THE COURT:  You're fine.

12             MR. SPECHT:  And now if we could go back, Karla, to

13   the one we were just on JX 6, page 19.

14             THE COURT:  You know, Ms. VanWagoner, I -- I want

15   you just to tell us what you know, not what somebody thinks

16   you should know or -- so your --

17             THE WITNESS:  Sure.

18             THE COURT:  -- you don't -- your apology is not

19   necessary.  So you're doing fine.  Thank you.

20   A.  I would add that it was one of other criteria for Watch

21   List in the document you just previously showed us.  There

22   were other criteria related to Watch List.  It isn't just

23   related to information ratio.  I believe I saw in there there

24   was some criteria about discretion for the Retirement

25   Committee regarding things like philosophy, process, people,

1    right?

2    Q.   Yeah.   Let me just read it, and you tell me if this sounds

3    familiar.

4              At the discretion of the Retirement Committee, an

5    option may be added to the Watch List for people, process,

6    and/or performance reasons.

7              Is that what you're referring to?

8    A.   That's correct.

9    Q.   Okay.

10   A.   The information ratio was a tool.

11   Q.   I'm not suggesting anything other than that.

12   A.   Okay.

13   Q.   Okay.   Gross performance refers to the performance of the

14   fund before the expense ratio is applied, right?

15   A.   Yes.   Before the expense ratios for the various share

16   classes are applied to the funds, correct.

17   Q.   Okay.   And it makes sense to tie Investment Team

18   compensation to gross performance because the Investment Team

19   doesn't have any control over the expenses, correct?

20   A.   I don't know.   I don't have -- I'm not part of those

21   conversations.

22   Q.   Do you know who said --

23   A.   But fundamentally.

24   Q.   Do you know who at American Century determines what the

25   expense ratio is going to be for each of the funds?

1   A.  Do I know how they do that?

2   Q.  No.  Do you know who is responsible for that?

3   A.  Who is responsible.  I do not know who is responsible

4   specifically.

5   Q.  Okay.  Fair enough.  It's fair to say that an investor in

6   a mutual fund would never realize gross performance as their

7   return on the investment, right?

8   A.  I'm sorry.  I don't agree with that statement.  An

9   investor could very possibly earn well beyond the gross

10  performance because of performance itself.  I mean, funds are

11  supposed to earn their investment fees, right, and over time

12  outperform.

13  Q.  Sure.  But they're never going to get -- they're always

14  going to have a fee charged, right?

15  A.  There is a fee for investment management business, yes.

16  Q.  Okay.  Yes.  So when you're measuring performance based on

17  gross performance, you're not actually measuring the return

18  that an investor gets who invests in one of these funds?

19  You're measuring the return before the fees are deducted,

20  right?

21  A.  Well, that's -- I -- you know, I'm going to get lost in

22  the language that you're using versus the language that I'm

23  using.

24  Q.  If there's a better way, better language to use, help me

25  out.

1    A.   So investors pay a fee for an investment vehicle.  Much of

2    the time, the mutual funds -- or all the time, mutual funds,

3    it's taken out of the return before the return is recorded, or

4    reported rather to that investor.

5    Q.   The investor always --

6    A.   In the institutional world, right?

7    Q.   Right.  The investor always has to pay that fee?

8    A.   Well, I don't know that the investor always pays the fee.

9    Sometimes the plans pay the fee and --

10   Q.   How about this.

11   A.   Yeah.

12   Q.   No one gets an American Century fund, a fee-free American

13   Century fund, right?

14   A.   I believe there were money market funds that --

15   Q.   Ah.

16   A.   -- American Century waived the fees on related to those

17   funds.  So, amazingly, I'm going to have to say no.

18   Q.   Aside from the money market funds, no one gets a fee-free

19   investment in an American Century product, right?

20   A.   Generally not.

21   Q.   Okay.  So the investors do pay -- or do get the net

22   performance, not the gross performance on their investment,

23   right?

24   A.   Yes.  Many times which outperform the fee and the

25   benchmark.  If -- what are you comparing it to?  Just gross to

1   net?

2   Q.  I'm not comparing it -- I'm not comparing it to anything.

3   I'm just trying to make this point clear on the record here

4   that the investors -- the performance that they actually

5   realize is the net performance of the fund --

6   A.  Yes.

7   Q.  -- not the gross performance?

8   A.  Yes.

9   Q.  You would agree with that, right?

10  A.  I would agree with that.

11  Q.  Okay.  Let's go back to JX 54.  This is the Investment

12  Policy Statement again.  And, Karla, can you take us to page

13  15, Appendix A?

14          Do you see here listed the core investment options

15  in the Plan and then the index or peer group for each of those

16  options?

17  A.  Yes.

18  Q.  Okay.  And then flip ahead, Karla, to the last page.  Can

19  you blow up the box on the bottom?

20          So we're looking at the change in methodology going

21  from -- or being a benchmark methodology in connection with

22  the change to the -- the way the benchmark was being

23  addressed.  Here, we also have a reference to a peer group

24  comparison rather than a -- versus a passive benchmark.  Do

25  you see that?

1  A.  I do.

2  Q.  So in some instances, you're looking at comparison to a

3  benchmark.  In other instances, you're looking at comparison

4  to a peer group.  Is that fair?

5  A.  That's what this says, yes.

6  Q.  Okay.  And this peer group methodology, it says that the

7  peer groups chosen by the Retirement Committee are the same

8  peer groups used by American Century Investment Management's

9  (ACIM) Investment Oversight Committee.

10         Do you see that?

11 A.  I do.

12 Q.  So whether we're talking about the benchmark methodology

13 or the peer group methodology, in both instances, the

14 Retirement Committee is relying on methodologies that the

15 mutual fund company has developed; is that fair?

16         THE COURT:  Well, it said --

17         THE WITNESS:  I'm trying to --

18         THE COURT:  It says Morningstar and Lipper.

19         THE WITNESS:  Yeah.  I mean, if you look on, it says

20 they're based on Morningstar and Lipper universes.  But in

21 some cases, it might be adjusted for some -- I mean, I'm --

22 Q.  Right.  I'm not suggesting that they're generating all

23 that data themselves.  They're going out and getting it from

24 other sources like Morningstar and Lipper, right?

25 A.  Right.

1  Q.  And by "they," I'm talking about the mutual fund company,

2  right?

3  A.  Yes.

4  Q.  Okay.  And to the extent that the Retirement Committee is

5  relying on these -- this peer group comparison, you're using

6  the same peer groups used by the mutual fund company, right?

7  A.  Not without having considered it as an appropriate peer

8  group.  The Retirement Committee would have had to have that

9  conversation.  There's no way that we would have just outright

10  adopted something that we didn't believe --

11  Q.  Okay.

12  A.  -- was a reasonable measure for a peer group.

13  Q.  Whether it's the peer group methodology or the benchmark

14  methodology, in both -- under both of those methodologies,

15  you're using the same metric that the mutual fund company

16  uses, right?

17          MR. FALVEY:  Objection, asked and answered.

18          THE COURT:  Overruled.  I mean, this is -- I'm not

19  sure -- this is very hair splitting, but are you just asking

20  where she got the -- where she -- if she knows where they got

21  this information or --

22          MR. SPECHT:  No.  I'm just trying to establish the

23  point that the metrics that the Retirement Committee is using

24  are the same metrics that the mutual fund company is using for

25  the Watch List.  That's all.

1          THE COURT:  Do you agree with that?

2          THE WITNESS:  I think they're similar from an

3     algebraic perspective looking at performance.  I don't know

4     what the mutual fund company specifically did as it related to

5     the qualitative pieces, where the Investment Committee had a

6     mandate to also look at the qualitative pieces of the

7     investments as they related to this Plan for the participants.

8          THE COURT:  And you also just testified,

9     Ms. VanWagoner, that there's that little tail related to

10    information ratios, right?

11         THE WITNESS:  Yeah.

12         THE COURT:  You're looking at other things as

13    well --

14         THE WITNESS:  Absolutely.

15         THE COURT:  -- in your role other than information

16    ratios and the Watch List.  But that's all part of the metrics

17    that the Committee's tasked with --

18         THE WITNESS:  Right.  It's --

19         THE COURT:  -- in the evaluation of this core

20    investment option?

21         THE WITNESS:  Right.  The investment -- the

22    information ratio was the tool that was used.  Peer groups are

23    another tool that is used in establishing --

24         THE COURT:  Yeah.

25         THE WITNESS:  -- Watch List criteria and longevity

1    and whatnot.  But also looking at, you know, the people that

2    are investing those assets, those individual portfolio teams,

3    their process, any changes they're in.  And, most critically,

4    the market itself and what was happening in the market related

5    to that particular fund versus its basic measures.

6              THE COURT:  Mr. Specht, sir, you got about two

7    minutes.

8    Q.  We talked -- or you talked a little bit on your direct

9    about the sophistication of the Plan participants.  Do you

10   recall that?

11   A.  Yes.

12   Q.  You would agree that not every single person in the Plan

13   is a sophisticated investor, right?

14   A.  Of course.

15   Q.  Can we take a look --

16   A.  But you don't -- you don't manage a DC plan based on the

17   lowest common denominator.  You base your decisions on the

18   participant group as a whole and the characteristics of that

19   participant group.  American Century's Retirement Plan was

20   focused on asset manager employees.  They were very

21   knowledgeable about their strategies --

22   Q.  Sure.

23   A.  -- day in, day out.

24             THE COURT:  Okay.  Okay.  Please proceed.

25             MR. SPECHT:  I'm about to get into a new topic.

1    Should we take a recess?

2              THE COURT:  Okay.  We'll take a lunch recess for one

3    hour.  Thank you all.

4         (Recess at 11:59 a.m. until 1:01 p.m.)

5              THE COURT:  All right.  Mr. Specht, do you have any

6    more questions?

7              MR. SPECHT:  A few more.

8              THE COURT:  A few more.

9              MR. SPECHT:  A few more.

10   Q.   Okay.  Can we go to JX 16, page 33.

11             Ms. VanWagoner, you were asked about this document

12   in your direct testimony.  Do you recall that?

13   A.   Yes.

14   Q.   This is the Expense -- Expenses By Investment Options for

15   the Plan as of February 28, 2011, right?

16   A.   Yes.

17   Q.   And just to make sure we're on the same page with how this

18   works, what's going on here is that for each investment option

19   in the Plan, we're being told what the expense ratio is for

20   that option, and then we're giving a percentile rank within

21   the peer group for that investment option, right?

22   A.   Correct.

23   Q.   And there's an indication of what the peer group is for

24   each one of those on the far right-hand column?

25   A.   Yes.

1  Q.  And I think you said in your direct testimony that you --

2  at the time you were receiving these reports, you understood

3  that the peer groups that were included here included all

4  share classes?

5  A.  That's correct, as footnoted at the bottom of the page.

6  Q.  As footnoted at the bottom.  Right.  Okay.  And so the

7  effect of including all the share classes, we've heard quite a

8  bit of testimony about this, is that the more expensive share

9  classes -- and by more expensive, I mean more expensive than

10 the institutional share classes that we see reflected here --

11 all of those share classes are included in the universe -- the

12 peer universe, right?

13 A.  To my understanding, yes.

14 Q.  And so that's going to have a tendency to make these

15 inexpensive institutional share classes that American

16 Century's listing here, it's going to have a tendency to make

17 those look better from a cost perspective, right?

18 A.  Not necessarily.  I mean, when you're looking at all share

19 classes, which is a standard thing to do, it's -- it would

20 definitely pile the cheaper ones to the top of the list and

21 the more expensive ones to the bottom of the list so --

22 Q.  Fair enough.

23 A.  But it depends on the asset class too.

24 Q.  Okay.  And you said it was a standard thing to do, but

25 it's actually called out in the footnote, right?

1    A.   Yes.

2    Q.   Okay.  So it wasn't so standard that it didn't have to be

3    explained in the footnote?

4    A.   Well, that's standard practice to source your data and the

5    compilation of the data.

6    Q.   Uh-huh.  But the footnote -- it could have been done

7    without all share classes, right?  That's what the footnote is

8    telling you is that there's two different ways to do this and

9    here's how we did it?

10   A.   No.  It's --

11             MR. FALVEY:  Objection.

12   A.   -- just telling you that all share classes --

13             THE COURT:  Sustained.  It kind of sounds like we're

14   arguing about this --

15             MR. SPECHT:  Sure.

16             THE COURT:  -- Mr. Specht.

17             MR. SPECHT:  Fair enough.  I'll move on.

18   Q.   So this chart does not tell you, as a member of the

19   Committee, how any of these American Century funds, the

20   institutional share classes of those funds, would compare to

21   the institutional share classes of the peer groups, correct?

22   A.   Solely to institutional share classes, no.

23   Q.   Okay.  And this is from the time frame before we've got R6

24   or CITs.  But when those come in later, the same would be

25   true, this same kind of chart wouldn't tell you how the R6

1   share class cost for the American Century fund would compare

2   to the R6 share class cost for the peer groups, right?

3   A.   I don't know what they were using for peer group

4   comparisons when they had R6.

5   Q.   That's after your time?

6   A.   I think it was.  I'm not sure.

7   Q.   Okay.

8   A.   I'd have to look at data.

9   Q.   So -- but at least for your time on the Committee, that's

10  the case, right?

11  A.   That the peer groups were all share classes, that's

12  correct, which was a standard practice in not only investment

13  management but in consulting.

14  Q.   The costs for institutional share classes are public

15  information, right?

16  A.   Yes.

17  Q.   So, for example, we started out your -- my questioning of

18  you was this chart that had some of these other fund families.

19  You can go on the websites and find out what the costs are for

20  their, for example, Large Cap Growth Fund, institutional share

21  class?

22  A.   Yes.  You can research all of that information.  The

23  problem is that there are hundreds and hundreds of share

24  classes that come up in these data basis.  I believe this was

25  Lipper.  Yeah.  And deciphering that -- I think Mr. Bouffard

1  had mentioned -- is just a herculean task.

2  Q.  Did you ever try to do that?

3  A.  No.  I never tried to --

4  Q.  Did you ever ask anyone at the time to try to do that?

5  A.  No.

6  Q.  Okay.  But if you wanted to just know, hey, how do we

7  compare to Dodge & Cox, Fidelity, PIMCO, T. Rowe Price, you

8  could have looked those up pretty easily, right?

9  A.  It was all public data.

10  Q.  Could we go back to the first page, Karla?

11          I just want to get a sort of -- give everyone a lay

12  of the land in terms of what's included in this report.  So

13  this is the report, the materials that were included for the

14  meeting that occurred on April 6, 2011, right?

15  A.  Yes.

16  Q.  Okay.  And, Karla, I just want to flip through the first

17  two pages.

18          So we start out with an agenda.  And then we've got

19  the minutes from the prior meeting, right?  The draft minutes?

20  A.  Yes.

21  Q.  And then we've got, it looks like, some draft minutes from

22  a special meeting?

23  A.  Yes.

24  Q.  And then -- keep going, Karla.

25          Then here we've got the Watch List -- listing of

1    what's on the Watch List and then what the methodology is,

2    right?

3    A.  Correct.

4    Q.  Okay.  And next one.

5           And this is just an explanation for how information

6    ratio works, right?

7    A.  Correct.

8    Q.  Okay.  And then here we start to get into the reports for

9    the funds that are on the Watch List.  Karla, do you want

10   to -- yeah.  Maybe just pull up that first one.  I think it's

11   the Veedot.

12          So what you're given here -- and we talked about

13   this I think with some other witnesses -- is the gross return

14   for each fund, right?

15   A.  Correct.

16   Q.  And then some comparisons.  So for the Veedot, we've got

17   the Russell 3000.  That's the benchmark for that fund, right?

18   A.  In this report, it is.

19   Q.  In this report.  And then the next thing in the line is

20   the calculation of the excess return as compared to the

21   benchmark, right?

22   A.  Correct.

23   Q.  And, again, that's calculating the return -- the gross

24   return, not the net of fees return, right?

25   A.  That's correct.

1    Q.  And then we've got the information ratio, right?

2    A.  Yeah.  That's on this line.

3    Q.  And then we've got some data about how that compares to

4    peer groups, right?

5    A.  Yes.

6    Q.  So this doesn't tell you how the Veedot fund performed net

7    of fees, does it?

8    A.  No, it does not.

9    Q.  Let's back out, Karla.

10        And then this -- we can go through each one, but I

11   hope we don't have to, that's going to be true for every one

12   on here, right?

13        THE COURT:  I hope we don't have to.

14        THE WITNESS:  I would think no.

15   A.  Yeah.  I'm sure that's true.

16   Q.  Okay.  Great.

17        So let's flip ahead, Karla.

18        The next thing we see in here, these are the charts

19   that show the information ratios going back over different

20   time periods.

21   A.  Uh-huh.

22   Q.  Do you recall that?

23        THE COURT:  Could you slow down just a little bit

24   for us?

25   A.  Yes.

1  Q.  Okay.  And then, Karla, do you just want to flip -- keep

2  going.

3          So after we've gotten through those information

4  ratio charts -- why don't you blow this up, Karla.

5          And then, actually, this is going back and doing the

6  same thing we just looked at.  So I wonder if this is maybe

7  just accidentally included a second time.  We've got the

8  Veedot again.  Does that look like a mistake to you

9  potentially?

10 A.  I wouldn't know without comparing it to the other page.

11 Q.  Okay.  Well, we already saw the Veedot a minute ago,

12 right?  And this is still Watch List funds?

13 A.  We did.  I didn't look at the date, but I -- you know,

14 if -- if it's a repeat, it's a repeat.

15 Q.  Okay.  That's fine.  I agree with you on that.  So let's

16 back out and go to the next page, Karla.

17          All right.  Here we go.  So now we're past, I

18 believe, the Watch List.  And now we've got the reports for

19 everything else, all the other funds that are not on the Watch

20 List.  Does that sound right?

21 A.  I assume so, without looking at the Watch List.

22 Q.  Okay.  And in these reports, it looks like it's the same

23 format, so we've got gross return, right?

24 A.  Yes.

25 Q.  And then we've got the benchmark, right?

1   A.   The benchmark used in this report, correct.

2   Q.   Yep.  And then we've got the excess as compared to the

3   benchmark, right?

4   A.   Yes.

5   Q.   The information ratio?

6   A.   That's what I see.

7   Q.   And then the peer group data?

8   A.   That looks correct.

9   Q.   So I think those are the same sort of metrics that we

10  looked at with the Watch List funds.  Does that sound right to

11  you?

12  A.   Yes.

13  Q.   Okay.  And again, this doesn't tell us the net return for

14  the Large Cap Growth Fund, right?

15  A.   Not on this page, no.

16  Q.   Okay.  And it doesn't give any comparison of the net

17  return of the Large Cap Growth Fund to any other fund, right?

18  Any other Large Cap Growth Fund?

19  A.   I'm sorry?

20  Q.   This report does not give you any information about the

21  net return of the Large Cap Growth Fund compared to any other

22  fund, does it?

23  A.   Well, Select and Ultra are both on here so --

24  Q.   Okay.  Any fund other than an American Century fund?

25  A.   No.

1    Q.  Okay.  We can back out, Karla.

2    A.  Just a peer group median.

3    Q.  And then we can, I hope, just flip through and have an

4    agreement that that format of the information that's being

5    reported is the same for all the other funds in the Plan,

6    right?

7    A.  That looks correct to me --

8    Q.  Okay.

9    A.  -- although --

10   Q.  Oh.

11   A.  -- I'm seeing a lot of INV, for investor share class, not

12   institutional share class.  Is that just the way this report

13   was put together?

14          THE COURT:  Could we get you to pull up closer to

15   the microphone?

16          THE WITNESS:  Oh, sure.

17          THE COURT:  And repeat that -- repeat that again

18   slowly.

19          THE WITNESS:  Sure.  So I'm seeing INV dashed after

20   most of these funds.  And I thought I recalled at the time

21   that they were institutional share class, not investor share

22   class.  But that could just be the way the report was put

23   together --

24          MR. SPECHT:  Okay.

25          THE WITNESS:  -- and that they are institutional

1  share classes.

2  Q.  So separate from whether this is telling you about an

3  institutional share class or an investor share class, this is

4  telling you information about the American Century funds that

5  are in the Plan, right?

6  A.  Yes.

7  Q.  Okay.  And whether it's telling you an investor share

8  class or an institutional share class, it's giving you gross

9  return, right?

10 A.  Yes.

11 Q.  And it's not giving you the net return, right?

12 A.  No.

13 Q.  No, it is, or no, it is not?

14 A.  Oh, I'm sorry.  No, it is not.

15 Q.  Okay.  Thank you.  Keep going, Karla.

16         And as we're going through here, we're just flipping

17 through all the different asset classes and the funds that are

18 in the Plan for each asset class, right?

19 A.  That's what it looked like, yes.

20 Q.  Okay.  So then this page is a little different.  We've got

21 a -- some reporting of the performance of the American Century

22 stock price, right?

23 A.  Yes.

24 Q.  That's the -- the stock of the company American Century,

25 right?

1    A.  Yes.

2    Q.  Okay.  So that's the company stock that is in some

3    people's portfolios?

4    A.  Yes.

5    Q.  Okay.  Keep going.

6            This is the dividend yield for the American Century

7    stock, right?

8    A.  It's showing the dividend yield for the last 12 months as

9    of that date compared to others.

10   Q.  Okay.  Keep going.

11           And then this is just some information about that,

12   right?

13   A.  Yes.  That's what it looks like.

14   Q.  Now, we've got the chart that we talked about with the

15   expenses that we saw earlier?

16   A.  Uh-huh.  Yes.

17   Q.  Keep flipping ahead, Karla, to page 38.

18           Page 38 gives you some information about assets that

19   are held in the Plan.  And it looks like it's the investment

20   option utilization, right?

21   A.  Yes.  As of that date.

22   Q.  Okay.  And this is organized -- it's sorted by assets in

23   descending order, right?

24   A.  Correct.

25   Q.  So it's got the assets -- the fund that's got the most

1    assets at the top, and then the fund that's got the least at

2    the bottom, right?

3    A.  As of that date, yes.

4    Q.  Okay.  And I think you said earlier you weren't sure about

5    the utilization for the equity index fund.  This would

6    demonstrate that it was the 20th -- it's number 20 on the

7    list, right?

8    A.  Yes.  At 2.3 percent of the 100 percent.

9    Q.  So the marks are probably not quite accurate, but 2.3

10   percent, 2.39, right?

11   A.  It's really hard to read.

12   Q.  Okay.  Could we blow that up, Karla?

13   A.  I have to find it again.  2.39.

14   Q.  2.39.  All right.  You want to back out, Karla?

15          And the biggest one is 6.25, right --

16   A.  Correct.

17   Q.  -- in terms of percentage?  And then if we look at the

18   amount of money that's held in that fund, the average -- well,

19   let's start with -- blow up the equity index again, Karla.

20          So total assets are a little over 11 million, right?

21   A.  That's correct.

22   Q.  And then the column on the far right, this is an average

23   account column.  Is that saying that the average participant

24   who has got this fund in their portfolio has $37,000 and

25   change?

1  A.  I think it's just the math between the eleven million one

2  and the 293.

3  Q.  So that's the average balance for this fund?

4  A.  Yeah.

5  Q.  Okay.  Let's back out, Karla.  And then go to the next

6  page.

7         Similar information, but now we've got it -- the

8  funds in the Plan sorted by average account balance rather

9  than total holdings, right?

10 A.  Yes.

11 Q.  And on this one, I think the index fund is number 12.  Do

12 you see that?

13 A.  I do.

14 Q.  And if we -- well, I don't think we even need to zoom in

15 on that.  So that would indicate that if you're evaluating the

16 funds based on how much money does the average participant

17 have in a fund, then the index fund would have been the 12 --

18 number 12 on the list, right?

19 A.  Yes.  That's how the report is set up.

20 Q.  Okay.  So both of those metrics put it at least in the top

21 half, right?

22 A.  By what measure?

23 Q.  By the measure --

24 A.  By both measures.

25 Q.  By the measures that are being reported here?

1    A.  Yes.

2    Q.  Okay.  Karla, let's just keeping flipping through.

3         So we've got some other measures of the holdings.

4    We've got a fund transfer analysis.  We have a pie chart

5    showing where things are at in terms of equity, cash.  Keep

6    going.  Assets by Morningstar class.  Here we've got a little

7    bit more on the costs for these funds, right?

8    A.  Yes.

9    Q.  This chart is showing us for each fund in the Plan the

10   total expense ratio and then the amount that's going to

11   JPMorgan as a service fee, right?

12   A.  Yes.  The basis points.

13   Q.  Okay.  And nothing on here tells you that -- anything

14   about the net performance of any of these funds, right?

15   A.  I'm sorry?

16   Q.  Nothing on this table tells you anything about the net

17   performance of any of these funds, correct?

18   A.  Not -- let me look.  I don't believe so, no.

19   Q.  Okay.  Nothing -- sorry.  Go back to that table.

20        Nothing there tells you about how the performance of

21   these funds would compare to any peers, right?

22   A.  No.

23   Q.  And nothing on this table tells you anything about how the

24   cost of the funds would compare to any peers, right?

25             THE COURT:  You're going way too fast, Mr. Specht.

1          MR. SPECHT:  I'll slow down.

2          THE COURT:  That last sentence.  Is there anything

3   you'd like us to do to Mr. Specht, Ms. McBride -- or

4   Ms. Lambrecht?

5          THE REPORTER:  Not yet.

6          THE COURT:  All right.

7          MR. SPECHT:  Thin ice.

8          THE COURT:  Don't mess with her.

9          MR. SPECHT:  I won't.  Should I repeat that?

10         THE COURT:  Yes.

11  Q.  Nothing in this table tells you anything about how the

12  costs of the funds compare to any peers, correct?

13  A.  No.  That wasn't the function of the report.

14  Q.  Okay.  Let's keep going.

15         We've got some disclosures, a trading summary,

16  fiduciary update.  That doesn't, in this one, contain

17  anything.  The notes.  And then, I believe, if we continue

18  going through the rest of this, it's going to have these same

19  performance reports.  And these are the same -- you can just

20  stop there, Karla.

21         These are the same sort of metrics we saw before.

22  Gross return, benchmark, information ratio, et cetera, right?

23  A.  It looks to be, yeah.

24  Q.  So, again, nothing here on the net performance of the

25  fund?

1   A.  No.

2   Q.  Nothing here on how the expenses would compare to any

3   peers, right?

4   A.  That's not what the report was created for.

5   Q.  Okay.  But you agree that information is not here

6   nonetheless?

7   A.  It is not there, no.

8   Q.  Okay.  And I believe we can just flip through to the end.

9   That will take us to the end of the document.

10          So, ma'am, the information provided to the Committee

11  for the meetings did not tell you what the net return was on

12  the funds in the Plan, did it?

13  A.  No.

14  Q.  And it also didn't tell you how that net return would

15  compare to any other fund that might be available on the

16  market, did it?

17          MR. FLECKNER:  Objection.

18          THE COURT:  Sustained.  We've already been through

19  this, I think, and she said this isn't even the purpose of

20  this report so --

21          MR. SPECHT:  Well, the point I'm trying to make,

22  Judge, is that the information that was given to the Committee

23  that they considered at the meetings doesn't include any of

24  this information.  Whether it was the purpose of the report or

25  not --

1          THE COURT:  Well, we're talking about a particular

2     report here.  We're talking about JX 16.  And we've been

3     talking about JX -- was it 13?  You called -- you called JX 13

4     after lunch, right?  This witness has just said, hey, you're

5     right, this information is not there, but that's not what she

6     felt like the purpose of this report was in the first place.

7     Correct, Ms. VanWagoner?

8          THE WITNESS:  Not for many of the pages that he

9     cited.  For the expense ratio page versus the universes, the

10    peer universes, that's what that report was intended for.

11         THE COURT:  Okay.  Okay.

12         MR. SPECHT:  I think we're not on the same page,

13    Judge.  And I can --

14         THE COURT:  Okay.

15         MR. SPECHT:  I'll move on after this but --

16         THE COURT:  I'd like you to move on.

17    Q.  All right.  Well, I am trying to establish that this is

18    the materials that was provided to the Committee for this

19    meeting, right?

20         MR. FALVEY:  Objection, Your Honor.  This is one

21    report in a thick set of materials provided to the Committee

22    at this meeting.

23         MR. SPECHT:  This is the entire document.

24         THE COURT:  Well, hold on.  Hold on.  Hold on.  Was

25    this the only document that was given to you in preparation

1    for this meeting that you know of?

2            THE WITNESS:  I don't --

3            THE COURT:  That you can recall?  This was --

4            THE WITNESS:  This looks like standard reporting for

5    an Investment Committee meeting.

6            THE COURT:  You received a packet of documents

7    before the meeting?

8            THE WITNESS:  Yes.

9            THE COURT:  And I think -- I think it was

10   Mr. Cowherd who said -- who testified maybe a week before the

11   meeting, you usually got a packet of documents?

12           THE WITNESS:  That's correct.

13           THE COURT:  And sometimes was that packet of

14   documents supplemented from time to time before the meeting?

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.

17           THE WITNESS:  Depended what was on the agenda.

18           THE COURT:  And what you looked through with

19   Mr. Specht is consistent with what you would have received as

20   part of that packet of documents?

21           THE WITNESS:  Yes, as a standard agenda item.  It

22   came in a book like this.

23           THE COURT:  Would you get it in a binder like that?

24           THE WITNESS:  Yeah.

25           THE COURT:  Okay.

1          THE WITNESS:  All of them.

2          THE COURT:  So the lawyers are using the same

3     binders that you would use?

4          THE WITNESS:  Yes.

5          THE COURT:  All right.

6     Q.  All right.  And, if I may, that binder doesn't have any

7     information in it that tells you what the net return on the

8     funds was, does it?

9     A.  No.

10    Q.  Okay.  And it doesn't tell you how that net return

11    compared to any other fund on the market, does it?

12    A.  No.

13         MR. FALVEY:  Objection.

14    Q.  And it doesn't tell you --

15         THE COURT:  Sustained.  Sustained.  She's answered

16    the question.  She -- she said -- she said it doesn't have the

17    net return.  I need you to move on.  We're -- we're going in a

18    circle is what we're doing (indicating).  And I want you to

19    move forward away from this circle, please.

20    Q.  Your current employer is -- you testified on direct is the

21    advisor called DeMarche, correct?

22    A.  Yes.  That's correct.

23    Q.  And one of the things that DeMarche does is provides

24    investment advice to retirement plans, correct?

25    A.  Yes.

1   Q.  And DeMarche has got a whole section on its website about

2   defined contribution plans, correct?

3   A.  Yes.

4   Q.  You're familiar with that -- that information on the

5   website?

6   A.  Generally, yes.  I don't have it memorized.

7   Q.  Do you review it from time to time?

8   A.  I -- yeah, occasionally.

9   Q.  Have you written any of the information that's on that

10  website?

11  A.  No, not directly.

12  Q.  In the times that you've reviewed it, have you ever seen

13  anything that you've disagreed with?

14  A.  On the DeMarche company website?

15  Q.  Correct.  I'm talking about the website specifically

16  related to the services that you provide to defined

17  contribution plans.

18  A.  Not that I recall.

19          THE COURT:  Drum roll please, Mr. Specht.

20          THE WITNESS:  Yeah.  Right?

21          THE COURT:  What is this?

22  Q.  One of the things that DeMarche talks about on its website

23  as it relates to defined contribution plans is the fact that

24  historically defined contribution plan sponsors have not

25  exercised the same level of due diligence that defined benefit

1    sponsors would have exercised.  Do you recall that?

2         MR. FALVEY:  Objection.  Hearsay without reference

3    to the document.

4         THE COURT:  Yeah.  This is not -- this is not going

5    to be anything I'm going to make a decision about in this --

6    listen, the judge has entered the pushy mode.  I need you to

7    move on or -- like I said, if we're not being productive in a

8    way that's helpful, I'm going to -- you're not going to be

9    able to ask more questions.  And I know that's offensive, but

10   that's the way I do this, especially in bench trials.  So I

11   encourage you to find good questions to ask this witness.

12        MR. SPECHT:  Fair enough, Judge.  One more question

13   about the website and I'll move on.

14        MR. FALVEY:  Your Honor, if I may, in addition --

15        THE COURT:  The website is not relevant to anything

16   I'm doing here.  And -- I'm sorry.  Go ahead, Mr. Falvey.

17        MR. FALVEY:  I was going to say, Your Honor imposed

18   a protocol at the outset that we've been following about

19   exchanging binders and material beforehand.  I don't see

20   anything this -- among the documents.

21        THE COURT:  That's even worse.  That's even worse,

22   Mr. Specht.  I didn't expect this from you.  Is there anything

23   about this in the binder that you gave Mr. Falvey?

24        MR. SPECHT:  It's not -- it's not an exhibit.  I'm

25   asking her about the website --

1          THE COURT:  Yeah.

2          MR. SPECHT:  -- for her company.

3          THE COURT:  We're not going to explore the website.

4     So I'm not going to allow any questions about the website.

5          MR. SPECHT:  Fair enough.

6     Q.  Ma'am, would you agree that one of the areas in which

7     DeMarche adds value for its client is its manager search

8     process?

9     A.  Yes.

10    Q.  And the manager search process, that refers to searching

11    for an investment manager, generally within a particular asset

12    class?

13    A.  Yes.

14    Q.  That would include looking at a number of different asset

15    managers, for example, the ones we had on our list, Fidelity,

16    PIMCO, T. Rowe Price, et cetera?

17    A.  It would depend on the asset class and the research work

18    that was done by the research team.

19    Q.  So depending on the asset class, it could include some of

20    those names?

21    A.  Potentially.

22    Q.  Okay.  Have you done manager searches that involved those

23    asset managers?

24    A.  I probably have in the past, but I couldn't tell you

25    specifically which strategies today.

1    Q.  DeMarche's manager search process that it goes through in

2    looking at different asset managers leads to better outcomes

3    for plan participants in terms of costs, right?

4              THE COURT:  Mr. Falvey?

5              MR. FALVEY:  Objection.

6              THE COURT:  What's that -- why?

7              MR. FALVEY:  Time frame that we're in now, you know,

8    2018, with DeMarche, I just don't think it's relevant to

9    anything we've heard from the witness on direct.

10             THE COURT:  How is this relevant to our inquiry,

11   sir?

12             MR. SPECHT:  Well, it goes into how you go about

13   finding a fund manager and the benefits of an asset manager

14   search in terms of a number of factors.

15             THE COURT:  I mean, this sounds like a -- it sounds

16   like a place I don't want to go.  I'm going to give you like

17   one more question to make this seem like it's going to be

18   relevant to my -- how is this relevant to my determination

19   about prudence and those issues before the Court?

20             MR. SPECHT:  I think it goes to the heart of all of

21   those issues as it relates to limiting your plan to a single

22   fund family.

23             THE COURT:  Mr. Falvey?

24             I'm inclined to ask Mr. Specht to respectfully just

25   sit down after that question.

1          MR. FALVEY:  Your Honor, I would just say the

2     testimony is uniform that the Committee inherited a lineup.

3     It scrutinized the lineup to make sure it complied with the

4     investment selection criteria and monitored accordingly and

5     would only have to go to a manager outside or think about

6     different management if the fund was not meeting its -- its

7     role in the lineup.  And since this witness has said that

8     never happened, I think the parameters in another context of

9     investment manager search just don't have relevance.

10          THE COURT:  I need you to sit down, Mr. Specht.

11     This is -- we're just kind of spinning our wheels here.  This

12     is not inquiry I think that's appropriate or helpful to me in

13     making this decision.

14          The last two subject matters, I -- the website and

15     DeMarche's role in all this, I'm sorry, I think you're off,

16     and I need -- I need you to be finished.

17          MR. SPECHT:  Well, Your Honor, respectfully, the

18     inquiry about how these plans are run turns on the universe

19     of --

20          THE COURT:  How DeMarche runs -- how -- what

21     DeMarche does, that's not what -- what we're hearing here.  Is

22     that even your role to work for DeMarche and select fund

23     managers?

24          THE WITNESS:  I participate on the side of the Plan

25     sponsor to help facilitate the process.

1          THE COURT:  And so you do communicate about those

2    things from time to time?

3          THE WITNESS:  I do.

4          THE COURT:  Okay.  I'm going to give you just

5    another question.  Just ask your best question, and then

6    please sit down.

7          MR. SPECHT:  Your Honor, I can move on from the

8    DeMarche stuff altogether.

9          THE COURT:  Well, I mean, if we go to another

10   subject, we're just wasting time here, in my opinion.

11   Let's -- let's -- Mr. Specht, what's your next subject matter

12   going to be about?  Could you tell me first?

13         MR. SPECHT:  Yeah.  My next subject matter, Your

14   Honor, is going to be to go to JX 46, which is one of the

15   these reports that has the fund lineup --

16         THE COURT:  Yes, sir.

17         MR. SPECHT:  -- and ask her some questions about

18   that.  I'm done with DeMarche.

19         THE COURT:  About -- about American Century's fund

20   lineup?

21         MR. SPECHT:  Correct.

22         THE COURT:  Okay.

23   Q.  So, Karla, if we could go to JX 46, page 87.

24         This is a style box that we've seen with a number of

25   the other witnesses in this case and it includes in each box

1  the different funds in the Plan.  Does that look right to you?

2  A.  Yeah.  It says the data is as of August 31st of 2016.  I

3  wasn't on the Committee.

4  Q.  Okay.  But you recognize the format of this in terms of a

5  style box and the funds that are in the Plan in each box?

6  A.  I recognize style box comparisons.  I couldn't speak to

7  the funds in the Plan.  I have to assume that this is

8  accurate.

9  Q.  Okay.  Many of these are funds -- Karla, let's just zoom

10  in on the top left one.  Many of these are funds that were in

11  the Plan while you were a member of the Retirement Committee,

12  correct?

13  A.  That looks correct.

14  Q.  Okay.  And for each style box that we have here, if the

15  Committee had looked outside of the American Century fund

16  family, in many of these boxes, they could have found lower

17  cost, better performing funds, correct?

18          MR. FALVEY:  Objection, Your Honor.

19          THE COURT:  I don't -- you can answer the question.

20  Overruled.

21  A.  It depends on time frame.  It depends on market activity

22  and how these funds were performing in that period of time.

23  So maybe.  But, again, it's -- really, it depends on time

24  frame.

25          MR. SPECHT:  Thank you.  No further questions,

1  Judge.

2          THE COURT:  All right.  Mr. Falvey.

3          MR. FALVEY:  You know, I do have just a couple.  Can

4  I be heard from this microphone?

5          THE WITNESS:  I can hear you.

6                        REDIRECT EXAMINATION

7  BY MR. FALVEY:

8  Q.  Just a couple of questions on adoption of the information

9  ratio as the metric.  And you recall you were asked a series

10  of questions about the adoption in 2009 and 2010 of that

11  metric.  Did anyone from outside of the Retirement Committee

12  influence the Retirement Committee's thinking on whether that

13  metric should be adopted?

14  A.  No.

15  Q.  Was Lisa Lattan present at each of those meetings in 2009

16  and 2010 as secretary?

17  A.  To my recollection, yes.

18          MR. FALVEY:  That's all I have.

19          THE COURT:  All right.  Anything else, Mr. Specht?

20          MR. SPECHT:  No, Your Honor.

21          THE COURT:  All right.  Thank you.  Thank you,

22  Ms. VanWagoner.

23          All right.  Please call your next witness.

24          MR. FALVEY:  Defense calls Diane Gallagher.

25          THE COURT:  Ms. Gallagher.

1          Ms. Gallagher, yes, you know.

2      DIANE MARY GALLAGHER, DEFENDANTS' WITNESS, SWORN

3          THE COURT:  Please have a seat, Ms. Gallagher.

4  Welcome to you, Ms. Gallagher.  You've been -- you've been

5  here every day, haven't you?

6          THE WITNESS:  I have.

7          THE COURT:  Yeah.  Please begin, ma'am, by speaking

8  your full name, and spell your last name for us.

9          THE WITNESS:  Sure.  Diane Mary Gallagher.

10  It's G-A-L-L-A-G-H-E-R.

11                    DIRECT EXAMINATION

12  BY MR. FALVEY:

13  Q.  Good afternoon, Ms. Gallagher.

14          Thank you, Your Honor.

15          Ms. Gallagher, you're the last member of the

16  Retirement Committee, the last fact witness we're going to be

17  presenting in the case.  You're the anchor leg.  You've got

18  the baton.  Is there anything we haven't heard?  No, I -- I --

19          THE COURT:  That's my question, Mr. Falvey.

20          MR. FALVEY:  I know.  I'm going to unbundle that

21  just a bit, Your Honor.

22  Q.  Ms. Gallagher, you have been sitting at counsel table

23  throughout, correct?

24  A.  Correct.

25  Q.  Listening attentively to the testimony?

1    A.  Correct.

2    Q.  Passing notes to the lawyers?

3    A.  Yes.

4    Q.  Are they getting -- are they executing on anything?

5    A.  They're doing great.

6    Q.  Tell us what you do at American Century, Ms. Gallagher.

7    A.  I am a vice president of client marketing at American

8    Century.

9    Q.  And for how long have you been there?

10   A.  This time, I've been here six years.

11   Q.  Is this your second round at American Century?

12   A.  It is.

13   Q.  How do you describe your specialty, Ms. Gallagher?

14   A.  For my career, I have been focused on participants'

15   communications and education in retirement plans.

16   Q.  Do you sometimes refer to yourself as a retirement plan

17   design specialist?

18   A.  Yes.  Occasionally.

19   Q.  And what does that encompass?

20   A.  Working with plan sponsors on the design features that

21   they should adopt or consider adopting that will -- are most

22   likely to help their participants save for retirement.

23   Q.  Have you been on the Retirement Committee since 2014?

24   A.  I have.

25   Q.  And have you been a chair since 2017?

1    A.  Correct.

2    Q.  How were you lucky enough to obtain that role?

3    A.  I looked up at the wrong time.  No.  I volunteered to do

4    it.

5    Q.  Let's -- let me go back and ask about your educational

6    background and then your professional background before coming

7    to American Century.  Tell us first about your education.

8    A.  I graduated with a bachelor of arts from the University of

9    Detroit in 1989.  It's now known as Detroit Mercy.  And I

10   worked for a large teaching hospital in Detroit, Michigan,

11   doing public affairs and employee communications until I moved

12   to Kansas City in 1994.

13   Q.  And in 1995, did you join American Century?

14   A.  I did.  It was Twentieth Century then, yes.

15   Q.  All right.  And which part of American -- sorry, which

16   part of Twentieth Century did you join?

17   A.  I joined the communications team in the recordkeeping

18   business.

19   Q.  So at that time -- and we've heard this once before --

20   Twentieth Century had a recordkeeping function --

21   A.  Correct.

22   Q.  -- which it subsequently sold to JPMorgan?

23   A.  Correct.

24   Q.  What did you do from 1995 forward until that record- --

25   the recordkeeping function was sold in the recordkeeping area?

1  A.  I developed employee communications materials for the

2  employees of our client companies about their retirement

3  benefits.  So writing about how important it is to save for

4  retirement, what was available in their plans, communicating

5  plan changes.

6  Q.  And what happened -- let's see.  In what year did

7  American -- did Twentieth Century sell the recordkeeping

8  business to JPMorgan?

9  A.  2003.

10 Q.  And what did you do then?

11 A.  I largely continued a similar role.  I was managing a team

12 of folks who did that work.

13 Q.  So did you move over to JPMorgan with the business?

14 A.  I did.

15 Q.  And that was in 2003?

16 A.  Correct.

17 Q.  For how long did you stay at JPMorgan?

18 A.  Until 2012.

19 Q.  Where was that JPMorgan recordkeeping business located?

20 A.  In -- here in Kansas City.

21 Q.  Okay.  And in 2012, what happened professionally for you?

22 A.  I had the opportunity to return to American Century.

23 Q.  And was that because JPMorgan had different ideas for you?

24 A.  The next career opportunities for me at JPMorgan required

25 a relocation, most likely to New York.  And my husband and I

1    wanted to stay in Kansas City.  So I made a resolution to work

2    for a company headquartered in Kansas City.

3    Q.  And -- and what did you do then in 2012?

4    A.  I rejoined American Century in the defined contribution,

5    so the retirement plan business, to add some expertise around

6    participant experience and communications in retirement plans.

7    Q.  So about 15 years of your career, before you came back to

8    American Century, you were part of the recordkeeper part of

9    investment management and retirement plan management, correct?

10   A.  Correct.

11   Q.  And can you describe, broadly, your role in -- in the

12   recordkeeping function during, say, the latter part of that

13   period as you -- as you came to more senior roles?

14   A.  Sure.  I continued to do different types of projects

15   working with large clients.  In 2007, I was named head of the

16   participant communications and education department, was about

17   75 people that I had responsibility for.

18   Q.  And -- and then you came to American Century.  And what

19   group were you in in American Century when you rejoined in

20   2012?

21   A.  I was in the defined contribution investment only

22   business.

23   Q.  Okay.  And what title did you have there?

24   A.  Vice president of practice management.

25   Q.  Could you describe basically the functions that you've had

1   from 2012 forward to the present as part of the defined

2   contribution business?

3   A.   Sure.   I would work with our client facing organizations

4   to add additional content, papers, presentations around

5   participant saving behaviors.   One of the -- the key parts of

6   my responsibility over the last six years has been sponsoring

7   a national survey of retirement savers and sharing those

8   findings and presentations, collateral, et cetera, and what

9   people across the country think about saving for retirement.

10  Q.   As part of your job, have you stayed current on trends in

11  retirement plan management over time?

12  A.   Yes.

13  Q.   And what do you do to stay current?

14  A.   In addition to -- to following all of the sort of industry

15  publications and sources, I attend conferences.   I talk with

16  colleagues from -- from peer organizations and just continue

17  to -- to participate in webcasts just to stay on top of the

18  industry.

19  Q.   As part of your -- your roles both at JPMorgan and then at

20  American Century, have you from time to time attended

21  fiduciary committees overseeing plans that are comparable to

22  the Retirement Committee that you're sitting on now?

23  A.   Yes, I have.

24  Q.   And how many times have you had occasion professionally to

25  appear at other retirement or investment committees?

1    A.  Several dozen.

2    Q.  And just what's the nature of your appearances at

3    retirement committees?

4    A.  I was either presenting a communication strategy or

5    recommendation for a plan that was making changes, or I was

6    sharing the results of our national survey with committees.

7    Q.  Did you participate in give and take with committee

8    members at those dozens of meetings?

9    A.  Yes.

10   Q.  And was that kind of part of your job both at JPMorgan and

11   then later at American Century?

12   A.  Yes.

13   Q.  Has it been part of your role at American Century to

14   present in various forums, to take on speaking engagements?

15   A.  It has.

16   Q.  And what has been that part of your role?

17   A.  I am a spokesperson at industry conferences and client

18   meetings as well as with industry reporters.

19   Q.  What are some of the large industry conferences that

20   you've presented at?

21   A.  Institutional Investor, Pensions & Investments, 401(k)

22   Summits, and the National Association of Plan Advisors.

23   Q.  And you just mentioned several institute -- several

24   industry associations.  Where do those rank in terms of size

25   and prominence within the investment and retirement plan

1    industry?

2    A.   Institutional Investor particularly serves really the

3    largest defined contribution plans in the country.  Those

4    employers make up that audience.  The National Association of

5    Plan Advisors is the largest gathering of retirement plan

6    consultants.  Annually, about 1,200 people every spring.

7    Q.   And when you're presenting at those sorts of conferences,

8    what's the size of the audiences you're typically presenting

9    to?

10   A.   It could be anywhere from 25 to 30 to several hundred.

11   Q.   What -- what types of specific topics do you tend to

12   present on?

13   A.   The main topic I present on is related to participant

14   behavior with respect to retirement savings.

15   Q.   Let's pull up DX 738, please, Chris.

16            Do you recognize this -- the face -- this is a face

17   page of a presentation, correct?

18   A.   Yes.

19   Q.   And it's a PowerPoint deck that's behind this?

20   A.   Yes.

21   Q.   Do you recognize the specific presentation and can you

22   describe what it is?

23   A.   I do.  It is the presentation I delivered at the P&I

24   401(k) Conferences about our national study called "Who's in

25   the Driver's Seat."

1  Q.  And what's the answer?  Who's in the driver's seat?  And,

2  actually, I'll actually ask, what's meant by that, the

3  driver's seat of what?

4  A.  It's -- it's really what participants are looking for in

5  terms of who's driving their decisions around saving for

6  retirement.

7  Q.  And why is this a topic that's of interest to the -- the

8  investment professionals, the retirement plan professionals

9  who are -- who are attending your talks?

10  A.  Because there's so much discussion about decision making

11  with respect to saving for retirement.  Preserving choice for

12  employees, for participants, and also making certain that

13  employers are putting forward sort of the best path for people

14  to make the decisions about saving.  So it's a balance.

15            THE COURT:  What year is this?

16            THE WITNESS:  This would have been 2016.

17            THE COURT:  Okay.

18  Q.  And you know that from memory --

19  A.  Yes.

20  Q.  -- because you were at some of these -- in some of these

21  cities?

22  A.  Yes.

23  Q.  Did you present in one or more of these cities on this

24  topic?

25  A.  I did, yes.

1    Q.   I'm going to pick my best slide, taking some of the

2    judge's cues -- or at least a slide.  Let's go to page 19,

3    please.  A new graph.  It doesn't actually relate specifically

4    to American Century, but can you tell us what is conveyed on

5    this slide that says, Plan sponsors still underestimate how

6    much participants want?  What are you conveying with this set

7    of data?

8    A.   Right.  What this has shown over the years -- and I'm

9    going to correct myself.  This was actually 2015.  I'm sorry.

10    I'm now looking at the -- the dates.

11          What participants are saying is they want at least a

12    slight nudge, if not a strong nudge from their employers in

13    terms of telling them how much they should be saving and how

14    they should be preparing for retirement.

15    Q.   So you've got four not very scientific sounding categories

16    here that go from a kick in the pants on the left, strong

17    nudge, slight nudge, leave you alone.  Do I read that right?

18    A.   That's correct.

19    Q.   And then the bar graphs are telling you for particular age

20    groups how people are responding and how much direction they

21    want in terms of their savings and investment behavior in

22    Plans?

23    A.   Correct.

24    Q.   Is that the idea?

25    A.   Correct.

1    Q.  And what's the -- what's the data base that you're drawing

2    from here?

3    A.  It is the --

4    Q.  Is it American Century data or other data?

5    A.  No.  It is a national sample.  We work with a firm called

6    Greenwald & Associates in Washington, D.C.  They do a lot of

7    work with respect to employee benefits.  So it is a national

8    database that mirrors the U.S. consumer population.

9              THE COURT:  Green Wallet?

10             THE WITNESS:  Greenwald.

11             THE COURT:  Wald.

12             THE WITNESS:  G-R-E-E-N-W-A-L-D.

13             THE COURT:  Thank you.

14   Q.  And the specific question they answered with -- with this

15   chart is which best describes what you would like your

16   employer to do for you when it comes to encouraging you to

17   save more for retirement?  Right?

18   A.  Correct.

19   Q.  And there's significant numbers over on the left and right

20   side of the -- of the charts, right?

21   A.  Correct.

22   Q.  So a bunch of people want a kick in the pants, right?

23   A.  Yes.

24   Q.  And a bunch of people want to be totally left alone,

25   right?

1    A.  Yes.

2    Q.  But is your point that actually more are in one of those

3    other categories of wanting some or a lot of nudge in the

4    right direction?

5    A.  That's correct.

6    Q.  And by nudge, what's being referred to?

7    A.  It really does refer to the whole concept around automatic

8    programs.  And we talked about automatic enrollment, automatic

9    savings increases, and re-enrollment.  And that's really what

10   it speaks to.

11   Q.  And is this data and research that's been done that you

12   speak on from time to time one of the things that informs how

13   you approach things on the Committee?

14   A.  Yes.  Absolutely.

15   Q.  And do you bring that into conversations and the like?

16   A.  Yes.  It's --

17   Q.  Okay.

18   A.  -- what I think about.

19   Q.  We can take that down.  Thanks, Chris.

20        Is one of your jobs also at American Century to --

21   to appear in the media and sort of speak on behalf of the firm

22   in the media?

23   A.  Yes.

24   Q.  And can you describe that part of your job?

25   A.  Yes.  I am a designated spokesperson for the company with

1    respect to individuals and retirement savings.

2    Q.   And what -- in what forums do you find yourself speaking

3    on behalf of the company?

4    A.   Really, all of them.  So I've appeared with local -- local

5    television -- local network affiliates, like local NBC

6    affiliate, for example, as well as our industry media, like

7    Ignites, 401kWire, Bloomberg Radio.  I'm on at least once a

8    year Bloomberg Radio.

9    Q.   So you're a -- you're a talking head for the firm on --

10   A.   Yes.

11   Q.   -- retirement plan matters?

12   A.   Yes, I am.

13   Q.   Do you also write on the topic -- topics?

14   A.   Yes.

15   Q.   What kinds of pieces do you write?

16   A.   I will write -- often, I write the summaries of the

17   research that will go to our clients.  I write content for our

18   blog about retirement savings as well.

19   Q.   On top of your professional life that you described a bit

20   and your family life, are you involved in charitable

21   activities?

22   A.   I am.

23   Q.   Can you describe your major charitable commitments over

24   the past 10 years or so?

25   A.   Sure.  The primary involvement that I have is related

1    really to two organizations, Children's Mercy Hospital here in

2    Kansas City, as well as the Ronald McDonald House here in

3    Kansas City.

4    Q.  And how did you get involved with the Ronald McDonald

5    House?

6    A.  I -- one of my three daughters has very complex both

7    medical and developmental challenges.  She's 18 now, and we

8    became involved with the organization because we used its

9    services when she's been hospitalized.

10   Q.  And what have your roles been for the Ronald McDonald

11   House?

12   A.  I served -- I'm currently on the advisory board.  I was on

13   the board of directors for seven years and served as chair for

14   three of those years.

15   Q.  And is that for the Ronald McDonald House in Kansas City?

16   A.  In Kansas City, correct.

17   Q.  What's -- what's your role been at Children's Mercy

18   Hospital?

19   A.  I currently serve on the Hands and Hearts for Children

20   Auxiliary.  I'm currently on the board and am co-chairing

21   their major single fundraiser this winter.

22   Q.  And does that commitment also arise out of your family's

23   experiences?

24   A.  Absolutely.

25   Q.  Let's move forward to your role in the Retirement

1  Committee, Ms. Gallagher.  We talked about your coming on in

2  June of 2014.  Was there a particular incident or episode that

3  brought you on to the Retirement Committee?

4  A.  When I rejoined the company in 2012, Julie Smith and Lisa

5  Benson -- the Committee at the time was looking for -- about

6  to do the recordkeeper change and the recordkeeper search.

7  And because I had been involved in so many presentations on

8  the other side as a recordkeeper, they asked if I would take a

9  look at some of the materials, if I would listen to some of

10  the presentations, think of other questions that hadn't been

11  asked.  So I really focused in on what the recordkeepers are

12  saying about participant communications and what support they

13  would give us.  So I had participated in an ad hoc basis for

14  that.

15  Q.  And then you were asked to come on that following year?

16  A.  And then -- correct.

17  Q.  So you mentioned that you've attended dozens of other

18  committee -- sponsored committees over retirement plans.  And

19  you've had some time on this Retirement Committee.  What can

20  you observe about the quality of the composition and

21  discussion that occurs on the American Century Retirement

22  Committee?

23  A.  It is a very animated group.  When I look around the

24  table -- and I felt this the first meeting I attended -- there

25  are seasoned retirement plan and/or investment experts around

1    the room.  And I really appreciated -- I was honored to be

2    part of the group.  But I really appreciated the level of

3    consideration that took place in that group.

4             I know -- I think Margie Morrison made a comment on

5    Friday that we didn't -- we were -- we didn't talk as fast or

6    that we were -- and I think -- I'm going to disagree with her

7    because I think we talk over each other and very quickly and

8    very animated and passionate when we're together.  It's a very

9    high caliber group of professionals.

10   Q.  Does anybody listen?

11   A.  Yeah.  Yes.

12   Q.  Sometimes when there's all talkers, no one is listening.

13   A.  No.  I do -- I follow Robert's Rules of Order and make

14   everyone stop talking.

15   Q.  So people listen with consideration?

16   A.  Absolutely.

17   Q.  I haven't asked you about fiduciary training.  Did you

18   have past experience as a fiduciary before coming on to the

19   Committee?

20   A.  I was a fiduciary at Ronald McDonald House.

21   Q.  Okay.  And had you been dealing for decades with clients

22   who had fiduciary roles?

23   A.  Yes.

24   Q.  Had you indeed had the responsibility at a point in time

25   to write fiduciary materials?

1    A.  Yes.  I was the ghostwriter for our head of legislative

2    and regulatory affairs at JPMorgan.  So I would interview him

3    and write materials on his behalf to share with clients.

4    Q.  And he was a lawyer, so he needed somebody to do the

5    writing?

6    A.  He wouldn't agree with that.

7    Q.  But did you, nonetheless, when you received the fiduciary

8    toolkit coming on to the Committee, did you read it?

9    A.  I did.

10    Q.  And did you read it thoughtfully and closely?

11    A.  Yes.

12    Q.  How do you think about your fiduciary role in serving on

13    this Committee?

14    A.  I take it very seriously and am very cognizant of the

15    gravity of the responsibility.

16    Q.  And is there anybody you think of in particular when you

17    think about what you're doing on that Committee?

18    A.  Yes.

19    Q.  Who?

20    A.  I think about my assistant.  She's a single mom in her mid

21    forties, and I worry about her future.  So I always think of

22    her.

23    Q.  And does that affect your consideration of information

24    coming before the Committee, and does it affect your

25    discussion on the Committee?

1    A.  It is certainly a -- a part of my consideration.

2    Q.  You -- you've spent a lot of your time researching and

3    speaking on the participant perspective.  Is that a role -- is

4    that a perspective you bring to bear on the Committee?

5    A.  It is.

6    Q.  Let me ask briefly about the Information Policy Statement

7    that I think all of the members of the Committee have been

8    asked about.  Did you read it upon joining?

9    A.  I did.

10   Q.  Did you read the investment lineup upon joining the

11   Committee?

12   A.  Yes.

13   Q.  Did you think about that investment lineup?

14   A.  I did.

15   Q.  What did you think of the investment lineup?

16   A.  I was already familiar with it when I joined the Committee

17   as I was a participant in the Plan.  And it -- it looked as I

18   expected it would.

19   Q.  Okay.  Did you think about its appropriateness as a full

20   core lineup for this Plan?

21   A.  Yes, I did.

22   Q.  And what did you think about its appropriateness?

23   A.  I thought it was a diverse array of choice for our

24   participants, knowing that, as we've talked about, we have a

25   sophisticated group of participants.  So we had an array of

1   diverse choices covering the style boxes, as we've talked

2   about.  So I thought it absolutely put forward the right

3   amount of choice.

4   Q.  A moment further on, the IPS, had you reviewed the IPSs of

5   a lot of other retirement committees during your times at

6   JPMorgan and American Century?

7   A.  Yes.

8   Q.  What did you think of this IPS in terms of the degree of

9   guidance it provided and the degree of flexibility that it

10  provided?

11  A.  I thought it was appropriate.  And I think the most

12  important part in the Investment Policy Statement is that

13  there still remains some discretion for the Committee members.

14  Q.  Before I shift to my next topic, Ms. Gallagher, I want to

15  touch back on that recordkeeper search that you were involved

16  in just before you came on to the Committee.  The end result

17  of that RFP and selection process was that Schwab was chosen.

18  Was it chosen in connection with any other corporate

19  relationship that it might have had with American Century for

20  the time -- at the time?

21  A.  No.

22  Q.  And were you familiar with how it had competed on the --

23  on the relevant elements of the RFP that was being responded

24  to?

25  A.  Yes.

1   Q.  And how was it selected?

2   A.  I think a couple of things beyond just -- just fees, the

3   per participant fee that Schwab was charging.  From a

4   participant experience, which is my corner of the world, they

5   offered a very robust program for participants.  Their website

6   was superior to others that we have looked at.  So I thought

7   it certainly would support our participant base.

8   Q.  And at the same time, it was coming in at the right price?

9   A.  Correct.

10  Q.  And indeed has dropped its pricing since?

11  A.  Yes.

12  Q.  The next thing I want to talk to you about, Ms. Gallagher,

13  is your and the Retirement Committee's priorities.

14  A.  Uh-huh.

15  Q.  I'm going to ask to pull up DX 511, please.

16          So this is the face page of the July 8th, 2015,

17  Retirement Committee minutes.

18  A.  Yes.

19  Q.  Let's see.  Can you flip through the next couple of pages

20  slowly, Chris?  Stop right there.

21          Do you recognize this as a Charles Schwab

22  presentation?

23  A.  Yes.

24  Q.  And it's dated July 2015, date of this meeting?

25  A.  Yes.

1    Q.  And it goes over July -- goes over 2018 [sic] to 2013

2    trends.  Do you see that?

3    A.  Yes.

4    Q.  So I'm not actually going to ask about trends but

5    priorities.  Let's go to page 4, please.

6               What's presented on this page of the Schwab

7    presentation?

8    A.  These are kind of key themes or topic areas for plan

9    sponsors in terms of designing and running a 401(k) plan.

10   Q.  Did these reflect, in your view, the priorities of --

11   appropriate priorities for a Retirement Investment Committee?

12   A.  It did, yes.

13   Q.  And in your view, are they in the -- at the -- the correct

14   order of priority, or would you -- would you have a different

15   ranking of priorities?

16   A.  I would put them in this order.

17   Q.  And I want you to just go through these one by one,

18   because -- you know, they're short PowerPoint topics.  Just

19   explain briefly what each of these is and why you think it's

20   being placed here in the right order of priority?

21   A.  Number one, plan design and feature adoption rates really

22   speaks to how the plan is structured, which really gives your

23   employees the best chance of -- of saving well for retirement.

24   So plan design comes really before anything else.

25   Q.  And that includes features that you just -- like the ones

1  you just mentioned?

2  A.  Correct.

3  Q.  Automatic enrollment, automatic escalation and the like?

4  A.  Correct.

5        Next we'll look at employer contribution levels,

6  because this is beyond the savings of the individual

7  participant of what the employer contributes as well.  That's

8  all additive to a participant's retirement account.

9  Q.  And --

10  A.  So again --

11  Q.  And this piece is the one piece that's not something that

12  you as a Retirement Committee can affect so much, but it's

13  very important?

14  A.  Right.

15  Q.  Correct?

16  A.  But it's a sponsor consideration, correct.  Correct.

17        Number three -- and this is really what I hone in

18  on -- related to participation and savings levels.  So thing

19  one is to make sure that you have as many participants in the

20  plan as possible.  But thing two is they have to be saving at

21  a high enough rate because nothing will make up for somebody

22  not saving enough.  Nothing -- nothing solves for that.  So

23  it's so important that a sponsor kind of deploys everything at

24  their fingertips to effect that -- that element.

25        And then number four, plan sponsor investment

1    decisions.  So structuring a diverse lineup of choice, picking

2    the default, deciding whether or not to have a brokerage

3    window.  All that goes into plan sponsor decisions.

4              Number five is then how the participants make their

5    own decisions.

6              And then number six, plan loans just really refers

7    to the idea that -- keeping the money in the plan.  Don't use

8    your retirement account to buy Christmas presents.  Leave it

9    saving for retirement.

10   Q.  So this case is largely about -- plaintiffs' case here is

11   largely about the fourth issue, plan sponsor investment

12   decisions.  Would you agree with that --

13   A.  Yes.

14   Q.  -- having sat through the trial so far?

15   A.  Yes.

16   Q.  And it's -- and it's one of -- there are six on the list,

17   but let's say it's one of five issues that you saw to

18   influence why you were on the Committee, correct?

19   A.  Yes.  Yes.

20   Q.  And in your way of thinking, it's probably the third most

21   important of the tasks that the Retirement Committee is taking

22   on year to year to year to year?

23   A.  Yes.

24   Q.  Is that what I understand?

25   A.  Yes.

1    Q.  And -- and in -- in saying that, are you minimizing or

2    shirking your responsibility with respect to that -- with

3    respect to that task?

4    A.  Not at all.  It's just that the savings rates are so

5    important, and it's the thing that I worry about the most,

6    that -- that folks are saving as much as they can through the

7    Plan.  Because, again, nothing -- nothing is going to make up

8    for the loss of time there.  Nothing will make up for that.

9    Q.  I asked you whether you reviewed the investment lineup in

10   its entirety when you came on.  I want to ask you some

11   questions now about what are essentially the plaintiffs' big

12   three, as you've been listening to this case.

13            All proprietary lineup, length of lineup,

14   insufficient use of index funds in the Plan.  All right.  So

15   let's go one by one.  First, all proprietary lineup.  You took

16   note, I assume, when you came on to the Committee, that the

17   lineup was all American Century funds, correct?

18   A.  Yes.

19   Q.  Why were you comfortable with the investment -- investment

20   option lineup, the core lineup, given that that was the case?

21   A.  Because we still had in the lineup diversity.  Our

22   participants still had choice among asset classes.  We were

23   able to fill the style box.  So there was still plenty of

24   opportunity for diversification within that proprietary

25   lineup.

1  Q.  And how did risk and risk awareness factor into your
2  thinking, if at all?
3  A.  One of the kind of hallmarks of -- of our investment
4  management philosophy, which we talked about, is -- is a
5  sensitivity of risk and being risk aware.  And, you know, as
6  has already been brought up, we are -- we've set the record on
7  the longest bull market.  So we are operating in a unique
8  period.
9          And I spent -- in the fall of 2008, I sat with a
10 representative with a headset on for hours listening to calls
11 from people calling in saying my account is now worth half of
12 what it was last week and --
13 Q.  And where were you such that you were in a position where
14 you were listening to that kind of conversation on a headset?
15 A.  Because I was -- I was the head of the participant
16 communications and education department.  I just went over to
17 the contact center and said I need to listen in.  I want to
18 hear what people are saying so I could write any
19 communications we needed to write.  I participated in calls
20 with plan sponsors to tell them what we were hearing from
21 participants.
22 Q.  I'm going to talk about actively managed and passively
23 managed funds briefly in a little bit.  Did that awareness of
24 risk and downside risk always play a part in your thinking?
25 A.  Yes.

1    Q.  And in evaluating this all American Century lineup, what

2    consideration did you give to the knowledge of these funds and

3    these portfolios and the portfolio teams?

4    A.  Well, first and foremost was related to the access -- that

5    we had not only easy access, we had immediate access to

6    portfolio management.  You know, we didn't have to wait six

7    months to get someone scheduled.  We could get to them

8    quickly.  So we had intimate knowledge.  We had people on the

9    Committee like Margie Morrison when I joined the Plan -- when

10   I joined the Committee.  Chris Bouffard before that.  These

11   are folks who live and breathe with these products.  So we had

12   that -- that institutional knowledge of the funds.

13   Q.  So it's been asked -- and I've asked some witnesses --

14   didn't you have an obligation to go find the all star lineup?

15   Didn't you have an obligation to go find best in class funds

16   in each of those style boxes?

17   A.  I can't take credit for this phrase, but it, I think,

18   summarizes this best.  Best in -- in class is best in last.

19   We would constantly be running after whoever was number one

20   before.  And there's no way to do that.  And it -- it's using

21   a retirement plan to chase returns, buy high and sell low all

22   the time.

23   Q.  When you say there's no way to do that, Mr. Specht, I

24   think, was making a point in cross-examination recently,

25   today, that you could actually go back and figure out who had

1  done best last year and the year before that and the year

2  before that.  Why isn't that the right exercise?

3  A.  Because then you're basically taking everyone's accounts

4  and just following -- you're just running after those returns

5  forever.  It doesn't work for an individual investor.  It

6  doesn't work for retirement savings.

7  Q.  Does -- and in your experience, does last -- last year,

8  last three year, last five-year performance predict reliably

9  who's going to do best next year, three years, five years down

10  the road?

11  A.  It doesn't.  And -- and Margie Morrison I think showed the

12  periodic table, the quilt chart, that really showed that,

13  that, you know, if someone could predict that going forward,

14  he or she would not be working.

15  Q.  Including Margie?

16  A.  Including Margie.

17  Q.  Okay.  Let's talk about lineup length briefly.  The lineup

18  had thirty-ish funds plus all the retirement -- target date

19  funds at the time --

20  A.  Yes.

21  Q.  -- that you joined?

22  A.  Yes.

23  Q.  What did you think of that lineup length?

24  A.  Again, as a participant, I knew what the options were.  It

25  looked as I expected.  It was not the longest lineup I've ever

1    seen, nor the shortest.  It was -- it was what I've seen.  It

2    would be appropriate for a financial services organization.

3    Q.  Had -- I think one other witness referred to this, and I

4    don't want to belabor.  Had there been a trend over time and

5    were we at a point in time in a trend during this 2010 to 2018

6    time period?

7    A.  Well, I'll go back a little bit, but I'll be fast.  When

8    DC plans, defined contribution plans, first started, they

9    really were very short, three options, four options, looking

10   much more like the Thrift Savings Plan, the TSP.  And then as

11   we came into the early '90s particularly, participants were

12   demanding choice.  And the market was on a run in the '90s.

13   So many plans really ballooned from that period among in the

14   mid '90s.  I personally probably wrote, I don't know, a

15   hundred communications to participants saying that XYZ fund

16   will be added to your plan in January.  They just kept

17   ballooning to give participants more options.  I think --

18   Q.  And because you were at JPMorgan as --

19   A.  Yes.

20   Q.  -- the recordkeeper at the time, right?

21   A.  Right.

22   Q.  And it was the one sending the correspondence out --

23   A.  Right.

24   Q.  -- every time a new fund was going to be added to

25   somebody's --

1   A.   Right.

2   Q.   -- plan?

3   A.   We had to let participants --

4   Q.   And you were the one who got to write --

5              THE REPORTER:  Excuse me.

6              THE COURT:  Hold on.  Hold on.  Hold on.  She's got

7   to write down everything you say.

8   Q.   Someone had to write the letter to explain that to the

9   participants?

10  A.   Correct.

11  Q.   And the someone was you?

12  A.   That was me.

13  Q.   And you did this hundreds of times?

14  A.   Hundreds of times.

15  Q.   So you watched and participated in the growth of the

16  lineups?

17  A.   I did.

18  Q.   What were some of the longer lineups you've seen?

19  A.   Sixty, seventy funds.

20  Q.   And did we get to a point sometime after 2000 where people

21  started to reevaluate the longer is better syndrome?

22  A.   It really started after the Pension Protection Act in 2006

23  when -- when target date funds were ostensibly blessed to be

24  defaults.  We started to see lineups start to pull down a

25  little bit more.  So we -- we kind of swung the pendulum from

1  having no choice to lots of choice and then starting to come

2  back to medium choice.

3          THE COURT:  That was 2006, the Pension --

4          THE WITNESS:  Protection Act.

5          THE COURT:  -- Protection Act?  Okay.  Thank you.

6  Q.  And was there also some behavioral research being done out

7  there on that topic that maybe too much choice confuses the

8  chooser?

9  A.  Yes, there was.

10  Q.  Okay.  So during the time you've been on the Committee,

11  has it been a priority to think about whether we can trim the

12  lineup a bit?

13  A.  It has been.

14  Q.  Have you actually seen concerning evidence of participant

15  confusion that led to that effort?

16  A.  No.  We have not seen evidence of confusion.  We are just

17  looking at it if there's an opportunity to tighten the lineup.

18  Q.  One of the ways in which the lineup is allegedly too long

19  is its inclusion of several specialty funds, Global Gold, Real

20  Estate, Equity Market Neutral.  Have you observed other plan

21  lineups during your time as recordkeeper, and have you seen

22  specialty funds on the lineups of other plans?

23  A.  Yes.

24  Q.  How many and how frequently?

25  A.  The one I recall specifically writing communications about

1    was real estate, so plans adding a real estate fund.

2    Generally, the plans that have specialty funds have a few in

3    particular sectors.  And they're -- my experience -- very

4    common with financial services organizations.

5    Q.  So let's talk about active versus passive funds and the

6    Committee's approach to that issue during your tenure.  When

7    you came on to the Committee, it had no index funds, correct?

8    A.  Correct.

9    Q.  And then it added index funds a year and a half, a year

10   and three quarters after you joined?

11   A.  Correct.

12   Q.  Was it appropriate in your view when you first looked at

13   this lineup that it didn't have any index funds and, if so,

14   why?

15   A.  I thought it was appropriate.  The lineup, again, was --

16   was well diversified.  I was really focused on the addition of

17   automatic savings increases as I thought savings was the

18   number one thing we needed to address.

19   Q.  So -- but costs are one important issue to think about,

20   aren't they?  The fee levels?

21   A.  They're one thing.

22   Q.  Okay.  And -- and you knew that index funds delivered, you

23   know, funds and access to the underlying portfolio at lower

24   fees, right?

25   A.  Yes.

1    Q.   So why did that not cause you to think, gee, we should

2    have index funds in the lineup immediately?

3    A.   Again, I thought savings was the most important thing we

4    needed to address, was to get our -- our contribution rates

5    higher.  And index funds -- we were not hearing a lot from our

6    participants.  Index funds were still available on the -- in

7    the brokerage window.  But I really wanted to make sure that

8    we got our savings increase implemented first.

9    Q.   In 2016, in April, there was a decision to add the

10   Vanguard Index Funds to the lineup.  Do you remember that?

11   A.   I do.

12   Q.   What was your view on adding index funds at that time?

13   A.   I was probably a little agnostic about it, that -- that we

14   would add index funds, again, down the middle of the style

15   box, as Chat Cowherd shared on Friday.  It wasn't requiring a

16   change to anything else, that I thought we should just go

17   ahead and add them then.

18   Q.   In that same meeting, were you also -- it's in the

19   minutes, but were you also talking about the auto-escalation

20   and re-enrollment features that have been testified to?

21   A.   Yes, yes.

22   Q.   And was that something that actually you viewed to be more

23   important to long-term outcomes than index funds or not index

24   funds?

25   A.   I did.  That was my personal sense was that the

1    re-enrollment was very important and that we do the right due

2    diligence with the recordkeeper to get that done.  And I saw

3    that as a bigger priority.

4    Q.  I'll go to that re-enrollment in just a moment.  You

5    mentioned brokerage window.  There's been some criticism and

6    questioning about whether people going to the brokerage window

7    are incurring unduly high either transaction fees or

8    management fees on some of the choices there.  Have you heard

9    that testimony?

10   A.  Yes.

11   Q.  And from your job on the -- or role on the Retirement

12   Committee, are you familiar with whether there are also some

13   very low fee options that are available through the brokerage

14   window?

15   A.  There are.  There are -- there are funds in -- through the

16   brokerage window that are available as low as three basis

17   points.

18   Q.  And do you know whether there's a series of Schwab funds,

19   index funds --

20   A.  Yes.

21   Q.  -- that are available --

22   A.  Yes.

23   Q.  -- that are very low fee, along those lines?

24   A.  Very low, yes.

25   Q.  Okay.  So let's talk about auto re-enrollment.  Chat

1  Cowherd talked at length today about that.  And by the way, I

2  didn't ask about members and who's who.  Do you and Chat

3  Cowherd have a long track record running next to each other?

4  A.  We do.  We've worked together for about 22 years.

5  Q.  And -- and do you come at things from a slightly different

6  vantage point, given your different roles?

7  A.  Yes.

8  Q.  In kind of a sentence, what's your angle?  What's his

9  angle?

10  A.  I think we have complementary angles.  Chat, historically,

11  would consult with a plan sponsor.  And I bring the

12  participant point of view.  So he and I often work with

13  clients together covering both those angles.

14  Q.  Okay.  So let's -- let's talk about the re-enrollment

15  program, the feature.  I think it's been well described.  It's

16  coming online now, correct?

17  A.  Yes.

18  Q.  It was described to the Court.  It sounds a little

19  paternalistic.  Are you taking choice away from participants

20  when you put in place this automatic re-enrollment in target

21  date funds with the opt out feature?

22  A.  We are actually creating an event that assures that our

23  folks who want choice are making a decision.  And that's what

24  we're doing with the re-enrollment.

25  Q.  And the folks who don't opt out and stay with the target

1    date, are they themselves, in effect, making a choice?

2    A.   They are.

3    Q.   And that choice is?

4    A.   To -- to kind of turn the keys over to some element and

5    invest through the target date solutions.

6    Q.   And from what you've studied over time, spoken about over

7    time, is that a good place for lots of the participant base to

8    be?

9    A.   It is a good net for a lot of folks.  And the distinction

10   I would make as well is even with a sophisticated investor

11   base, there's two elements.  There's the sophistication and

12   investment knowledge, but there's also the time.  So you could

13   have someone who's very engaged and knows everything but says

14   I'm never going to spend the time to monitor my investment.

15   So a target date solution is still appropriate.

16   Q.   And people in your -- in your line of work talk about

17   inertia as an important thing to think about?

18   A.   Yes.

19   Q.   And does the -- does the auto re-enrollment feature help

20   inertia work in their long -- in the long-term interest of

21   anybody who's not paying attention?

22   A.   It does.  And that is a -- that's actually a conference

23   topic I've covered is how plans can use inertia to work for

24   the benefit of participants through automatic features,

25   creeping them up on how much they save and then doing an

1  investment re-enrollment that if they don't do anything, they

2  end up in a target date solution, which is, in most cases, a

3  more appropriate investment than left to their devices.

4  Q.  And among the Plan features that are in place, would you

5  say that auto re-enrollment is kind of over in that strong

6  nudge category?

7  A.  Yes.

8  Q.  Maybe over even near kick in the pants?

9  A.  A little bit.

10 Q.  I'll bet you're aware that the various funds in the Plan

11 have different fee levels, right?

12 A.  Yes.

13 Q.  So we've well established most of them are American

14 Century funds, but some are higher fee, some are lower fee.

15 They're all going to be -- those who don't opt out are going

16 to be put down into the target date fund.

17 A.  Yes.

18 Q.  Do those tend to be lower fee or higher fee?

19 A.  Lower.

20 Q.  Potentially less profit over to American Century as this

21 becomes effected, correct?

22 A.  Perhaps.

23 Q.  How much discussion has that gone -- gotten at the

24 Retirement Committee?

25 A.  None.

1  Q.  Why not?

2  A.  It's -- it's irrelevant to us.

3  Q.  How is -- how is the -- you're in this opt out window,

4  right?  You're in the four-week opt out window.  And Chat

5  mentioned that you're halfway through it.

6  A.  Yeah.

7  Q.  And he also mentioned you-all kind of know what you'd

8  normally expect in terms of an opt out rate.  And I forget

9  from my notes.  Did he say you'd typically expect a 30-ish

10  percent opt out?  Or what is your experience along those --

11  A.  Yeah.  My experience is it's 20 -- anywhere from 20 to 30

12  percent of folks will opt out.  I --

13  Q.  And so, typically, if you were like everybody else, you'd

14  expect in a year that there would be a lot of conformity to

15  that nice, smooth American Century glide path, right?

16  A.  Yes.

17  Q.  What are you actually finding now that you're in the

18  window?

19  A.  The last I checked, we have about 40 percent opt out with

20  two weeks to go.

21  Q.  Okay.  So there will be more?

22  A.  There will be more.

23  Q.  So you're not going to conform to the usual numbers?

24  A.  No.

25  Q.  And that's because?

1    A.  We have a sophisticated group, and we're -- we're kind of

2    forcing those folks to affirm those decisions.

3    Q.  And you may have some sophisticated folks who are deciding

4    to stay in target date funds, right?

5    A.  Yes.

6    Q.  All right.  But you're continuing to think about choice,

7    honor choice as part of your philosophy on the Committee?

8    A.  Yes.

9    Q.  And one final exhibit I want to put in front of you,

10   Ms. Gallagher.  Can we see DX 862, please.

11            So a lot of colors, a lot of stuff up here.  This is

12   not a document that you reviewed in the normal course.  This

13   is something that we've created as a demonstrative in this

14   case, correct?

15   A.  Yes.

16   Q.  And can you describe for the Court what it is, please?

17   A.  Yes.  It's a timeline that shows along the bottom topics

18   or discussions that the Committee had had over the last eight

19   years.  And the top, above -- above the year line shows

20   decisions that have been made over the last eight years.

21   Q.  So it's discussion by subject below, and then

22   action/resolutions on the top, correct?

23   A.  Yes.

24   Q.  And there's a color coding and -- and a color coding

25   legend over on the right-hand side, right?

1   A.  Yes.

2   Q.  And do those color codes make an effort to -- to group the

3   topics of discussion and action by category?

4   A.  Yes, they do.

5   Q.  So what this -- what did you think this chart -- let me

6   withdraw that question.

7           It says, Selected Retirement Committee Deliberations

8   and Resolutions.  Is this an effort to capture everything that

9   was discussed and everything that was done?

10  A.  No.  I would say these are milestones.

11  Q.  There's a list at the bottom in fine print of the various

12  exhibit numbers that it was drawn from.  Do you see that?

13  A.  Yes.

14  Q.  And have you actually spent the time to compare these

15  entries to the exhibit references to confirm whether this is

16  an accurate summary or not?

17  A.  I have not.

18  Q.  You have not.  Did you -- did you flip through the book

19  on --

20  A.  Oh, yes, yes.  I'm sorry.  Yes, yes.

21  Q.  Okay.

22  A.  I did go through those.  I did check.

23  Q.  And -- and did you review the entries here against the

24  minutes --

25  A.  Yes.

1    Q.   -- to determine whether they were accurate?

2    A.   Yes.

3    Q.   And is this an accurate set of excerpts from the Committee

4    minutes?

5    A.   Yes, it is.

6              MR. FALVEY:  I offer DX 862, please, in evidence.

7              MR. LUKAS:  No objection, Your Honor.

8              THE COURT:  Thank you.  862 is admitted.

9         (Defendants' Exhibit 862 admitted in evidence.)

10   Q.   What does the -- what does the chart, the -- the

11   demonstrative illustrate in terms of how this Committee

12   operates from consideration to action?

13   A.   I think it shows that there is consideration and debate

14   initially around kind of broad themes and topics.  And there

15   is then some discovery and questions and investigation that

16   needs to happen after our initial discussions before we make

17   the final decision to implement.

18   Q.   So there's a color code on here for yellow?

19   A.   Yes.

20   Q.   And -- and the legend tells us that's -- those are entries

21   relating to reduced lineup size?

22   A.   Yes.

23   Q.   And the first entry we see below the line is a discussion

24   in June of 2010 that this Hewitt study is coming online.  Do

25   you see that?

1    A.   Yes.

2    Q.   Then there's an entry above the line for the removal of

3    some funds at the April 2011 meeting.  Do you see that?

4    A.   Yes.

5    Q.   And then considerably later in time, more discussion in

6    2016, and then some removal of funds again in 2017?

7    A.   Yes.

8    Q.   And is that kind of the way the chart works, you can kind

9    of follow through thinking and action on various of the topics

10   that the Retirement Committee has taken on?

11   A.   Yes.

12   Q.   Let's just look at two quick more examples.  Tan is the

13   auto-escalation entry?

14   A.   Yes.

15   Q.   What's the -- what does the chart show us there?

16   A.   That there was a discussion of adding auto-escalation

17   starting in October of 2012.

18   Q.   And it has continued through when?

19   A.   It continued through 2015, the decision to add it made in

20   July of 2015, and then the implementation in November of 2016.

21   Q.   So it shows that kind of path of consideration to action?

22   A.   Yes.

23   Q.   And now another example would be one of the ones -- one of

24   the topics that's been at the heart of this case, the

25   discussion of active against passive funds back in December of

1    2010.  That's in light blue, correct?

2    A.  Yes.

3    Q.  And then we can see more discussion in 2015 and -- and

4    then adding of Vanguard sleeve in 2016?

5    A.  Yes.

6    Q.  There's -- there's a topic that's come up of effort to

7    sequence activities and -- of the Committee from time to time.

8    Is that illustrated by this chart, or can you just explain how

9    the Committee has thought about that issue that you need to

10   sequence things sometimes and not rush into them?

11   A.  Right.  If you -- the -- the conversion of recordkeeper in

12   December 1 of 2013, that was before I joined the Committee,

13   but --

14   Q.  That's -- that's above the line?

15   A.  That's above the line.

16   Q.  It's grayed out in the -- in the background, right?

17   A.  Right.  And that is -- you know, to me, that's really a

18   marker.  A recordkeeping transition is fairly complex.

19   There -- it is disruptive to participants, and having come

20   from the recordkeeping side, there's a lot of opportunity for

21   that to go wrong and for participants to get wrong statements,

22   et cetera.  So I think it was absolutely appropriate to kind

23   of hands off related to the conversion to make sure that that

24   went as smoothly as possible.

25          THE COURT:  One moment, please.  Mr. Falvey, as I

1  look at that, what we're talking about here, that has a grayed

2  out box.  What -- what does that box -- that says date of

3  conversion to Schwab -- there's a couple grayed boxes.

4          MR. FALVEY:  Yeah.  Thanks, Your Honor.

5          THE COURT:  What's that mean again?

6  Q.  Can you explain that, Ms. Gallagher?  It's referencing

7  that -- excuse me, that legend to the right, but what's --

8  what's the point there?

9  A.  Right.  Those were changes that -- that -- that American

10  Century, that we mandated or decided upon, but those are the

11  effective dates when basically Schwab could do it.  So the

12  December 1st, 2013, was the day the system went live at

13  Schwab.

14          THE COURT:  And then November 2016, there's another

15  grayed out box.

16          THE WITNESS:  Right.  And that's the date that --

17  November 2016 is when that automatic escalation was activated

18  at Schwab, although the decision had been made sometime

19  earlier.

20          THE COURT:  There's a Schwab component here is what

21  this is?

22          THE WITNESS:  Yes.  Yes.

23          THE COURT:  Okay.

24          THE WITNESS:  They've got to update --

25          THE COURT:  That's what the grayed out box -- grayed

1  out box represents?

2            MR. FALVEY:  Your Honor, or another way to put that

3  is these are in a way items that the Committee can't take

4  credit for directly, right?  They happened external to the

5  Committee.  Although, for auto-escalation, there's a prior

6  entry above the line because you are the ones who decided to

7  add it.

8            THE WITNESS:  Yes.

9            MR. FALVEY:  The effectiveness of it was later by

10  company operation.

11            THE COURT:  Thank you.  That explains it.

12            THE WITNESS:  We had to wait until they could do it.

13            MR. FALVEY:  Thank you, Your Honor, for pointing

14  that out.

15  Q.  So, yeah.  But, generally, the idea is to show actions by

16  the Committee?

17  A.  So just following that, we really then continued to focus

18  on savings rates, as we just talked about, the discussion

19  around auto-escalation and how to implement that.  So starting

20  people at 4 percent, how high we wanted to go, to 15 percent.

21  So the mechanics.  So it's making the decision, then the

22  mechanics.  And then the dark green which, you know, we've

23  talked to with respect to the re-enrollment is making sure

24  that we had that scatter graph from Schwab, and then we could

25  discuss the little nuances of actually executing it in terms

1    of how long the window was.  And the part that's kind of

2    behind all of this is the participant communications that need

3    to be distributed -- developed and distributed.

4    Q.  Thank you.  You can take that down, Chris.

5            On issues like auto -- on savings increases and --

6    and this automatic re-enrollment is -- is this Retirement

7    Committee a leader or a follower?

8    A.  I think we're a leader.

9    Q.  And how do you know that from the data?

10   A.  Because we're starting, for example, at automatic

11   enrollment, starting higher, starting auto-escalation of folks

12   who had been at 1 or 2 percent, getting them all the way to 4.

13   Keeping that 1 percent increase to 15.  I think we -- we're

14   absolutely putting those nudges in place to make sure our

15   folks are -- are doing the best they can and the best we can

16   help them with to -- to save for retirement.

17   Q.  And do you believe this Committee has also put the hours

18   and thought and work into the investment side of the equation

19   as well?

20   A.  I do.

21   Q.  Did you ever take direction from anybody at American

22   Century outside of the Committee in connection with any work

23   that the Committee was doing on behalf of the Plan?

24   A.  No.

25   Q.  Did the Committee ever do that?

1    A.  No.

2    Q.  Did the Committee ever take into account in any way

3    financial interests of American Century in making decisions on

4    behalf of the Plan participants?

5    A.  No.

6    Q.  Have you always kept the participants' interests in front

7    as your sole concern in acting as the Committee?

8    A.  Yes.

9    Q.  Ms. Gallagher, you've had the opportunity, voluntary or

10   not, to sit here in the courtroom throughout and listen to

11   claims by plaintiffs' experts in particular, and perhaps

12   through some of the questioning of defendants' counsel,

13   suggesting that the Committee that you serve on has acted

14   disloyally to its participants and imprudently.  Do you have a

15   response or reaction to that, given your knowledge of this

16   Committee's work and processes?

17   A.  I do.

18   Q.  And what is it?

19   A.  We have been using the term plan participant as jargon.

20   And I have worked with -- on behalf of plan participants my

21   whole career.  The participants in this Plan are -- are

22   colleagues.  They're our friends.  It's unconscionable to me

23   that we wouldn't consider their best interests first.

24   Q.  And has that ever happened?

25   A.  No.

1   Q.  You mentioned your secretary earlier.  Was there a time

2   when you sat with a group of admins in your job at American

3   Century?  Were you kind of on a -- in an area where you were

4   kind of surrounded by admins?

5   A.  Yes.

6   Q.  And did you -- did you talk to them a lot about their

7   involvement in the Plan?

8   A.  I did.  I talked to --

9   Q.  Why?

10  A.  -- them a lot.  I wanted to make sure they were saving.

11  That was my biggest worry.  That they weren't looking too --

12  they weren't looking ahead far enough.  They were worried

13  about their kids and taking care of what they need to take

14  care of right now.  And I just wanted to make sure that they

15  were taking the full advantage of the match, they were saving

16  as much as they could in the Plan.  And -- and that's what I

17  would talk with them about.

18  Q.  Is that what the Committee has done?

19  A.  Yes.

20          MR. FALVEY:  That's all I have.  Thanks,

21  Ms. Gallagher.

22          THE COURT:  All right.  Thank you, Mr. Falvey.

23          Mr. Lukas, sir.

24          MR. LUKAS:  Thank you, Your Honor.

25                          CROSS-EXAMINATION

1    BY MR. LUKAS:

2    Q.  Good afternoon, Ms. Gallagher.

3    A.  Good afternoon.

4    Q.  So I'm going to just sort of start in the order of my

5    notes.  So I'm going to kind of track Mr. Falvey's exam, I

6    believe.  And I wanted to start with DX 738, which is that

7    material from your San Francisco conference back in 2015.

8    A.  Uh-huh.  Yes.

9    Q.  If you could turn to page -- let's see -- 10.  Some of

10   these pages look like they're from a survey.  Do you conduct

11   some kind of a survey in order to give this speech?

12   A.  Yes.

13   Q.  And how do you do that?  Like what's the -- what's the

14   population that you survey?

15   A.  We work with a -- a research firm in Washington, D.C. to

16   do the field work.  And we survey plan participants across the

17   country.

18              THE COURT:  Is that Greenwald?

19              THE WITNESS:  That's Greenwald & Associates,

20   correct.

21   Q.  And on this -- and this particular page is basically

22   showing what little confidence plan participants have in

23   choosing the correct investments for their retirement lineup,

24   right?

25   A.  Correct.  In the national sample.  Correct.

1    Q.   And you mentioned the balance between preserving choice

2    but providing the best path.  Do you remember that?

3    A.   Yes.

4    Q.   And providing the best path includes -- actually, both

5    include the lineup that the Committee chooses for the core

6    lineup for the Plan, correct?

7    A.   Yes.  The -- the survey -- the first element, I think the

8    page that's before this -- what we heard from plan

9    participants in our study, their number one regret they have

10   is not saving enough.  So they say, I didn't save enough.  I

11   don't really know how I invested, but their first element was

12   how important it was to save.

13   Q.   And the other page that I wanted to bring your attention

14   to was page 25.  And this one's talking about the importance

15   of a -- the existence of a retirement plan to employees or

16   even potential employees, correct?

17   A.   Yes.

18   Q.   This slide is geared a little more toward the employers in

19   the audience, obviously, trying to highlight the importance of

20   a 401(k) plan from a attractive -- attracting employees and

21   retaining them, correct?

22   A.   Yes.

23   Q.   You said best in class is best in last.  What's -- so your

24   definition of best in class means performance chasing?

25   A.   In that instance, yes.

1  Q.  Okay.  Have you heard the phrase best in class means

2  something different than performance chasing?

3  A.  Yes.

4  Q.  And what -- how would you -- how -- what's the definition

5  of how you've heard it, the different definition of it?

6  A.  An additional dimension would be not just performance, but

7  looking at style drift, et cetera.  But when it is most --

8  most often used, it's referring to what's number one right

9  now.

10  Q.  But you have heard it used differently from investment

11  professionals when they're talking about best in class?

12  They're not talking about just investing in what was the best

13  thing last year, right?

14  A.  I don't know that I've heard it in that context.

15  Q.  Okay.  Does the performance of a fund matter?

16  A.  It is one of the factors, yes.

17  Q.  Why does the Committee bother to monitor the funds?

18  A.  To make sure that what we're putting forward is -- is an

19  appropriate lineup for our participants.

20  Q.  And the idea of monitoring is, at some point you would

21  remove a fund if you thought it no longer did that, correct?

22  A.  If that were the case.

23          MR. LUKAS:  And will you put up that chart?  You

24  can't read my mind?  Yeah, that one.  You normally do.

25          THE COURT:  Yeah, when you say put the chart, I

1    wonder how many charts we have here.  I'm with Karla on this

2    one.

3    Q.  So you talked about if appropriate, you would remove.  But

4    as I understand it, looking at this chart, we removed six

5    funds back here, April 6, 2011, and we removed -- or when I

6    say "we," the Retirement Committee removed six in March 23rd,

7    2017, right?

8    A.  Yes.

9    Q.  And --

10            THE COURT:  And for the record, this is DX 862.

11            MR. LUKAS:  Thank you, Your Honor.

12            THE COURT:  You got it.

13   Q.  Yeah.  I circled the box, the April 6, 2011, box, remove

14   six funds.  And I circled the box March 23, 2017, freeze one

15   fund and remove six.  And they're both yellow coded.  And I am

16   correct that between those two dates, no funds were removed

17   from the Plan, correct?

18   A.  According to this chart.  I can't speak to prior to --

19   Q.  Okay.  We know a Vista fund was closed by American

20   Century, and so that came out of the Plan.  But it wasn't

21   removed by the Committee, correct?  That was around 2014, I

22   think.  Is that about right?  Something like that?

23   A.  I don't remember the date, but, yeah.

24   Q.  And then we had the American Century Equity Index Fund

25   close, and so that came out of the Plan, but that wasn't a

1    removal from the Committee, correct?

2    A.  Again, I was not on the Committee at the time.  That's

3    what we've heard.

4    Q.  Okay.  And when we were talking about adding the index

5    funds, one of the things I heard -- you can take that off,

6    Karla.  Thanks.

7          One of the things I heard was that with respect to

8    adding index funds over the years, you were more concerned

9    about design and -- or more focused on design and features of

10   the Plan; is that right?

11   A.  Yes.

12   Q.  And then when the Committee did talk about it on April

13   28th of 2016, they added those index funds two weeks later,

14   right?

15   A.  It was -- the vote was shortly thereafter.

16   Q.  Right.  And you met on it, talked about it on the 28th,

17   and then two weeks later, it was voted on and approved.  In

18   fact, you even finalized the vote by email, correct?

19   A.  And we did it by email really because of me, because I

20   wasn't in the office.

21   Q.  Well, you didn't want to wait until the next meeting.  You

22   did it by email so that it was all voted on and done within

23   less than a month from when you met and talked about it,

24   right?

25   A.  We didn't need to wait until the next -- we didn't need to

1    wait until the next meeting.

2    Q.  I understand you didn't need to wait, but that was the

3    first time that the Committee voted by something on email with

4    respect to adding or subtracting from the Plan, correct?

5    A.  In the time that I had been on the Committee, that's

6    correct.

7    Q.  Okay.  Now, the job of -- of the client portfolio managers

8    that Ms. Morrison supervised -- you were here for her

9    testimony, and we kind of went through that -- that chart.

10   It's their job to talk to other plans and other clients just

11   like they came and spoke to your Committee, correct?

12   A.  That's my understanding of their responsibilities, yes.

13   Q.  Uh-huh.  And it's their job to be able to articulate

14   reasons why a fund may be not performing up to expectations if

15   that's the case, correct?

16   A.  That would be one of the things they would cover.

17   Q.  And it's their job to give optimistic reasons why a fund,

18   an American Century fund that is not performing up to

19   expectations will improve, correct?

20                MR. FALVEY:  Objection.

21                THE COURT:  Yeah.

22                MR. FALVEY:  Misstates.

23                THE COURT:  Well, I think it's a fair question, but

24   I think there's like four questions there that I think could

25   be merged into one maybe.

1          MR. LUKAS:  You can ask it.

2          THE COURT:  I mean, Ms. Morrison testified that part

3     of -- that they would communicate and explain things in the

4     context that Mr. Lukas has described.  True, Mr. Falvey?  Do

5     you agree with that?

6          MR. FALVEY:  Yes.  It's the optimistic piece that I

7     think there's been absolutely no testimony or direct evidence

8     on.

9          THE COURT:  Well, I'm suggest -- I believe that I

10    can ask one question for the four that he asked in that they

11    just -- they would answer questions.  They would interact and

12    say, hey, what questions do you have about this.  Because

13    Ms. Morrison was very capable of answering those questions.

14    And that type of interaction was what you got from

15    Ms. Morrison, true?

16         THE WITNESS:  True.

17         THE COURT:  That's what I got from Ms. Morrison.  I

18    assume that's what you got from Ms. Morrison.  Okay.  So --

19    Q.  Okay.  And when the --

20         MR. LUKAS:  I'm sorry, Your Honor.  Did I cut you

21    off?

22         THE COURT:  That's just -- my point is -- I think

23    your question's a fair question, but --

24         MR. LUKAS:  But yours was better?

25         THE COURT:  Well, mine -- mine's --

1          MR. FALVEY:  Judge's are always better.

2          THE COURT:  Yeah.  Thank you, Mr. Falvey.  Please

3    write that down.  That's a good point today.  But I think we

4    could ask one question to solve this.  I'm trying to -- I'm

5    trying to speed things along.  I'm sorry.  Go ahead.

6          MR. LUKAS:  No.  That's okay.  That's okay, Judge.

7    That's okay, Judge.

8    Q.   And so, Ms. Gallagher, when the American Century client

9    portfolio managers or American Century fund managers presented

10   to the Committee, did the Committee ever decide to remove the

11   fund despite what they told them about the fund?

12   A.   In the meetings -- in the Committee meetings that I've

13   been in, we have had continued discussion after they're out of

14   the room, after we've had our questions answered, but we've

15   not voted to remove the fund.

16   Q.   Okay.  And the same is true when you don't have an

17   American Century portfolio manager or a fund manager come in

18   and talk.  You don't have those -- those people come in and

19   talk about what's on the Watch List every -- every meeting.

20   It looked like you just -- some meetings you'd just talk about

21   what was on the Watch List, right?

22   A.   It has not been every meeting that we've had a guest

23   speaker.

24   Q.   And it seemed to me from reading the minutes when those --

25   those occasions, it was usually Ms. Morrison that would lead

1  the discussion about why or the perceived reasons why it was

2  doing poorly and what the future appears to hold for that

3  fund.  Is that a fair statement?

4  A.  She would facilitate those conversations because that is

5  her area of expertise.

6  Q.  Right.  And do you recall Ms. Morrison during those

7  times -- we looked at the minutes, but I'm wondering if you

8  recall her ever suggesting that, you know, we should really

9  get out of this fund?

10  A.  I don't recall a conversation like that.

11  Q.  Nothing like, you know, this is our weakest team, they've

12  been underperforming for a long time, we should really get rid

13  of this fund?  Nothing like that that you can recall?

14  A.  I don't -- I don't recall a conversation like that.

15          MR. LUKAS:  Okay.  I have no further questions, Your

16  Honor.

17          THE COURT:  All right.  Thank you.  Any redirect?

18          MR. FALVEY:  None, Your Honor.  Thank you.

19          THE COURT:  Ms. Gallagher, please take your seat,

20  right?

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you.

23          MR. FALVEY:  Not allowed to leave the table here,

24  though.

25          THE COURT:  We've got to get -- yeah, we got to get

1    Mr. Fleckner out of the way there.  Okay.  Let's call our next

2    witness.

3              MR. FLECKNER:  Okay.  Defendants next call Kathleen

4    Mann.

5              THE COURT:  Please come forward.  And I note there's

6    15 minutes left.  So we'll start --

7              MR. FLECKNER:  Do you want to break first or --

8              THE COURT:  No.  I'd rather start and get 15 minutes

9    in.

10             MR. FLECKNER:  Sure thing.

11             THE COURT:  Ma'am, would you please face our clerk,

12   raise your right hand and be sworn?

13        KATHLEEN MARY MANN, DEFENDANTS' WITNESS, SWORN

14             THE COURT:  Please have a seat.  Welcome.  And would

15   you like some water?

16             THE WITNESS:  Yeah.  Thank you.

17             THE COURT:  Okay.  Take -- here.  I got it.  It's a

18   little bit hard to reach there.

19             THE WITNESS:  Thank you very much.

20             THE COURT:  It should be a little bit almost cold I

21   think.

22             And Ms. Mann, if you would grab that microphone and

23   pull it close to you and try to speak in it, that will help

24   us.  And begin, if you would, by speaking your full name and

25   spelling your last name.

1          THE WITNESS:  Kathleen Mary Mann, M-A-N-N.

2          THE COURT:  Thank you.

3          Mr. Fleckner, sir.

4          MR. FLECKNER:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6     BY MR. FLECKNER:

7     Q.  Good afternoon, Ms. Mann.

8     A.  Hello.

9     Q.  I want to start by asking, have you been retained as an

10    expert in this case?

11    A.  Yes.

12    Q.  Okay.  And for what purposes have you been retained?

13    A.  I've been asked to opine on American Century Retirement

14    Committee's practices in overseeing and managing their 401(k)

15    plan, as well as answering questions with respect to the

16    expert reports of some -- two of their experts.

17    Q.  Okay.  Have you ever been an expert before?

18    A.  No, I have not.

19    Q.  Okay.  So this is your first time testifying in this

20    capacity, correct?

21    A.  Yes, it is.

22    Q.  Okay.  And are you being compensated for your expert work

23    in this case?

24    A.  Yes, I am.

25    Q.  Okay.  And at what rate?

1  A.  $775 per hour.

2  Q.  Okay.  And, Chris, if you can pull up the first Mann

3  demonstrative, DX 863.  Maybe just to expedite the background

4  section, we've put together a slide here of your experience.

5  Is this an accurate representation of highlights from your CV?

6  A.  Yes.

7        MR. FLECKNER:  Okay.  We move the admission of

8  demonstrative DX 863, Your Honor.

9        THE COURT:  Any objection?

10        MR. SPECHT:  None for demonstrative purposes, Your

11  Honor.

12        THE COURT:  All right.  Thank you, Mr. Specht.

13     (Defendants' Exhibit 863 admitted in evidence.)

14  Q.  Okay.  And maybe you can just walk the Court through your

15  background, starting with your educational background at the

16  bottom.

17  A.  Sure.  I have a BA in economics from Boston College and

18  earned an MBA in finance from Babson College, also located in

19  Massachusetts.

20  Q.  Okay.  And was there a particular concentration in your

21  MBA course?

22  A.  Yes, finance.

23  Q.  Okay.  And why don't you tell us about -- I'd like to go

24  now through your employment history after college, so maybe

25  reverse chronological order from the bottom up.  Can you tell

1    us -- let's start following graduation from business school.

2    A.   Sure.  Following graduation from undergrad, I started work

3    at Fidelity Investments and was trained as a registered

4    representative, earning the FINRA certification 6 and 63.

5    Those are the certifications necessary to speak to investors

6    and prospects.  I --

7    Q.   Okay.  And let me just pause there for a moment.  I think

8    we heard some discussion earlier today about Fidelity.  That's

9    a large asset manager, correct?

10   A.   Yes, it is.  One of the largest asset managers in the

11   world.

12   Q.   Okay.  So -- I'm sorry.  I interrupted you about your

13   qualifications.  You said that you were licensed when you were

14   at Fidelity; is that correct?

15   A.   Yes.

16   Q.   Okay.  And which licenses again?

17   A.   Series 6 and 63.

18   Q.   Okay.  And I think we've heard testimony about those FINRA

19   licenses.  And can you just tell us generally the jobs that

20   you performed while you were at Fidelity?

21   A.   Yes.  So the first job was as a registered representative,

22   talking to clients and prospects.  And soon after, I was asked

23   to join the global bond trading -- or the bond trading desk,

24   where I was trading U.S. government and corporate bonds and

25   eventually joined a team starting a global bond fund where I

1    began transacting sovereign bonds, currencies and derivatives.

2            THE COURT:  This is my signal for slow it down --

3            THE WITNESS:  Slow it down.

4            THE COURT:  -- just a little bit, please.

5            THE WITNESS:  Thank you.

6            THE COURT:  Thank you.

7            THE WITNESS:  Thank you.

8    Q.   Okay.  And when you say sovereign bonds, what do you mean

9    by that?

10   A.   International government bonds.

11   Q.   Okay.  And you were there, according to the CV, until

12   1992; is that accurate?

13   A.   Yes.

14   Q.   Okay.  And what did you do after that?

15   A.   Soon after that, I actually had a small consulting whirl

16   in between here working for Massachusetts Financial Services,

17   MFS.  I did a consulting job for the head of risk management.

18   And the work that I performed there was helping to enhance the

19   risk reporting of the portfolio reports for both internal

20   portfolio managers and management.

21   Q.   Okay.  So you analyzed risk in portfolios, correct?

22   A.   Yes.

23   Q.   And then what did you do after that?

24   A.   So I began -- I was recruited to Putnam Investments.

25   Putnam had amassed about $4 billion in global fixed income

1    assets and was in search of a new trader to trade their

2    hundreds -- their multibillion dollars.

3    Q.   Okay.  And again, you were trading bonds and sovereign

4    debt instruments; is that accurate?

5    A.   Global bonds, currency forwards, and other derivatives,

6    yes.

7    Q.   Okay.  And I think you said billions in assets while you

8    were at Putnam; is that fair?

9    A.   Approximately 4 billion, yes.

10   Q.   Okay.  And then following Putnam, what did you do?

11   A.   I -- later in 1998, I joined State Street Global Advisors,

12   SSGA for short.  SSGA is the investment arm of State Street

13   Bank where SSGA manages about 2.7 trillion dollars in assets.

14   My job was as a product engineer, which is also at State

15   Street a portfolio management role that reported up to the --

16   to the chief investment officer.  I was hired to do that work

17   in the area of global asset allocation.  And it was my

18   fundamental macroeconomic background from Putnam Investments

19   that was needed and a complement to a more quantitative

20   organization.

21   Q.   And maybe just for the Court, what do you mean by

22   fundamental macroeconomic background?

23   A.   So the work I did at Putnam was in doing economic research

24   on the country's politics within them, their bond markets,

25   interest rates, and currency expectations at -- in global

1  bonds.  And it was that fundamental work that was helpful at

2  State Street Global Advisors.

3  Q.  Okay.  And so your first role at State Street Global

4  Advisors was as this product engineer that you've just

5  described, correct?

6  A.  Yes.

7  Q.  And roughly how much in assets did that team manage while

8  you were there?

9  A.  Between 20 and 50 billion dollars.

10  Q.  Okay.  And that's over a period of time.  Did you then

11  progress to a different role within State -- the State Street

12  organization?

13  A.  Yes.  So at first, my boss asked if I would take on a role

14  to include currency strategies in my portfolio management

15  work.  But about five years after I was at State Street Global

16  Advisors and had been working with large institutional clients

17  as well as speaking to prospects of global clients around the

18  world, including central banks and other very large

19  institutions, by virtue of having spent a lot of time on

20  really every asset class, multiple asset classes, including

21  U.S. and international Equities, small, mid and large cap

22  stocks, bonds, international bonds, and money market funds, I

23  was asked to head up the Office of the Fiduciary Advisor.

24  Q.  Okay.  According to our exhibit, DX 863, that was in

25  approximately 2003, correct?

1  A.  Yes.

2  Q.  Okay.  And tell us what the Office of Fiduciary Advisor at

3  State Street Global Advisors does?

4  A.  So the Office of the Fiduciary Advisor is a -- a broad

5  advisory work group advising plans holistically.  So where

6  most of the other work at SSGA is done as individual

7  investment management, this was advice, planning, work on

8  asset allocation, plan lineup, mutual funds selection and

9  oversight, or investment strategy, selection and oversight,

10 helping investment committees of retirement plans and

11 endowments do their work as fiduciaries, including things like

12 helping them set agendas and helping deliver on the research

13 that was needed to help support their work as fiduciaries.

14 Q.  Okay.  And were those retirement plan committees both

15 defined contribution or 401(k) type committees and committees

16 with responsibility for pension or DB, defined benefit assets?

17 A.  So many of those plans were retirement committees that

18 were both committees for DB and DC plans.

19 Q.  Okay.  And so some were specifically DC as well, correct?

20 A.  Correct.  Yes.

21 Q.  Okay.  And for those plans, either type of plans, the DC

22 plans or the DB plans, was the role at the Office of the

23 Fiduciary Advisor to be actually a fiduciary or a co-fiduciary

24 for those plans?

25 A.  Yes.  We typically contracted as a co-fiduciary for that

1    work and in some cases actually were the fiduciary for one of

2    the largest DC plans.

3    Q.  And can you tell us, how large were the DC plans that you

4    had any involvement with, either as a co-fiduciary or

5    otherwise working with?

6    A.  Yes.

7    Q.  How large were those?

8    A.  Between about 25 million dollars and several billion

9    dollars.

10   Q.  Okay.

11          THE COURT:  So as he's doing that, as a -- someone

12   who studies macroeconomics, are you concerned about how much

13   commercial debt is out here in the -- in our locally -- in our

14   economy here in the United States?

15          THE WITNESS:  Yes.  In some parts, yes, to -- to

16   much degree.  And then we have a really nice growth trajectory

17   right now happening.  GDP growth is quite strong.  So

18   eventually, that will catch up with us.

19          THE COURT:  Okay.  Thank you.  I -- I thought I'd

20   take a little bit for me here --

21          MR. FLECKNER:  They're insights.

22          THE COURT:  -- while you all are fighting this out.

23          MR. FLECKNER:  It's your stage, so whatever --

24   whatever questions you have, certainly.

25   Q.  I just wanted to amplify one point.  You said that

1    sometimes you might help these committees with their agendas.

2    Were there other aspects of their fiduciary process that you

3    would work with them on?

4    A.  Yes.  To a certain extent, listening to Ms. VanWagoner

5    earlier, some of the work that the Office of the Fiduciary

6    Advisor did was similar to work as a consultant, like

7    DeMarche.  As a co-fiduciary, and in the cases as a fiduciary,

8    the work that we did was really help enhance the processes of

9    the investment committees with whom we worked.

10            In some cases, it was providing an educational

11   topic.  In some cases, it was helping them to evaluate and

12   enhance the asset allocation lineup of their plan, et cetera.

13   But with respect directly to your question about agendas,

14   sometimes we were helping to set or enhance the agendas and

15   then helping the committees follow through with them.

16   Q.  And did you ever have occasion to help committees with

17   their Investment Policy Statements?

18   A.  Yes.

19   Q.  Okay.  Maybe elaborate just a little bit on that.

20   A.  Sure.  Probably looked at a large number of Investment

21   Policy Statements.  For the Office of the Fiduciary Advisor,

22   working with our legal team, we drafted one sort of template

23   Investment Policy Statement that several clients might have

24   used if they didn't have one of their own, but really did a

25   lot of reviewing of Investment Policy Statements, about 25 of

1    them.

2    Q.   Okay.  And roughly how many fiduciary committees did you

3    work with during your ten years at the Office of Fiduciary

4    Advisor?

5    A.   Between 30 and 50, of which 30 were more ongoing clients.

6    And of those, about five were ongoing DC clients.  Of the

7    other plans, of the DB plans, maybe about 15 of those would

8    also ask us to do periodic discrete work on their DC plans.

9    Q.   Okay.  And did you observe that all the fiduciary

10   committees they worked with operated exactly the same way and

11   had exactly the same processes?

12   A.   Absolutely not.

13   Q.   Okay.  Did you observe a variety of processes in your

14   career?

15   A.   Yes.

16   Q.   Okay.

17   A.   Every single committee that we worked with and every

18   single plan was different from each other.

19   Q.   Okay.  And maybe just one last question to wrap this up,

20   and then our break.  Could you just describe briefly what

21   you've done professionally since 2013.

22   A.   Sure.  I was the chief investment officer at one of the

23   local law firms in Massachusetts where trust assets can be

24   managed in-house, for about $2 billion in assets.  And then

25   more recently spent time at the Massachusetts Technology

1    Collaborative spending my time learning financial technology

2    and FinTech.

3            MR. FLECKNER:  Okay.  I was about to move to a

4    different topic, but maybe there's a break?

5            THE COURT:  I think now is a good time for our

6    recess.

7            MR. FLECKNER:  Great.

8            THE COURT:  We'll take a 20-minute recess, since

9    this is the afternoon recess.  And thank you.  We'll be in

10   recess.

11           THE WITNESS:  Thank you.

12      (Recess at 2:59 until 3:21 p.m.)

13           THE COURT:  I'd like to start by announcing, we

14   usually go until five o'clock.  If I can just stop at 4:45

15   sharply --

16           MR. FLECKNER:  Okay.

17           THE COURT:  -- today because of something I need to

18   attend to.  Okay.  Sorry about that.  But we will make it up

19   to you somehow.

20           MR. FLECKNER:  No problem.  We cut a witness today.

21           THE COURT:  We'll cut off some direct and some

22   cross, how about that?

23           MR. FLECKNER:  We cut a whole witness.  We'll be

24   efficient.  We'll be efficient.

25           THE COURT:  That would be great.  That would be

1    great.  Thank you.  Please proceed.

2         MR. FLECKNER:  Okay.  Do you need her name back for

3    the record?  I forget.

4         THE COURT:  No, not until maybe -- after evening

5    break we do that generally.  Thank you.

6         MR. FLECKNER:  Okay.  Very good.

7    Q.  Okay.  So, Ms. Mann, welcome back.

8    A.  Thank you.

9    Q.  Now I want to turn to the opinions that you rendered in

10   this case.  And, first, can I just ask, what did you do to

11   render the opinions in this case?

12   A.  I reviewed the Plan documents, the meeting materials,

13   the -- a number of different publicly available research data

14   like Deloitte studies, et cetera.

15        THE REPORTER:  I'm sorry?

16        THE WITNESS:  I'm sorry.  Deloitte studies.

17        THE COURT:  Deloitte.

18        THE WITNESS:  Hewitt studies.

19   Q.  And did you review any materials looking at the Plan's

20   participation base?

21   A.  Absolutely, yes.  I -- included in the meeting materials,

22   I looked at the Plan's not only participation rates, the rates

23   at which participants were saving, as well as Plan balances.

24   Q.  Okay.  And based on the review that you did, did you form

25   any conclusions?

1   A.  Yes, I did.

2   Q.  Okay.  And can you just give a brief overview of your

3   conclusions, and we'll go through them in more detail?

4   A.  Sure.  I thought that the work of American Century

5   Retirement Committee was very solidly performed.  I felt that

6   they executed their fiduciary duties in some areas in a very

7   exemplary matter, in some areas consistent with trends,

8   with -- with industry standards and practices that I have seen

9   in the large number of plans that I have worked with over my

10  career.

11  Q.  Okay.  Well, let's -- let's start walking through some of

12  those opinions.  If you could bring up the second

13  demonstrative, Chris.  And I want to start with the

14  composition of the Committee.

15          What did you observe about the members of the

16  Retirement Committee during the class period, which is June

17  2010 to the present?

18  A.  So I thought it was terrific that the Committee included

19  one or two CFAs for all of its time periods, senior executives

20  that -- that -- based on the -- my reading of the record were

21  empowered to make decisions and render opinions on important

22  matters.

23  Q.  Okay.  And did you -- when you say that they were senior

24  employees, did you see whether or not they were operating free

25  of management influence?

1   A.  Yes.  It was -- it's my opinion that the Committee was,

2   while appointed by the Management Committee, operated without

3   any undue influence by management of the organization.

4   Q.  Okay.  And we heard earlier today reference to C-Suite.

5   Did you see the existence -- except for Ms. Neumann, who's a

6   technology officer, did you see any representation of C-Suite

7   executives?

8   A.  No, I did not.  And that's not typical.  Some of the

9   committees that I have seen and worked with have CFOs, have

10   general counsels, but some C-Suite members on their

11   committees.  And I thought this was a very effective rendering

12   of a Retirement Committee.

13   Q.  Okay.  And Demonstrative 3, Chris.  I think you mentioned

14   that you didn't observe any senior executives or management

15   influencing on the Committee.  Did you see management of

16   American Century have any role with respect to the Plan?

17   A.  Yes.

18   Q.  And what was that?

19   A.  Management Committee was responsible for appointing the

20   Retirement Committee members.  And I saw in the record

21   periodic keeping the Management Committee members abreast of

22   important matters.

23   Q.  Okay.  And based on your experience, was the Management

24   Committee's level of involvement consistent with what you see

25   in the industry?

1   A.   Yes.   Not hovering, not hovering over and making decisions

2   for the Committee.   Really empowering the Retirement Committee

3   to discharge its duties.

4   Q.   Okay.   Did you see any red flags or other warning signals

5   from the Committee or the operation of the Plan that might

6   counsel that the Management Committee take a more active role?

7   A.   No.

8   Q.   And, third, I want to talk -- Chris, Demonstrative 4.   I

9   want to talk about how Committee members joined the Committee.

10  Did you review information in the record about how Committee

11  members joined the Committee, the onboarding of Committee

12  members?

13  A.   Yes.

14  Q.   Okay.   And did you make any observations with respect to

15  that onboarding process?

16  A.   Yes.

17  Q.   And what was that?

18  A.   The fiduciary onboarding practice of this Committee is one

19  of the very exemplary things, practices that I have seen among

20  many of the committees that I have worked with.   The fiduciary

21  toolkit with which they were presented was solid.   The

22  material and the seriousness with which the organization took

23  and explained to new Committee members was their

24  responsibility.   And doing an in-person meeting as well to

25  walk through both the materials and the responsibilities was

1    really outstanding.

2    Q.   Do you typically see those kinds of in-person meetings

3    with other committees that you've worked with over the years?

4    A.   Some in-person meetings, but the combination of the

5    toolkit and the meetings and the materials shared was, I

6    thought, really outstanding.

7    Q.   Okay.  Based on your review of the material and some of

8    the testimony that you've seen -- and I know you've been in

9    the courtroom for some of the testimony, do you believe that

10   the Committee members understood that they were fiduciaries?

11   A.   Yes.  I strongly felt that way based on my reading of the

12   record, but I felt -- I feel even more strongly that way after

13   hearing some of the testimony.

14   Q.   Okay.  And -- and have you seen any indications in the

15   record that you reviewed that any of the fiduciaries acted

16   contrary to their obligations?

17   A.   No, I did not.

18   Q.   Okay.  I now want to move to the process that the

19   Committee utilized that you observed.  So let's start with

20   Demonstrative 5, Chris.

21        I'd like to start with the Investment Policy

22   Statement.  You've had an opportunity to review the Investment

23   Policy Statements that were applicable during this time

24   period?

25   A.   Yes.

1          MR. SPECHT:  Your Honor, I have an objection to the

2     way that this examination is proceeding.  It seems like

3     Mr. Fleckner is just sort of giving her a demonstrative that

4     summarizes her report, and he's asking if she agrees with it.

5     And I don't want to slow things down, but at the same time, I

6     don't think it's fair to just lead the witness this way.

7          MR. FLECKNER:  These are just, you know, point

8     slides as a guidepost to try and move this along.

9          THE COURT:  Yeah.  Listen, you're going to have a

10    chance to cross-examine.  I -- I want him to really do it the

11    way he's doing it to kind of make things move along here.

12    This witness wrote an expert report.  And these seem to be

13    consistent with that expert report.  And I'm -- I'm going to

14    overrule your objection at this time.

15         Please continue doing the same thing you're doing,

16    Mr. Fleckner.

17         MR. FLECKNER:  Thank you, Your Honor.  I will.

18    Q.   Why did you start with the Investment Policy Statement?

19    A.   I always start with the documents.  I think that that's

20    the first place to go.  It is the guidepost, and it's a set of

21    guidelines that every committee has to work with.  And I

22    really wanted to see in their words what their

23    responsibilities entailed and how they articulated their

24    responsibilities.

25    Q.   Okay.  And, again, we've heard quite a bit about the

1  Investment Policy Statements, so I won't go through all of the

2  specifics, but let me ask at a higher level.  Do all

3  retirement plan committees that you've worked with or observed

4  utilize an Investment Policy Statement?

5  A.  I would say they didn't all utilize Investment Policy

6  Statements earlier on, maybe in the '06s, before the PPA.  And

7  I would say since the Pension Protection Act, more committees

8  use an Investment Policy Statement.

9  Q.  Okay.  Would you consider this to be best practice?

10  A.  Yes.

11  Q.  Did you observe any indication in the record as to whether

12  the Retirement Committee adhered to the Investment Policy

13  Statements?

14  A.  Yes.  Everything that I read in the record indicated that

15  the Investment -- the Retirement Committee operated according

16  to its Investment Policy Statement.

17  Q.  And how would you compare the Committee's utilization of

18  the Investment Policy Statement to that of other committees

19  that you've observed in your career?

20  A.  Well, not every committee uses their IPS, if I can call it

21  that, and keeps it at every meeting as a reference tool.  I

22  thought that was a very -- a very solid practice.  This

23  committee also updated its Investment Policy Statement that I

24  saw five times, I believe, over the course of the -- of the

25  period.  And so it was a living, breathing document.

1  Q.  Okay.  And again, how does that compare to other

2  committees that you've observed in your career?

3  A.  Very strong practice.

4  Q.  Okay.  And I'd like to talk about some of the specifics,

5  more generally.

6          Let's wait one second, Chris.

7          More generally, how would you compare the substance

8  of the Plan's IPS or Investment Policy Statement with those

9  that you've reviewed or -- I think you talked about actually

10  offering drafts to other committees?  How does this IPS

11  compare?

12  A.  So this IPS is consistent with industry standards and

13  practices that I've seen.  And I like especially some

14  particular areas, one especially about the philosophy.

15  Q.  Okay.  And let's take a look at that, if we could, Chris.

16  The call out on JX 54.06.  And I'll just represent, this is

17  page 6 of the IPS.  We can look at the cover page.  Actually,

18  let's just look at the cover page briefly, Chris, so we can

19  orient the year of this.  So this is -- 54, Chris.

20          So this is the Investment Policy Statement as of

21  August 1st, 2010.  And now, Chris, if we can go to the callout

22  on page 6.

23          And is this the philosophy that you were referring

24  to?

25  A.  Yes.

1    Q.   Okay.  And what did you observe, and what did you like

2    about it?

3    A.   So I, as an investment person whose roots are in asset

4    management, I strongly agree with the long-term investment

5    performance being a function of asset class and

6    diversification.  And I also appreciated seeing the Retirement

7    Committee lay out the asset classes that they chose to

8    incorporate into the Plan, a very diversified set of solid

9    asset classes --

10   Q.   Okay.

11   A.   -- that would allow -- I'm sorry, Jamie --

12   Q.   Yeah.

13   A.   Excuse me.  To make diversified investments for their Plan

14   and for their retirement savings.

15   Q.   Okay.  There's been some discussion in the case about one

16   of the asset classes identified here, sector funds.  Do you

17   have any concerns with the listing of sector funds in the

18   Investment Policy Statement?

19   A.   I do not.

20   Q.   And why not?

21   A.   Well, when you think about the risk and return of certain

22   asset classes, to you, Your Honor, if money market funds are

23   here, sort of lower risk, and as you go up the spectrum,

24   bonds, U.S. equities, international equities, sector funds

25   would be here, and then individual securities, like company

1    stock, would be there.  So there's a really lovely and diverse

2    spectrum of asset classes across there.  And for a

3    sophisticated investor base like American Century's, that

4    seemed fine.

5    Q.  Okay.  And did -- there's also been some discussion about

6    the monitoring procedures that were encompassed in the

7    Investment Policy Statement.  Did you have an opportunity to

8    review those procedures?

9    A.  Yes.

10   Q.  Okay.  And do you have any concerns about those

11   procedures?

12   A.  No.

13   Q.  Okay.  Let's do the callout now on Exhibit 56.10.  And

14   this is from that same 2010 Investment Policy Statement in JX

15   54.  And these are the monitoring procedures that you referred

16   to; is that correct?

17   A.  Yes.

18   Q.  Okay.  And what about that --

19   A.  And --

20   Q.  Yeah.  Go ahead.

21   A.  -- if I may?

22   Q.  Please.

23   A.  Under the performance objectives, this piece here about --

24   ooh -- recognizing that the short-term fluctuations may cause

25   variations, the Retirement Committee intends to evaluate

1    performance over a long-term perspective.  And I also think

2    that's a very important component of looking at investment

3    management.

4              THE COURT:  Could you slow down?

5              THE WITNESS:  Thank you.

6    Q.  Okay.  Because I know this is your first time testifying

7    as an expert, because we have the court reporter here and

8    we're creating a written record, we just need to accommodate

9    that --

10   A.  Thank you.

11   Q.  -- as we -- as we go.

12             Why did you believe that this focus on long-term

13   performance or long-term perspective, more accurately, in the

14   IPS was appropriate?

15   A.  It -- it is both my observation of investment reality and

16   the practices that I saw many other committees utilize,

17   including committees that I advised, that -- looking at

18   investment managers over a market cycles -- over a market

19   cycle.  And full market cycles can last three years, five

20   years.  We're in one that's longer than 10 years currently.

21   So over full market cycles is the best way to observe

22   different strategies.  In addition, sometimes a -- more of a

23   value based bias strategy or a growth bias strategy might have

24   a market environment in which any strategy like that is not

25   performing well.  So to -- to see, to observe this, it's

1   helpful over a full market cycle.

2   Q.  Okay.  And did you have any views on the second part that

3   we have in the callout about frequent change?  Did you form

4   any opinions about that language in the Investment Policy

5   Statement?

6   A.  Yes.  It --

7   Q.  Go ahead.

8   A.  It's been my observation that frequent manager turnover is

9   not helpful for plan participants, or, frankly, any plan or

10  fund.  Frequent manager turnover can result in locking in

11  losses, attempting to transact in very difficult or illiquid

12  market environments, and can add costs to -- to the underlying

13  assets with -- with too much manager turnover.  And also, it's

14  disruptive to Plan participants.  But I think the -- the other

15  three pieces are just -- are the most important.

16  Q.  Okay.  So have you observed committees that have a

17  different philosophy and that do engage in that kind of

18  short-term turnover?

19  A.  Yes, I have.

20  Q.  And do you believe that that's a best practice in the

21  industry to have that kind of short-term turnover?

22  A.  I don't believe that is a good or solid practice.  There

23  are some exceptions.  And some of those exceptions might be

24  during, say, the period of time where there was market turn --

25  market timing in international equity markets.  There -- one

1  of our clients was utilizing a manager who had very strong

2  small cap performance and loved having that fund in their

3  401(k) lineup.  However, we advised them, look, the -- the

4  managers and the senior C-Suite executives are actually doing

5  market timing trading in these own funds and taking away from

6  performance.  So is this the kind of organization and asset

7  manager you want to do business with.  So there may be things

8  that aren't just about performance.  It may be about other

9  factors that might cause you to want to make change.

10 Q.  And -- and maybe just for the record, can you explain what

11 market timing is in that context that you observed?

12 A.  I hope I can do it shortly and slowly.  In international

13 equity funds at that time, the NAV, or the net asset value,

14 was set at four o'clock in the afternoon as U.S. mutual funds

15 typically do.  However, with international equity funds, the

16 market and benchmark stopped trading at noontime London --

17 noontime east coast and end of day London time so that there

18 was this gap of time where markets moved and people could take

19 advantage of the difference between that move and the end of

20 day price.

21 Q.  Okay.  So that would be an example where you think a

22 short-term move away from that fund might be sensible, fair?

23 A.  Yes.

24 Q.  Okay.  And there's been some suggestion, I think, in fact,

25 by one of the experts who testified for plaintiffs that

1    perhaps the best approach for a committee to take is to field

2    a team of all stars.  I don't know if you were there for that

3    particular testimony?

4    A.  I was.

5    Q.  Okay.  Do you agree with that view?

6    A.  I think that would be great if somebody can do that.

7    However, it's -- I've never seen it done.  Neither have

8    retirement committees been able to field a team of all stars

9    that are all stars all the time.  And it's extremely difficult

10   in advance to select managers who will be all stars because

11   one doesn't know what the markets will -- will do and will

12   allow going forward.

13   Q.  So you don't believe that would be a fiduciary best

14   practice; is that fair?

15   A.  I don't believe it's possible.

16   Q.  Okay.  I want to turn now to another aspect of the

17   Investment Policy Statement, maybe Mann Demonstrative 6.

18   We've talked about the philosophy.  I want to ask you now more

19   specifically about the monitoring.  Did you get a chance to

20   review the Watch List criteria that's been discussed in the

21   case?

22   A.  Yes.

23   Q.  Okay.  And what did you observe with respect to the Watch

24   List?

25   A.  I observed several things.  The Watch List was actively

1  used.  Not always true of every committee.  I saw funds -- and

2  I wanted to see this in my review, funds go on the Watch List

3  according to the criteria set out.  I wanted to see the

4  process where funds coming off of the Watch List, which I also

5  saw.  And I wanted to look at the criteria for putting funds

6  on the Watch List.

7  Q.  Okay.  So let's start with the criteria.  There's been a

8  lot of discussion that for the majority of time period in this

9  class period, the criteria involved something like --

10 something called information ratio.  Are you familiar with

11 that concept?

12 A.  Yes.  Very.

13 Q.  Okay.  And you reviewed those criteria in the Investment

14 Policy Statement, correct?

15 A.  Yes.

16 Q.  Okay.  And I don't think we need to go over again what the

17 information ratio is unless it would help the Court.  I don't

18 think it might.

19       THE COURT:  You gave me a great tutorial, you and

20 Mr. -- and the plaintiffs have given me a good tutorial on

21 that too.

22       MR. FLECKNER:  Fabulous.

23 Q.  So let me just ask you whether you felt it was appropriate

24 for the Committee to use information ratio as a criteria for

25 whether a fund comes on the Watch List?

1  A.  Yes.  Absolutely.

2  Q.  And why do you believe that was an appropriate criteria?

3  A.  Information ratio is a great tool for looking at a

4  combination of risk and return.  When a Retirement Committee

5  wants to review a manager or managers, it wants to see how

6  effectively managers are using the risk budget that they are

7  allowed to use to deliver returns.  And information ratio is a

8  terrific tool to do that.  It is also something that I have

9  used and introduced to many of my more sophisticated

10  committees, at least at the beginning of the class period,

11  that wasn't really what -- well, it wasn't always used.  It

12  became -- it has become a more useful tool, even if the notion

13  of information ratio has been used for a long time within

14  asset managers.

15  Q.  And are you aware that the Retirement Committee in this

16  case utilized an information ratio that looked at gross

17  performance of fees as opposed to net performance of fees?

18  A.  Yes, I am.

19  Q.  And did you have any concerns with their utilization of

20  gross performance as opposed to net performance for purposes

21  of the information ratio?

22  A.  I did not.

23  Q.  And why not?

24  A.  Two reasons.  One, the notion of a Watch List and having

25  information ratio, among many other tools, as a trigger for

1    Watch List really was what then brings attention and

2    additional oversight to -- to that strategy.  So as a trigger,

3    I see it's perfectly fine.

4          Second, if you're trying to see how a manager

5    delivers risk adjusted returns, it's also a very effective

6    tool.

7          And I guess there's a third reason.  And that is

8    because I saw the Committee looking at fees at the strategy

9    and at the overall plan level in every meeting as well.

10   Q.  And maybe, if we could, Chris, DX 843, which we introduced

11   with Mr. Bouffard.  The issue that I think the plaintiffs have

12   raised is that one aspect of the denominator -- I'm sorry, the

13   numerator, the funds performance is gross, is the benchmark

14   that it compares itself to as the other aspect in the

15   numerator, also a gross figure?

16   A.  So, yes, benchmarks don't have fees taken out of them, so

17   it's a better apples to apples comparison.

18   Q.  Okay.  You can pull that down, Chris.

19          And I think it was implicit in your testimony, but

20   just to make explicit, has every fiduciary committee that

21   you've worked with over the years used information ratio in

22   monitoring funds?

23   A.  No.  They have not.

24   Q.  Okay.  But yet you didn't have concern with its use,

25   correct?

1    A.   Excuse me?

2    Q.   You didn't have concern with its use here?

3    A.   Not at all.

4    Q.   Okay.  Because the more -- I think you testified, the more

5    sophisticated committees utilize it, correct?

6    A.   Yes.  I think some committees are still using just risk

7    and looking at return separately.  This is a good tool.

8    Q.   Okay.  And then focusing on the practical application of

9    the Watch List, what was the effect of a fund being on the

10   Watch List for this Plan?

11   A.   What I saw in the record is that when a strategy was below

12   zero, negative 0.5 IR, it was added to the Watch List, and the

13   Committee then looked more closely at performance, moved it up

14   the priority list.  I liked seeing that the Watch Listed funds

15   were looked at first typically in the -- in the meeting

16   materials.  Often, and as needed, the Retirement Committee

17   brought in portfolio managers to do some further

18   investigation, so I thought it was given the gravity and the

19   additional attention that I thought it should be.

20   Q.   Okay.  Was that consistent with what you observed in

21   better functioning committees?

22   A.   Yes.

23   Q.   One of the plaintiffs' experts, or maybe both of their

24   experts, have criticized the Investment Policy Statement that

25   was in use at this time for lacking detail, characterizing the

1  criteria as "toothless."  Have you heard that criticism in

2  this case?

3  A.  I did.

4  Q.  And do you share that view?

5  A.  I do not.

6  Q.  And why not?

7  A.  Well, having rigid criteria would force a committee to

8  make decisions such as getting rid of a fund at perhaps the

9  most difficult time, maybe even locking in losses.  And that's

10  not the way I observed solid industry practices in my

11  experience.  Good industry practices gave retirement

12  committees the flexibility to make decisions the way they saw

13  them in the best interest of plans and participants.

14          And every committee didn't all use the same set of

15  tools or the same set of criteria.  But the committees that I

16  have worked with and advised were able to utilize a Watch

17  Listing criteria that some might have called toothless for the

18  same reason but provided the right amount of flexibility for

19  the retirement committee to execute its duties.

20  Q.  Okay.  And just generally in your field in working with

21  retirement committees, have you observed whether there's

22  differing opinions as to the amount of specificity in the

23  criteria that could be included in an IPS?

24  A.  Yes.  Sure.

25  Q.  Okay.  There's a debate --

1    A.  Wide range I would say.  In the same way that every plan

2    is different in its -- maybe the risk comfort of its

3    retirement committee or the asset classes they're willing or

4    able to utilize.  The way they monitor their plans also is

5    unique and doesn't all conform to one rigid manner.

6    Q.  Okay.  Do you believe that the Investment Policy Statement

7    that we just looked at, effective 2010, is inconsistent with

8    industry standards that you've observed in that it does not

9    include specific criteria to make a sell decision or to remove

10   a fund from the menu?

11   A.  No, not based in my experience.

12   Q.  Okay.  And we also heard testimony from Mr. Levy that in

13   his experience, it would be highly unusual for an investment

14   to remain in a plan's lineup if it spent more than five

15   consecutive quarters on a Watch List.  Is that --

16              THE COURT:  What's your objection?

17              MR. SPECT:  Objection.  That mischaracterizes

18   Mr. Levy's testimony.

19              THE COURT:  What did Mr. Levy say?

20              MR. SPECHT:  He said it would be unusual for it to

21   remain on the Watch List for five consistent quarters without

22   a prudent justification for hanging onto it.  So it's not just

23   the five quarters and you're out.  It's five quarters and then

24   you have to have a reason to hang onto it.

25              THE COURT:  Well, I've got about six notebooks of

1  notes, and I don't have Mr. Levy's notes with me.  Maybe --

2  and I -- so I don't recall that nuance, but that's an

3  important nuance.  I agree with Mr. Specht.

4          MR. FLECKNER:  So we're just looking now at --

5  understanding it's the rough transcript.

6          THE COURT:  Well, you've got to be careful on that.

7          MR. FLECKNER:  I understand.

8          THE COURT:  Why don't you show Mr. Specht that too

9  before you --

10         MR. FLECKNER:  Certainly.

11         MR. SPECHT:  We can read all that into the record.

12 I'm fine with that.

13         THE COURT:  No, you can't, according to the contract

14 you signed with my court reporter so you --

15         MR. FLECKNER:  Let me ask you this without regard --

16         THE COURT:  And there's -- and there's a reason why

17 we don't let these uncertified transcripts in.  But if you two

18 can agree on what it says or what -- if you can agree on what

19 Mr. Levy said, then that's -- that's fine.

20         MR. FLECKNER:  Why don't I ask the question without

21 regard to Mr. Levy, and maybe that will work.

22         THE COURT:  Okay.  Thank you, Mr. Fleckner.

23         MR. FLECKNER:  You're welcome, Your Honor.

24 Q.  Do you believe that it would be highly unusual for an

25 investment to remain on a Plan's lineup if it spent more than

1    five quarters on a Watch List?

2    A.   Jamie, would you say that one more time?

3    Q.   Sure.  Do you believe it would be highly unusual for an

4    investment to remain on a plan's lineup if it spent more than

5    five consecutive quarters on a Watch List?

6    A.   No.

7    Q.   Okay.  Why not?

8    A.   Well, investment strategies can remain on Watch Lists for

9    several years at times.  Again, depends on the market cycle,

10   the range of underperformance and the reasons for that.  So

11   mostly depends upon what is the practice and what is the

12   review process that the Committee goes through to understand

13   why a strategy is on -- is -- is performing the way it's

14   performing.  And so no --

15   Q.   Okay.  Have you observed in your career committees that

16   you believe are functioning appropriately that nonetheless

17   have investments on their plan's lineup that have remained on

18   their Watch List for more than five quarters?

19   A.   Yes.

20   Q.   Okay.  So did you see anything out of step with -- with

21   fiduciary practices that you've observed to the extent there

22   have been funds on this Plan for American Century that have

23   remained on a Watch List for more than five quarters?

24   A.   No.

25   Q.   Let's turn back to Mann 6 just for a moment.  One last

1    item of the Investment Policy Statement I wanted to ask you
2    about.  Did you observe that the Investment Policy Statement
3    as of 2010 stated an intent to offer American Century funds?
4    A.  Yes, I did.
5    Q.  Okay.  And did you have any concerns with that stated
6    aspect of the Investment Policy Statement?
7    A.  I did not.
8    Q.  Okay.  We can pull that down, Chris.
9              In your experience, was the American Century Plan
10   unusual in including affiliated funds, even up until 2016,
11   exclusively affiliated funds on the core lineup with a
12   brokerage account?
13   A.  No.  That was not unusual among financial services firms'
14   asset managers that I've experienced.
15   Q.  Okay.  So you have personal experience with how asset
16   managers utilize their own products for their own employees'
17   401(k) plans?
18   A.  Yes.
19   Q.  Okay.  And just describe that experience, please.
20   A.  So one of the clients that I worked with closely was an
21   asset manager and used all but one strategy in their lineup of
22   affiliated funds.  And my experience working at Fidelity
23   Investments for seven years and Putnam Investments for five
24   and a half years also showed their 401(k) plans that used all
25   in-house lineups.

1  Q.  And in addition to your personal experience, did you

2  observe any indication in this particular record that

3  corroborated your experience about the utilization of -- we'll

4  call it proprietary funds for a 401(k) lineup?

5  A.  Yes.  I actually wanted to see and compare and take a look

6  at how asset managers did this or update it.

7  Q.  Okay.  And let's take a look -- I think it's DX 769,

8  Chris.

9             And I'm showing you now DX 769.  Are you familiar

10  with this document?

11  A.  Yes.

12  Q.  Is this the look that you -- or form that you just

13  mentioned?

14  A.  Yes.

15  Q.  Okay.  Can you explain to -- it says Exhibit 15 on the

16  top.  That's Exhibit 15 of your report, correct?

17  A.  Yes, it is.

18  Q.  Okay.  And can you explain what you did here in Exhibit 15

19  of your report?

20  A.  Yes.  So I gathered the asset managers by retirement plan

21  usage by plan.  And the top 15 managers are listed here.  And

22  then the name of their 401(k) plan is next and -- as well as

23  the number of options.  But the column that we're looking at

24  here is did they use affiliated investments in their 401(k)

25  plan.  And all of the top 15 managers do use affiliated

1    investments in their funds.

2    Q.   All right.  And the data source that you utilized is what?

3    A.   This is the BrightScope -- BrightScope Beacon data.

4    Q.   And, generally, what are those data?

5    A.   BrightScope gathers data from the 5500 filings on the

6    number of managers they use in their plan lineup assets, other

7    information about their plan.  The number of participants

8    would be included, as well, for example.

9    Q.   Okay.  And, Chris, if we can highlight row 13.

10            And we see this is the row for American Century

11   Investments, correct?

12   A.   That's correct.

13   Q.   And what does the value 13,632 in the third column

14   signify?

15   A.   So this column is the number of retirement plans that

16   utilize at least one strategy at each of these asset manager

17   firms.

18   Q.   Okay.  So --

19   A.   13,362 -- 632, excuse me, plans used an American Century

20   fund.

21   Q.   And that's as of December 2015, correct?

22   A.   That's correct.

23   Q.   Okay.  And just so we don't have to bring this slide up a

24   second time, you had also mentioned firms like Fidelity that I

25   think we've heard quite a bit about.  And this indicates that

1  they utilized their own funds for their own plan.  And we've

2  heard a little bit about T. Rowe Price.  And this indicates

3  that they use their own funds for their own plan.

4  A.  Yes.

5  Q.  Is that correct?

6  A.  Yes, it is.

7  Q.  Okay.  And the other thing that I'd like to ask you about

8  that's come up is the number of investment options that were

9  offered in the core lineup of this plan.  Did you learn

10  anything when you did this exercise about whether the Plan

11  lineup in this case was inconsistent with other financial

12  services companies?

13  A.  I concluded from this that -- and among other things as

14  well that the Plan lineup at American Century wasn't overly

15  large.

16  Q.  Okay.  What other things -- and -- and let me just pause.

17  When you say "this," are you referring to the second to last

18  column of data here that identified a number of core

19  investment options utilized as of December 2015 by these other

20  asset management firms?

21  A.  Yes, I am.  And American Century sort of falls close to

22  the middle of this range.

23  Q.  Okay.  And what other experiences were you referencing a

24  moment ago?

25  A.  I guess I was also thinking about the -- one of the firms

1    that I also worked for, State Street, who also used a

2    predominantly in-house lineup.

3    Q.  Okay.  And also offered a range of options consistent with

4    what's identified here for the American Century Plan?

5    A.  Yes.

6    Q.  Okay.  You can take that down, Chris.  And I know no one

7    in this courtroom wants to see JX 10 again, which is the

8    Hewitt report.  But did you see any indication in the Hewitt

9    report of 2010 about use of proprietary funds for these

10   financial services companies?

11   A.  Yes, I did.

12   Q.  And what did you observe?

13   A.  I observed in the Hewitt report Hewitt noting that

14   American Century utilized affiliated funds and that of the

15   plans that they looked at, about 82 percent utilized some

16   affiliated funds of the -- of the financial services firms

17   they reviewed, and 41 percent used all affiliated funds in

18   their lineup.

19   Q.  Okay.  And that was consistent with your personal

20   experience, the independent invest- -- and the independent

21   investigation that you performed in this case; is that

22   correct?

23   A.  Yes.

24   Q.  Okay.  And did you believe that the Committee, the

25   Retirement Committee here, was under any obligation to

1  consider nonaffiliated investment options?

2  A.  No.

3  Q.  And why not?

4  A.  Because the lineup of funds that they had was -- was

5  prudently and diligently reviewed, overseen and put into the

6  Plan.  The lineup was a solid lineup of strategies,

7  diversified across the asset classes, that would allow

8  participants to -- to create and invest in diverse funds for

9  their retirement savings.  So, no, I didn't see any reason

10 that they needed to.

11 Q.  Okay.

12 A.  And I have the -- excuse me.  They also had the PCRA as

13 well for those who wanted to go outside.

14 Q.  Okay.  So you considered the PCRA as part of your

15 thinking, correct?

16 A.  Yes.

17 Q.  Chris, if we can pull up Demonstrative 8.  Turning to

18 another aspect of the Committee's process, did you form any

19 opinions about the regularity with which the Committee met?

20 A.  So I recognize that this -- yes, I did.

21 Q.  Okay.  And what did you observe?

22 A.  I was going to say I recognize that this may not be the

23 sexy part of -- of retirement overviews and diligence,

24 however, this Committee --

25            THE COURT:  There is a sexy part?

1          THE WITNESS:  Some people would not say that.  I

2     know.  I know.  So --

3          THE COURT:  We're getting close to the end now, and

4     I haven't seen -- but go ahead.

5          MR. FLECKNER:  My wife precludes me from talking

6     about ERISA at cocktail parties.

7          THE COURT:  So does mine, by the way.

8          MR. FLECKNER:  But this is what I do, sadly.

9     Anyway.

10          THE WITNESS:  As have I.  Investments are also not

11     the sexy part.  The equity part is, right?

12          So -- so what I very much appreciated seeing was the

13     meeting of the Committee, meeting three or four times a year,

14     adding special meetings as they saw necessary, delivering

15     meeting minutes a week or so in advance.  Not every committee

16     does this.  This Committee did it incredibly well.  Expecting

17     that Committee members would come prepared with reasonable

18     questions.  And in the record and in the minutes, I observed

19     that the dialogue and the questions were very helpful, really

20     showed an engaged set of Committee members.

21          And one of the other things that I don't think folks

22     think about, but I have observed with looking at committees

23     where there's maybe a very dictatorial chair or one strong

24     member, I appreciated seeing that commentary came from a

25     variety of the Committee members, not always one single

1   member. And, to me, that's one of the many signs of a very

2   strongly working committee and a committee able to work and

3   function together.

4   Q. Okay. So is it -- how would you compare this to other

5   committees that you've worked with?

6   A. I would say exemplary. Very, very, very strong.

7   Q. Okay. And let me pull up DX 857, the ninth demonstrative,

8   Chris.

9          And does this summarize what you observed as to

10  attendance at the committees?

11  A. Yes. I -- I actually wanted to see who was showing up.

12  Was it just people showing up in name or in -- did people

13  really attend these meetings. I was -- I was very pleased to

14  see very consistent attendance at -- at all of them, including

15  the special meetings as well.

16  Q. Okay. And so maybe you can just walk us through. You

17  mentioned special meetings. Is that the blue/purple star on

18  the left-hand side?

19  A. Yes. So down the left side are the dates of each of the

20  meetings with a green rectangle and the purply blue star were

21  the special meetings that were put in place to do things like

22  review the Hewitt report in November of 2010 and then

23  follow-up with that in December of 2010, for example.

24  Q. Okay. And we're familiar, I think, with the names on the

25  top row. What did the green -- as members of the Committee,

1   including those who have the CFA designation that you

2   identified, what do the green dots tell us?

3   A.   That the green dots are the Retirement Committee's

4   attendance at the meetings.

5            MR. FLECKNER:  Okay.  And, actually, can we move to

6   admit DX 857 at this point?

7            THE COURT:  Any objection to 857?

8            MR. SPECHT:  One very minor thing, Your Honor.  This

9   exhibit indicates that Ms. VanWagoner is a CFA charter holder.

10  I don't believe that's accurate.  And so that would be the

11  only issue I'd have.  Clear that up, I think --

12           THE COURT:  Well, you guys can clear that up without

13  me and mark that out if that's --

14           MR. SPECHT:  Fair enough.

15           THE COURT:  -- not the case.

16           MR. FLECKNER:  We'll take a look at that.  Yes.

17           THE COURT:  DX 857 is admitted.

18       (Defendants' Exhibit 857 admitted in evidence.)

19           MR. FLECKNER:  Thank you, Your Honor.

20           THE COURT:  Yes.

21  Q.   And how does this attendance that you observed compare to

22  other committees you've worked with?

23  A.   Very strong.  Consistent with committees that take their

24  responsibilities seriously.

25  Q.   Okay.  And I think you touched a little bit, but I want to

1  make sure I got it, did you observe the Committee receiving

2  material before the meetings?

3  A.  Yes, I did.

4  Q.  Okay.  And just -- we don't have to go through all the

5  material.  There's been a lot of discussion about it.  But how

6  did their receipt of information and what you observed about

7  any review of that information compare to other committees

8  that you've worked with?

9  A.  I thought it was -- the material was thorough.  I thought

10 it was on point, brought forth the work that the Committee

11 needed to -- to look at.  And I -- as I said, I really

12 appreciated that it went to Committee members in advance so

13 that they had proper time to prepare and -- and be effective

14 in their meeting time.

15            I also appreciated that they gave due time to these

16 topics.  Some other committees have scheduled, say, an hour

17 for their meeting, that's -- whatever they get through.  This

18 Committee gave time and attention to the matters that counted.

19 And, again, another sign of a strong functioning Committee

20 that took its responsibility seriously.

21 Q.  And did you notice that the Committee continued to debate

22 a similar issue sometimes over the course of more than one

23 meeting?

24 A.  Yes.

25 Q.  And did that inform your view as to whether the process

1    here functioned favorably compared to other committees that

2    you've worked with?

3    A.  Yes.

4    Q.  And how so?

5    A.  Very much so.

6    Q.  How so?

7    A.  A couple of ways.  I appreciated seeing that when a topic

8    got brought up that one of the Committee members suggested

9    needed to get addressed, I saw follow-up in the next Committee

10   meeting minutes or the attendance of a portfolio manager they

11   wanted to see.  I appreciated seeing that there's some topics

12   that can't be finished, if you will, in one meeting, that need

13   to be reviewed and pondered and thought about from several

14   different perspectives.  And some of those topics lasted

15   several meetings.  And the ebb and flow of committee work is

16   typically quarterly, three times a year.  It's -- these things

17   don't happen in a -- in a nanosecond.  They take time to work

18   through.

19   Q.  Okay.  And let me pull up -- if we can pull up, Chris, DX

20   509, please.  And we're showing a exemplar -- I'll call it --

21   agenda from a meeting, this one dated October 23rd, 2014.

22            Did you have an opportunity to look at the agendas

23   that the Committee set for itself for its meetings?

24   A.  Yes.

25   Q.  And is the DX 509 that we've identified here consistent

1   with the agendas for regular meetings, not special meetings

2   that you observed?

3   A.   Yes.

4   Q.   And how does this agenda compare to committees that you've

5   worked with?

6   A.   Strong, solid agenda, consistent with strong performing,

7   well-performing committees.

8   Q.   In --

9   A.   I like the -- I like that minutes, prior minutes get

10  approved, that their performance update highlights the Watch

11  List first, that the Plan update then goes to speak to how the

12  participants are utilizing the Plan, and that they have that

13  Investment Policy Statement at the ready at every meeting

14  should they need to refer to it.  And there are lots of times

15  when committees do need to refer to that Investment Policy

16  Statement, even if it's neither intended nor does typically

17  change very frequently.

18  Q.   Okay.  I want to dig in just a little bit to some items

19  that have been challenged by other experts in this case, by

20  plaintiffs' experts, that go particularly to the materials

21  that the Committee looked at to look at performance and to

22  look at fees.

23           So let me start maybe with Demonstrative 10, Chris.

24           Did you have the ability to review material that the

25  Committee reviewed with respect to the performance and fees of

1    the funds utilized by the Plan?

2    A.   Yes.

3    Q.   And at a high level, what did you observe about that?

4    A.   I observed that the Committee regularly reviewed

5    investment performance and regularly reviewed fees, both at

6    the strategy and at the overall plan level.  And I think it's

7    important to do both.

8    Q.   Okay.  Why is it important to do both?

9    A.   Well, the way I've advised our committees is that one of

10   your responsibilities is that you must know what the fees are

11   of your -- of your plan.  People will be asking.  Participants

12   care.  And there -- there are a couple of ways to tackle one

13   is.  One is at the strategy level, but one of the big proof

14   statements is at the plan level.

15   Q.   Okay.  And -- and just at a high level, do you believe

16   that the Committee reviewed appropriate material and data to

17   allow it to monitor the performance and the fees of the funds?

18   A.   Yes.

19   Q.   I don't think I need to show the Court a copy of the --

20   the -- what we call the benchmark summary or BSR.  We just saw

21   an example of that that looked at gross information ratio

22   data.  And, again, I think you mentioned that you believe that

23   that was appropriate, correct?

24   A.   Yes, I do.

25   Q.   Okay.  And I think the fact testimony was that those were

1  just one piece of data that the Committee looked at.  Do you

2  believe that that was appropriate to utilize a panoply of data

3  to monitor the fees and the performance of the funds?

4  A.  Yes.

5  Q.  Okay.  I'd like to -- at the risk of being just slightly

6  redundant, Your Honor, and I apologize.  I'll be quick.  Can

7  we pull up JX 17, page 30, which we've been well over?

8          You're familiar with this type of report showing

9  expenses by investment option that were contained in the

10 Committee materials, correct?

11 A.  Yes.

12 Q.  Okay.  And did you have any concern with the Committee's

13 utilization of these data?

14 A.  No.

15 Q.  Okay.  And you're aware, as the footnote -- I don't know

16 if the footnote in this one.  Yeah.  Yeah.  The source

17 identified in this document is Lipper data in this particular

18 period, which is as of May 31st, 2011.  This identifies Lipper

19 data as of 3-31-11.  Do you see that?

20 A.  Yes, I do.

21 Q.  Okay.  And are you aware that these Lipper data include

22 all share classes?

23 A.  Yes, I am.

24 Q.  Okay.  Did you have any concerns with the Committee's

25 utilization of these Lipper data as part of their review?

1    A.   No.

2    Q.   Why not?

3    A.   One, because they're looking at fees at the individual

4    level.  Two, because the American Century Retirement Plan

5    itself was comprised of different share classes themselves --

6    the funds were not all the same share class is one way to say

7    that.  And when I looked back at the Investment Policy

8    Statement, the IPS charges the Retirement Committee with

9    having fees that are competitive.  And that was -- this is

10   consistent with all of that.

11   Q.   Okay.  Explain the second piece.  You mentioned that not

12   all the funds are the same share class.  What does that mean,

13   and why does that factor into your opinion?

14   A.   Well, I see that the Lipper data indicates that it's not

15   based on a specific fund share class.  Sometimes this data,

16   and maybe data earlier on in the period, once uses the data

17   that comes and is easiest to get at rapidly.  And you can --

18   it's just facile for your committee meetings.

19               THE COURT:  It's just what?

20               THE WITNESS:  Facile.

21               THE COURT:  Facile.

22               THE WITNESS:  So you can get at it and use it

23   rapidly.

24               THE COURT:  Okay.

25   A.   Lipper is definitely one of many and one of the key

1    sources of this data that's perfectly fine.  Earlier on,

2    getting data rapidly from Lipper was probably important for

3    this Committee.  And it came initially from JPMorgan in the --

4    in their recordkeeping report and was carried through by the

5    American Century folks.  And then later, they also looked at

6    fees from their recordkeeper to Charles Schwab.

7            So I think this was something initiated by their

8    recordkeeper.  And so they were getting it from a third party.

9    So they were saying thank you for the ways we can look at

10   fees.

11   Q.  And we'll turn to the Schwab in just a moment.  But let me

12   still talk about this -- I'll call it the JPMorgan record-kept

13   era, which is before the switch to Schwab in -- 2014?  2013?

14           All right.  The -- the RFP was in '13, and they

15   switched in 2014.

16           Getting back to the JPMorgan era, did you also see

17   other indications before --

18           THE REPORTER:  I'm sorry.

19   Q.  Yeah.  Turning back to the JPMorgan record-kept era, were

20   the -- did you see any indication in the record that the

21   Committee was monitoring fees other than through this

22   particular page in the materials?

23   A.  Yes.

24   Q.  Okay.  What did you observe?

25   A.  I saw them looking at fees at the overall plan level.

1   Q.  Okay.  And so let's pull up JX 7, please, Chris.  And

2   these are minutes dated June 30, 2010.  And if we can go to

3   page 3, Chris.  And if we can blow up the paragraph that

4   starts, "Ms. Benson then led a review," which is -- right,

5   that paragraph right there.  The middle paragraph in Plan

6   Update.

7           Ms. Benson then led a review of the recordkeeping

8   fees received by JPMRPS, JPMorgan Retirement Plan Services,

9   and noted that a 2009 Deloitte benchmarking survey showed the

10   expense ratios for the Plan are in line with other plans its

11   size.

12           Is this an example of what you meant by looking at

13   fees at the Plan level?

14   A.  Yes.

15   Q.  And can you explain for the Court what the Deloitte

16   benchmarking survey is?

17   A.  So Deloitte surveys a wide range of funds and plans and

18   gathers details of their fees that their 401(k) plans are --

19   are charging, are -- have, as well as separating out their

20   recordkeeping fees.

21   Q.  Okay.  Are the Deloitte surveys regularly used in the

22   industry?

23   A.  Yes.  Commonly.

24   Q.  Okay.  And we can pull that down, Chris.

25           Did you also observe that the Hewitt report --

1    again, which we won't bring up -- but the Hewitt report in

2    2010 also looked at fees?

3    A.   Yes.

4    Q.   Okay.  And what was -- what did you observe Hewitt to

5    observe?

6    A.   So Hewitt indicated that the recordkeeping services that

7    the American Century Plan was availing themselves of were at

8    or above the services that others were receiving and that

9    their fees were in line with others.

10   Q.   Okay.  And did you also observe that the Committee

11   separately looked at reports directly from JPMorgan concerning

12   the fees both of the investments and then the revenue sharing

13   component?

14   A.   Yes.

15   Q.   And I won't pull those up, but did that factor into your

16   conclusion about the appropriateness of how the Committee

17   looked at fees?

18   A.   Yes.  For me, that showed me that the Committee was

19   looking at fees at the individual strategy level, at the

20   overall Plan -- at the recordkeeping piece, and then bringing

21   that together at the overall Plan level.

22   Q.   Okay.  And now I'd like to move to the -- the Schwab era.

23   Did you -- I'll just pause.  Did you make any observations

24   about the decision to change recordkeepers from JPMorgan to

25   Schwab?

1    A.   Yes.

2    Q.   Okay.  What did you observe?

3    A.   Well, I observed that the Committee chose to properly go

4    out to RFP, that it chose to do a full survey of potential

5    providers and look at and compare the tradeoffs of the

6    capabilities of potential providers.  I think that's basics.

7    Q.   And that was -- Lockton was the consultant used for that

8    RFP process?

9    A.   Yes.

10   Q.   And do you believe that process was conducted consistent

11   with what you view as industry practices?

12   A.   Yes, indeed.

13   Q.   Okay.

14   A.   And also to say that looking for a new recordkeeper is not

15   something that plans do annually, right?  It's a big deal.  It

16   is -- State Street, where I worked for 15 years, is also a

17   very large custodian of $33 trillion in assets under custody

18   and recordkeeping and administration.  And so it wasn't my

19   area of the business, but being part of the business, I was

20   observant of that, that recordkeeping changes were a big deal.

21        I thought that the process that American Century

22   used to change recordkeepers was a very sound process by going

23   out to RFP and then looking at the -- and comparing the -- the

24   cost, capabilities and -- of their new recordkeepers.

25   Q.   Okay.  And now I'd like to turn to the monitoring of fees

1  during the Schwab era.  Once Schwab was selected as

2  recordkeeper, did it then provide the Committee additional

3  data on fees for the Committee's consideration?

4  A.  Yes.

5  Q.  Okay.  And let's just pull up one example.  DX 511.  So

6  these are materials from July 2015 after Schwab has been

7  selected.  And let's, just for an example, Chris, pull up page

8  91 of these materials.

9          And I'll just highlight here, for example -- this is

10 one of the pages of the data that Schwab provided the

11 Committee.  And I've circled the beginning of the column that

12 starts net expense ratio and rank.  Do you see that?

13 A.  Yes.

14 Q.  And is this what you meant by the additional data that

15 Schwab provided?

16 A.  Yes.

17 Q.  Okay.  And what was Schwab doing here?

18 A.  So here, if we just take the first line, the American

19 Century Diversified Bond Fund in the R6 share class, they

20 identify the category or the asset class.  Whoops.

21 Q.  No.  That's great.

22 A.  And the -- so the net expense ratio of the strategy was 35

23 basis points.  The average expense ratio for the -- for the

24 sector was 87 basis points in the rank -- and it identified

25 the rank as well.

1    Q.  Okay.  And so the rank 6th in the asset category, that's a

2    good rank.  Six is a top rank, not a bottom rank, correct?

3    A.  Correct.

4    Q.  Okay.  And are these data that -- comparative fee data

5    that Schwab were providing?

6    A.  Excuse me?

7    Q.  The --

8    A.  Yes.  This is the fee data provided by Schwab.

9    Q.  Okay.  And did you have any concerns with the fee data

10   that Schwab provided the Committee for its review?

11   A.  No.  And this -- at this point, in 2013/'14 was then --

12   recordkeepers typically provided information at the, you know,

13   more detailed level because data was -- as time goes on and

14   tools and data analysis evolved, there was -- they were able

15   to get data at the net level as well.

16   Q.  Okay.  So was utilizing Schwab's data as one input

17   consistent with committee practices that you observed?

18   A.  Yes.

19   Q.  Okay.  Let's pull this down, Chris.

20          And I want to -- did you also observe that Schwab

21   was providing Plan level data to the Committee?

22   A.  Yes.

23   Q.  Okay.  And let's pull up JX 39.  And these are more

24   materials from 2015 that were provided to the Committee.  And

25   let's focus on page 114, please, Chris.  And, Chris, if we can

1    blow up the data on the top of this page.

2           Are these the Plan level fee data that Schwab was

3    providing the Committee that you referenced?

4    A.  Yes.

5    Q.  Okay.  And can you explain what's being shown here?

6    A.  So -- sure.  The shareholder servicing compensation at the

7    top is the recordkeeping and other trust services.  The

8    overall expense ratio is for the investment management

9    component.  And Schwab calls that third party funds because

10   these are not Schwab's own funds.  And then they total up the

11   fees, divide them by the assets, and give them as a percent of

12   the portfolio as well as just for also use per participant.

13   So 63 basis points is the -- is the all-in fee at this point.

14   Q.  Okay.  So we've looked at a lot of different fee data that

15   the Committee's reviewed from the JPMorgan era and from the

16   Schwab era.  In toto, did you believe that the Committee was

17   looking at an appropriate amount of fee data?

18   A.  Yes.  Absolutely.

19   Q.  And did you believe that the Committee was looking at

20   appropriate types of fee data?

21   A.  Yes.

22   Q.  And was the Committee's review of the fee data as one

23   input consistent with the type of review of fee data that you

24   observed in the industry?

25   A.  Yes, it was.

1    Q.  Okay.  We can pull that down.

2    A.  And -- and I would also say maybe better than some.  Not

3    all committee members of DC plans, at least earlier in the

4    class period, were -- were aware of what the all-in fees were.

5    And for me, I'm a top down contextual person.  I want to see

6    at the top level and then the pieces as well.

7         And so I've counseled clients that I've worked with,

8    whether they be DB, DC or endowment or foundation to know what

9    the all-in fees are and be able to see those and look at those

10   over time.

11   Q.  Okay.  So that's the Plan level data --

12   A.  That's right.

13   Q.  -- fee data that we were talking about?

14   A.  That's right.

15   Q.  Okay.  You've opined that you believe the Committee was

16   looking at appropriate fee data.  Did you form any opinions as

17   to whether the Committee took appropriate actions with respect

18   to expenses for this Plan?

19   A.  Yes, they did.  Yes, I did.

20   Q.  Okay.  And what are those opinions?

21   A.  That, yes, they did.

22   Q.  Okay.  And how did you observe that?

23   A.  One, I saw the overall plan fees coming down.  And, two, I

24   saw it as part of the meeting minutes and part of the record

25   the changes to less expensive share classes over time.

1   Q.  Okay.  So let's take those in steps.  Chris, if you can

2   pull up DX 858, Mann Demonstrative 11.

3          What is DX 858 showing us, Ms. Mann?

4   A.  This is a summary that I wanted compiled so I could see

5   was there some proof statement that the Retirement Committee

6   brought fees down.  And so from 2010 to 2016, we see the fees

7   on the overall Plan level coming down from 82 to 58 basis

8   points.  And that's a drop of 29 basis points and a

9   substantial reduction in cost to participants.

10  Q.  Okay.  And -- and you said you had this chart compiled

11  from data that you looked at in this case.  Is that accurate?

12  A.  Yes.  From either JPMorgan or from Schwab.

13          MR. FLECKNER:  Okay.  Your Honor, we move the

14  admission of DX 858.

15          THE COURT:  Any objection to 858?

16          MR. SPECHT:  No.  No objection, Your Honor.

17          THE COURT:  Thank you.  858 is admitted.

18      (Defendants' Exhibit 858 admitted in evidence.)

19  Q.  Okay.  You talked about overall fee costs, but then you

20  also talked about a review of specific minutes.  So perhaps we

21  can pull up now DX 859, which was Mann Demonstrative 12.  Is

22  this addressing the second part of your earlier answer?

23  A.  Yes, it is.  And don't laugh at this picture that I wanted

24  created.  So across the bottom are the meetings in either a

25  green square, the regular meetings, or the special meetings,

1  that purply blue star.  And I wanted to see the -- I wanted to

2  see a list of the changes that the Committee made.  And so

3  these are done according to the resolution date.  So, for

4  example, the first one is April 6th, 2011, to switch three

5  plan funds to CITs and was a reduction in basis points of a

6  range of 19 to 22 basis points.  And that's how each of these

7  goes.  So, for example, the January 2, 2014, resolution to

8  switch ten mutual funds to CITs was a reduction of between 8

9  and 30 basis points.

10  Q.  Okay.  And I see that with respect to the July 9th, 2013,

11  box, it looks like there's two separate boxes.  Can you

12  explain what's being shown there?

13  A.  So July 9th is -- is a change from 12 funds to the R6

14  share class.  And there's a resolution to switch one fund,

15  mutual fund, to a CIT.

16  Q.  I see.  So those are two different fee reduction actions

17  taken at that same meeting; is that correct?

18  A.  That's correct.

19  Q.  Okay.  So this identifies, it looks like -- one, two,

20  three, four, five -- six meetings where there's specific

21  reductions in share classes or movement from mutual funds to

22  CITs resulting in lower fees for participants, correct?

23  A.  Correct.

24  Q.  And then you also identify the June 13th, 2016, resolution

25  to add five Vanguard mutual funds.  Why did you include that

1  on this chart?

2  A.  I wanted to see other ways that the Committee offered less

3  expensive share classes and/or funds.

4        MR. FLECKNER:  Okay.  And we move the admission of

5  DX 859.

6        MR. SPECHT:  No objection.

7        THE COURT:  Thank you.  859 is admitted.

8     (Defendants' Exhibit 859 admitted in evidence.)

9  Q.  And what opinion did you draw from the data that you

10  reviewed and compiled that are contained in DX 859?

11  A.  That this Committee was working diligently.  And when

12  their -- the criteria was met for the ability to utilize lower

13  cost share classes, just like it states in their Investment

14  Policy Statement, they sought to utilize those less expensive

15  share classes in the Plan.

16  Q.  Okay.  There's been some suggestion earlier in this case

17  that there was a period of time when the Plan was

18  transitioning recordkeepers from JPMorgan to Schwab that at

19  about that time period, R6 share classes of a number of funds

20  had been made available to the marketplace but weren't

21  utilized immediately by the Plan.  Are you familiar with that

22  assertion?

23  A.  Yes.

24  Q.  Okay.  And did you form an opinion as to whether there was

25  any undue delay of the switch of share class during that time

1    period?

2    A.   No.  I saw that there was a delay; however, knowing what I

3    know and -- and seeing what a big deal it is to change

4    recordkeepers, including having a blackout period where

5    participants can't do anything, that it seemed to me that

6    based on the dialogue in the meeting minutes that the

7    Committee was prioritizing moving to its new recordkeeper

8    rather than trying to get the old recordkeeper to change data.

9         It sort of made me think about when you're buying a

10   house, do you want the seller to make the changes that you

11   need made before you buy the house, or do you, when you buy

12   that house, want to be the one responsible for either hiring

13   the contractor or doing the work to your new house?  And so to

14   me, it seemed like the right incentive to get the right -- I

15   mean, this is meant to be long-term plan, long-term decisions,

16   that were moving in the right direction.  I didn't see any

17   issue with that delay.

18   Q.   Okay.  So based on your review of the record, was the --

19   we'll call it the delay at that time period appropriate and

20   consistent with what you would anticipate seeing from a

21   prudent committee process?

22   A.   Yes.  I also thought that -- it seemed in the record that

23   there may have been assumptions that that -- that the new

24   recordkeeper would be able to bring on the R6 share classes

25   right away, but they later found out that that wasn't going to

1    be possible immediately.  So I don't think it was necessarily

2    intended or understood that way.

3    Q.  Okay.  If we can pull up Mann 13, Chris.  Just the last

4    piece of this section that I wanted to cover with you.

5           We've talked about how the Committee looked at

6    performance and fee data.  Did you have the opportunity to

7    review what they did with respect to reviewing data on the

8    participant experience?

9    A.  Yes.

10   Q.  Okay.  And what did you observe?

11   A.  Well, this was a regular agenda item.  And the Committee

12   wanted to see how the participants were utilizing the Plan

13   across a range of different measures.  I took from the record

14   that there are a number of occasions where the dialogue

15   indicated that the Committee members were really seeking out

16   maybe places where certain participants might need additional

17   education or where the strong investment savvy of the populus

18   could tolerate good -- good habits, some of the decisions that

19   it made as well.

20   Q.  So let's move to Demonstrative 14.

21          Again, just -- is this a summary of the type of

22   information about the participant experience that the

23   Committee reviewed?

24   A.  Yes.

25   Q.  Why don't you go through it with us.

1    A.   Again, I think it's important to note that there is a -- a

2    range of ways to look at plans and oversee them and manage

3    them.  One of the things that this Committee did well was to

4    think about its particular Plan participant base.  And they

5    recognized the sophisticated levels of the investment -- of

6    the organization as well as being able to provide education if

7    it needed.  And then they also wanted to -- I liked seeing the

8    data that also backed this up and showed how and that

9    participants were utilizing the Plan through account balances,

10   deferral rates and participation rates.

11   Q.   Do you believe that it was appropriate for the Committee

12   to take into account the -- what it perceived as the

13   sophistication of its participant base?

14   A.   Yes, absolutely.

15   Q.   Okay.  And there's been some discussion in the case that

16   perhaps this participant base wasn't all that sophisticated.

17   Is that consistent with your observations and review of the

18   record?

19   A.   I would say noting that the participant base was

20   sophisticated is consistent with what I expected.  At the same

21   time, I also expected that there are, of course, outliers of

22   people who aren't completely investment savvy as well.

23   Q.   Okay.  You mentioned before a proof statement.

24   A.   Yes.

25   Q.   Did you see any proof statements in the record that

1  supported your view of the sophistication level of this

2  participant base?

3  A.  Yes.  I saw several mentions of it in the Committee

4  meeting minutes.  I saw the sophistication of the participant

5  base mentioned in the RFP work by Lockton.

6  Q.  And let's pause there.  I don't think this is a document

7  we've seen so far in the case.  If we can -- ah, it's below

8  the staple.  If we can pull up, Chris, DX 570, please.

9          And you mentioned the RFP results.  Again, these are

10  RFP results as to the recordkeeping change, correct?

11  A.  Yes.

12  Q.  So these are materials that aren't looking specifically at

13  what investments to utilize, but these are materials looking

14  at how to select a new recordkeeper and what might be useful,

15  correct?

16  A.  Yes.

17  Q.  And let's turn to the second page, Chris.  I'm sorry, the

18  22nd page, Chris.  And let's blow up, if we could, the third

19  and fourth diamonds, we'll call them.

20          And these two -- well, why don't you tell us how

21  this factored into your views?

22  A.  So one of the key things that a consultant does is they

23  try to identify what are some of the key themes that a client

24  would like in their search.  And you can see at the top of

25  this page, these are called Areas of Importance for American

1    Century.  And two of these bullets here indicated that they

2    were seeking or would benefit from a call center for

3    participant questions sensitive to the advanced knowledge

4    level of and industry experience of the American Century

5    participants.  And as well, that employee education should be

6    tailored to the sophistication of the participants.

7    Q.   And the minutes that you referred to earlier oftentimes --

8    and I think we've shown the Court, so I won't go back through

9    that again -- showed that there was discussion of

10   sophistication of participants when it came to investments.

11   This is also identifying the same investment sophistication

12   and how it might relate to the recordkeeping needs.  Is that

13   fair?

14   A.   That's right.

15   Q.   Okay.  And from your review of the record, do you share

16   the view that this Plan's participant base was, in some

17   regards, a sophisticated participant base?

18   A.   Yes.

19   Q.   Okay.  And how do you derive that conclusion?

20   A.   I wanted to see some of that data myself.  So I looked at

21   how many registered representatives to see that it was

22   quantifiable, how many portfolio managers are at American

23   Century.  And that number was quite a large number, over 400

24   registered representatives, 70 portfolio managers.  And the

25   Plan's active base was about 1,200 -- 1,200 participants.

1          So of present employees -- and knowing what I know

2    about asset management firms, that in addition to portfolio

3    managers, there are a large number of analysts and other

4    support people who work in the investment part of the

5    organization and the personnel who work selling the strategies

6    of that asset management firm who are all well aware of the

7    investment tradeoffs and are pretty savvy in terms of

8    investments.

9    Q.   So --

10   A.   To very savvy.

11   Q.   So just to summarize, you have about a third of the

12   participant base that you observe from your research that were

13   registered representatives or portfolio managers, correct?

14   A.   Yes.

15   Q.   And of the other two-thirds of the participants, you have

16   formed a view, based on your experience and what you've

17   observed in the record, that some of those may also be

18   sophisticated; is that fair?

19   A.   Yes.  That's correct.

20   Q.   Okay.  And again, that's because of their relation to a

21   organization whose mission is asset management, correct?

22   A.   Yes.  This is the business of their business.  When you

23   are in the asset management business, you are aware of what's

24   happening to the general markets.  You are aware of how your

25   strategies are performing.  You are aware of what's happening

1    overall in the mutual fund or 401(k) and DB business.

2    Q.   Okay.  And not all of the 1,200 or 1,300 participants

3    might themselves be personally sophisticated.  Did you see any

4    evidence in the record that the Committee sought to reach out

5    to those people who might need a little more assistance in

6    making choices for their 401(k) plan?

7    A.   Yes.

8    Q.   And what did you observe?

9    A.   I saw comments in the meeting minutes indicating that

10   there might be participants who would need additional

11   education.  And as far as the Plan was concerned, during the

12   JPMorgan era, there was Financial Engines, and during the

13   Schwab era, Guided Choice, where individuals could speak on a

14   phone for custom information about their particular situation.

15   Q.   Okay.  And just again remind us what the Guided Choice

16   was?

17   A.   A similar type of plan -- program to Financial Engines

18   where participants would be able to talk about their custom

19   needs and seek guidance as to asset allocation or fund ideas.

20   Q.   Okay.  And did you view this attention to the

21   participants' sophistication levels or needs to be appropriate

22   for this Plan?

23   A.   Yes.  Very much.

24   Q.   And did you view it to be consistent with good fiduciary

25   practices that you've observed in your career?

1    A.   Yes.   Absolutely.   So a diversified plan lineup, education

2    where it was needed, a PCRA for those folks who wanted to go

3    out and find -- identify their own strategies is -- was the

4    hallmark of a -- a strong plan.

5    Q.   Okay.

6               THE COURT:   You got about five minutes left, sir.

7               MR. FLECKNER:   Understood.   Thank you, Your Honor.

8    I might not finish my direct today but --

9               THE COURT:   I understand.

10              MR. FLECKNER:   -- it won't be too long tomorrow

11   morning.

12   Q.   So in these five minutes today, Ms. Mann, did you observe

13   that the Committee reviewed deferrals -- I think there was

14   some discussion even this morning when you were in the

15   courtroom where Mr. Cowherd was presented with some data from,

16   both plaintiffs and myself, about the deferral rates and the

17   elections of participants.   Did you observe that that was

18   something that the Committee was looking at as part of its

19   regular process?

20   A.   Yes.   I saw that as a very good practice to observe and

21   look at those -- at those levels.   Yes.

22   Q.   Okay.   And -- and did you yourself look at the deferral

23   levels of participants in this plan?

24   A.   Yes.

25   Q.   Okay.   And actually, first, let me ask, why did you

1  believe it was a good practice of the Committee members to

2  look at the deferrals?

3  A.  Because it's critical for a committee to understand how

4  its plan is being used.  If participants are not using their

5  plan, or if they're not saving at all, then that's a sign that

6  they may need to make change or seek other information.  But

7  this plan had -- had numbers that I -- I wanted to see and so

8  chart out for myself.

9  Q.  Okay.  And the fact that part of the meeting materials

10 included participation levels, did you feel that was a good

11 fiduciary practice based on your experience?

12 A.  Yes, indeed.

13 Q.  Okay.  So let's take a look at the results of some of your

14 own analysis.  If we can pull up DX 860, which is Mann

15 Demonstrative 15, Chris.

16         Is this the result of the independent review you

17 conducted of the deferral rates of this plan?

18 A.  So -- yes.  I gathered the data that was available from

19 2011 to 2015.  And the darker blue bars are the participation

20 rates for defined contribution plans on average.  The -- and

21 that's about, let's call it, 75 percent.  Then I wanted to see

22 American Century's Plan -- that's sort of the teal color on

23 the left -- between 93, 94, let's call it 95 percent-ish

24 across the board.  This Plan is -- has participation rates

25 from most of the employees who are able to -- to participate

1    in the Plan that are even higher than those in defined

2    contribution plans that provide auto-enrollment.  And I think

3    we heard earlier the -- one of the importances of

4    auto-enrollment and this notion of nudging.

5    Q.  And so just to fill out the record, when you say that the

6    participation rates in this plan are even higher than those of

7    plans that use auto-enrollment, the auto-enrollment figure is

8    the third bar for each year in green on the right-hand side,

9    correct?

10   A.  That's correct.

11          THE COURT:  And that auto-enrollment number is

12   not -- well, it just started at American Century, so it's not

13   related to -- that's just the industry auto-enrollment.

14          THE WITNESS:  That's correct.

15          THE COURT:  Okay.

16   Q.  Yeah.  The green line is the industry auto-enrollment.

17   And I think the idea here -- and Ms. Mann can correct me if

18   I'm wrong, but the idea here is that even when accounting for

19   the use of auto-enrollment, we still see -- or you tell me, do

20   you still see high --

21   A.  Extremely high usage rates.  Right.  And I saw the more

22   recent data, which shows it even higher at 97 percent more

23   recently.

24   Q.  Right.  Because these data, which were reflected in your

25   report, only go up to year-end 2015, correct?

1    A.  Correct.

2          MR. FLECKNER:  Okay.  And I'd like to move the

3    admission of DX 860.

4          MR. SPECHT:  No objection.

5          THE COURT:  Thank you.  DX 860 is admitted.

6         (Defendants' Exhibit 860 admitted in evidence.)

7    Q.  Okay.  And did you draw any conclusions from the deferral

8    rates in this plan contained in DX 860?

9    A.  Yes.

10   Q.  And what -- what conclusions did you draw?

11   A.  Participants like this Plan, use this Plan, are invested

12   in this Plan.  There are incentives for them to save.  This is

13   very solid -- this is extremely solid performance.  It's

14   almost like participation rates can barely go higher.

15   Q.  Okay.  And there was also some discussion, as you might

16   have seen in the Hewitt report, that for some plans having too

17   many funds could lead to something called choice overload that

18   would reduce participation rates.  Did you draw any

19   conclusions about whether there was choice overload or too

20   many funds based on these data?

21   A.  I did not.

22   Q.  You did not draw any conclusions?

23   A.  I -- I did draw conclusions.

24   Q.  And what conclusions were those?

25   A.  That there was -- there was no -- there was no confusion

1   based on -- based on the number of options.

2   Q.  Okay.

3            MR. FLECKNER:  I know we're at our limit, and I'm at

4   a stopping point, Your Honor.

5            THE COURT:  All right.  Thank you --

6            THE WITNESS:  Thank you very much.

7            THE COURT:  -- Ms. Mann.  We'll see you tomorrow.

8   And we'll be in recess.  I look forward to seeing you

9   tomorrow.  Thank you all.

10           MR. FLECKNER:  Thank you, Your Honor.

11           THE WITNESS:  Thank you, Your Honor.

12       (Proceedings concluded at 4:44 p.m.)

13                   C E R T I F I C A T E

14       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

15   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

16

17   /s/Regina A. Lambrecht          October 4, 2018
     REGINA A. LAMBRECHT, RDR, CRR   DATE
18   Official Court Reporter

19

20

21

22

23

24

25