1                      UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MISSOURI
2                           WESTERN DIVISION

3

STEVE WILDMAN, et al.,      )  Case No. 4:16-CV-00737-DGK
4                           )
         Plaintiffs,      )
5                           )
VS.                       )
6                           )
AMERICAN CENTURY SERVICES,   )
7  LLC, et al.,             )
                       )  September 18, 2018
8           Defendants.      )  Kansas City, Missouri

9           *******************************************

10
                  VOL 10 (Pages 2268 - 2528)
11                TRANSCRIPT OF BENCH TRIAL
                 BEFORE GREG KAYS
12         UNITED STATES CHIEF DISTRICT JUDGE

13          *******************************************

14 APPEARANCES:

15 For Plaintiffs:       Paul J. Lukas
                     Kai H. Richter
16                  Brock J. Specht
                 Carl Engstrom
17                  Nichols Kaster, PLLP
                 46000 IDS Center
18                  80 South 8th Street
                 Minneapolis, Minnesota  55402
19

20                  Regina A. Lambrecht, RDR, CRR
                 United States Court Reporter
21                  400 E. 9th Street, Suite 8652
                 Kansas City, MO  64106
22

23 Proceedings recorded by mechanical stenography, transcript
produced by computer.
24

25

1    APPEARANCES (Continued):

2    For Defendants:        W. Perry Brandt
                            Bryan Cave Leighton Paisner, LLP
3                           1200 Main Street
                            Suite 3800
4                           Kansas City, Missouri  64105
                                 and
5                           James O. Fleckner
                            John J. Falvey, Jr.
6                           Alison V. Douglass
                            David Rosenberg
7                           Paul Nemser
                            Goodwin Procter, LLP
8                           100 Northern Avenue
                            Boston, Massachusetts  02210
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3      Defendants' Witnesses:                                    Page

4      KATHLEEN MARY MANN
           Direct Examination (Continued) By Mr. Fleckner      2274
5          Cross-Examination By Mr. Specht                     2283
       BRUCE ALAN STROMBOM
6          Direct Examination By Mr. Nemser                    2356
           Cross-Examination By Mr. Engstrom                   2503

7

8                            E X H I B I T S

9

10        Defendants'
          Exhibits                                        Received

11
                 797                                          2430
12               798                                          2429
                 799                                          2404
13               800                                          2467
                 805                                          2438
14               806                                          2442
                 807                                          2394
15               808                                          2501
                 847                                          2452
16        849 through 855                                     2355
                 861                                          2282
17               864                                          2486
                 867                                          2434
18               870                                          2404
                 875                                    2449,  2452
19               877                                          2448
                 878                                          2459
20               879                                          2467
                 882                                          2479
21               883                                          2481
                 889                                          2488
22               891                                          2441

23

24

25

1          (Begin proceedings in open court at 9:05 a.m.)

2          THE COURT:  All right.  Mr. Specht, sir.

3          MR. SPECHT:  Yes, Your Honor.  There's just one

4    issue that hopefully we can get through quickly I wanted to

5    raise.  And the reason I'm raising it now is because I think

6    it's going to affect the testimony of this witness and also

7    the next witness, so maybe we can just deal with it in one

8    fell swoop.

9          THE COURT:  What's the name of the next witness, by

10   the way?

11         MR. SPECHT:  Dr. Strombom.

12         THE COURT:  Strombom, okay.

13         MR. SPECHT:  And it relates to an objection I raised

14   yesterday in terms of the use of the demonstratives and sort

15   of leading the witnesses through the testimony --

16         THE COURT:  Sure.

17         MR. SPECHT:  -- with the demonstratives.  I just

18   want to make sure the nature of the objection is clear.  And

19   then if we -- we need to, we just make it a continuing

20   objection.

21         THE COURT:  Sure.

22         MR. SPECHT:  But the issue we have is that the

23   demonstratives are really just sort of PowerPoint slides with

24   text on them that is summarizing the expert reports.

25         THE COURT:  So how different is this than your use

1    of demonstratives with your experts?

2           MR. SPECHT:  Well, there's some differences -- and I

3    think also the way that the defendants are using some of the

4    demonstratives, which are charts and graphs and images that I

5    think of as traditional demonstratives that are illustrating

6    things versus the slides that are just pure text that are

7    restating what's in the reports.

8           We had -- we had originally proposed putting all the

9    reports in evidence, and the Court didn't want to go there,

10   and the defendants didn't want to go there.  And that's fine.

11   But we think it's not fair that they're just taking the

12   reports, putting them into slides, putting them on the screen,

13   and then having their experts sort of read the answers to the

14   questions off the screen.

15          THE COURT:  And the second part of that, Mr. Specht,

16   is you haven't been objecting to their admission, have you?

17          MR. SPECHT:  They haven't been offered for

18   admission.

19          THE COURT:  Okay.

20          MR. SPECHT:  Only the --

21          THE COURT:  None of them have been offered for

22   admission?  Okay.

23          MR. SPECHT:  The charts and those things have been,

24   and those are fine.  We're fine with those.

25          THE COURT:  Okay.

1    MR. SPECHT:  It's really just the slides that are

2 just text, bullet points from the reports that we have an

3 issue with.  I don't --

4    THE COURT:  Yeah.  I'll probably -- I'm going to

5 give you the answer I think I gave the defendants when they

6 fussed about this.  This is to assist the trier of fact, the

7 judge, in understanding and appreciating the testimony of the

8 expert witness because this is hypertechnical information.

9 And I note your objection, and it can be a continuing

10 objection, but I intend to allow this to proceed in the same

11 fashion it is.

12    MR. SPECHT:  And I appreciate that, Your Honor.

13    THE COURT:  In fact, I told Mr. Fleckner -- I told

14 him to keep up the good work because I need all the help I can

15 get, right?  And these are very helpful.  And I don't think

16 that it will assist the Court if we were not allowed to do

17 such a thing so -- thank you.

18    MR. SPECHT:  And we'll make that a continuing

19 objection --

20    THE COURT:  Sure.

21    MR. SPECHT:  -- for this witness and for

22 Dr. Strombom.

23    THE COURT:  Sure.  Yes, sir.

24    MR. SPECHT:  Thank you, Your Honor.

25    THE COURT:  All right.  Mr. Fleckner.  Oh, let me

1    start with Ms. Mann.  Ms. Mann, welcome back.

2              THE WITNESS:  Thank you.

3              THE COURT:  Have you been eating Kansas City

4    barbecue since you've been here?

5              THE WITNESS:  Yes, I have.

6              THE COURT:  Good for you.  Good for you.

7              THE WITNESS:  And lots of other delicious Kansas

8    City food too, I might add.

9              THE COURT:  Very good.  Very good.  I'll remind you

10   you're still under oath.  And would you please begin by

11   speaking your full name and spelling your last name again for

12   our record?

13             THE WITNESS:  Sure.  Kathleen Mary Mann, M-A-N-N.

14             THE COURT:  Thank you, Ms. Mann -- or Dr. Mann.

15             Please proceed.

16        KATHLEEN MARY MANN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

17                  DIRECT EXAMINATION (continued)

18   BY MR. FLECKNER:

19   Q.  Good morning, Ms. Mann.

20   A.  Good morning.

21   Q.  I just want to conclude your direct testimony on a few

22   discrete issues.  First, I'd like to talk about the use of

23   passive investments or index funds.  Did you see any evidence

24   in the record that you reviewed that the Retirement Committee

25   considered adding passive investment options to the Plan?

1  A.  Yes.

2  Q.  Did you see whether -- yeah.

3  A.  Yes.

4  Q.  Did you see whether they did that?

5  A.  Yes.

6  Q.  Okay.  And what did you observe?

7  A.  I observed that seeing the Hewitt report, the Committee

8  scheduled an additional meeting to discuss the output of the

9  Hewitt suggestions and considerations.  I saw that the

10  Committee reviewed and discussed the notion of passive versus

11  active in the next regular Committee meeting.  I saw that

12  there was an index fund in the -- in the lineup through 2013.

13  And so then the Committee ultimately decided to add a slate of

14  index funds in 2016.

15  Q.  Okay.  And we -- did you find that consideration of

16  passive investments to be appropriate from your perspective?

17  A.  Yes.

18  Q.  And can you elaborate in how you view that compared to

19  other committees?

20  A.  So like any good retirement committee who engages the use

21  of a consultant, the Committee wanted to take a look at --

22  and, in my opinion, reading the materials -- discuss and chew

23  on and consider the output from that report.  Like also any

24  good committee, one can consider these ideas but doesn't have

25  to incorporate each and every one of them, but to really

1   deliberate about them and determine if and which were -- would

2   be appropriate to incorporate into the Plan.  So I saw the

3   Committee do that in a deliberative way.

4   Q.  Okay.  There's been some suggestion earlier in the trial

5   that perhaps the Committee should have investigated specific

6   passive funds to be utilized for the Plan as a result of the

7   Hewitt report.  Would you agree that -- that the appropriate

8   exercise of the Committee's consideration would include a

9   consideration of specific passive funds to use?

10  A.  Well, I saw in the report from Hewitt that there were

11  specific passive suggestions that were made.  And I suppose a

12  committee could discuss specific passive asset classes, but I

13  don't think it necessary to -- to discuss or review in order

14  to be deliberative about this to have gone into the detail of

15  looking at each and every passive manager strategy.

16  Q.  Thank you.  I'd like to turn now to stable value.  We've

17  also heard a great deal in this trial about stable value

18  funds.  And maybe to set the stage a little bit, there's been

19  some testimony about liquidity constraints that are imposed in

20  stable value funds as a result of the insurance wrapper.

21  Maybe just to level set, can you just describe what you've

22  experienced in the market about that?

23  A.  Sure.  One of the DC plans with which I worked had a

24  stable value fund in its -- in its lineup when it came under

25  my -- into my team and the work that I needed to do.  And this

1    was in 2008.  And, of course, the global financial crisis was

2    hot and heavy.  Equity markets were declining.  Bond markets

3    were declining.  U.S. treasuries and gold were the only real

4    things that rallied that year in 2008.  In 2009, plans with

5    stable value funds began to experience difficulty in getting

6    wrap coverage.  And so just -- perhaps as a quick reminder,

7    since the stable value fund --

8              MR. SPECHT:  Your Honor, I apologize for

9    interrupting, but I don't think any of this is in her report.

10   So I object to this line of testimony.

11             MR. FLECKNER:  In her report at paragraphs 128

12   through 131, she explains why she believed it was prudent to

13   have considered or not considered stable value as plaintiffs

14   have alleged.  This is just background to get us to that

15   opinion.

16             MR. SPECHT:  It's a whole lot of background, Your

17   Honor.

18             THE COURT:  Okay.  Here's the deal.  I'll look at

19   128 and 131.  But if you're wrong, you're going to lose some

20   credibility here, Mr. Specht.

21             MR. SPECHT:  I haven't had a chance to --

22             THE COURT:  Because I'll chase whatever rabbit you

23   want me to chase, but I'm only going to chase it one time.

24             MR. SPECHT:  I haven't had a chance to look at the

25   paragraphs that he just cited, but --

1          THE COURT:  Why don't you look at it real quick --

2          MR. SPECHT:  -- I'll look.

3          THE COURT:  -- because this is going to be -- this

4    is going to be a long cross-examination.

5          MR. FLECKNER:  And for the record, 128 through 131.

6          THE COURT:  Thank you.

7          MR. FLECKNER:  So 128, 129, 130 and 131, Your Honor.

8          MR. SPECHT:  So I agree that there's a discussion in

9    there about stable value, but the matters that the witness was

10   just talking about, I don't see any of that in there.

11         THE COURT:  Well, overruled.  Please proceed.

12   Q.   Okay.  Maybe if you can briefly explain this background so

13   that we can go to your report.

14   A.   I think it was noted in earlier testimony that a stable

15   value fund is basically bond funds that are wrapped with an

16   insurance wrapper to maintain the net asset value between --

17   between a range.

18         So during 2009, when stable value -- plan committees

19   were dealing with -- or portfolio managers were dealing with

20   the difficulty in getting wrap coverage.  There was a lot of

21   concern about stable value liquidity, among other things.  In

22   addition, there are some specific limitations with stable

23   value funds, such as the equity wash and the inability for

24   participants to leave the stable value fund and come back to

25   it or to leave the stable value fund and go to what is often

1 called a competing fund as well.

2 Q. Okay. And did you form an opinion in this case as to

3 whether you believed it was reasonable for the Plan Committee

4 to have decided not to include a stable value fund during the

5 class period here?

6 A. Yes, I did.

7 Q. And what was that opinion?

8 A. I thought it was a reasonable decision not to include a

9 stable value fund because the Committee already had in place

10 money market funds and short-term bond fund that participants

11 could use to gain the lowest risk -- lower risk investment in

12 their Plan options.

13    I also considered that there are other plans that

14 use stable value funds, and that's perfectly fine if they put

15 their stable value fund into their plan prudently. And I've

16 worked with plans that have done that. I did not see it as an

17 issue that this particular Retirement Committee did not

18 include stable value fund in their plan.

19 Q. Okay. And that opinion is based both on your review of

20 the record and your personal experience that you just

21 described, correct?

22 A. Yes, it is.

23 Q. I'd like to turn now -- you mentioned a little bit about

24 the Hewitt report. We're not going to bring up DX [sic] 10.

25 But you've had a chance, I take it, to look at the Hewitt

1    report, correct?

2    A.  Yes, I have.

3    Q.  Okay.  And I think you just testified a moment ago about

4    the consideration that you observed the Committee taking in

5    response to the Hewitt report.  Did you believe that their

6    consideration of the Hewitt report's considerations was

7    appropriate?

8    A.  Yes.

9    Q.  And do you believe it was consistent with what you observe

10   in the industry of other committees you've worked with?

11   A.  Yes.  When committees receive a report from a consultant,

12   their consultant that they engaged, and they go through it

13   and -- and look at the considerations, I think that is

14   consistent and exactly what a retirement committee should be

15   doing to be deliberative in their process.

16   Q.  So in your experience, would it be appropriate for a

17   committee to reflexively just adopt whatever a consultant puts

18   in a deck to them?

19   A.  Absolutely not.

20   Q.  Why not?

21   A.  Well, sort of like going to Macy's and having the

22   salesperson say, hey, that dress looks really great on you.

23   I, of course -- you know, and I think we heard from

24   Ms. VanWagoner that consultants will often try to expand the

25   potential set of services that they can deliver to a client.

1    It's typical.  It's common in the industry.  However, the

2    Committee did look at the considerations and did look at those

3    but is under no obligation to adopt each and every one of the

4    thoughts and ideas that come from such consultant.

5    Q.  Okay.  Thank you.  And just to wrap up, Ms. Mann, you

6    observed the record.  You've heard some of the testimony.  Do

7    you believe that American Century and the Committee created a

8    successful 401(k) plan for their participants?

9    A.  I absolutely do.

10   Q.  Okay.  Let's pull up, Chris, DX 861.  And this is taken

11   from your report, correct?

12   A.  Yes, it is.

13   Q.  Okay.  And can you describe to the Court what is being

14   depicted on DX 861?

15   A.  So this is a year-by-year view of the average plan

16   balances in the American Century Plan.  So it's the assets

17   divided by the number of participants in the Plan.  And it

18   shows that the balances here are between 183 and two

19   hundred -- nearly $300,000, $296,000, relative to let's call

20   it less than half of that for the average DC plan value.

21          So this is a very successful measure of participants

22   using the Plan, saving for their retirement.  And it should be

23   one of the check marks for the Committee to say we're doing a

24   successful job.

25          THE COURT:  Where did you find your plan average at?

1          THE WITNESS:  This data was available through the

2    5500 reports, the form 5500s that the plan files.  And I think

3    the broader plan data was from BrightScope.

4          THE COURT:  BrightScope?

5          THE WITNESS:  Yes.

6          THE COURT:  Thank you.

7          MR. FLECKNER:  We move to admit DX 861.

8          THE COURT:  Any objection to --

9          MR. SPECHT:  No.

10          THE COURT:  And, Mr. Specht, this wasn't the kind of

11    thing you were objecting to at all.

12          MR. SPECHT:  This, Your Honor, I would view as a

13    perfectly appropriate demonstrative --

14          THE COURT:  Okay.

15          MR. SPECHT:  -- unlike the text only demonstratives.

16    And with this one, there's no objection.

17          THE COURT:  Thank you.

18          MR. FLECKNER:  So is it admitted, Your Honor?

19          THE COURT:  It is admitted

20       (Defendants' Exhibit 861 admitted in evidence.)

21          MR. FLECKNER:  Thank you, Your Honor.  And we've not

22    been moving the admission of the text only that Mr. Specht

23    mentioned.

24    Q.  So, again, can you tell us, Ms. Mann, to be clear why do

25    you believe DX 861 demonstrates whether this plan has been

1    successful?

2    A.  Well, this Committee put together a Plan lineup that was

3    incredibly diverse.  I think Hewitt says that as well in their

4    review of the American Century Plan -- with a variety of

5    investment options from which the participants can choose to

6    save for their retirement.  When Committee member -- when Plan

7    participants are using the Plan and investing in the Plan,

8    they are doing really exactly what they are incented and we

9    all hope people will do to save for their retirement.  So this

10   is considered a very successful plan.  And the Committee's

11   work -- this is a contribution or a proof statement of some of

12   the Committee's work that the participants were utilizing the

13   Plan and utilizing the fund options.

14                MR. FLECKNER:  Okay.  Thank you very much, Ms. Mann.

15   Those are all the questions I have subject to any redirect.

16                THE COURT:  All right.  Mr. Specht, please proceed,

17   sir.

18                          CROSS-EXAMINATION

19   BY MR. SPECHT:

20   Q.  Good morning, ma'am.  I'm going to ask you a series of

21   questions this morning.  And for the most part, I'm focusing

22   on the period of time prior to 2016 when the Vanguard funds

23   were added.  Does that make sense?

24   A.  Sure.

25   Q.  And I think most of your report kind of focuses on that

1    time period as well; is that fair?

2    A.  Yes.

3    Q.  So when we're talking about that period of time, you would

4    agree that nothing in the record shows that the Retirement

5    Committee ever discussed the basis for considering only

6    American Century funds, correct?

7    A.  Would you repeat that question, please?

8    Q.  Sure.  Nothing in the record shows that the Retirement

9    Committee ever discussed the basis for considering only

10   American Century funds, correct?

11   A.  Correct.

12   Q.  And I think at this point, we've probably proven beyond a

13   reasonable doubt that the Committee never considered a

14   specific nonproprietary fund to add to the Plan during this

15   time period, right?

16              MR. FLECKNER:  Objection.  I don't know that she can

17   testify what the trial record has shown by a preponderance of

18   the evidence or --

19              THE COURT:  Well, is there any -- I think --

20              MR. SPECHT:  I can rephrase.

21              THE COURT:  -- anything -- help us, Mr. Specht.

22              MR. SPECHT:  Sure, sure.

23   Q.  You'd agree that it's clear from the evidence in this case

24   that the Committee never considered a specific --

25              THE COURT:  The objection is the same.  How about do

1   you agree based on what you reviewed of the minutes that the

2   Committee didn't consider a specific nonproprietary fund?

3          MR. SPECHT:  That's a much better question, Judge.

4   Thank you.

5          THE COURT:  Thank you.

6   A.  I would say that's correct.  However, it wasn't necessary,

7   in my opinion, for the Committee to do so.  In its Investment

8   Policy Statement, there is a commentary that says American

9   Century intends to utilize in-house proprietary strategies

10  where they meet the requirements.  And this Committee -- I

11  think just using one thought about whether they considered one

12  item or not is not enough to determine how prudent or

13  deliberative a committee is.  This is why this project, to me,

14  was like a big puzzle, and you have to investigate all of the

15  processes and a range of decisions that the Committee was

16  making.

17  Q.  And given the fact that the Committee never considered

18  adding a nonproprietary fund, we know that they could not have

19  analyzed whether a nonproprietary fund was in the

20  participants' best interest, correct?

21  A.  Would you say that again?  It sounds like two questions in

22  there to me.

23  Q.  Well, I think we've established that they never considered

24  adding a nonproprietary fund to the Plan.

25         THE COURT:  Well, I think you established there was

1   not a discussion in the minutes about a nonproprietary fund.

2   And other witnesses have testified the minutes are not

3   transcriptions but just highlight decisions made in this.  So

4   the first part of your question, I don't think you have

5   established that.  I don't think the evidence has established

6   that yet.  But -- so why don't you ask a -- I agree with the

7   witness.  Ask a different question.

8   Q.  Did you see any evidence in the record, not just the

9   minutes, but depositions, the other documents, the emails,

10   everything -- everything that you looked at, did you see any

11   evidence there that the Committee ever considered adding a

12   specific nonproprietary fund before 2016 when the Vanguard

13   funds were added?

14   A.  I did not see evidence of adding a specific nonproprietary

15   fund.  However, what I would say is the Committee did compare

16   the returns of other funds through the performance reports, in

17   the benchmarking report, and through the Schwab performance

18   reports as well.  So there was awareness, because the

19   Committee was deliberating the peer universes for performance

20   as well as considering the range of fees as well.  And the

21   Committee was staffed with senior executives who were very

22   familiar with the marketplace and what other options were out

23   there and available.  And I think the most important part to

24   me is the Plan states its intention in the Investment Policy

25   Statement to utilize in-house funds.  So I didn't see any need

1   for them to do otherwise.

2   Q.  So given that they didn't, in your review of the evidence,

3   ever consider adding a specific nonproprietary fund to the

4   Plan, you would agree that they couldn't have analyzed whether

5   moving to a nonproprietary fund was in the participants' best

6   interest, correct?

7   A.  No, I don't agree with that.

8   Q.  Because of the peer groups you're talking about?

9   A.  Well, I think the way you're -- could you just repeat the

10  way so that -- I just need to listen to that and the parts.

11  Q.  Yeah.  Given your conclusion from reviewing the evidence

12  in the case that the Committee never considered adding a

13  specific nonproprietary fund to the Plan --

14  A.  I'm sorry to interrupt.  I don't think I said I know they

15  never considered it.  What I said is I didn't see it in the

16  record.

17          THE COURT:  Sustained.  Yeah.

18  A.  So if you wouldn't mind --

19          THE COURT:  Hey, Mr. Specht, you got -- you -- I'm

20  watching this, and you're kind of -- she stops you and you --

21  you loop back and kind of ask the same thing that she's

22  objecting to.  So you got to help me with this, Mr. Specht,

23  because I want you to be able to complete your

24  cross-examination.

25          MR. SPECHT:  I understand.

1           THE COURT:  I'm pulling for you, but I'm telling

2      you --

3           MR. SPECHT:  I appreciate it.

4           THE COURT:  -- we're going to shut this baby down

5      here pretty quickly.

6           MR. SPECHT:  I appreciate that, Judge.  Why don't I

7      move on and --

8           THE COURT:  All right.  That would be great.

9           MR. SPECHT:  -- maybe we'll come back to it or maybe

10     not.

11          THE COURT:  Please.  Yeah.  We're doing this thing

12     here again, right (indicating)?

13          MR. SPECHT:  I hear you.

14          THE COURT:  Okay.

15     Q.  You would agree that there was a significant financial

16     benefit to American Century, the mutual fund company, that

17     arose out of having the roughly 500 million in assets from

18     this Plan invested in American Century funds, wouldn't you?

19          MR. FLECKNER:  Objection.

20          THE COURT:  Why?

21          MR. FLECKNER:  It's beyond the scope.  There's been

22     no evidence of financial benefits in the --

23          THE COURT:  I think I'm going to allow that

24     question.  Yeah.

25     A.  So if you think that a plan of approximately $500 million

1    in a -- an asset manager with, I don't know, depending on when

2    we talk about it, $150 billion in assets, so what is that,

3    half of 1 percent of assets is -- is the key driver of the

4    future fortunes of that organization, I would not --

5    absolutely would not agree with that.

6            Did American Century receive revenue?  Sure.  From

7    having investments strategies there?  Sure.  Was it a large

8    amount as a percentage of their assets or their business?

9    Absolutely not.

10   Q.  So I'm not asking you if it was a key driver or anything

11   like that.  I just want to see if you agree with me that

12   having this $500 million worth of investments in American

13   Century funds provides a financial benefit to the mutual fund

14   company.  Do you agree with that?

15   A.  Yes.

16   Q.  For the assignment that you were given in this case, you

17   were not asked to provide any opinions related to any sort of

18   conflict of interest, right?

19   A.  Correct.

20   Q.  Karla, can you pull up DX 863?

21           I want to talk a little bit about your professional

22   background.  What I was going to put up was Exhibit 863, which

23   is the demonstrative that you and the defense have prepared

24   that sort of gave the overview of your professional

25   background.  I assume we probably don't need that because you

1  probably know the information on that slide.  So let's just go

2  without it.

3          You worked for most of your career, before you

4  joined the Office of the Fiduciary Advisor at State Street,

5  you worked as a portfolio manager or a fixed income trader; is

6  that fair?

7  A.  Yes.

8  Q.  And so then the time that you joined that office, that

9  being the Office of the Fiduciary Advisor, that was sometime

10 in 2003?

11 A.  That's right.

12 Q.  Okay.  And so prior to that 2003 date when you joined that

13 office, is it fair to say that you were not engaged in

14 providing consulting or advice to retirement committees

15 regarding fiduciary issues?

16 A.  No, not exactly.

17 Q.  In what capacity were you giving advice or consulting to

18 retirement committees regarding fiduciary issues prior to

19 2003?

20 A.  So in the five years as a portfolio manager at SSGA in the

21 global asset allocation and currency group, the global asset

22 allocation team, which managed between $20 and $50 billion,

23 would frequently provide ideas and updates to DC plans and

24 prospects to their retirement committees about potential use

25 and structuring of multi-asset class strategies in their

1    lineup or a quick review of their lineup so they might

2    consider what type of multi-asset class funds to include

3    there.

4    Q.  So you were giving presentations about the products that

5    you manage?

6    A.  We were giving presentations about that, yes, and also

7    thoughts and insight to the retirement committee about what

8    diversification lay in their plan lineups.

9    Q.  Okay.  But you're not being hired as a fiduciary advisor

10   to that the committee, right?

11   A.  That was correct.

12   Q.  Starting in 2003, you were being hired as a fiduciary

13   advisor to retirement committees?

14   A.  That's correct.

15         THE COURT:  Did you get that?

16         THE REPORTER:  Yes.

17         THE COURT:  You kind of tailed off a little bit.

18   Q.  And in your career in that capacity as a retained

19   fiduciary advisor to retirement committees ran through 2013,

20   correct?

21   A.  Correct.  And let me just say, for some of the plans, it

22   was -- technically, we conducted -- we contracted as a

23   co-fiduciary.  For some of the plans, we were the fiduciary.

24   And in other -- for other plans altogether, it was

25   predominantly advice.  So it was a range.  But yes.

1   Q.  And then after you left State Street in 2013, you ceased

2   engaging in that type of activity professionally, correct?

3   A.  Not necessarily.  So my work --

4   Q.  Let me be more specific.  I think I know where I screwed

5   up there.  As it relates to 401(k) plans?

6   A.  Well, I attended conferences and financial conferences

7   where there was this type of activity going on and where I

8   continued to educate myself.  And I did work for a law firm

9   where some of the same themes and threads are necessary to run

10  through really every portfolio.  But predominantly for 401(k)

11  plans, no.

12  Q.  So after you left State Street in 2013, have you been

13  engaged as a professional consultant to advise a retirement

14  plan on its fiduciary practices?

15  A.  No.

16  Q.  Most of the time when you were at State Street doing this

17  work -- or, excuse me, during the time that you were at State

18  Street doing this work, most of your clients were defined

19  benefit plans, right?

20  A.  Well, I would say it this way, and the way I said it in

21  direct.  There were about 20 or 30 ongoing clients, but I

22  worked with 30 to 50 clients.  Many of the 20 came through --

23  20, 30 came through as DB clients initially; however, the work

24  that we did, we were asked by the DB client to perform studies

25  and discrete projects or provide insight and advice to the

1      retirement committee about their DC plan.  And in addition,

2      many of those committees were the same committee overseeing

3      the DB and the DC plan.  So as we would present to them about

4      state of the markets, performance of funds, issues that were

5      happening in the market and educational topic, all of those

6      things were listened to by the same committee members, who

7      were looking at the DC plan.  And so often, we were asked to

8      provide additional insight on a -- on a maybe not ongoing

9      basis for all of those.

10     Q.  So in some instances, an entity will have both a defined

11     benefit and a defined contribution plan, correct?

12     A.  That's correct.

13     Q.  And I believe what you're saying is that oftentimes, it's

14     the same committee that oversees both of those plans and

15     you're presenting to that committee; is that fair?

16     A.  Oftentimes is not exactly right, but it's close enough.

17     Q.  Okay.  And so you're giving general information about the

18     markets, other things, to that committee, without regard to

19     whether it's DC or DB.  You're just giving information to the

20     committee, right?

21     A.  No.  I don't agree with what you just said.  When you --

22           THE REPORTER:  I'm sorry?

23     A.  No, I do not agree with what you just said.  The nature of

24     our work was -- and in a new engagement probably took about

25     four quarters to get to know a committee, the committee

1   members, the risk comfort of that -- and risk style of that

2   committee, its DB plan, what else it offered in terms of other

3   retirement work, the kind of asset classes they were

4   comfortable utilizing, and the kind of funds that they used.

5           So in a DB arrangement, once you got to know that,

6   you -- we then spent our time assisting clients with really

7   enhancing or buttressing some of their fiduciary practices,

8   their agendas and educational item about the markets.  And

9   most of these things applied both to DB and DC.

10  Q.   Okay.  During your direct testimony yesterday, I believe

11  you testified that on an ongoing basis during your time at

12  State Street, you had five defined contribution clients?

13  A.   Yes.

14  Q.   Does that sound accurate?

15  A.   Yes.  However, what I didn't share with you was that

16  several of those plans were multibillion dollars with upwards

17  of 50 different asset managers and multiple asset classes.  So

18  shear -- the shear number of DB plans alone doesn't tell you

19  anything about the complexity or the issues that a particular

20  DC plan has to deal with.

21  Q.   So the defined contribution plans that you were advising

22  used as many as 50 different asset managers?

23  A.   That's correct.

24  Q.   They didn't use a single asset manager, correct?

25  A.   The DC plans that I was working with were ones that had

1    been established prior to them coming to me and my team for

2    the work and advice.  And as you probably know, a DC plan like

3    the Retirement Committee like at American Century, committee

4    members join a committee of a plan that already exists.

5    You're not starting from tabula rasa.  And so, you're coming

6    in and looking at what does the Plan look like today, how does

7    its asset allocation satisfy the needs of the plan and its

8    participants, and how might it be tweaked.  And in no -- none

9    of the DC, the ongoing DC work that we had were -- was I

10   working with asset managers.  I was working with an asset

11   manager who came on as a DB client who often asked us to do

12   work on a DC plan.  Sorry.  That was my one ongoing DC plan.

13   Yeah.  Sorry.

14   Q.  I apologize if I missed it.

15   A.  No, I'm confusing.

16   Q.  That's okay.  That's okay.  I'm not sure if I got -- if

17   you answered my question or not, so let me try it again.  None

18   of the defined contribution plans that you advised ever used a

19   single asset manager for all their investments; is that

20   correct?

21   A.  That is correct.  However, one of the DC plans that I did

22   advise used all but one in proprietary funds.  All but one

23   option in proprietary funds.

24   Q.  Their own proprietary funds?

25   A.  That's correct.

1    Q.  And which one was that?

2    A.  Which what was that?

3    Q.  Who was that?

4    A.  I'm not sure I'm at liberty to say.

5    Q.  Oh, okay.

6         When you were working as an advisor, you offered

7    advice to your clients as to how they should select asset

8    managers, correct?

9    A.  In some -- most cases, what we did -- so the short answer

10   is not exactly.  And the longer answer is the work that we did

11   in many cases was actually to do the research and work around

12   identifying asset managers to fill slots within clients'

13   plans.

14   Q.  So if you've got a slot, whether it's because the

15   committee's decided they want to add a new asset class or

16   maybe it's an existing asset class where they've decided to

17   replace the manager, that's sort of the circumstance you're

18   talking about?

19   A.  I'm talking about -- just trying to think of a couple of

20   examples -- potentially adding a new asset class or other.

21   Q.  Other would be?

22   A.  Or other -- replacing a manager, yeah.

23   Q.  Okay.  And so the process you used for doing that would be

24   to look at -- well, within a given asset class different asset

25   managers that have products that could fill that asset class,

1    right?

2    A.  Well, it depended on the client, and it depended on the

3    arrangement.  Every plan that I've worked with has a totally

4    different plan set of risks, set of funds.  No two plans are

5    alike.  And there are a range of different work.  So in some

6    cases, when a strategy might have gone on a Watch List and/or

7    needed to be replaced, that strategy might have been pulled

8    from an internal set of funds or an external set of managers.

9    Q.  When you were looking to find an asset manager for an

10   asset class, you would look at specific managers that you knew

11   had strength in that particular asset class, correct?

12   A.  It depended on the client.

13   Q.  At least in some instances that was true?

14   A.  Yes.

15   Q.  Okay.  And in those instances, you typically would present

16   three or four options to your client; is that fair?

17   A.  So for our nonasset manager client, yes.  However, I'm

18   just wondering why the work that I did at State Street

19   advising some of our clients applies to American Century.

20            THE COURT:  Well, you -- you can't ask him

21   questions.

22            THE WITNESS:  Thank you.

23            THE COURT:  I promise you, Mr. Fleckner is very good

24   about objecting if it runs afoul, so -- but -- so please

25   proceed, Mr. Specht.

1          MR. SPECHT:  Thank you, Your Honor.

2     Q.  Now because you were an asset manager yourself at State

3     Street, you knew who the key players were in the major asset

4     classes, right?

5     A.  Yes.

6     Q.  And those would typically be the three or four that you

7     would present to your clients as options for a given asset

8     class, right?

9          MR. FLECKNER:  Objection.

10          THE COURT:  I told you.  Well, I think you -- the

11     question was and you would typically be -- be the three or

12     four that you would present to your client as options.  An

13     asset class.  I don't think she testified to that.  So this --

14     your -- Mr. Specht, you're looping back with things that she

15     didn't testify to like she said those things.  So please be

16     careful about that.

17          MR. SPECHT:  I will try, Your Honor.

18          THE COURT:  I call it looping.  What do you call it?

19          MR. SPECHT:  I think looping is a fair word.  Yeah.

20          THE COURT:  Okay.  It's the nicest word I can come

21     up with.

22          MR. SPECHT:  I figured there were maybe a couple of

23     others you might have been holding back on.

24     Q.  All right.  So maybe I can clear up the confusion here.

25     So is it true that when you're doing a manager search to fill

1    a particular asset class, you would typically look at three or

2    four options?

3              MR. FLECKNER:  Objection.

4              THE COURT:  Well, I'm going to allow that question.

5    Would you look -- she already testified she didn't.  It

6    depends on the client.

7              MR. FLECKNER:  It depends -- that's --

8              THE COURT:  She's already said -- she already

9    answered that question, so I'll sustain that.  She said it

10   depends on the client.

11   Q.   Sure.  And for some clients you did, right?

12   A.   For some clients, we might look at a larger number.  And

13   for some clients -- the reason I say it depends on the client

14   is that at American Century, this particular committee had a

15   lot of investment knowledge.  They weren't hiring somebody

16   like us to do work with them.

17            In my particular case, many of our clients were

18   looking at us because they didn't have the capacity, the

19   talent, the knowledge, and were not asset managers themselves

20   in order to -- to seek and research and look at other

21   managers, among other things, really.  It was a broad holistic

22   relationship on the whole plan, and asset management was just

23   one piece of it.

24   Q.   My struggle here, and I think why I'm getting into some of

25   this looping, is I'm having a hard time figuring out if

1    there's an answer to the question or not so I want to limit

2    it --

3            THE COURT:  She's saying it's apples and oranges.

4            MR. SPECHT:  Well, I understand that.  I understand

5    that.

6    Q.  Setting aside this apples and oranges issue, when you're

7    looking to fill a slot of an asset class where you're looking

8    to find a manager, your practice in consulting with your

9    clients at State Street was that you would typically look at a

10   range of managers for that asset class; is that fair?

11           MR. FLECKNER:  Objection.

12           THE COURT:  It depends on the client.  Please move

13   on.

14   Q.  Would you agree that that is the typical process in the

15   Retirement Plan industry for finding a manager to fill an

16   asset class?  And by that, I mean looking at a range of

17   options?

18   A.  Well, you said --

19           MR. FLECKNER:  Objection.

20           THE COURT:  Overruled.

21   A.  You said typical.  And I think what I -- not I think --

22   what I wrote in my report and my experience in working with

23   many plans and many committees is no two plans are alike.  So

24   you say typical, but I would not agree with the word typical

25   in many ways.

1                  However, if you're saying in a specific arrangement

2     where a client has asked us to look at external asset managers

3     and come up with a slate of some asset managers, would we look

4     at a range of asset managers to provide, let's say, a

5     particular asset class?  Sure.

6     Q.   And, for example, in certain asset classes, there are key

7     players.  Would you agree with that?

8     A.   What do you mean by "key players"?

9     Q.   I think that's a phrase that you used in prior testimony

10    in this case.  And so if you understand or recall that, what

11    you meant by that, maybe you could explain it to us?

12    A.   I'm not sure what -- could you just tell -- repeat where

13    that was or what that context was --

14    Q.   Let me try --

15    A.   -- because I think the context matters?

16    Q.   Sure.  Let me try a different -- let me try a different

17    example.  Would you agree that in the fixed income or bond

18    space, entities like PIMCO, Western Asset Management, or

19    DoubleLine would be considered the key players in that space?

20    A.   Well, I would say they would be asset managers who managed

21    lots of fixed income, but where -- would you please remind me

22    if that's in my deposition what the question that I was asked

23    was?

24    Q.   Setting aside your deposition, you would agree that in the

25    fixed income space, those are some of the key players in that

1    area, right?

2    A.  Those are some prominent asset managers in that space,

3    sure.

4    Q.  And then other asset classes are going to have other

5    prominent asset managers, correct?

6    A.  It depends on what you mean specifically.

7    Q.  Large cap growth, there's going to be prominent asset

8    managers in that space, right?

9    A.  Over what time period?  Over what -- I mean, I think it

10   depends on when.  Again, the short answer is it depends.  I

11   hope you're not surprised to hear me say that, right?

12   Q.  Sure.

13   A.  It depends on when you're talking about and for what

14   purpose and for what level, a lot of things.

15   Q.  Sure.  Let's talk about 2010.  In the large cap growth

16   space, there were prominent managers in that space, right?

17   A.  When you say "prominent managers," what do you mean by

18   that?

19   Q.  Would you consider there to be key players in the large

20   cap growth space in 2010?

21   A.  Well, what do you mean by "key players"?

22   Q.  This is -- let's move on.

23          Yesterday, I believe you testified that in your

24   career you had reviewed approximately 25 Investment Policy

25   Statements.  Does that sound right?

1  A.  Yes.

2  Q.  Isn't it true that for your 401(k) clients, you never

3  substantively reviewed their Investment Policy Statements to

4  make recommendations for improving them?

5  A.  I -- would you just repeat that, please?

6  Q.  Sure.  For your 401(k) clients, you never substantively

7  reviewed their Investment Policy Statements to make

8  recommendations for improving them?

9  A.  That was not one of the assignments that necessarily I was

10  given, but I definitely have reviewed Investment Policy

11  Statements.

12  Q.  Okay.

13  A.  401(k) Investment Policy Statements.

14  Q.  Regardless of whether it was an assignment you were given

15  or not, is it true that for your 401(k) clients, you never

16  substantively reviewed their Investment Policy Statements to

17  make recommendations for improving them?

18  A.  Can we just --

19       THE COURT:  Your answer would be -- your answer

20  would probably be that's true because that wasn't your

21  assignment, right?

22       THE WITNESS:  Yeah.  I think that's approximately

23  right for the -- a large portion of them, that's right.

24  Q.  And then again, I think -- I don't recall if we covered

25  this yesterday or not, but for the five 401(k) plans that you

1  advised on an ongoing basis, you didn't draft the Investment

2  Policy Statements for those clients, right?

3  A.  No.  There was an Investment Policy Statement in place,

4  which we reviewed and enhanced on occasion -- or they reviewed

5  and enhanced on occasion.

6  Q.  And there was one sort of a generic sample IPS that you

7  provided to clients; is that fair?

8  A.  Yes.

9  Q.  Let's switch topics and talk a little bit about the

10  process for selecting funds as it happened in this case.  So

11  there's one instance prior to 2016 where the Retirement

12  Committee decided to add a new fund to the Plan, not as a

13  replacement for something that was being removed, but just a

14  new fund that went in.  Do you recall that?

15  A.  Can we just note which fund it was?

16  Q.  The Strategic Inflation Opportunities Fund.

17  A.  Yes.

18  Q.  Did you remember that?

19  A.  Yes, I do.

20  Q.  Okay.  And that, of course, goes without saying, that was

21  an American Century fund, right?

22  A.  Yes.

23  Q.  Okay.  Now, you were here for Mr. Levy's testimony,

24  correct?

25  A.  Yes.

1    Q.  Okay.  Mr. Levy testified that when the Committee decided

2    to add that fund, they did not analyze whether it satisfied

3    the performance and cost criteria for the fund selection in

4    the IPS?  Do you recall him giving that testimony?

5    A.  I don't recall the specifics.

6    Q.  Okay.  Do you have any basis to dispute the assertion that

7    when the Committee added the Strategic Inflation Opportunities

8    Fund that it failed to analyze whether it satisfied the

9    performance and cost criteria for fund selection in the IPS?

10              MR. FLECKNER:  Objection.

11              THE COURT:  Overruled.

12   A.  I saw the Committee looked to add a strategy that filled a

13   unique slot in the Plan lineup with this inflation protected

14   strategy.  I noticed too that in the Investment Policy

15   Statement, it says that the Committee should look to satisfy

16   these criteria, but it doesn't say they must satisfy all of

17   the criteria.

18   Q.  That's a little bit different, though.  I'm asking whether

19   they actually did, not whether they should or must, but

20   whether they actually did?

21              THE COURT:  I think -- I thought she answered your

22   question, Mr. Specht.  She said that she looked at that fund

23   to fill a certain void or place within the lineup.  And so she

24   didn't directly contradict your expert.  But I think her --

25   you know, she didn't take on Mr. Levy here, but she did say

1    she felt that that was appropriate, and it filled a space.  Is

2    that fair?

3              THE WITNESS:  I did.  Yes.

4              MR. SPECHT:  Okay.

5              THE COURT:  So that is your question, right?

6              MR. SPECHT:  Sort of.

7              THE COURT:  That was your question.

8              MR. SPECHT:  I think so.

9    Q.  Can we agree that in adding that fund, the Committee

10   didn't analyze whether it satisfied the performance criteria

11   in the IPS?

12             MR. FLECKNER:  Objection.

13             THE COURT:  If you know the answer, if you have a --

14   I'm going to -- overrule the objection.

15   A.  Can you just remind me of the specific --

16             THE COURT:  Can we agree that in adding the fund,

17   the Committee didn't analyze whether it satisfied the

18   performance criteria in the IPS is the question.

19   A.  I just want to see the wording of the performance item in

20   the IPS and the performance data.

21   Q.  JX 54.  I don't know the page number, unfortunately.  So

22   we can flip ahead, Karla.

23   A.  I think it's like 4.

24             THE COURT:  I'm really disappointed in that,

25   Mr. Specht.  You've spent a lot of time with JX 54.

1          MR. SPECHT:  I have.

2          THE COURT:  Okay.  Let's -- let's thumb through it

3    if we can here.  And, Ms. Mann, tell us when to stop.  You've

4    probably spent a little time with it too.

5          THE WITNESS:  I have.

6    Q.  I think it's the next page, page 7.

7    A.  Right here.  Yes.  Page 4.

8    Q.  All right.  Can you zoom in on that middle section?

9    A.  Yep.  Right.  So you're saying number one.

10   Q.  So, yes, number one.  And I'll just read it.  Performance

11   should be equal to or greater than the median return for an

12   appropriate, style-specific benchmark or peer group over a

13   specified time period.

14         Did I read that correctly?

15   A.  Yes.

16   Q.  Did you find any evidence in your review of this case

17   indicating that the Committee analyzed that criteria?

18   A.  No.

19   Q.  Okay.  Then if we look at number 3.  Fees should be

20   competitive compared to similar investments.

21         Did I read that right?

22   A.  Yes.

23   Q.  And did you find any evidence that the Committee analyzed

24   that criteria in adding the Strategic Inflation Opportunities

25   Fund?

1    A.   I did not see fee specific information.  However, I would

2    say that remembering that the SIOpps fund is comprised of

3    three separate American Century funds, two of which were in

4    the lineup and had been in the lineup for quite sometime.

5    Right?  So the three funds are an Inflation Protected Bond

6    Fund, the International Bond Fund, and a Commodities fund.

7    And the strategies, the standalone strategies were in the

8    lineup, and that was -- you know, information was available.

9    And the commodities fund was run by a portfolio manager who

10   ran the gold fund, which is in the portfolio.  So the strategy

11   is -- the pieces and the people were well known to the

12   organization.

13   Q.   So if you're looking at this fund as compared to the other

14   funds in the lineup, you would agree there's significant

15   overlap between the strategies?

16   A.   No, I wouldn't.

17   Q.   Well, you would agree that two of the three parts that

18   make up the Strategic Inflation Opportunities Fund are already

19   in the lineup, right?

20   A.   No, I wouldn't.

21   Q.   I thought that's what you just said?

22   A.   No.

23   Q.   Okay.  Where am I getting this wrong?

24        THE COURT:  Okay.  Hold on here.  We are getting in

25   the argument part of this and which we don't allow on

1   cross-examination, as you've heard.  And so just ask the

2   question, answer the question.  I don't want you to argue with

3   the witness.  I don't want the witness to argue.  But that --

4   that's what this is.  It's just asking questions and getting

5   answers.  And I always say this, you may not like any of her

6   answers, but you're stuck with them.  So please proceed.

7           MR. SPECHT:  I appreciate that, Judge.

8   Q.  Can you explain what you were just talking about again in

9   terms of the strategies already being in the lineup or

10  something to that effect?

11  A.  Sure.  Perhaps it would be useful to say the SIOpps fund

12  was an inflation strategy to try to protect against inflation.

13  Right?  There were a number of new strategies and

14  strategies -- I'm sorry, what I wanted to say is the inflation

15  protection was something that many asset managers were

16  concerned about.  I saw in the record this committee talking

17  about inflation concerns in their records and in their minutes

18  in prior times.  So in this global financial crisis where the

19  Fed lowered interest rates to incredibly low levels, there's

20  an expectation that inflation was going to begin to shoot up

21  very rapidly.  And what I saw -- and this strategy, the SIOpps

22  fund was -- was intending to add value by reweighting the

23  different components of the fund that -- that -- the TIPS

24  fund, the International Bond, and the Commodities fund.  And

25  so the goal here was inflation protection by moving through

1    these funds.  So it wasn't -- that strategy was not the same

2    as the individual parts.  It was using them, but it was using

3    them in a different -- in a different way.

4    Q.   Okay.  Let me see if I understand.  The Strategic

5    Inflation Opportunities Fund has three main components; is

6    that fair?

7    A.   That's right.

8    Q.   Okay.  One of those is the TIPS fund; is that fair?

9    A.   That's right.

10   Q.   That fund's already in the Plan, correct?

11   A.   Yes.

12   Q.   Okay.  And then the second component is the International

13   Bond Fund, right?

14   A.   Yes.

15   Q.   And that one's already in the Plan as well?

16   A.   Yes.

17   Q.   Okay.  And then the third one is the Commodities --

18   A.   Uh-huh.

19   Q.   -- component?

20   A.   Yes.

21   Q.   And that's not in the Plan?

22   A.   Correct.

23   Q.   Now, I think you said that at this time, this concern with

24   inflation was sort of widespread in the industry; is that

25   fair?

1    A.  Yes.  In fact, we see it in the meeting minutes.  And I

2    think Chris Bouffard mentions concerns about inflation.  And

3    there were several meeting minutes that I recall talking about

4    inflation concerns.

5    Q.  And I think you also said there were a number of new

6    strategies that were coming on the market at this time as a

7    result of that concern; is that fair?

8    A.  Yes.

9    Q.  Okay.  So the American Century fund is not the only fund

10   on the market in this category, correct?

11   A.  Yes.

12   Q.  Some questions yesterday -- or at least one question

13   yesterday about Mr. Levy's five quarter rule.  And I -- what

14   I'm referring to there is his statement that funds should not

15   be in the Plan for more than -- or on the Watch List for more

16   than five quarters.  Do you recall that?

17   A.  I think it was stated that way but --

18   Q.  Okay.

19   A.  -- I agree to the general concept of what you're saying.

20   Q.  Okay.  Karla, can you pull up PX 455?

21           This is Mr. Levy's report.  You reviewed this report

22   in forming your opinions in this case, right?

23   A.  Yeah.

24   Q.  Karla, can you go to page 15?  And blow up paragraph 56,

25   please.

1          Paragraph 56 of this states, In my experience, it is

2     highly unusual for a fund which remains on a Watch List for

3     five consecutive quarters to remain.  For that to occur, there

4     would have to be a prudent and documented reason that

5     justifies a fund's retention.

6          Did I read that correctly?

7     A.   You did.

8     Q.   Okay.  So do you understand Mr. Levy to be saying that

9     after five quarters, you're automatically out of the Plan?

10    A.   No.

11    Q.   Okay.  What he's saying is that after five quarters, for a

12    fund to remain in the Plan, there should be a prudent and

13    documented reason that justifies fund -- the fund's retention,

14    correct?

15    A.   If you say so, yes.

16              MR. FLECKNER:  Objection.

17              THE COURT:  Yes.

18              MR. FLECKNER:  There's a separate paragraph in

19    Mr. Levy's report that says something different about five

20    quarters.  This isn't the only place that Mr. Levy talks

21    about --

22              THE COURT:  What's the other paragraph?

23              MR. FLECKNER:  It's paragraph 103 where Mr. Levy

24    says, In my experience, a fund which has been on a Watch List

25    for five consecutive quarters will be removed unless there's a

1    prudent and documented reason.

2         THE COURT:  You -- do you agree with that,

3    Mr. Specht?  Is it 103 and 56, do they contradict each other?

4         MR. SPECHT:  No.  I think that's saying exactly the

5    same thing.  If it's been there for more than five quarters,

6    it will be removed unless there's a prudent reason to keep it.

7         THE COURT:  Well --

8         THE WITNESS:  Oh, that's different than this.

9         THE COURT:  Hold on.  Hold on.  Hold on.

10        THE WITNESS:  Sorry.

11        THE COURT:  103 -- what Mr. Fleck's [sic] reading to

12   me that it's automatically removed, is that -- isn't that what

13   103 says, Mr. Fleck?

14        MR. FLECKNER:  That was our reading of --

15        THE COURT:  Well, let's put up -- Karla, could you

16   help us out with this?

17        MR. SPECHT:  What page is that?

18        MR. FLECKNER:  I'm sorry.  Mr. Levy's report, page

19   29, carry-over to page 30.

20        THE COURT:  Let's take a look.  Well, this says with

21   number of years.

22        Okay.  A fund which has been on the Watch List for

23   five consecutive quarters will be removed unless there is a --

24   that is what Mr. Specht is saying.  That's consistent with

25   paragraph 56.

1          MR. FLECKNER:  That's fine.  I thought he was

2     contradicting that there was a will be removed component.

3     That's all.

4          MR. SPECHT:  I think he's saying the same thing,

5     Judge.

6          THE COURT:  I'm with Mr. Specht on this one,

7     Mr. Fleckner.

8          MR. FLECKNER:  Fair enough.

9          MR. SPECHT:  Okay.

10          THE COURT:  Let's get back to this.  I'm sorry,

11     Mr. Specht.

12          MR. SPECHT:  That's okay.

13     Q.  So let's just talk about this concept.  After five

14     quarters on the Watch List, the concept I think that's being

15     advanced here is that if the fund is going to remain in the

16     plan, i.e., not be removed, there should be a prudent reason

17     to keep it in the Plan.  Would you agree with that concept?

18     A.  Sure.  However, I would just say that as a practitioner,

19     that may be a lot different than somebody who is looking at

20     these things theoretically.  Both as a former portfolio

21     manager and as somebody would has sat with retirement

22     committees and gotten a phone call from retirement committees

23     who are saying, you know, this strat- -- you know, the markets

24     are doing this, what should I do about this.  We -- it is very

25     important to go back to the reasons that a strategy was put

1    into the portfolio, what role that it plays, and the market

2    environment that it is living in.  So I think, as I said

3    yesterday, there can be market environments where a particular

4    style is out of favor for some time, and we may be talking

5    several years.  And so it is not enough to just say okay, five

6    quarters, it's out unless we have a good reason.  If the

7    Committee is looking quarter in and quarter out or in their

8    meeting cycle as to -- and they know the historic body of work

9    of why the strategy was added to the portfolio, they don't

10   need to repeat this and state that for each and every fund in

11   the lineup at each and every meeting.  They know this body of

12   work.

13   Q.  What if they don't know the historic body of work?  What

14   if they don't know the reason why it was originally included?

15   A.  I mentioned yesterday that I thought that it was exemplary

16   the way that American Century's Retirement Committee is

17   trained in their fiduciary duties and provided with recent

18   meeting minutes, a summary of the Investment Policy Statement,

19   as well as the Plan lineup.  So I think this particular

20   Committee, more than many others, is highly educated as to

21   what the overall plan is before they were asked to step into

22   the job of -- of Committee member.

23   Q.  But you would agree --

24   A.  So I wouldn't see that happening here.

25   Q.  You would agree that if the Committee or members of the

1    Committee don't know why it was included, then they would need

2    to do a deeper dive on what's happening with this fund and

3    make a decision about whether it should continue to be there,

4    correct?

5    A.  Well, I feel like you are looking at one specific item and

6    trying to judge whether a committee or somebody does a good

7    job.  Remember that this is a whole Plan.  It's made up of

8    many investment strategies, and it's a body of work that's

9    happening over months and quarters.  The Committee cannot

10   highlight and prioritize each and every item at each and every

11   meeting.  I think utilizing Watch Lists and having a good

12   Watch List tool, like American Century did, is very diligent

13   and is what should be done for strategies that are on the

14   Watch List, yes.

15   Q.  So as I understood your testimony, what I thought you were

16   saying is that when a committee has an understanding of the

17   historic background, including the reasons that a fund is

18   included, the role it plays in the plan, and the market

19   environment that you're in, that those would be the types of

20   things that the committee would understand and would make it

21   okay to hang onto a fund that's on the Watch List for an

22   extended period of time.  Is that fair?

23   A.  Yes.  More or less.

24   Q.  Okay.  So my question is if you don't have that historic

25   background, if you don't know, then the result would be

1   different, right?

2   A.  I guess it depends.  It depends on who the committee is

3   and what you're talking about.

4   Q.  And the list that you gave, the reasons included, the

5   role, the market environment, those would all be prudent

6   reasons for maintaining a fund in the Plan, right?

7   A.  Could be.  Depends, again, on what the strategy is, what

8   the story is, what's happening.

9   Q.  Uh-huh.  So that would be consistent with what Mr. Levy

10  was saying about having a prudent reason to retain the fund

11  beyond a certain point in time, right?

12  A.  I don't pretend to know what Dr. Levy was saying.

13  Q.  Sure.  But in terms of how you view that analysis about

14  what would be a prudent reason to hold onto a fund, those

15  would be examples, right?

16  A.  There are a wide variety of reasons to maintain a

17  strategy.  So I...

18  Q.  You spent some time yesterday talking about issues like

19  the level of contributions that were made by the employer, in

20  this case American Century, the auto-enrollment feature, the

21  auto-escalation feature, the educational resources that were

22  provided.  Do you recall that testimony?

23  A.  My testimony or someone else's?

24  Q.  Yours.

25  A.  I testified not to all of that --

1   Q.  Okay.

2   A.  -- but some of it, yes.

3   Q.  You heard other testimony from others on all of those,

4   right?

5   A.  Yes.

6   Q.  Okay.  And you would agree with me that those are not

7   actions that the Committee is taking in a fiduciary capacity,

8   would you not?

9   A.  Could you --

10          MR. FLECKNER:  Objection.

11          THE COURT:  Well --

12          MR. FLECKNER:  It calls for a legal conclusion,

13   amongst other things.

14          THE COURT:  Well, I'm going to give you some leeway

15   here, Mr. Specht, on that one.  So do you believe this is all

16   part of the fiduciary role of the Committee?

17          THE WITNESS:  The Plan design is something that the

18   firm sets out.  However, in the Investment Policy Statement, I

19   see the intention of American Century stated to be able to

20   provide and retain employees but to help them provide for

21   their retirement and to save for the long term.  And that -- I

22   think it's perfectly reasonable for the Retirement Committee

23   to understand and look at the Plan design as they go to do

24   their work, because, for example, if a plan design didn't

25   provide any match, for example, the Committee would have to do

1   a lot of work to encourage a lot more savings, as we heard

2   Ms. Gallagher say yesterday.  The savings and the

3   participation rates are gigantic part of individuals'

4   abilities to save.  So the Retirement Committee must look at

5   this because it's a part of what they -- they have to deal

6   with.  And they know their Plan populus.  And they need to be

7   able to identify, I think like Ms. Gallagher said, should

8   auto-escalation or other nudges continue to propel savings,

9   which in the end is what we all want, individuals to save in

10  their retirement plan.

11  Q.  So you used an example of a matching contribution as a

12  Plan design feature in your answer, right?

13  A.  Yes.

14  Q.  Okay.  And would that or other Plan design features, in

15  your opinion, diminish the Committee's responsibility to

16  follow prudent process in maintaining the Plan's investment

17  menu?

18         MR. FLECKNER:  Objection.  And, I mean, we can

19  stipulate this again, the PCRA on the first day, there's never

20  been an argument that any sponsor activity diminishes any

21  fiduciary responsibility.  It's just --

22         THE COURT:  I'm going to allow the question.

23         MR. FLECKNER:  -- made up.

24  A.  Would you repeat the question, please?

25  Q.  Is it your opinion that these Plan design features you're

1    describing diminished the Committee's obligation to follow a

2    prudent process in maintaining the Plan's investment menu?

3    A.   No.   This particular Committee had a wide variety of asset

4    classes, an attractive diversified core lineup, a PCRA,

5    educational help for those who needed it.   I was impressed

6    with this.

7              THE COURT:   You know, we start out here with this

8    witness coming in here and saying I looked at the Plan.   I

9    looked at other plans.   They're doing a great job.   And then I

10   feel like your questions are a list of questions meant to --

11   to trick her to not follow her -- not support her

12   recommendation.   Certainly, I think it's -- it's appropriate

13   for you to ask questions about, well, is this -- like that

14   question I do think it's all right, that in this -- does this

15   undermine their efforts to be a good and prudent Plan

16   Retirement Committee.

17             But, I -- I mean, she's -- she's watching your words

18   very carefully, as she should, and I am too.   I just want you

19   to know, this game of gotcha isn't going to work at all with

20   the trier of fact at all here.   So I just want you to --

21   because I feel like that's what this is, an exercise of

22   gotcha, Mr. Specht, to be quite honest with you.   And that's

23   not a good strategy with me.   I'm just telling you, that's not

24   going to -- this is not gotcha.   This is, listen, here's her

25   opinion.   She came a long way to give this opinion.   I assume

1    she still believes in the opinion even after Mr. Fleckner sat

2    down.  And I just -- I just want you to streamline this

3    because there are good questions you can ask.  But let's not

4    do gotcha for a while.  Let's take a gotcha break.  All right?

5    Please.

6          And if you change your mind during the course of

7    your testimony, would you let us know?

8          THE WITNESS:  Thank you.  I will.

9          THE COURT:  All right.

10         THE WITNESS:  Yes.

11   Q.  Okay.  You talked, I believe, about the level of matching

12   contributions as one of the examples you gave for Plan design.

13   And in this case, I believe the record will show that as of

14   2013, the matching level was 4 percent of eligible

15   compensation.  Does that sound right?

16   A.  I'm not a hundred percent certain that that was right at

17   2013, but it sounds right.  However, what I think I said in my

18   report was the contributions of American Century were very

19   generous.  And we saw that in the Hewitt report.  Well, I

20   don't know if it was the Hewitt report or another report.

21   That American Century's overall contributions in total,

22   matching and profit sharing Plan, were among -- you know,

23   among the -- were high and so encouraged savings.  That's

24   important.  That's, I think, consistent with an organization

25   that wants to help its employees save for retirement.

1    Q.   And then at some point, the level of matching went up to 5

2    percent.  Does that sound familiar?

3    A.   I don't remember where that was.  I don't remember seeing

4    that, but --

5    Q.   Okay.  Okay.  Your experience at State Street, the

6    matching contribution there is 5 percent.  Do you recall that?

7    A.   I don't -- I actually don't remember what the match was.

8    Q.   Okay.  There was a match?

9    A.   Sort of a shoe the cobbler thing.  Like if you're asking

10   about my personal account, I was more concerned about clients

11   than my own.

12   Q.   Okay.  So you don't know what -- the level of match you

13   received at State Street?

14   A.   I don't remember.

15   Q.   Okay.  Do you recall whether State Street provided a

16   defined benefit plan in addition to the defined contribution

17   plan?

18             MR. FLECKNER:  Objection.

19             THE COURT:  Overruled.

20   A.   It depends on when.

21   Q.   At some point in time, they did?

22   A.   Yes.

23   Q.   Okay.  Do you recall whether State Street had

24   auto-escalation as part of the 401(k) plan?

25   A.   I don't recall.

1    Q.  How about auto-enrollment, do you recall?

2    A.  Don't recall.

3    Q.  Karla, can you pull up DX 766?

4            You recognize this document, correct?

5    A.  I do.

6    Q.  This is a chart you prepared that looks at the total plan

7    cost or the cost of the American Century Plan, right?

8    A.  Right.  On the core plan assets.  So it's exclusive of the

9    PCRA and the loans.

10   Q.  Okay.

11   A.  Yes.

12   Q.  And the -- Karla, maybe you can just blow up the table.

13           The overall level of cost went down from 2010 to

14   2016, right?

15   A.  That's right, from 82 basis points to 58 basis points on

16   Plan assets, yeah.

17   Q.  And the overall trend in the industry during this time

18   frame was also for cost to go down, correct?

19   A.  Sure.

20   Q.  In preparing this chart, you didn't do any sort of a

21   comparison to what other plans were paying during these time

22   frames, did you?

23   A.  No, I don't agree with you.  I actually looked at several

24   other places.  And I also saw places in the record where the

25   Committee looked at overall Plan costs, like the Deloitte fee

1    study.  So -- so, yes, I did see that.  And, frankly, I

2    consider this one of the strong proof statements that the

3    Committee was doing its diligent work in reducing plan costs,

4    going to lower cost share -- share classes overall.  This

5    is -- and doing their work to reduce recordkeeping fees

6    where -- where possible, yeah.

7    Q.  So just focusing on this chart for now, the chart doesn't

8    have any comparative data on what other plans are paying,

9    correct?

10   A.  No.

11   Q.  Okay.  And you mentioned the Deloitte study.  That was a

12   study from 2009, right?

13   A.  I don't remember what year the study was.

14   Q.  Okay.  Did you do anything to look at how these costs

15   compared to averages across 401(k) plans?

16   A.  No.  I mean, I did observe that through some of the work

17   that I looked at, but that wasn't part of my -- my kind of

18   assignment.  What I would say is -- actually, let me just say

19   -- let me think for a minute before talking.  Yeah.  I did --

20   I did see American Century's fees relative to others in a

21   couple places in the -- in the material.

22   Q.  Karla, can you give us PX 451?  And blow up the table.

23           PX 451 is a chart prepared by Dr. Pomerantz that

24   compares the fees on this Plan against a number of other

25   comparators.  He's got two sets of statistics from ICI.  He's

1    got Hewitt.  He's got the Largest.  And he's got Vanguard.  Do

2    you see that?

3    A.  I see that, yes.

4    Q.  And you didn't do any sort of analysis like this comparing

5    the fees that this plan paid to averages from ICI or other

6    composites or other options, did you?

7    A.  No, I didn't.

8    Q.  Okay.  And you don't have any basis to dispute

9    Dr. Pomerantz's analysis, do you?

10   A.  Well, I guess what I -- I'm not trying to dispute his

11   data, but -- he has it here, but remember that the Hewitt

12   study that compared American Century's fees used -- the plans

13   that it compared, if I recall, had assets that were double

14   that in their typical plan of American Century's.  And they

15   also had a number of participants that was about -- an average

16   number of participants of about 17,000, compared to American

17   Century's approximately 2,200.

18          So when you look at plan costs and you look at that

19   dollar value of what it costs, you have to divide it by

20   something.  And one of the somethings is the number of

21   participants.  So a lot of the data depends on what the

22   underlying studies you're looking at are.  So I don't dispute

23   that Dr. Pomerantz got this data and looked at it and compared

24   it.  But what I guess I would say is is he comparing it to

25   other active managers?  Of course, with an all active lineup,

1    which is what American Century Plan predominantly was, it --

2    it's going to have higher fees than maybe an average of a

3    whole bunch of other plans.  If he looks at it against other

4    asset managers, he might come up with a different number.  So,

5    no, I'm not disputing this, but I'm not sure it's a reasonable

6    comparison.

7    Q.   So one of the things you just mentioned -- and I think

8    Hewitt points this out as well -- that the all active lineup

9    in this Plan drives a higher level of fees; is that fair?

10   A.   No.  What Hewitt said was that the recordkeeping fees are

11   lower than other plans and that the investment management fees

12   were higher average by virtue of being active.

13   Q.   And Hewitt also says that by including passive funds in

14   the investment mix, that would lower the overall fees paid by

15   participants, right?

16   A.   Sure.

17   Q.   And you don't disagree with that, do you?

18   A.   No, I don't.  That's math.

19   Q.   You talked about the Committee considering in the wake of

20   Hewitt the philosophy of active management, right?

21   A.   Yes.

22   Q.   Do you see anywhere in the record where the Committee did

23   any analysis of how adding the passive categories that Hewitt

24   recommended would have impacted the level of fees that were

25   being paid?

1      MR. FLECKNER:  She already testified to this in

2  direct.

3      THE COURT:  I -- we've touched on this subject, but

4  I'm going to allow the question, just because I forgot what

5  the answer was on direct.

6  A.  Could you repeat the question, please?

7  Q.  Sure.  Did you see anywhere in the record where the

8  Committee analyzed the impact that adding the asset -- the

9  passive funds that Hewitt recommended, where they analyzed

10  what impact that would have on these fees?

11  A.  The way you just said that, Hewitt didn't suggest what you

12  said, the index funds that Hewitt suggested adding.  Remember

13  that American Century had a passive fund in the lineup through

14  2013.  And if you're talking about the other individual asset

15  classes, is that what you're saying?

16  Q.  There were --

17  A.  Help me understand.

18  Q.  -- four additional asset classes that Hewitt identified

19  would be helpful to have index funds in those asset classes,

20  correct?

21      MR. FLECKNER:  Misstates.

22      MR. SPECHT:  We can go to JX 10 and look at it if we

23  want.

24      THE COURT:  Yeah.  Let's go to JX 10.  And how much

25  longer do you got here on this cross?

1          MR. SPECHT:  A little while.

2          THE COURT:  Well, we'll see.  It's -- you got 12

3    minutes at least until our first recess.

4          MR. SPECHT:  All right.  Let's go to JX 10.  And,

5    I -- Karla, you can flip through.

6          THE COURT:  Why don't you ask Karla to flip through

7    where you're talking about.

8          MR. SPECHT:  Yeah.  I don't have the page number

9    memorized.  Here we go.  That's the one.

10   Q.  The second bullet point.  Consider adding passive

11   investment options in the core asset classes where they are

12   not currently offered: diversified bond, small/mid cap

13   equities, and international equity.  This will help to reduce

14   overall fees to participants.

15         Do you see that?

16   A.  I do.

17   Q.  Okay.  Did you see anywhere in the record of this case

18   where the Committee considered the impact on fees that would

19   result from adding these passive options in these asset

20   classes?

21   A.  No.  However, I did see the Committee look at -- so,

22   again, remembering these are considerations, they're not

23   recommendations.  And I saw the Committee look at and consider

24   the potential thought or discuss active versus passive.  I saw

25   them shift to lower cost investment vehicles.  And I saw them

1    eliminate several underutilized funds.

2    Q.  Let's see if we have DX 859 available.  We do.  Great.

3         This is a demonstrative that you prepared, correct?

4    A.  That's right.

5    Q.  Okay.  And what this is showing is transitioning to lower

6    cost investment vehicles during the time frame relative to

7    this case, right?

8    A.  That's right.

9    Q.  So you've got one here, July 15, 2015, 1 Plan mutual fund

10   switched from investor class to institutional class.  Do you

11   see that?

12   A.  Yes.

13   Q.  And that was a savings of 20 basis points, right?

14   A.  That's right.

15   Q.  It's a significant savings, in your view?

16   A.  It depends on who's in it, how much assets are being used.

17   But, yes, it's a reduction.  Absolutely.

18   Q.  Okay.  And do you recall that that is the short-term

19   government fund?

20   A.  I don't recall which of the funds is applicable to each of

21   these items.

22   Q.  Okay.  Do you recall that the fund in question here, that

23   the institutional share class had been available to the Plan

24   since the beginning of the class period in this case, since

25   June of 2010?

1    A.  No.

2    Q.  DX 755, please.

3            MR. SPECHT:  Judge, I'm moving along as quickly as I

4    can here, skipping a few topics.

5            THE COURT:  Thank you.

6    Q.  Karla, can you blow up this sort of top portion?

7            Ma'am, this is another document that you prepared as

8    part of your report, correct?

9    A.  Yes.

10   Q.  And this collects all of the assets that were in the

11   American Century Plan and gives the levels throughout the

12   years, correct?

13   A.  There are two pages, yes.

14   Q.  Yeah.  There's multiple pages, right?

15   A.  Yeah.

16   Q.  So here we've got U.S. equities.  And it looks like there

17   are two that are benchmarked to the S&P 500.  Do you see that?

18   A.  I do.

19   Q.  And we can go to the next page, Karla.  And blow up the

20   top again.

21           And then up until 2012, we had an index fund that

22   was also benchmarked to the S&P 500.  That's the American

23   Century Equity Index, right?

24   A.  In this report it's 2012.  I think we used year-end.  So I

25   think it was into -- well into 2013 that the fund existed.

1    Yeah, for two -- two and a half, 2.6 percent of the assets,

2    that's right.

3    Q.  So it was in the Plan through year-end 2012 and then

4    carried over into '13 but was closed at some point in '13?

5    A.  That's correct.  That's the best of my knowledge.

6    Q.  And your data shows that at the end of 2012, that index

7    fund had 13.88 million in assets?

8    A.  Right.

9    Q.  Let's go back to the prior page.  And so in that time --

10   same time frame, 2012, the other two that we had in the Plan

11   that were benchmarked to the S&P 500 had less assets, right?

12   A.  But about the same amount, depending on how you're

13   measuring.  Yes, less, 11 and 12 million, yeah.

14   Q.  But the index fund had the most.  Would you agree with

15   that?

16   A.  If you're asking the math of those three numbers, yes, I

17   am.  However, remember that the way that participants might

18   use these strategies, they are large cap allocation, or

19   they're U.S. equity allocation, might have been to multiple

20   funds.  It could have been to several funds.  They might have

21   preferred the -- the more diverse Russell 3000, which captures

22   not just large, but mid and small cap.  I mean, I'm not sure

23   what you're trying to say here because we can't know from the

24   way participants allocated their assets from this data how

25   they're allocating their large cap funds.

1    Q.  We can know that, from what participants are doing, where

2    they have three options for funds that are benchmarked against

3    the S&P 500 Index, the one that had the most assets was the

4    index fund, right?

5    A.  Well, you may say that you know that, but I would not

6    agree with you.  I think that when I've seen participants

7    allocate assets across a range of different U.S. funds, they

8    might use -- they might choose to use an S&P 500, a mid, a

9    small.  They might choose the Russell 3, and they might want

10   more small cap exposures, so they might use more small.  They

11   might use Russell 1.  They might use growth and value.  So I

12   don't think it's fair at all to say that this is -- and we

13   can't know from this data -- we can't know from this data.

14         This does not tell us anything about how the

15   participants are allocating their portfolio's large cap assets

16   and how they are using -- which large cap funds or combination

17   of U.S. equity funds they are using, other than to say the

18   balances in these funds at this time are these numbers.  But I

19   think it would be absolutely inaccurate for you to compare it

20   the way you were doing.

21   Q.  The only comparison I'm trying to make is to the total

22   balances.  The balance in the index fund is greater than the

23   balance in the other two funds.  That's accurate, right?

24   A.  The balance --

25         THE COURT:  Not allocation.  He's not -- you're not

1    saying allocation at this point.  You're saying they just --

2    there's -- it's more popularity.  Is that a better way to say

3    it?

4         MR. SPECHT:  I'm just talking balances, the dollars.

5    Q.  It's more money in the index fund than the other two,

6    right?

7    A.  I think if you're just saying these three funds, of

8    course, yes.  But what I would say is I don't think you're

9    doing a reasonable comparison if you're trying to get a

10   measure of large cap funds.

11        THE COURT:  Yeah, yeah.  That's -- that's okay.  I

12   mean, he -- I understand what he's trying to accomplish, and I

13   think we agree that that number is bigger than the other two

14   numbers, right?

15        MR. SPECHT:  It doesn't seem very controversial.

16        THE COURT:  All right.

17        THE WITNESS:  It's math.

18        THE COURT:  All right.  I think -- I don't know

19   where the word allocation got in there, but that's what kind

20   of threw me, so -- and that's a word that has a different

21   meaning, right?

22        MR. SPECHT:  I hope that I wasn't the one that put

23   that word in there because I didn't --

24        THE COURT:  Well, we'll find out over the break.

25   I'll tell you that, Mr. Specht.

1  Q.  All right.  So when that American Century Equity Index

2  Fund closed in 2013, it wasn't replaced by another option,

3  right?

4  A.  It wasn't replaced -- I'm sorry.  Could you say that --

5  Q.  It wasn't replaced by another index fund, correct?

6  A.  That's correct.

7  Q.  There were numerous almost identical index funds available

8  on the market, right?

9          MR. FLECKNER:  Objection.

10          THE COURT:  Yeah.  We covered this.  There was a lot

11  of different index funds in the market.  You -- you have

12  proven that.

13  Q.  Well, index funds that are going to invest in exactly the

14  same underlying securities?

15  A.  And there were thousands of investment options available

16  through the PCRA for that as well.

17          THE COURT:  That's the answer we always get on that.

18          MR. SPECHT:  That is the answer we always get.  It

19  seems like the PCRA is sort of the answer to everything.

20          THE COURT:  Well, I don't know if that's right, but

21  the Court will note there are thousands of index funds.

22  Q.  Okay.  And, in fact, the Committee could have gone on the

23  open market and got an S&P 500 Index Fund for significantly

24  cheaper than what the American Century Equity Index Fund had

25  been charging prior to the time it was closed, right?

1    A.   I don't know what was available at that time.  I can't

2    speak to that.

3    Q.   You're not aware of what was available in the S&P 500

4    Index Fund market in 2013?

5    A.   Correct.

6    Q.   Okay.

7              THE COURT:  You got three minutes.

8              MR. SPECHT:  I'm crossing stuff off the list.

9    Q.   Let's go to DX 509.  These are the meeting materials for

10   the October 23rd, 2014, meeting of the Retirement Committee.

11   And you can see here that within these -- this packet, there's

12   a presentation by Schwab.  Do you see that?

13   A.   Yes.

14   Q.   Okay.  And if we go to page 41, Karla.  This is the -- the

15   first page or the Schwab sort of insert that was in this

16   overall packet of materials.  Just kind of orienting you to

17   this.

18             So now let's go to page 111.  And here we've got, in

19   the Schwab materials, a fiduciary -- you can just leave it

20   like this, Karla.  You don't need to blow it up.

21             Fiduciary Best Practice Checklist.  Do you see that?

22   A.   I do.

23   Q.   And it looks like Schwab has gotten this from that Fi360

24   organization.  You're familiar with that organization, right?

25   A.   I wasn't until the start of this program.

1  Q.  Okay.  Fair to say that Schwab was familiar with that

2  organization at this time, right?

3  A.  At this time, sure.

4  Q.  And that's -- that's an organization that Mr. Levy works

5  with in the work that he does now, right?

6  A.  That's what I heard him say.

7  Q.  Okay.  And do you have any disagreement with this

8  Fiduciary Best Practices Checklist?

9  A.  I don't.  It seems just as good as any fiduciary ideas and

10 best practices.  I've seen JPMorgan produce one.  We saw one

11 earlier.  I've seen Schwab.  I've seen this one.  I've seen

12 lots of other ones that I've -- I would say shared and thought

13 about with clients.  But there are some key threads that run

14 through all of these.  But there's no one specific checklist

15 that should be used for this.

16          MR. SPECHT:  Good time for a break, Judge?

17          THE COURT:  Yeah.  That would be great.  We'll take

18 a 15-minute break.  Thank you all.

19      (Recess at 10:29 until 10:48 a.m.)

20          THE COURT:  All right.  Mr. Specht, sir.

21          MR. SPECHT:  Thank you, Your Honor.  I did get a

22 chance to narrow down my categories a little bit here, so just

23 a couple more.  In hopefully 15 or 20 minutes, I'll be done.

24          THE COURT:  I really appreciate that, Mr. Specht.

25 Thank you, sir.

1          MR. SPECHT:  My pleasure.

2     Q.  Welcome back, ma'am.  Yesterday when Ms. VanWagoner was on

3     the stand, I went through a -- an example of the meeting

4     materials that the Committee had during the JPMorgan era.  And

5     I'm not going to go back through that with you again.  But

6     then at a point in time, we switched to the Schwab era.  I

7     think that's kind of the line of demarcation that Mr. Fleckner

8     used with you yesterday.  Are you generally familiar with this

9     change of recordkeepers?

10    A.  Yes.

11    Q.  Okay.  And I think the example Mr. Fleckner gave you for

12    the Schwab era was DX 511.

13          Karla, could we have that?

14          So here we have a set of meeting materials from July

15    of 2015.  And you can actually even see the little holes here

16    where they were originally in a binder and then got pulled out

17    and photocopied.  And you'll notice here that this has got --

18    somewhere on here, there's -- well, let's just go to the

19    second page, Karla.

20          So the first thing that's in this booklet is this

21    Schwab Investment Management Trends report, and I'm not going

22    to ask you about that.  We can skip through it.  So we're

23    going to skip ahead a bunch of pages, actually up to page 36.

24          And now we get to something that looks familiar.

25    This is the Watch List, both the listing of funds on the Watch

1  List, and then also the methodology that's used.  And this --

2  it looks similar to the way this was set up in the JPMorgan

3  era, right?

4  A.  Yes.

5  Q.  And so, Karla, if we can then skip to page 47.  And maybe

6  just blow up that first one, the large cap growth.  And again,

7  this is the same sort of reporting that we saw in the example

8  that I used yesterday with Ms. VanWagoner in terms of gross

9  return and the benchmark and all those things.  Do you see

10  that?

11  A.  Yes.

12  Q.  And this is similar to the type of reporting we had in the

13  JPMorgan era as well, right?

14  A.  My understanding is this benchmark report was provided

15  throughout, yeah.

16  Q.  Yeah.  Same benchmark report?

17  A.  Yes, yes.

18  Q.  Okay.  That didn't change.  Great.

19       And then if we go all the way to the end, page 91.

20  So all the way at the end, we have some new stuff.  And this

21  is the page that Mr. Fleckner went over with you yesterday.

22  This is sort of a -- in the Schwab era something that's new

23  that we didn't have in the JPMorgan era, right?

24  A.  Some of this information is new, that's right.

25  Q.  Yeah.  So let's -- let's -- maybe you can just blow up the

1    table, Karla, so it's a little bit easier to read.

2         So this is -- similar to the earlier reporting, this

3    is the Plans that are -- excuse me, the funds that are in the

4    Plan.  And we've got some performance information and some fee

5    information, right?

6    A.  Yes.

7    Q.  Okay.  And in -- for each fund, do you see that there's

8    a -- a category listed?

9    A.  Yes.

10   Q.  What do you understand those categories to represent?

11   A.  The asset class that this strategy might be -- that Schwab

12   might have considered this to fall into.

13   Q.  Okay.  And then within that asset class, there are

14   comparisons.  You see the percentile rank and the number of

15   funds in these columns?

16   A.  Yes.

17   Q.  And those are comparisons to the other funds in those

18   categories, correct?

19   A.  That's correct.

20   Q.  Okay.  Do you know whether these categories include all

21   share classes or whether they're limited to, for example, the

22   R6 share class for a fund where we've got an R6 in the Plan?

23   A.  I don't know off the top of my head.  Is it in the book --

24   is it in the footnotes at the bottom?

25   Q.  I couldn't find it anywhere in here.  But I do have --

1   let's see here.  If we go to -- let's look at large value.  So

2   the large value category, Schwab is representing -- whoops.  I

3   kind of -- about 1,300 funds in that category.  Do you see

4   that?

5   A.  Yes.

6   Q.  So large value, they've got about 1,300.  Karla, let's go

7   to PX 460 really quickly.

8            So this is the 2017 ICI Fact Book.  Are you familiar

9   with ICI?

10  A.  I am.

11  Q.  And, Karla, could we go to page 240?

12           So we were looking at large value.  And you're going

13  to find this faster than I'm able to.  Here we go.  Large

14  value.  The number of funds that they're reporting is about

15  300.  And then the number of share classes is over a thousand.

16           Do you see that?

17  A.  I'm familiar with ICI, but I'm not necessarily familiar,

18  nor have I looked at this recently or lately, so let me just

19  take a look, please.

20  Q.  Sure.  Take your time.

21           THE COURT:  Now, we had a 322 -- 322 circled, number

22  of -- what is under that?

23           MR. SPECHT:  My understanding, Your Honor, is that

24  that is telling us that in 2016 in the large value category,

25  they're reporting that there are 322 funds in that category.

1          THE COURT:  But you've circled it.  It says number

2    of something classes.  Number of share classes in there.

3          MR. SPECHT:  Oh, yeah.

4          THE COURT:  I'm sorry.

5          MR. SPECHT:  That's right.

6          THE COURT:  Yes, sir.

7    Q.  So my understanding of what's being reported -- and,

8    Ms. Mann, maybe you can correct me if you have a different

9    understanding -- is that in 2016 in the large value category,

10   there were 322 funds, and there were over a thousand share

11   classes.  Is that consistent with your reading of this table?

12   A.  I don't know what -- I'm not familiar with this specific

13   report.  It looks like that, but I'm not a hundred percent

14   certain.

15   Q.  Given your extensive background in this industry, does

16   that sound roughly accurate to you that there would be about

17   300 -- a little over 300 large value funds and then within

18   that, over a thousand share classes?

19   A.  I'm not sure about the thousand share classes, yeah.

20   Q.  What's your understanding of the number of large value

21   share classes?

22   A.  It's not about large value share classes, but it's about

23   number of share classes, right?  This sounds like a large

24   number of share classes.

25   Q.  Okay.  Okay.  Well, if we go -- if we go back to where we

1  were a minute ago, which is DX 511, page 91. And for our

2  large value category, we see that they're reporting --

3  whoops -- during different time frames --

4  A.  Uh-huh.

5  Q.  -- and including in the one year, more than a thousand

6  funds, right?

7  A.  So this is Schwab's report. And the other one we looked

8  at was ICI. So they may not be exact. So I'm not a hundred

9  percent certain which is referring to what.

10  Q.  Right. They don't line up exactly, but that suggests to

11  me that the 1,305 is the including all share classes, not

12  limited just to, for example here, an R6 share class?

13  A.  Maybe.

14  Q.  And, in fact, if you look at the funds, the American

15  Century funds, we've got an institutional fund, an R6 fund and

16  a CIT and then another R6. Do you see that?

17  A.  Yes.

18  Q.  So those are all different share classes or for the CIT a

19  different vehicle, right?

20  A.  Uh-huh.

21  Q.  And they're all being compared to the same category,

22  right?

23  A.  By Schwab in this report, yes.

24  Q.  Yes. So the information that's provided in this report,

25  this new Schwab report that we didn't have before, is

1    basically comparing funds across different share classes or

2    different vehicles, right?

3    A.   Maybe.  Yes.

4    Q.   We've also got in this report net expense ratio.  Do you

5    see that?

6    A.   Yes.

7    Q.   And we've got a ranking for net expense ratio, right?

8    A.   Yes.

9    Q.   And, again, we have the -- the same issue in the sense

10   that those rankings and those comparisons are including all

11   share classes, right?

12   A.   Well, if you say so.  Whatever it is, it seems like Schwab

13   is doing it consistently across both performance and fees,

14   yes.

15   Q.   We know just from looking at just the American Century

16   funds that are included here that we've got different share

17   classes or different vehicles, right?

18   A.   For American Century, yes.

19   Q.   And so there's nothing here that would suggest that

20   they're segregating out, for example, R6 to R6 or CIT to CIT,

21   right?

22   A.   No.  I mean, yes, you're right.

23   Q.   Okay.  Karla, you can take that down.

24            So I believe your testimony, as I understand it, is

25   that it is consistent with industry standards and practices

1    for American Century to maintain an investment menu that

2    consists exclusively of proprietary funds; is that fair?

3    A.   What's -- could you repeat that, please?

4    Q.   Yeah.  Is it your testimony that maintaining a menu of

5    exclusively proprietary funds is consistent with industry

6    standards and practices?

7    A.   American Century maintaining a lineup of American Century

8    funds.  Over what time period are we talking?  I just want to

9    make sure --

10   Q.   Starting in 2010 and running up until the time frame that

11   the Vanguard funds were added in 2016.

12   A.   Okay.  And would you repeat the question again?

13   Q.   Is it your opinion that American Century in maintaining a

14   lineup that consisted exclusively of proprietary funds, that

15   they were acting consistent with industry standards and

16   practices over that time frame?

17   A.   I would say they were acting within a range of

18   reasonableness and across a range of industry standards and

19   practices that I have seen among asset manager firms, yes.

20   Q.   So the range of industry standards and practices that

21   you're comparing their conduct to is the standards for asset

22   management firms?

23   A.   No.

24              THE COURT:  It's the standards for other mutual fund

25   companies that have mutual funds that provide this defined

1    contribution or this DC plan, true?

2                THE WITNESS:  The way Mr. Specht just asked the

3    question was about conduct --

4                THE COURT:  I know.  Yeah.

5                THE WITNESS:  -- so -- but yes --

6                THE COURT:  That's been your testimony.

7                THE WITNESS:  -- the lineup is consistent with what

8    I've seen.  Absolutely.  Their conduct was overall exemplary.

9                THE COURT:  And apples and oranges, right?

10               THE WITNESS:  Yes.

11               THE COURT:  Sometimes when a company is in this

12   business, they tend to have more proprietary funds versus

13   companies that are outside of this -- U.S. Steel --

14               THE WITNESS:  Right.

15               THE COURT:  -- does not have proprietary funds,

16   right?

17               THE WITNESS:  Correct.  Yes.

18               THE COURT:  Okay.

19               THE WITNESS:  Yes.

20               THE COURT:  And that's what you're talking about

21   it's consistent with --

22               THE WITNESS:  Yes.

23               THE COURT:  -- true?  Okay,

24               MR. SPECHT:  Yeah.  I think we've seen on a number

25   of occasions now that Your Honor is much better at asking

1   these questions than the lawyers are.

2          THE COURT:  Well, I'm trying to cut through this

3   because --

4          MR. SPECHT:  You're helping.

5          THE COURT:  -- this has been her testimony and...

6   Q.  Okay.  So the industry standards and practices that you're

7   talking about are the standards and practices for mutual fund

8   companies or asset managers, right?

9   A.  No.  The standards and practices that I'm talking about

10  overall in looking at American Century's behavior, prudence,

11  diligence, in doing all of the work that a Retirement

12  Committee does is across sort of the key threads that I think

13  are very important and should be common among most plans, as

14  well as the specific -- and when you talk about the lineup,

15  the lineup is consistent with industry standards and practices

16  among other asset managers like -- like the judge said.

17  Q.  Okay.  So let's go to DX 757.

18          This is a chart you prepared and I think you talked

19  about in your direct.  You're comparing participant rates --

20  excuse me, participation rates between American Century and

21  other DC plans, right?

22  A.  Yes.

23  Q.  So this comparison is not limited to mutual fund companies

24  or asset managers or anything like that, right?

25  A.  Correct.  This analysis was really to talk about the

1    participation rates among American Century Plans and to

2    compare them to other data, yes.

3    Q.   To all other retirement plans?

4    A.   All other available in purple, and those with

5    auto-enrollment in green.

6    Q.   Great.  DX 758, please.

7              So same thing here.  You're doing a comparison

8    between the American Century Plan and all other retirement

9    plans for which data was available, right?

10   A.   These are the deferral rates for the American Century and

11   other DC and auto-enrollment 401(k) plans, yes.  I should say

12   yes first.

13   Q.   And the universe that you're comparing this to is all

14   other plans for which you had available information?

15   A.   Yes.

16   Q.   Okay.  And then DX 759, please.

17             And now here, again, we've got a comparison of

18   average plan balances between the American Century Plan on the

19   one hand, and then all other retirement plans for which data

20   is available, correct?

21   A.   Yes.

22   Q.   Okay.  The only place where you're limiting the universe

23   of comparators is when you're looking at the issue about

24   proprietary funds, right?

25   A.   Can you point to specifically where you mean?

1   Q.  Well, your testimony that it's consistent with industry

2   standards to limit the Plan only to proprietary funds, there

3   you're limiting your universe not to all retirement plans,

4   just to retirement plans of asset managers, right?

5           MR. FLECKNER:  Objection.  She just explained this.

6           THE COURT:  I'm going -- I'm going to overrule your

7   objection and allow it.  If you want to answer, please do.

8   Please answer.

9   A.  So with respect to the fund manager selection, that's

10  correct.  However, with respect to the asset allocation and

11  diversification of the plan, that's consistent with broad

12  industry standards.  So I guess the short answer is it depends

13  on what aspect you're speaking about.

14  Q.  For the asset allocation aspect of your opinion, you're

15  comparing it to the broader retirement plan universe in

16  general, right?

17  A.  Yes.

18  Q.  And then for the fund manager component of that -- and

19  that's where we get the all proprietary lineup -- there you're

20  limiting the universe you're comparing to to other fund

21  managers, right?

22  A.  Yes.  And I just want to say the process for this

23  Retirement Committee selecting and overseeing and maintaining

24  the set of investment strategies, American Century investment

25  strategies in their Plan, the process is being compared to all

1    plans and industry standards and practices.

2    Q.   And I think we've seen other evidence in this case that

3    there are no other retirement plans with more than 250 million

4    in assets that are comprised exclusively of American Century

5    funds.  Do you have any evidence that would contradict that?

6                MR. FLECKNER:  Objection.

7                THE COURT:  Sustained.

8                Do you know -- not whether you have any more

9    evidence.  Do you know if there are any other retirement plans

10   with more than $250 million in assets that are comprised

11   exclusively of American Century funds?

12               THE WITNESS:  I do not know.

13               THE COURT:  Okay.  How are we doing?  Are we about

14   ready to wrap this up?  One more question.

15               MR. SPECHT:  Well, couple questions, last topic.

16               THE COURT:  Okay.  You put this one up.

17               MR. SPECHT:  One topic.  I don't have a question

18   count, but it's short.

19               THE COURT:  Okay.

20   Q.   All right.  So when you were at the Office of the

21   Fiduciary Advisor at State Street, I think you've already

22   testified to this, part of your job was advising ERISA plans

23   with respect to managing their investments, right?

24   A.   Yes.

25   Q.   Okay.  And then another part of your job was actually

1    working as an in-house consultant for the defined benefit plan

2    at State Street; is that fair?

3    A.  I did not say it that way.

4    Q.  You didn't say it that way, but that's true, that you were

5    an investment advisor for State Street's defined benefit plan,

6    correct?

7    A.  It's technical, right?  So investment advisor is one

8    thing, SSGA was an investment advisor to State Street's plan.

9    I in the Office of Fiduciary Advisor did advise State Street's

10   DB and DC plan on occasion, right.

11   Q.  Your team served as one of the advisors to the defined

12   benefit plan at State Street, correct?

13   A.  Yes.

14   Q.  With regard to the defined contribution plan at State

15   Street, the Committee had a separate consultant for that plan,

16   correct?

17   A.  They did.  And they asked us to provide services,

18   periodically to look at and provide them with insight on the

19   lineup and other assorted things.

20   Q.  Right.  You gave input and provided other information with

21   regard to the defined contribution plan, right?

22   A.  That's correct.

23   Q.  But for that plan, there was a separate consultant?

24   A.  That's correct.

25   Q.  Okay.  And I think you mentioned yesterday in your

1   testimony that the State Street plan uses primarily

2   proprietary funds; is that right?

3   A.  Yes.  All but one.

4   Q.  All but one.  And the State Street plan also uses

5   primarily index funds, correct?

6   A.  I don't know the answer to that question.  When are you

7   talking about?

8   Q.  How about 2016?

9   A.  I don't know the full lineup of the options.

10  Q.  How about 2013 when you were working there?

11  A.  I don't remember the full lineup.

12  Q.  You remember there was a lot of index funds in that plan,

13  right?

14  A.  I remember there are index funds in that lineup, yes.

15  Q.  And, in fact, it's almost entirely index funds.  Do you

16  remember that?

17  A.  I don't.

18  Q.  Okay.  Do you remember the --

19          THE COURT:  That was already asked, that question

20  was.

21  Q.  Do you remember that there -- well, let me ask you a

22  broader question.  So you also talked yesterday I think about

23  the TSP, the Thrift Savings Plan.  You're familiar with that

24  plan?

25  A.  I did not talk about that.

1  Q.  Okay.  May ask you a different question.  You're familiar

2  with the Thrift Savings Plan?

3  A.  I am.

4  Q.  Okay.  And the lineup in that plan, you're familiar with

5  that?

6  A.  I am.

7  Q.  Okay.  The State Street plan, the lineup in the State

8  Street plan is very similar to the lineup in the Thrift

9  Savings Plan, correct?

10  A.  If you say so.

11  Q.  You haven't looked at the --

12         THE COURT:  Hold on.  Hold on.  Hold on.

13         THE WITNESS:  So the TSP -- I don't know the TSP

14  well, and I don't know the State Street plan, per se,

15  depending on when he's talking about.

16         THE COURT:  So you can't really give an opinion if

17  they're similar?

18         THE WITNESS:  Correct.

19         THE COURT:  Okay.

20  Q.  The way that you would be able to find that out would be

21  look to the Form 5500s for the State Street plan, right?

22         MR. FLECKNER:  Objection.

23         THE COURT:  Sustained.  Please -- please move along.

24  I mean, she doesn't know the answer.

25         MR. SPECHT:  Well, she does give in her report a

1    bunch of information about other plans based on --

2              THE COURT:  She doesn't know the answer to that

3    question.  She's unequivocal about that.

4              MR. SPECHT:  No, I understand.  It's a different

5    question, though, Judge.  The question I'm asking is to get

6    the answer, to find the information, the place to look is the

7    Form 5500.

8              THE COURT:  But is that important to us today?

9    Because we've talked about 5500s for -- how many days have we

10   been doing this now?

11             MR. SPECHT:  How about this, Judge?

12             THE COURT:  Have we been doing this 10 days?  Eleven

13   days?

14             MR. FLECKNER:  Ten.

15             THE COURT:  Ten days.  And I feel like I'm in a loop

16   a little bit.

17             MR. SPECHT:  If you let me ask that question, Judge,

18   it will be my last one.

19             THE COURT:  You found my weakness.

20             MR. SPECHT:  I thought so.

21             THE COURT:  All right.

22   Q.  All right.  Ma'am --

23             THE COURT:  If she knows the answer.  I don't know

24   if she knows the answer.

25             MR. SPECHT:  If she doesn't know, she can tell me.

1    That's fine.

2    Q.  So, ma'am, if you wanted to find out what the lineup is

3    for the State Street retirement plan, one of the places you

4    could look to get that information would be the Form 5500,

5    correct?

6    A.  Yes.

7             MR. SPECHT:  Thank you.  No further questions.

8             THE COURT:  Thank you, Mr. Specht.  Any redirect?

9             MR. FLECKNER:  No.

10            THE COURT:  Ms. Mann, thank you.

11            THE WITNESS:  Thank you very much, Your Honor.

12            THE COURT:  All right.  Call your next witness.

13   Mr. Nemser, welcome back, sir.

14            MR. NEMSER:  Thank you, Your Honor.  Your Honor, I

15   have a quick housekeeping matter --

16            THE COURT:  Yes, sir.

17            MR. NEMSER:  -- maybe before I call Dr. Strombom.

18            THE COURT:  Yes, sir.

19            MR. NEMSER:  At the close of Dr. Pomerantz's

20   testimony, plaintiffs offered their Pomerantz demonstratives

21   as exhibits, and I offered mine at that time too.  And I had

22   no objection to theirs if mine came in.  And you said that you

23   wanted to take theirs because it was about to be their moment

24   to rest, and you would take mine later.  So --

25            THE COURT:  Okay.

1          MR. NEMSER:  -- I have now got them marked with DXs

2     and everything, our exhibits.  They're -- they're now DX 849

3     through DX 855.  And those correspond sequentially to

4     Pomerantz 1 through 8.  I'm sorry, 1 through 7 it is.  And so

5     I offer those.

6          THE COURT:  Any objection?

7          MR. RICHTER:  I don't think so, Your Honor.  I

8     haven't seen them with the stickers, but I trust Mr. Nemser as

9     an officer of the Court.

10          THE COURT:  All right.  Why don't we admit them.  If

11     there's a problem, bring it to my attention, and I'll kick it

12     out if we have to.

13          MR. RICHTER:  Thank you, Your Honor

14       (Defendants' Exhibits 849 through 855 admitted in

15     evidence.)

16          MR. NEMSER:  And if I -- I understand the procedure

17     is to move for leave to update the exhibit list, so I so move.

18          THE COURT:  Thank you.

19          MR. NEMSER:  Thank you.

20          THE COURT:  Yes, sir.  All right.

21          MR. NEMSER:  Defendants call Bruce Strombom to the

22     witness stand.

23          THE COURT:  Mr. Strombom, sir, would you please come

24     around this direction?  And if you'll stop there, face our

25     clerk, and raise your right hand and be sworn, sir.

1              BRUCE ALAN STROMBOM, DEFENDANTS' WITNESS, SWORN

2                   THE COURT:  Thank you, sir.  And please have a seat.

3       Good morning, sir.

4                   THE WITNESS:  Good morning.

5                   THE COURT:  Would you please begin by speaking your

6       full name and spelling your last name for us?

7                   THE WITNESS:  Yes.  Bruce Alan Strombom,

8       S-T-R-O-M-B-O-M.

9                   THE COURT:  Thank you, sir.  Mr. Nemser.

10                  MR. NEMSER:  Thank you, Your Honor.  It will take me

11      one second to get my equipment plugged in.

12                  THE COURT:  Sure.  Is this the last witness?

13                  MR. NEMSER:  It is, Your Honor.

14                  THE COURT:  Okay.  Well, we're really glad to see

15      you, sir.

16                  THE WITNESS:  That's my sense.

17                  MR. NEMSER:  Almost there.

18                  THE COURT:  Yes, sir.

19                         DIRECT EXAMINATION

20      BY MR. NEMSER:

21      Q.  Good morning, Dr. Strombom.

22      A.  Good morning.

23      Q.  What's your area of expertise, sir?

24      A.  I'm an economist.

25      Q.  And we have a demonstrative related to your experience.

1    It's -- could you please call up DX 865, Chris?

2              And does this demonstrative accurately summarize

3    your areas of expertise, your education, and your work

4    experience?

5    A.  Yes, it does.

6    Q.  And so you have degrees from San Jose State and University

7    of California, Irvine, in economics.  Could you describe

8    what -- what that entailed, and particularly emphasize any

9    education you had that was relevant to the issues to which you

10   are being to asked to testify in this case?

11   A.  Yes.  My degrees are in economics.  I have a minor in

12   business as well.  I focused in economics in a couple of

13   areas, finance and industrial organization.

14   Q.  What is finance?

15   A.  Finance is a study of financial assets and the markets in

16   which they trade.  So my Ph.D. pursuit in particular dealt

17   with stocks and bonds, derivatives, foreign exchange, various

18   financial securities and what's called modern portfolio

19   theory, which is really how those assets are combined into

20   portfolios in an efficient way, how investors evaluate

21   performance of those securities, and -- and how they're

22   combined in portfolios, like mutual funds or like the

23   offerings in a 401(k) plan.

24              And in industrial organization, I focused on just

25   the structure of industries in competition within industries,

1  and also did a significant amount of work in statistics and

2  econometrics, which is essentially the application of

3  statistics to answer economic questions.

4  Q.  Where do you work now, sir?

5  A.  I work at Analysis Group.

6  Q.  And what -- what's your position there, and what do you

7  do?

8  A.  I'm a managing principal at Analysis Group.

9  Q.  What do you do there?

10  A.  I have some firm management responsibilities, but the bulk

11  of my time is spent as a case leader, doing various types of

12  consulting assignments for businesses, industry, and in

13  litigation.

14  Q.  And what is Analysis Group?

15  A.  Analysis Group is an international economic finance and

16  strategy consulting firm.  We have about 900 employees

17  throughout the world.

18  Q.  How long have you worked there?

19  A.  I've been at Analysis Group for 25 years.

20  Q.  And how long have you been a managing principal?

21  A.  Since 2003.

22  Q.  And you've been working about 35 years?

23  A.  Yeah.  I've been gainfully employed for the last 35 years.

24  Q.  And so in terms of the work experience that's shown on the

25  demonstrative, do -- did any of that entail work that was

1  relevant to your testimony or the expertise that you're

2  applying in connection with this case?

3  A.  Yes.  My whole career has been involved in economic and

4  financial analysis.  I began right out of school with working

5  at the Tribune Newspapers West, a subsidiary of the Chicago

6  Tribune.  I was a financial analyst, focused on mergers and

7  acquisitions and capital budgeting.  So I did a lot of

8  economic analysis of proposed investment projects for the

9  Tribune company.  I spent two years there.

10          I went to Price Waterhouse in their management

11  consulting group, which was where I first became involved in

12  litigation consulting and economic loss analysis.  After a

13  couple of years at Price Waterhouse, I went to a division of

14  Citibank that was involved in mergers and acquisitions for

15  middle market companies.  I ran a valuation group there.  We

16  value about 500 companies a year.  So I'm looking at financial

17  and economic information for these companies and determining

18  the value of their stock.  Spent one year running a data

19  processing company.  And then I joined Analysis Group, as I

20  say, 25 years ago and have been there since.

21  Q.  So what's your understanding of what this case is about?

22  A.  My understanding is the plaintiffs claim that the process

23  by which the Retirement Committee operated was -- was one that

24  was not prudent and that they didn't act with loyalty.  And

25  that as a consequence of that, the Plan participants in the

1    Plan suffered economic loss.

2    Q.   So how does your experience, your education, your work

3    experience, qualify you to testify in this case?

4    A.   Well, my academic training certainly is in the area -- in

5    the area of finance.  And I -- I did my Ph.D. after joining

6    Analysis Group.  And specifically, I crafted my coursework in

7    economics around what I plan to do for the rest of my career,

8    which is study economic loss and damages.  And that is what I

9    have focused on at Analysis Group for the last 25 years.

10        The vast majority of my cases involve evaluating

11   damages and economic loss, in some cases rebutting damage

12   analysis, and in some cases affirmatively preparing damages

13   analysis.  But that's the sort of underlying theme of what I

14   do is damage analysis across the whole range of industries and

15   types of cases.  So I do antitrust cases, securities cases,

16   breach of contract cases.  I basically apply the principles of

17   economics and statistics to the question of economic harm and

18   damages.

19   Q.   And about how much of the work that you do at Analysis

20   Group is related to the -- these issues of economic harm and

21   damages?

22   A.   It's the vast majority.  I would estimate about 80

23   percent.

24   Q.   And so you've been an expert in litigation before?

25   A.   I have.

1  Q.  About how many times?

2  A.  I've testified at trial or arbitration about 35 times and

3  at deposition another 80 or 90.

4  Q.  And did the majority of the cases deal with issues of

5  economic loss and damages?

6  A.  They did.

7  Q.  So what percentage of your litigation work has been

8  defense side rather than plaintiff's side?

9  A.  About 60 percent of my cases I'm on the defense side, and

10  about 40 percent of the time I'm on the plaintiff's side.  So

11  it varies.

12  Q.  Okay.  And in terms of these economic loss issues and

13  damages issues, has your work tended to be on one side or on

14  the other?

15  A.  No.  I think it's roughly an equal split, a 60/40 split in

16  damages, maybe even closer to 50/50 on damages in particular.

17  Q.  Have you ever been disqualified as an expert by a court?

18  A.  No.

19  Q.  Has your testimony ever been dis-- excluded by a court?

20  A.  I have one case in which I had a main assignment, and over

21  the course of the case was asked to perform some probability

22  calculations using data that had been collected by another

23  expert through a survey.  The judge decided not to admit the

24  survey, and that portion of my testimony that related to using

25  that data was not admitted.  But to my knowledge, that's the

1    only instance.

2    Q.   So the exclusion was related to the other expert's work?

3    A.   That's right.  And consequently, my -- my calculations,

4    the data underlying them were not admitted.  So mine were

5    not -- not admitted as well.

6    Q.   And have you ever had your testimony excluded based on

7    improper logic or the improper application of economic

8    principles?

9    A.   No.

10   Q.   How did you become involved in this case?

11   A.   This case had been in -- Analysis Group had been involved

12   in this case for some period of time.  And at some point, the

13   defense counsel asked one of my colleagues about potential

14   damages and economic harm experts.  And so I was introduced to

15   the case at that time.

16   Q.   And what was your assignment, in brief, in this case?

17   A.   I -- I kind of had two assignments.  Initially, I was

18   retained to issue an expert report on class certification.  So

19   I evaluated the plaintiffs' proposed approach to the case from

20   the perspective of class certification.  And then

21   subsequently, I -- I was asked to evaluate Dr. Pomerantz's

22   report with respect to damages and economic harm.

23   Q.   So you've talked about economic harm or economic loss and

24   damages.  Do you see a difference between those things?

25   A.   I speak of those differently.  And in my experience, there

1    is a difference.  I think typically, there's a question of

2    whether a plaintiff or group of plaintiffs experienced harm.

3    So this is the fact of damages.  Was there an adverse impact

4    on the plaintiff.  And --

5    Q.  But the fact of harm resulting from some alleged

6    misconduct, is that what it is?

7    A.  That's right.  So did the -- did the liability -- the

8    legal theory of liability, does that translate into an actual

9    economic harm to -- to the plaintiff?  So it's a question of a

10   fact of -- of harm.  And that's what I generally mean by

11   economic loss.  And then damages is simply a question of

12   quantifying that harm.  So it's the quantum of damages.  And

13   damages can also extend beyond just the concept of harm.  So

14   things like unjust enrichment are sometimes a remedy that's

15   available to a plaintiff.  That's not actually a measure of

16   economic harm to the -- to the plaintiffs, but it sometimes is

17   a remedy.  So damages is a bit of a broader concept.

18   Q.  So your work here on the -- in the second assignment, to

19   address Dr. Pomerantz's analyses of economic harm and damages,

20   were -- were the methods that you used in evaluating and

21   responding to Dr. Pomerantz's work the kind of work that you

22   usually do?

23   A.  Yes.  I think this assignment and the work that I did is

24   typical of the kinds of things I do routinely in my job for

25   the last however long.  So both the nature of the -- the

1  plaintiffs' damage model and my evaluation of that, my

2  application of my economic training and experience is -- is

3  typical of the kind of work that I do.

4  Q.  So you were on familiar ground here?

5  A.  Yes, I was.

6  Q.  And -- and when did American Century retain you in this

7  case?

8  A.  I believe it was March of 2017.

9  Q.  Are you being compensated?

10  A.  Analysis Group is being compensated for my time on the

11  case.

12  Q.  And what's your hourly billing rate for your time?

13  A.  $720 an hour.

14  Q.  Okay.  So you said -- still at a high level -- that you're

15  opining on economic loss and damages.  Are you also opining on

16  whether the American Century Plan's Retirement Committee used

17  a prudent or imprudent process?

18  A.  No.  That's not an area of -- that I'm opining on.

19  Q.  Okay.  So you said that your assignment included

20  evaluating the economic loss and damages methodology of

21  Dr. Pomerantz.  What's your opinion about his methodology?

22  A.  Well, I think at the very highest level, I think his

23  methodology is inappropriate, and I think it's flawed.  And

24  the bottom line is that I don't think that it establishes any

25  economic harm or economic loss to the plaintiffs.  His

1    approach suffers from a number of deficiencies in my view.

2           I think -- you know, I'll list a few of those.

3    We'll talk about those in details.  But I don't think that his

4    methodology actually isolates and measures the economic impact

5    of the alleged breaches that are at issue in this case.  I

6    think that his measure of damages, I would say, is sort of

7    contaminated by many other factors that are affecting this

8    damage value that he calculates.

9           Secondly, I think in his analysis, the question that

10   he's trying to answer or should be trying to answer is but for

11   the alleged breach, what would have happened.  And that

12   translates into his model what would the Plan menu have looked

13   like and what are the funds that would have been on the menu.

14   In each of his models, he chooses a single answer to that

15   question.  It's always a comparison to one fund.  And I think

16   there's, in fact, a range of potential outcomes that could

17   have resulted from a loyal and prudent process, assuming that

18   the process in place was not.

19   Q.  Let me stop you for a sec.  We'll go back there.

20   A.  Yes.

21   Q.  But I -- before we -- we go into any more detail about

22   flaws in his methodology, in your opinion, what should a

23   proper methodology for determining economic loss and damages

24   look like?

25   A.  Well, there's a few principles in economic loss analysis.

1    And I think probably the leading principle or the first thing

2    is whatever it is you're measuring as damages, whatever your

3    calculation isolates as damages needs to have resulted from

4    the alleged misconduct.  So that's -- that sounds obvious, but

5    in many cases, damage analysis actually measures something

6    different.  And I think in this case, they do measure

7    something different.

8            The second idea is kind of a corollary of that.  And

9    that is that whatever you're measuring of damages has to be

10   cleansed of any other kind of influence.  So it should be

11   these are really corollaries and they come to the topic

12   generally of loss causation that this thing calling economic

13   harm or damages has to be caused by the alleged mis--

14   misconduct.

15           THE COURT:  Hold on one second.  One second.

16   Reggie, how are we doing?

17           THE REPORTER:  Good.

18   A.  And then, I guess, thirdly, that any damage model makes

19   assumptions.  So that's the nature of the beast.  But those

20   assumptions have to be made with reasonable certainty.  There

21   has to be a basis for those assumptions.  They can't be

22   speculative.  They can't be arbitrary.  Otherwise, you run

23   into problems with the first two objectives that you're -- you

24   end up measuring something that's not actually a result of the

25   alleged misconduct.

1    Q.   And is a good practice to make assumptions, at least the

2    major assumptions explicit?

3    A.   Absolutely.  I think you -- you -- I mean, oftentimes,

4    that's the problem with the damage analysis is there's an

5    implicit assumption that's sort of baked into the -- the

6    analysis.  And it needs to be made explicit so that we can all

7    agree that that's a reasonable assumption, that there's a

8    reasonable basis for it.

9    Q.   So did Dr. Pomerantz's analysis, did his methodology for

10   calculating damages or showing economic loss, did they -- did

11   that follow the principles that you just articulated?

12   A.   No.  I don't believe it did.

13   Q.   Okay.  So let's focus now specifically on Dr. Pomerantz's

14   four damages models, which he labels Models 1 through 4 and he

15   also has names for, which we'll get to.  But when you

16   evaluated his four models, what was your high level

17   conclusion?

18   A.   So at the -- as I say, at the highest level, I think he

19   has an inappropriate damages methodology that contains many

20   flaws and that the calculations he performs do not demonstrate

21   that the plaintiffs in this case suffered any economic harm.

22   Q.   So what do these models purport to calculate?

23   A.   So his -- he has four damage models that I call the -- I

24   think he may call these underperformance models.  So he looks

25   at four different alternative lineups for the menu and

1    calculates the difference between the Plan's actual assets at

2    the end of the damage period and what he calculates the Plan

3    assets would have been worth under his alternative menus.  And

4    the difference between those two things is what he calls -- he

5    calls damages.  I call that underperformance damages.

6    Q.  So he's -- he's looking at the performance of the assets

7    as they actually performed, and he's actually subtracting fees

8    from there, right?

9    A.  That's true.  These analyses are net of fees.  So when we

10   talk about the performance of the actual investment, that's

11   after fees are paid.  When we talk about the performance of

12   the alternative investments, those are also after fees.

13   Q.  And then he's also doing a look at some but-for world you

14   could say, the -- a menu that he's contending would have been

15   in place but for the alleged misconduct, right?

16   A.  That's right.  At each --

17   Q.  And he looks at what that performance would have been of

18   that but-for menu and subtracts out fees from that side too?

19   A.  He does.  Yes.

20   Q.  And that's -- those two performance minus fees,

21   performance minus fees, that -- if there's a difference

22   between them, that's -- that's what he calls damages?

23   A.  That's correct, in those four underperformance models.

24   Q.  Okay.  So he was -- he was looking at this net

25   performance, you could say, or performance minus fees, right?

1  A.  He was.  That's -- that's the -- the -- the quantity that

2  he's studying.

3  Q.  So is looking at that net performance alone the right way

4  to make a damages calculation?

5  A.  I don't think so.  I think there are nonperformance

6  attributes to these investments that have to enter the

7  analysis in order for there to be, you know, a valid analysis.

8  Q.  So it's not just this net performance, but there are other

9  values.  And we'll talk about those in more detail later,

10 right?

11 A.  That's right.  I call them nonperformance attributes.

12 Q.  Okay.  Now, the four models are each intended to calculate

13 the same type of damages, right?

14 A.  That's right.  This is -- this is four separate cuts at

15 estimating the same thing.  So these are -- you know, it's

16 either one or two or three or four.  They're not additive, but

17 they're just four different ways of attempting to -- to

18 calculate this -- this quantity.

19 Q.  It will be double counting to pick one and three and add

20 them up?

21 A.  Yes.  It would be.

22 Q.  And that's true of all -- all four of them.  You have to

23 pick one?

24 A.  That's correct.

25 Q.  Okay.  So is there a common methodology that Dr. Pomerantz

1  used to design the menus, the lineups of funds in his models?

2  A.  No.  I don't think there is a common methodology.  I think

3  each of his models was motivated by, you know, a different

4  idea.  So I find that there's not a common methodology for or

5  motivation for him to select the -- the four alternative

6  menus.

7  Q.  Okay.  So you've said that there are flaws, that you have

8  identified flaws in his models?

9  A.  Yes.

10  Q.  And did you make a demonstrative that summarizes those

11  flaws?

12  A.  I did.

13  Q.  And call DX 867, please.

14        So could you please take us through this slide, and

15  just briefly describe what you intended by each of these seven

16  characteristics?

17  A.  Yes.  So I'll start with the first one.  Damages in the

18  models are not attributable to the alleged defects.  I think

19  the -- there are many examples of this.  I think Model -- his

20  Model 4 is -- is an example.  The motivation for Model 4, as

21  Dr. Pomerantz described it, was to faithfully implement the

22  recommendations of the Hewitt study.

23        I -- I think if we look at the Hewitt study and look

24  at the alternative menu that was constructed, there is a lack

25  of connection between what was actually recommended or

1    suggested in the Hewitt model and the changes that are

2    reflected in the alternative menu.

3             So as a consequence of that, when he calculates

4    damages as the difference between the actual menu and his

5    but-for menu, he's calculating damages on a lot of fund

6    combinations that are on the new menu that aren't really

7    responsive to the Hewitt report.  So I think that's an example

8    of what I mean by the -- the alleged -- the damages that he

9    calculates aren't connected to the alleged breaches or result

10   from the alleged breaches.

11   Q.  What is the second item here, differences in returns are

12   not statistically significant?  And, again, brief -- brief

13   description of what you had in mind.

14   A.  Sure.  When -- when an economist looks at a series of

15   returns or two values or a coefficient from a regression, just

16   the scientific method applied to economics, the first question

17   you ask is is there actually a difference between these two

18   values?  And so in the case of securities returns, any two

19   securities are going to have a different series of monthly

20   returns over whatever period we're looking at them.

21   Q.  So what do you mean by returns?

22   A.  So I'm talking about the monthly returns on any particular

23   investment.  So I -- I have an investment.  It goes up 2

24   percent one month, it comes down 1 percent the next month.

25   And if it's my investment, it probably goes down 4 percent the

1   next month and what have you.  So that's a series of returns.

2   It's affected by a lot of information that hits the market,

3   how the -- exactly what comprises the investment.  But these

4   statistical -- these returns, because they're going to be

5   different for any two investments, you have to ask the

6   question as an economist, are these differences large enough

7   that they're just not random chance.  Can they be explained by

8   random chance, or are they significant enough, large enough

9   that there's really some underlying difference in the

10  investment?  And as an economist, if you can't rule out that

11  this is just -- this result I'm getting is just by chance

12  because of the inherent volatility in returns, then you can't

13  make the next step, which is to say, well, the difference I'm

14  measuring is a result of alleged misconduct because it could

15  be just random chance that causes the difference.

16  Q.  So if you're looking at returns from two different funds

17  and -- those returns are going to go up and down because of

18  market fluctuations is what you're saying, right?

19  A.  Market fluctuations and a lot of other things that just

20  cause randomness in returns for financial assets.

21  Q.  Okay.  And so when you see a difference between the two

22  returns, you've got to ask yourself, are they real?  Is that

23  what you're saying?

24  A.  That's essentially the question.  Is there something

25  fundamental going on here, or is this just small enough

1    differences that this is random statistical -- we call it

2    statistical noise, but it's just results from the randomness

3    of the returns.

4    Q.   Okay.  And we'll -- we'll come back to this.  But you

5    tested for this statistical significance issue, right?

6    A.   Yes, I did.

7    Q.   Okay.  So what's -- what's the third item here, single

8    but-for alternative is inappropriate?

9    A.   So I -- I started to mention this.  I think the -- the

10   exercise we go through here is -- and Dr. Pomerantz goes

11   through is if -- but-for the alleged conduct, if we put

12   ourselves back in time, what would this menu have looked like?

13   And that translates into what are the prudent options, prudent

14   alternatives that might have been selected from a loyal and

15   prudent process?

16             Dr. Pomerantz himself demonstrates, because he

17   oftentimes chooses more than one alternative if you look

18   across his four models, and I think he testified on direct

19   that there's a whole range of possible prudent alternatives,

20   yet in his calculations, he's choosing only one of those

21   alternatives among a range of potential prudent and loyal

22   alternatives.  And the damage calculation that -- that matters

23   to damage calculation which particular alternative you pick,

24   if you're only going to pick one alternative.  It's

25   essentially arbitrary if we have a range of potential prudent

1    investments and I choose one of those, I need a reason why I'm

2    choosing it, or, alternately, I can look at a range of

3    potential outcomes that could have resulted from a loyal and

4    prudent process.

5           And so I think that's a fundamental problem with his

6    analysis.  And, as I say here, he's choosing a single but-for

7    alternative, which I think is inappropriate.

8    Q.   So in any given model, Model 1, Model 2, Model 3, Model 4,

9    he's mapping one actual Plan fund into just one other fund

10   which he's picked for his -- his menu for that model, right?

11   A.   That's correct.

12   Q.   Okay.  And then what's the fourth item here, inconsistent

13   results across models?

14   A.   Well, if you -- he's attempting to calculate the same sum,

15   damages, across four different methodologies.  And I find that

16   his results are inconsistent across his four models.  At the

17   fund level, he has many times there's, you know, large damages

18   in two models and no damages in the other models or just

19   inconsistent results across the four models.  And I think that

20   is a red flag to a damages expert that if you're attempting to

21   calculate the same quantity and approaching it from different

22   angles, if you're getting different answers depending on which

23   model you're using, that suggests that maybe your model is

24   arbitrary, and maybe it's -- there's not a statistically

25   significant difference between the performance.  So it's

1     indicative of a problem.  And I think we see that in

2     Dr. Pomerantz's results.

3     Q.  Okay.  And then you have an entry here, alternatives have

4     different risk profiles.  So what's that one referring to?

5     A.  So a risk profile is just kind of a shorthand way of

6     saying that an investment has exposure to different elements

7     of risk.  So these are things like small stock versus large

8     stock, domestic market versus foreign market, growth strategy

9     versus value strategy.  There's a lot of dimensions that cause

10    investments to have different risk profiles.

11            And if you're comparing the at-issue fund that has a

12    particular risk profile to an alternative that has a

13    completely different risk profile, what you're likely

14    measuring if you're looking at the difference in performance

15    is really just the difference in the risk profile of the two

16    alternatives that you're looking at.  And that may not have

17    anything to do with the alleged misconduct.  So if you're

18    mapping a fund that has a narrow strategy into a fund that has

19    a much broader strategy, there's going to be a difference of

20    return there.  And that may have nothing to do with the

21    breach.  And I think in --

22    Q.  So -- so to take an extreme case -- sorry to interrupt,

23    but if your -- the real fund in the Plan were a stock fund,

24    and you'd mapped it into a bond fund, and you were trying to

25    figure out whether the difference in performance between the

1    two was caused by misconduct, the -- the differences between

2    the stock performance and risk attributes and the bond

3    performance risk attributes could very well be driving it and

4    the difference, you know, would -- would have shown up anyway,

5    regardless of the misconduct?

6    A.   That's -- that's the basic idea.  That's an extreme

7    example.  But that's -- that's exactly what -- what I'm

8    talking about with this --

9    Q.   Okay.

10   A.   -- issue.

11   Q.   Great.  So then you have here that the models ignore the

12   nonperformance attributes of the at-issue funds.  You gave us

13   a sentence about that a minute ago, but give us two more

14   sentences if you have --

15   A.   So -- so the nonperformance attributes of funds include

16   things -- and I think in this case principally the idea that

17   actively managed funds are different and have different

18   attributes than -- than passively managed funds or index

19   funds.  People invest in actively managed funds for reasons

20   that are different than the reason you invest in a passively

21   managed fund.  There's different strategies that can be

22   implemented in active funds.  And we'll talk about it in

23   detail.

24              But that's an example of nonperformance attributes

25   that -- that investors value that can affect the relative

1    performance of an investment in an up market or a down market

2    differently.  And the analysis of damages has to take into

3    account these nonperformance attributes, in my opinion.  And I

4    don't think Dr. Pomerantz -- or I know Dr. Pomerantz's

5    analysis does not.

6    Q.  So what would be -- very quickly, what would be an example

7    of an active fund being sort of addressed to the possibility

8    of a down market?

9    A.  Yeah.  There are -- there are strategies in actively

10   managed funds that can be characterized as conservative in the

11   sense that in an up market, we know those passive funds -- or

12   active funds are designed in a way that they're going to

13   underperform the benchmark or an index fund.  But on the other

14   side, in a bear market, those funds are going to hold up

15   better than -- than an index or a passively managed fund.  And

16   so investors know that.  If there's an up market and you have

17   an investment in a conservative fund, you -- you're not

18   surprised that that fund is not doing as well as another

19   passive fund in the same investment style that you might be

20   able to point to.  You're not holding it for that reason.  And

21   if your analysis doesn't account for that fact, you're going

22   to, as Dr. Pomerantz does, calculate damages on that type of

23   a -- of a match when that's not -- that's not a source of

24   economic harm to participants, and it may not even be

25   unexpected.

1  Q.  Okay.  And the last item you've got here is asset mapping

2  reduces choice and ignores participants' preferences.  And

3  this is a characteristic I think that you said you've seen

4  through all these different other flaws.

5  A.  Yeah.

6  Q.  What did you have in mind?

7  A.  Yes, I -- what I'm trying to summarize here is that the

8  participants in the American Century Plan have certain

9  preferences that are apparent from the types of choices

10 they're making between active and passive funds in the PCRA,

11 for example, and preferences for American Century funds, which

12 is evident from the funds that they invest in when they have

13 options for other alternatives.

14          Dr. Pomerantz essentially ignores those.  In several

15 of his models, he completely replaces every fund on the menu

16 with a -- with a whole new lineup.  But he makes the

17 assumption that people are going to invest the same amounts,

18 they're going to invest in exactly his replacement fund and

19 leave their money there, and invest the exact same way as he

20 sort of prescribes in his new menu.  And I think that's a --

21 that's a very unrealistic assumption, particularly in some of

22 the instances where the -- the fund that he adds to the menu

23 really is a completely different type of fund than he's

24 replacing in the -- in the -- among the at-issue funds.

25 Q.  Okay.  So do all of the models, Models 1 through 4, suffer

1    from some of these flaws?

2    A.  Yes.  I think many of these flaws apply to all models.

3    And every one of his models has multiple -- multiple of these

4    flaws that apply, in my view.

5    Q.  So if we could go to DX 868, which is isolating the first

6    one, which you -- you gave a brief account of.  And so with

7    respect to this issue about damages in models not attributable

8    to the alleged breaches, you -- you mentioned Dr. Pomerantz's

9    Model 4, his -- his Hewitt model.  Did you evaluate that model

10   and his methodology?

11   A.  Yes, I did.

12   Q.  Okay.  And what did you find, briefly?

13   A.  Well, the -- the brief summary is that there is -- I think

14   the alternative menu that he proposes in Model 4 is really

15   untethered to the recommendations in the Hewitt report that

16   the lineup that he ends up with in his Model 4 doesn't flow

17   from the Hewitt report.  It's -- it's -- it's based on his --

18   whatever it is that he connects the dots in order to come

19   up --

20   Q.  Well, he said he was faithfully implementing the

21   recommendations in the Hewitt report.  That's what he said in

22   his report, right?

23   A.  That's right, that his effort in Model 4, the motivation

24   was to faithfully implement the recommendations in the Hewitt

25   report.  And in my view, I don't see the connection between

1    the Hewitt report and the alternative model that he's proposed

2    here.  And I think Dr. Pomerantz testified that somebody else

3    might look at the Hewitt report and come to a different

4    conclusion about what the model might look like.  And I would

5    agree with him in that respect.

6    Q.  You -- you were in the courtroom when Dr. Pomerantz

7    testified?

8    A.  Yes.

9    Q.  You heard when I questioned Dr. Pomerantz about his

10   statement that the Hewitt model faithfully implemented the

11   recommendations of Hewitt?

12   A.  Yes.

13   Q.  And I took him through the Hewitt report, right?

14   A.  Yes, you did.

15   Q.  And did seeing that testimony affect your opinion

16   regarding Dr. Pomerantz having a flawed methodology in his

17   Model 4?

18   A.  It didn't affect it.  I think, if anything, it

19   strengthened it.

20   Q.  Okay.  Can you give an example of how, in your view, Model

21   4 fails to reflect what's in the Hewitt report?

22   A.  Well, there -- there are many, but I think gold --

23   Q.  Maybe two.  Maybe two.

24   A.  Okay.  I think the gold fund is -- I know there's a lot of

25   discussion with the gold fund with respect to the Hewitt

1    report.  But in my view, the Hewitt -- the reading of the

2    Hewitt report is -- does not indicate that the gold fund must

3    be removed, and also that -- that it should be replaced with

4    the American Century Global Growth Fund.  So that's an example

5    of a change to the menu -- in this case, a very important

6    change to the menu that I don't think flows from the Hewitt

7    report.

8    Q.   And one more example.

9    A.   Another example is the replacement of the money market

10   fund with the stable value fund.  That's another example of a

11   change to the menu that has a material effect on the damage

12   value for Model 4, but which doesn't flow from the -- from the

13   Hewitt report.

14   Q.   So -- so, Dr. Strombom, were you here in court when

15   Dr. Pomerantz testified that the Hewitt report stated that

16   other plan fiduciaries do not use specialty or sector funds?

17   A.   Yes.

18   Q.   And he was including the gold fund as a -- as a specialty

19   fund, right?

20   A.   That's correct.

21   Q.   Okay.  Was that a true statement about the Hewitt report?

22   A.   No.  I think the Hewitt report explicitly shows that

23   specialty funds are actually on the menu of other 401(k)

24   plans.

25   Q.   Could you please call up JX 10, page 17?

1       So this is a page from the Hewitt report, which you

2   pointed me to and was part of my questioning of Dr. Pomerantz

3   as well.  What do you see on here which is inconsistent with

4   Dr. Pomerantz's statement about plans not having specialty

5   funds on their -- their menus?

6   A.  Well, in this particular exhibit, down towards the bottom,

7   there's a row labeled Specialty/Sector funds.  And this

8   exhibit indicates that 8 percent of the plans that were

9   surveyed by Hewitt offered a specialty or a sector fund.  And

10  then just below that, you also see the line called REIT, which

11  is real estate investment trust, which is actually any type of

12  specialty fund.  It's a sector fund that invests in real

13  estate.  19 percent of the surveyed plans apparently had that

14  option on their menu.  So this is consistent with -- or

15  inconsistent with the idea that specialty funds are not on the

16  menus of 401(k) plans.

17  Q.  Well, when I asked Dr. Pomerantz about the -- the bar for

18  REITs, he said that REITs are a different animal from a mutual

19  fund in real estate equities or in REITs, right?

20  A.  Yes, he did say that.

21  Q.  So do you think that's right?  Are they different?

22  A.  Well, I mean, they're different in the sense that a REIT

23  has a specific legal structure, and a mutual fund that invests

24  in REITs, like the American Century fund, is a mutual fund.

25  But from an economic perspective and a financial perspective,

1    the issues is -- are -- are plan participants gaining exposure

2    to the real estate sector with this type of investment.  And,

3    I mean, there's no -- there's no question that they are.  And

4    so there's no practical difference between a REIT and a mutual

5    fund that invests in a REIT for purposes of this case.

6    Q.   And do you have any view on what Hewitt's interpretation

7    was of whether it -- this bar related to REITs was intended to

8    include the American Century Real Estate Fund?

9    A.   Yes.  The column on the far right of this exhibit shows

10   where Hewitt indicates with a check mark if American Century

11   has a -- an offering on their menu that falls into each of

12   these categories.  And as you can see, in the REIT category,

13   there's a check mark for American Century.  So it's pretty

14   clear that Hewitt categorized their -- the offering of

15   American Century, or the menu option, as being within this

16   category that they're calling -- calling REITs.

17   Q.   And it was -- 19 percent of the plans that Hewitt surveyed

18   had one of these REITs, which could include a real estate fund

19   just like American Century's, right?

20   A.   That's correct.

21   Q.   Okay.  So I know we've seen this many times, and we'll go

22   quickly through it.  But could we go to page 5 of the Hewitt

23   report.  So this is the Executive Summary, and it's entitled

24   Recommended Considerations.  In your view, do any of the

25   recommendations mention the gold fund or the money market fund

1  or constitute a recommendation that the gold fund, the Global

2  Gold Fund or the American Century Money Market Fund should be

3  removed?

4  A.  No.

5  Q.  And now let's look at page 24, please.  There's a section

6  here called Suggestions in the middle of the page.

7  A.  Yes.

8  Q.  And again, do any of those suggestions mention the gold

9  fund or the money market fund or constitute a recommendation

10  or a suggestion that those funds be removed from the Plan?

11  A.  No.

12  Q.  So how does Dr. Pomerantz's replacement of the American

13  Century Global Gold Fund with the American Century Global

14  Growth Fund, which -- what it was replaced in, if I'm right,

15  how did that impact his damages calculation?

16  A.  In Model 4, that single substitution represents about half

17  the damages in Model 4.  It's something greater than $14

18  million of about $29 million in damages in Model 4, according

19  to Dr. Pomerantz.

20  Q.  So I just said -- I should have asked you first about the

21  Global Gold Fund being mapped in Model 4 into the Global

22  Growth Fund, right?

23  A.  Yes.

24  Q.  Are those similar funds?

25  A.  No.  They're -- they're completely different funds.  Gold

1    fund is a specialty fund.  It invests in the equities of gold

2    mining companies internationally, or globally.  The American

3    Century Global Growth Fund is a widely diversified nonsector

4    equity fund that -- that invests in -- in a global portfolio

5    of equities.

6              It's an example that we'll talk about later of two

7    options that have completely different risk profiles.  They're

8    completely different objective -- investment objectives.  And

9    what we're really measuring in the damage number that

10   Dr. Pomerantz calculates is just the difference in performance

11   between those two, you know, completely different investments.

12   Q.  So from the viewpoint of an -- of an expert in economic

13   loss in damages, did -- was there something wrong with mapping

14   this American Century Gold Fund into a comparator in a

15   different asset class?

16   A.  Yes.  I think the -- what we're -- what we're measuring

17   in -- or what Dr. Pomerantz is measuring in this case is just

18   the difference in the performance between these two sectors in

19   the particular market that we happen to have, which was --

20   which was an up market for equities and a down market for

21   gold.  So it's -- it's a -- it lacks -- it's not connected

22   to -- to the breach, in my view.  And it's -- it's an

23   erroneous assumption about what would have happened in the

24   but-for world if the gold fund had gone away.  If the gold

25   fund had gone away, would all this money have flowed into this

1   completely different type of investment?  It seems highly

2   unlikely, but that's the only kind of mapping that

3   Dr. Pomerantz's model will accommodate.  And so I think

4   it's -- it's a deficiency in the model, and it doesn't measure

5   what Dr. Pomerantz should be measuring.

6   Q.  And in -- is -- is a Morningstar category an example of --

7   at least a comparison or a categorization that one could try

8   to use at least in the first instance to distinguish between

9   different asset classes?

10  A.  Yes.  I think Morningstar category, Dr. Pomerantz uses

11  that in other of his models to identify comparable funds or

12  his alternative funds.  I think it certainly is a component or

13  piece -- it's a good place to start when you're thinking about

14  is one fund comparable to another one, is it an alternative

15  investment, to look at funds that are in the same Morningstar

16  category.

17  Q.  So very briefly, because I know this has been touched on

18  in places, but just to be sure we're all on the same page,

19  what's a Morningstar category, from your point of view?

20  A.  Morningstar is -- is an independent company that looks at

21  mutual funds and other types of pooled investment options and

22  evaluates their -- their strategy, the types of assets they

23  hold, and puts those assets into a range of categories of

24  similar and comparable types of investments.

25          And so the categories are fairly broad.  There still

1    is a lot of diversity within a category.  But as a first cut,

2    it's a -- it's a reasonable way to think about funds that may

3    be comparable.

4    Q.  And did you analyze the Morningstar categories of the

5    funds that are on the Plan's actual menu and then

6    Dr. Pomerantz's model for comparators?

7    A.  I did.

8    Q.  If we could call up, please, DX 807.

9           THE COURT:  Mr. Nemser, we're about ready for a

10   recess.  If you're close, I'll let you finish.  Otherwise, we

11   might take one now.

12          MR. NEMSER:  I think we should stop now, Your

13   Honor --

14          THE COURT:  All right.  Thank you.

15          MR. NEMSER:  -- because we're about to enter into

16   the discussion of this.

17          THE COURT:  We'll take a one hour -- and you may

18   have to loop back and tell me what we just talked about.

19          MR. NEMSER:  Sure.

20          THE COURT:  And I'm using the word looping in a

21   positive way there, Mr. Specht.  Thank you.

22          MR. NEMSER:  Thank you.

23       (Recess at 12:00 until 1:04 p.m.)

24          THE COURT:  All right.  Mr. Nemser.

25          MR. NEMSER:  Okay.  Your Honor.

1          THE COURT:  Please proceed, sir.

2          MR. NEMSER:  I'm going to step back a couple of

3     questions and just run them quickly.

4          THE COURT:  Thank you.

5     Q.  So Dr. Strombom, you were talking about the lack of

6     similarity between the Global Gold Fund and the Global Growth

7     Fund and attributed that, at least in part, to the fact that

8     they were from different asset classes; is that right?

9     A.  That's correct.  Different Morningstar categories I think

10    we were talking about.

11    Q.  Right.  And we -- we went from different asset classes as

12    a broader term to --

13    A.  Yes.

14    Q.  -- specifically one way of classifying assets, which is

15    Morningstar categories?

16    A.  Correct.

17    Q.  And I think you said it was a first cut at figuring out

18    whether things are in the same asset class or not?

19    A.  Yes.

20    Q.  And could you give, maybe in a little briefer form, what a

21    Morningstar category is?

22    A.  Well, just generally, Morningstar breaks up the market and

23    sort of develops these large buckets that have similar types

24    of assets, investment strategies, market capitalizations, and

25    is able to create these categories and then assigns particular

1    mutual funds or other investments to a particular category

2    that -- that best represents what their basic investment

3    strategy is.

4    Q.  And I asked you from the viewpoint of an expert on

5    economic loss and damages, is there potentially something

6    wrong with mapping from one Morningstar category fund into a

7    different Morningstar category fund?  Again, give me a briefer

8    answer.

9    A.  Yeah.  Briefly, yes.  If you're mapping from one

10    Morningstar category into another Morningstar category, it's

11    likely that you're going to have a difference in the

12    performance between those two funds that's just a result of

13    the fact that they have different risk profiles, they have

14    different investment strategies.  And that -- that may or may

15    not have anything to do with the breach that you're attempting

16    to address, or it may not represent how -- an appropriate

17    representation of the but-for world.

18    Q.  And you did a demonstrative that was actually part of your

19    report that compared the Morningstar categories of the funds

20    that were actually in the Plan menu with the model for

21    alternatives, Dr. Pomerantz's comparators that he chose,

22    right?

23    A.  That's correct.

24    MR. NEMSER:  Okay.  So, Chris, if you could bring up

25    DX 807.

1          THE COURT:  Does somebody need a cough drop over

2     there?  I have plenty of cough drops.

3          MS. GALLAGHER:  I'm good.  Thank you.

4          THE COURT:  Okay.  Thank you.

5     Q.  And so this goes on for many pages, right?

6     A.  It does.  I think four.

7     Q.  We're looking at the first page.  And that's where we'll

8     stay for a while.  So tell us briefly what's in the left

9     column and what's on the right side and what's going on here.

10    A.  So this is an attempt to look at these -- the actual fund,

11    the at-issue fund, which is on the left here, and the

12    Pomerantz alternative, which is on the right, and ask the

13    question, are these -- are these two funds in different

14    investment categories, different Morningstar categories, and,

15    therefore, are we going to see a difference in performance

16    that's just a fact -- a result of the fact that they're

17    different types of investments.

18          And so I list there on the left the at-issue funds.

19    In the fourth column over, I show the Morningstar category.

20    And then I list Dr. Pomerantz' alternatives and the

21    Morningstar category that the alternative is in.  And in the

22    far right-hand column, if there's a difference in the

23    Morningstar category between the at-issue fund and Dr.

24    Pomerantz's fund, I indicate that with an X.

25    Q.  So -- so let's start with the one at the top, Capital

1    Preservation Fund, on the left, that's the one from the Plan

2    menu?

3    A.   That's right.

4    Q.   The at-issue fund?

5    A.   That's right.  So the at-issue fund is the American

6    Century Capital Preservation Fund, had about $3 million in

7    assets.  It's categorized by Morningstar as a money market

8    fund.  It's in the money market category.  Dr. Pomerantz takes

9    those assets that are in the -- the money market fund,

10   eliminates the money market fund, replaces it with a stable

11   value fund.  And as you can see, the stable value fund

12   Morningstar categorizes differently.  It categorizes it as a

13   stable value fund in that stable value category.  So this is

14   an instance where we're -- Dr. Pomerantz is replacing a fund

15   in one category with a fund that's in a different category.

16   Q.   Okay.

17   A.   And there's an X in --

18   Q.   And the X in the right-hand side indicates that they're in

19   different categories?

20   A.   Correct.

21   Q.   Okay.  And then if we go down further, we can see Global

22   Gold and the Global Growth, right?

23   A.   That's right.

24   Q.   So where are those?  That's line 11, I think.

25   A.   That's right.  So if we look just at line 11 there, the

1  American Century Global Gold Fund, that's categorized by

2  Morningstar as an equity precious metals. There's a separate

3  category called equity precious metals in Morningstar. That's

4  being replaced by the American Century Global Growth Fund,

5  which is a different category. It's a world stock category.

6  So again, there's an X in the right-hand column, indicating

7  that there's a -- you know, there's a difference in -- in

8  asset category and in the mapping that Dr. Pomerantz does.

9  Q. So you have a highly specialized fund focused on stocks of

10 companies that are involved in the precious metals business on

11 the gold side, right?

12 A. That's correct.

13       THE COURT: And this is where you pointed out that

14 that made up half of the damages associated with this model,

15 is that --

16       THE WITNESS: That's correct. That's a little over

17 $14 million out of about $29 million is -- is just right there

18 on line 11. And similarly, on -- on line 1, that represents

19 about $5 million in damages. That's the -- the replacement --

20 well, I guess there's actually a couple of money market funds.

21 So the replacement of money market funds, of which there are

22 two, with a stable value creates --

23       THE COURT: His assessment of damages attributed to

24 these are not listed on this particular --

25       THE WITNESS: Not on this line, no.

1  Q.  But -- but together, if you took the $5 million on stable

2  value -- and we'll come back to stable value in Model 4 for a

3  couple minutes anyway -- and you added that to the 14.6

4  million for the gold fund, just those two alone are accounting

5  for 20 out of 29 million roughly?

6  A.  That's correct.

7  Q.  And you can see on the right-hand column that just even on

8  this first page, there are some number of Xs, so these ones

9  that don't match up in terms of the Morningstar category?

10 A.  That's correct.  I think there's six on this page.

11 Q.  Yeah.  And so if we could go, Chris, to the last page of

12 this one.

13         What is -- Doctor, what does this show in terms of

14 the totals that you found?

15 A.  So this is the summary.  And it shows that, in total,

16 Dr. Pomerantz replaced 35 funds with different funds.  And in

17 25 of those instances, there was a mismatch in the category

18 between the at-issue fund and the fund that he -- he mapped it

19 into.  So that's over 70 percent of the -- the funds that he

20 selected where he selected a different fund than the actual

21 American Century fund, we have this potential problem.

22 Q.  So in Models 1 and 3, he mapped on -- on the Morningstar

23 categories, right?

24 A.  That's correct.  I think 1 and 3, he used that as the

25 basis of identifying an alternative fund.

1    Q.  But in Model 4 -- and later, we'll get to Model 2 -- but

2    the same issue, in Model 4, 70 percent didn't get mapped into

3    the same Morningstar category?

4    A.  That's correct.

5    Q.  Okay.  And I'll move the admission of DX 807, this chart,

6    into evidence.

7                THE COURT:  Any objection to 807?

8                MR. ENGSTROM:  No objection, Your Honor.

9                THE COURT:  All right.  Thank you, Mr. --

10   Mr. Engstrom, you're leading the charge here obviously?

11               MR. ENGSTROM:  That's right.

12               THE COURT:  All right.  Thank you.

13       (Defendants' Exhibit 807 admitted in evidence.)

14   Q.  And so just briefly on the -- the money markets, I've

15   asked you already whether Hewitt recommended or suggested

16   removing money market funds in your view of the Hewitt report?

17   A.  That's correct.  I don't believe they did.

18   Q.  Okay.  And I haven't asked you as such, did Hewitt

19   recommend or suggest adding a stable value fund to the Plan

20   menu?

21   A.  No.  I don't believe they did.

22   Q.  Okay.  So, Chris, if we could go to DX 869, please.

23               The next, Doctor, of your seven flaws that you

24   pointed out at the beginning was the difference in returns not

25   statistically significant.  So -- and you testified -- when I

1    asked you, did you evaluate the statistical significance of

2    the differences between the performance of the at-issue funds

3    and Dr. Pomerantz's alternatives in his various models -- and

4    now we're not just talking about 4, we're talking about all of

5    them.  You said that you had looked at the statistical

6    significance?

7    A.   Yes, I have.

8    Q.   Okay.  And what did you find?

9    A.   Well, I found that for the vast majority of replacements

10   that Dr. Pomerantz makes, there's no statistically significant

11   difference between the performance of the at-issue fund and

12   the performance of alternative that he selects.  And as I

13   think we'll talk about, that's sort of a fundamental first

14   step in a damage analysis is to ask that question.

15   Q.   So why is it a fundamental first step?

16   A.   When -- whenever we're looking at something that has

17   variation, like a return on an asset like we're talking about

18   here, there's various factors, market factors, industry

19   specific factors, things that happen to a specific company in

20   a particular fund's portfolio that are going to cause those

21   returns to fluctuate over time.  If you've owned any mutual

22   funds, you know the value bounces around.

23          If we look at two alternative investments, there's

24   different influences on each of those.  And so there's --

25   there's movement or variation in the returns of these series

1  over time.  And they're going to end up at a different place

2  ultimately.  So we know any two investments, if you hold them

3  for six years, there's going to be some sort of difference at

4  the end.  And the question you need to ask is -- as a

5  scientist and as a economist is, is that difference big enough

6  that it's anything other than just chance that we happened to

7  stop the clock here, and this is the difference because these

8  things are fluctuating?  Or, in the alternative, if you can --

9  if you can exclude that as a possibility and say, well, this

10  difference in relation to how much volatility there is here,

11  there's actually a big enough difference that we know these

12  are -- these are behaving differently.  It's only then that

13  you can say, well, then that difference may be attributable to

14  the alleged misconduct.  And it's not just a -- just a random

15  chance difference between the -- the two returns.

16  Q.  And if you can't get to a level of confidence that, you

17  know, you can rule out chance as the cause of the difference,

18  where does that leave you in terms of thinking about damages?

19  A.  Well, if you can't -- and this is a general proposition

20  for economists and statisticians, econometricians, is if you

21  can't rule out that the difference you're observing is just a

22  random chance difference, then you certainly can't attribute

23  it to any difference in conduct or to the breach in this case.

24        And in those instances, you have to set that

25  observation aside and say I can't conclude that there's a real

1  difference here, and so I can't attribute that difference to

2  damages if I can't rule out that it's just due to chance.

3  Q.  So in brief, tell us how an econometrician or statistician

4  goes out trying to rule out whether chance was the cause.

5  A.  There's a -- there's a very basic test, the T-test, which

6  is taught in usually first semester statistics.  And it's a

7  well-accepted test that's designed to test exactly this

8  hypothesis, are the difference between these two values

9  statistically significant and different?  So that's the test

10 that I use to -- to test this proposition.

11 Q.  And so applying this T-test, what do you get?  What

12 happened?

13 A.  Well, I -- I found that roughly 90 percent of these

14 combinations, so for 90 percent of the at-issue funds that

15 were mapped into alternative funds, 90 percent of those

16 different -- differences were not statistically significant,

17 using a standard 95 percent confidence level.

18          THE COURT:  What -- what model are we addressing

19 here at this --

20          MR. NEMSER:  All four, Your Honor.

21          THE COURT:  Just -- we're on 4 still?

22          MR. NEMSER:  Yes.

23          THE COURT:  Okay.

24          THE WITNESS:  No.

25          MR. NEMSER:  And we'll show you a result for each

1    model in just a second.

2              THE COURT:  Okay.  Go ahead.

3              THE WITNESS:  He said all four.

4              THE COURT:  All four.

5              MR. NEMSER:  Oh, yeah.  I'm sorry.  I didn't say it

6    loud enough.

7              THE COURT:  Yeah.  Keep me oriented on the model.

8              MR. NEMSER:  Yes.

9              THE COURT:  Okay.  All four.

10   Q.  So this one -- the statistical significance problem

11   applies to Model 1, Model 2, Model 3 and Model 4; is that

12   right, sir?

13   A.  That's correct.  Yes.

14   Q.  Okay.  And so let's look at DX 799, please.

15             So this is another exhibit from your report, right?

16   A.  Yes.  This is one of the -- the sexier exhibits in my

17   report.

18   Q.  Well, any time anybody sees mean difference and standard

19   error, they get pretty excited?

20   A.  I certainly do.

21   Q.  So this one is called Statistical Comparison of Monthly

22   Returns of At-Issue Funds and Pomerantz Benchmark Model 1.  So

23   this one is related to Model 1 alone, right?

24   A.  That's correct.

25   Q.  But you did one like this for each of the four models,

1  right?

2  A.  That's -- that's right.  There's 12 pages in this exhibit,

3  and I assessed them all.

4  Q.  Okay.  And you don't have to get into all the technical

5  stuff, but just tell us generally what we're seeing in here.

6           THE COURT:  Before we -- before we start that.  And

7  I'm just -- I'm trying to make good notes here.  So as we go

8  through this list, the flaws in DX 867, there are six

9  different points that this witness is trying to make.  The

10  first point is only attributable -- is it only attributable to

11  Model 4?  We're on the second point, differences in returns

12  are not significantly -- or statistically significant.  These

13  are all to all four of them right?  So --

14           MR. NEMSER:  They are.

15           THE COURT:  -- when we leave 1, the first point you

16  make, damages in models are not attributable to breaches, is

17  that just related to Model 4?

18           MR. NEMSER:  Well, we used Model 4 as an example of

19  the problem.  And I should -- should let Dr. Strombom explain

20  a little more --

21           THE COURT:  Yeah.

22           MR. NEMSER:  -- because it could potentially apply

23  to all of them.

24           THE COURT:  Okay.

25           MR. NEMSER:  But Model 4, as I --

1          THE COURT:  Right now, we're just talking about 4,

2     right?

3          MR. NEMSER:  Right.

4          THE COURT:  Okay.

5          MR. NEMSER:  And then this statistical significance

6     one that we're on, that's all four models --

7          THE COURT:  Yes, sir.

8          MR. NEMSER:  -- for sure.

9          THE COURT:  So that's -- that's a good framework for

10    me to make notes on.  So please go forward.

11         MR. NEMSER:  Okay.

12    Q.  Well, let me ask you, Doctor --

13    A.  Yes.

14    Q.  -- did you see problems of -- of fit between the alleged

15    misconduct and the damages calculation that Dr. Pomerantz made

16    in his other models besides Model 4?

17    A.  Yes.  I -- I think the -- the first problem, this lack of

18    measuring the effect of the -- of the alleged breach is common

19    across all four models.  We just talked about Model 4 as an

20    example, but I think it applies -- so, for example, in Model

21    1, if the issue is that there should have been passive options

22    on the menu, for example.  What Dr. Pomerantz does in Model 1,

23    for example, is to substitute passive options for every

24    at-issue fund.  So all -- he just completely replaces all the

25    active funds with all passive funds.  That has a -- that's

1   like cutting your hand off because you have a cut on your

2   finger.  There's a lot of consequences to that kind of

3   wholesale replacement that don't have anything to do with the

4   alleged breach of not offering a passive fund, if that -- if

5   that's an alleged breach.  So I think that disconnect exists

6   across all four models.

7           THE COURT:  Very good.  Thank you.

8   Q.  And another question I'd have for you, Doctor, would be,

9   you were in the courtroom when I asked Dr. Pomerantz about

10  whether he had a model for -- related to -- to the Watch List

11  and how long things were on the Watch List and when they were

12  taken off the Watch List.

13  A.  Yes.

14  Q.  Do you recall that?

15  A.  Yes, I do.

16  Q.  And Dr. Pomerantz said that he didn't have a model that

17  measured that, that he hadn't done any model that was timed to

18  the addition or removal of things from the Watch List.  Is

19  that relevant to this question as well?

20  A.  I think that's -- I do think that's right.  I don't -- I

21  don't -- his models address kind of a -- a patchwork of the

22  alleged misconduct in not a systematic way.  Some models don't

23  address many of the alleged breaches, and others address the

24  breaches in a way that's more than -- where there's more

25  change than is needed to address the alleged breach.  So I

1    think that's a general feature of -- of all of these models.

2            MR. NEMSER:  Okay.  So I think we can expand part

3    one now to -- to cover all four models.  But we're -- if Your

4    Honor is okay with it, we can move on to the discussion of

5    Model -- of part 2 here, the statistical significance?

6            THE COURT:  Yes, sir.  Please do.  And please keep

7    me posted on what we're covering so I can --

8            MR. NEMSER:  Absolutely.

9            THE COURT:  -- connect my dots.

10           MR. NEMSER:  We'll do that.

11   Q.  So I asked you, Dr. Strombom, to just tell us at a high

12   level, without getting into technical stuff too much, what --

13   what's being shown here in this Exhibit 11?

14   A.  Exhibit 11 is just -- is a detail for each of the

15   combinations that are shown here.  So the at-issue fund and

16   whatever fund it is that Dr. Pomerantz replaces it with.  And

17   then on the right-hand side is simply the result of the T-test

18   that I'm doing.  And the critical column there is the P value.

19   That's the value that you look at to determine if there's a

20   statistically significant difference.  In general, it's -- if

21   it's less than .05, the difference is considered statistically

22   significant.

23           And in this chart, I've indicated with an asterisk

24   in the far right-hand column each of those rows that are

25   statistically significantly different.  So on this page, you

1   can see there's three of them that are statistically

2   significantly different, which means that all of the others,

3   the ones that aren't highlighted or don't have an asterisk by

4   them, there's not a statistically significant difference

5   between the returns of the at-issue fund and the returns of

6   the Pomerantz benchmarks.

7   Q.  So the apparent differences for all of those others, the

8   ones who don't have the asterisk, they -- you could say right

9   now they're not real.  You can't rule out that they were

10  caused by chance?

11  A.  That's correct.  They -- they could easily be attributed

12  to just random chance.

13  Q.  And did you make a demonstrative -- it's a little easier

14  to deal with -- that summarizes your outcome for all four

15  models?

16  A.  Yes.

17  Q.  Let's call up, please, DX 870.

18          And what is this showing?

19  A.  So this summarizes the results for the four models of

20  these statistical tests that I've done.  So, for example, in

21  Model 1 and Model 4, I find that 89 percent of the at-issue

22  funds don't differ statistically from the replacements that

23  Dr. Pomerantz identifies.  And then in Models 2 and 3, it goes

24  up to 91 percent of those -- those replacement funds' return

25  does not differ statistically from the returns of the at-issue

1   fund.  And consequently, those combinations, we can't

2   attribute damages to them because we can't rule out that the

3   difference is just a result of random chance.

4   Q.  So for about 90 percent of the funds in each model, you

5   can't distinguish the differences from chance.  And so

6   those -- those comparisons, those funds can't, from an

7   economic or statistical standpoint, be generating damages; is

8   that right?

9   A.  That's correct.  We can't attribute the differences to the

10  alleged misconduct.

11          MR. NEMSER:  So I'd like to move admission of both

12  the previous one, which was DX 799, and this one we're looking

13  at right now, DX 870.

14          THE COURT:  Any objection to DX 799 and DX 870?

15          MR. ENGSTROM:  No objection.

16          THE COURT:  Thank you.  Those will be admitted.

17      (Defendants' Exhibits 799 and 870 admitted in evidence.)

18  Q.  So we can see here that there is about 90 percent that is

19  not statistically significant, but what do we do with the

20  others?  Are there damages with respect to that other 10

21  percent or so?

22  A.  That's -- that's a question.  So what we can say about

23  those is there is a statistically significant difference

24  between the performance of the two that we've identified.  And

25  the question then is, well, is that difference due to the

1  alleged misconduct?  And so because of -- it's like a gate.

2  You have to first pass the gate of statistical significance.

3  If you pass that gate, then you're in the realm of asking

4  about why is there a difference between the two that we're

5  observing.  And, you know, in the proper damages model, the

6  answer to that should be, well, it's because of the alleged

7  misconduct.

8          I think in Dr. Pomerantz's model, there are many

9  other explanations, including, for example, that the two

10  alternatives are in different asset categories and that they

11  have nothing to do with the alleged breach.  So that 10

12  percent is just really eligible now for consideration as

13  potential -- as potential damages, but there's more work to be

14  done.

15  Q.  So Dr. Pomerantz, did he do any statistical comparison of

16  these differences?

17  A.  No.  He didn't -- he didn't take this -- the step of

18  testing for statistical significance of the differences that

19  he calculates.

20  Q.  And did he, therefore -- it's going to follow that he

21  didn't, but did he do an analysis that was limited to the 10

22  percent where there was statistical significance?

23  A.  No.  No, he didn't.  And -- and he incorporated all of

24  this statistical noise, as we would call it, for 90 percent of

25  these pairings into his damage number.  And they shouldn't be

1    in there.

2           THE COURT:  So that's a -- that's the phrase you

3    would use when you look at Model 1 and say 89 percent, that's

4    89 percent statistic -- statistical noise?  Is that what --

5           THE WITNESS:  It can be explained by statistical

6    noise or just chance.  You can say chance.  But statisticians

7    like that term statistical noise, which just recognizes that

8    these returns fluctuate, and you have to make sure that the

9    differences is large in relation to the fluctuation of the

10   underlying returns in order to make a conclusion about

11   damages.

12   Q.  It's kind of like static on the radio?

13   A.  It is, yeah.  That's why they call it noise.  It's just

14   kind of in the background going on and...

15   Q.  Okay.  And so what -- what's an example of one of these

16   problems that you would have -- once you get past the first

17   gate, you've got to do this other analyses you're saying,

18   right?

19   A.  Yes.

20   Q.  And so what's an example of one of these instances where

21   there's a mapping problem of some sort with respect to one of

22   those ones where there is a statistically significant

23   difference?

24   A.  Yes.  So the -- for example, one of the differences that's

25   statistically significant -- there's many examples.  One is

1    the money market fund to stable value fund.  That line is

2    generally statistically significant.  And it should be no

3    surprise that it's statistically significant.  Those are in

4    different Morningstar categories.  They have different risk

5    and return profiles.  And the differences are sufficient that

6    they're a statistically significant difference.  If you don't

7    believe that it's, per se, imprudent to have a -- to have a

8    money market fund and if you don't think it needed to be

9    replaced by a stable value fund, then that premise is -- or

10   the thing that's driving that difference is -- is not a

11   breach.  If you don't think that's a breach, then that

12   shouldn't be included in the damage calculation.

13           THE COURT:  Is that unique to Model 4, that mapping?

14           THE WITNESS:  No.  That is across all four models.

15           THE COURT:  Okay.  Okay.

16           THE WITNESS:  Yeah.  That's right.

17           MR. NEMSER:  This is the one, Your Honor, where he

18   incorporates that mapping in Model 4, but he does a separate

19   calculation for Models 1 through 3 where he makes a similar

20   mapping.

21           THE WITNESS:  That's correct.

22           THE COURT:  Okay.

23           THE WITNESS:  That's right.  His -- his stable value

24   damages is only baked into Model 1 -- Model 4, excuse me.

25   Yeah.

1    Q.  Right.  Okay.  So let's move on to the third of your

2    items.  And, Chris, if we could go to DX 871, please.

3           So this is the one about the single but-for

4    alternative being inappropriate?

5    A.  Yes.

6    Q.  And so what do you -- what do you have in mind there?

7    A.  Well, just to take a step back, what -- what Dr. Pomerantz

8    is doing or any damage expert should be doing is saying we

9    know what happened in the actual world, we know the conduct,

10   and we know the outcome.  If we step back into the but-for

11   world and say, well, instead of what the Retirement Committee

12   did, if they had done what the plaintiffs contend they should

13   have done, what would have happened?  What would the world

14   have looked like?

15          And in this case, there's a range of possible

16   alternatives that could have existed.  So, for example, if --

17   the one I just mentioned, if the alleged breach is that there

18   weren't passive funds included in the menu, then if they had

19   included passive funds, the -- what would that have looked

20   like?  Would that have been a complete replacement of all

21   active funds with passive funds?  From what I've heard in the

22   courtroom, that doesn't seem like that would have been the

23   solution, nor would that have to have happened in order for

24   the breach to have been cured.  More likely, there may have

25   been some passive alternatives added to the menu.

1  Q.  And did Dr. Pomerantz do any kind of a -- a modeling that

2  allowed for the adding of passive funds to the menu rather

3  than the wholesale replacement of the menu with passive funds?

4  A.  No.  He -- he didn't.  And he testified that his model

5  doesn't accommodate anything except a complete elimination and

6  replacement with an alternative.  So as a damages expert, I

7  considered that to be just -- it's a flaw in the model because

8  that's clearly an option that could have been pursued that

9  would have addressed the alleged breach, but his model doesn't

10  accommodate it.  But I --

11  Q.  So Dr. -- Dr. Pomerantz, as you were saying, he does these

12  one-to-one mappings in each of his models.  So each one maps

13  the -- the Plan fund into only one other fund.  But earlier,

14  you mentioned that there's another way of doing it

15  potentially, and that's to use a range of comparators?

16  A.  That's right.  I think that's the proper way to think

17  about the but-for world is that if there's a range of

18  alternatives that the Retirement Committee might have

19  selected, if they had been acting as the plaintiff claimed

20  they should have been, then it's going -- it's really

21  arbitrary to take just one of those alternatives and say I'm

22  going to calculate damages by comparing to that one

23  alternative.

24          If there's a range of alternatives, your damage

25  model should account for the fact that there are a range of

1    alternative -- alternatives, or we would say in the but-for

2    world, there could have been not just one fund that met the

3    criteria, but there's a whole range of funds that meet the

4    criteria.  And so our damage calculation should recognize that

5    fact and accommodate this idea that it's not a one-to-one

6    mapping, but it's a one to many mapping.  There's a range of

7    possibilities and -- and -- because that just corresponds to

8    the real world and what would have potentially happened in the

9    but-for world.

10   Q.   So Dr. Pomerantz testified here in court that he had four

11   different models, each of which could have been selected

12   assuming a prudent process.  Do you recall that?

13   A.   Yes.

14   Q.   And he further testified that any plan that is a result of

15   a prudent process would be prudent; is that right?

16   A.   Yes.

17   Q.   Okay.  By the way, did he say that that was true if and

18   only if he determined what was prudent?

19   A.   He did, I think, have that caveat on it, that he was the

20   arbiter of such things.

21   Q.   And he testified that there is latitude -- that was his

22   word I think -- in the outcome of a prudent process, and many

23   possible menus could have been the outcome of a prudent

24   process.  Do you remember that?

25   A.   Yes.

1    Q.   Okay.

2    A.   I do.

3    Q.   So does that testimony from Dr. Pomerantz change your view

4    that Dr. Pomerantz's use of single comparators in his models

5    is unreasonable?

6    A.   No.  It doesn't change my view.  It just confirms this

7    idea that -- that there are many alternatives that -- that

8    would have cured the breach or would have been a proper

9    choice.

10   Q.   And do you recall whether Dr. Pomerantz testified that his

11   alternative funds were prudent?

12   A.   No.  I think he explicitly -- I'll say in general, he said

13   that he didn't make a determination as to whether the

14   alternative lineup -- the funds in those lineups were prudent.

15   So he didn't -- he's not offering an opinion about the

16   prudence of the lineups, I guess with a couple exceptions.  I

17   know he did explicitly say that he didn't think Model 3 was a

18   model that a prudent process -- that would have resulted from

19   a prudent process.  So I guess he's in some way opining

20   about -- about that one.

21            MR. ENGSTROM:  Objection, Your Honor.

22   Mischaracterizes Dr. Pomerantz's testimony.

23            THE COURT:  You don't -- he -- the statement of he

24   didn't think Model 3 was a model that a prudent process would

25   lead to, right?  That's what your objection is?

1          MR. ENGSTROM:  Correct.

2          THE COURT:  He didn't say that?

3          MR. ENGSTROM:  I believe his testimony was, in fact,

4    that there were hundreds of fiduciaries that did engage in

5    processes and had selected those funds.  And while he took

6    issue with perhaps two or three specialty funds in the model,

7    I think he overall testified that Model 3 represented, in the

8    individual choices, a very likely outcome of the prudent

9    process.

10          THE COURT:  Yeah.  I'm going to let you

11   cross-examine on that.  Mr. Nemser, do you have any -- later.

12   Do you have anything?

13          MR. NEMSER:  I do have something to say, Your

14   Honor --

15          THE COURT:  Yes, sir.

16          MR. NEMSER:  -- which is that I read him his

17   deposition in this case in which he specifically said no

18   prudent sponsor -- in his opinion, no prudent sponsor would

19   have chosen that specific Model 3 menu.

20          THE COURT:  Was that the point where I looked at

21   Dr. Pomerantz and asked if he'd like to give up a particular

22   model?

23          MR. NEMSER:  Yes.

24          THE COURT:  Was that when I did that?

25          MR. NEMSER:  That was when that happened, Your

1    Honor.

2              THE COURT:  Okay.

3              MR. ENGSTROM:  But, Your Honor, I believe -- we

4    could look at the full transcript, that related just

5    specifically to the inclusion of a -- of a fund in a gold

6    asset class within Model 3 as well as the market neutral asset

7    class.

8              THE COURT:  All right.

9              MR. ENGSTROM:  But to characterize that as his

10   opinion with regards to Model 3 I think grossly misstates his

11   testimony.

12             THE COURT:  I understand your objection.

13             MR. NEMSER:  Well, the record will tell.

14             THE COURT:  Yeah.  And we'll let you cross-examine.

15   Please proceed.

16             MR. ENGSTROM:  Thank you, Your Honor.

17   Q.  So as an expert on economic loss and damages, is it your

18   view that mapping from the existing funds into imprudent funds

19   would be an appropriate way to go about measuring damages?

20   A.  No.  I think if there's a possibility that your model is

21   using imprudent funds as the but-for alternative or

22   alternative lineup, then I don't think you have a damages

23   model because that -- this -- that can't exist.  That's not

24   what you're trying to measure.  You're trying to measure what

25   a prudent alternative would have resulted in.  So I think

1    that's a -- kind of a terminating flaw.

2    Q.   Okay.  So you've talked about how -- I think how

3    Dr. Pomerantz himself offered multiple comparators in a few

4    contexts.  Even though when he does the mappings in the

5    models, he's going one-to-one every time, he did put forward

6    some situations where he -- he seemed to accept the idea of

7    multiple comparators.  Can you give the examples that you

8    thought of?

9    A.   Yeah.  I think there -- there are three that I think I

10   would point to.  One is, if you look at each at-issue fund and

11   then look across the four models that he proposes, he has up

12   for four alternative replacement funds in each -- in those

13   models.  So he himself has identified four alternatives for --

14   up to four alternatives to each at-issue fund, which he claims

15   could have resulted from a loyal and prudent process.  So

16   that -- that's one set, just the ones that he identifies,

17   which are up to four.

18           Then, secondly, in Model 3, if you'll recall, this

19   is the model where he uses this kind of popularity criteria to

20   say, you know, if a lot of funds have these -- or, excuse me,

21   if a lot of plans have these funds, then I'm going to use --

22   he's going to use that as a criteria to say, well, that's

23   likely -- that's likely a prudent alternative.  So he starts

24   that process by looking at the five most frequently subscribed

25   funds in 401(k) plans, but then he imposes a second criteria

1  and says, well, of those five, I'm going to pick the one with

2  the most assets.  And that's the comparator that he uses in

3  Model 3.

4          But there are, in some cases, hundreds of funds

5  within any particular comparator group.  He's got the five

6  that are most widely used, and he picks one of those.  But the

7  five that are most highly used out of a hundred or two hundred

8  funds, that meets a certain level of popularity criteria to my

9  mind as well.  So I take a look at a second group, which is

10  just taking those five most popular funds that he identifies

11  within each -- I think it's the Morningstar category, and I do

12  an analysis of those.  So that's another range -- if you want

13  to think about a range of possible prudent outcomes, that's

14  another set of possible prudent choices that a fiduciary could

15  have made.

16  Q.  And is there a third example of a situation where

17  Dr. Pomerantz is working with multiple comparators?

18  A.  Yes.  The third one is -- and I'm kind of moving most

19  directly to Pomerantz to get a broader category.  But the

20  third one is for 18 of the at-issue funds, Dr. Pomerantz

21  identifies what he calls marketplace alternatives.  And

22  there's between eight and 10, I think maybe up to 12

23  marketplace alternatives that he identifies for -- this is

24  just for 18 of the at-issue funds.  It's not the entire menu.

25  And he does some analysis of those.  He -- I think he listed

1  the beta, the alpha, the information ratio, and he kind of

2  looked at some of the -- some of the statistics for all of

3  those funds.  But that -- if you want to think about a

4  range -- you know, another possible range of prudent

5  alternatives, that set of eight to 12 is another group that he

6  considered to be competitor funds.

7  Q.  And, yeah, he said those were competitive funds with the

8  at-issue funds, right?

9  A.  That's correct.

10 Q.  Okay.

11 A.  I think he also said that the -- most of those were

12 superior to the American Century option.  So these are -- I

13 mean, these are well-performing funds, according to him.

14 Q.  And this -- this is from Exhibit 5 of Dr. Pomerantz's

15 expert report?

16 A.  That's correct.

17 Q.  And I -- and at cross-examination, I took him through one

18 example, which was the Heritage Fund, the American Century

19 Heritage Fund, and showed that it -- how it compared to all

20 those other comparators that he had --

21 A.  That's correct.

22 Q.  -- in the listing?

23 A.  That's correct.

24 Q.  Okay.  So did you analyze the performance of the at-issue

25 funds, the funds that were actually on the menu, using these

1    three different types of sub -- sets of multiple comparators

2    that you just talked about?

3    A.  Yes.

4    Q.  Okay.  So let's go through -- well, let me just ask you in

5    broadest terms, what did you find?

6    A.  Well, I found that if you move from a single alternative

7    to a range of alternatives -- and, actually, any one of these

8    three ranges of alternatives, you find no evidence of economic

9    harm to the Plan or Plan participants.

10   Q.  Okay.  So I do want to go through each of the three

11   groups.  So did you make a demonstrative of your analysis

12   about the range of competitors in the four damages models,

13   Models 1, 2, 3 and 4?

14   A.  Yes.  The narrowest set, correct.

15   Q.  Okay.  Could you pull up DX 798, please, Chris?

16          Great.  So this is -- this is in your expert report,

17   right?

18   A.  Yes, it is.  It's known as the Christmas tree chart.

19   Q.  Because of all the red and green?

20   A.  Yes.

21   Q.  And there's a lot of different red and green in here,

22   right?

23   A.  There is.  There's -- there's -- there's a lot of both

24   colors here.

25   Q.  And what -- what does red mean, and what does green mean?

1    And what does it mean that there's a lot of both?

2    A.   So this -- just to orient you to this exhibit, the -- I

3    have the at-issue funds on the left-hand side, and then there

4    are four columns there, Models 1, 2, 3 and 4.  Those are

5    Dr. Pomerantz' models.  And I show for each of those models,

6    for each of the at-issue funds what his estimate of the

7    damages is.  Red means there are damages.  I see positive

8    damages.  Green means there are negative damages, which means

9    the American Century fund actually outperformed the

10   alternative.

11   Q.   And we're looking here at a setup for the April 1st time

12   period that Dr. Pomerantz included in his report.  He didn't

13   put in any but the Model 4 damages calculation for this time

14   period at trial, right?

15   A.   That's correct.  This is for the shorter time period.  And

16   this is the -- he applies the Hewitt model in the shorter time

17   period because the Hewitt report came in after the June 2010.

18   So he actually calculates damages for Hewitt on a slightly

19   shorter time period than the other ones.

20   Q.   But you also did one for the longer time period for Models

21   1 through 3, right?  And we'll talk about that in a second.

22   A.   That's correct.

23   Q.   Okay.  So -- and we'll also come back in a second to the

24   columns on the far right here.  So for the moment, what I

25   propose to do is go to a demonstrative that you created that

1   isolates on the -- on the -- I think it's the second row

2   there, American Century Disciplined Growth Fund?

3   A.  Yes.

4   Q.  And just use that as an example to talk about how you're

5   thinking about what's on --

6   A.  Yes.

7   Q.  -- the -- DX 798.  And so if we could call up, Chris, DX

8   872, please.

9           So what is shown here?

10  A.  So this is just kind of the detail behind that second line

11  on the graph we were just looking at.  And this is for the

12  American Century Disciplined Growth Fund.  It shows for each

13  of Dr. Pomerantz' four models the four alternatives that he

14  selects.  So the Vanguard Growth Index Fund in Model 1; the

15  Vanguard Institutional Index Fund in Model 2; in Model 3,

16  Fidelity Contra; in Model 4, the American Century Growth Fund.

17          So for the American Century Disciplined Growth Fund,

18  he's identified four options that I'm using here as the range.

19  And what I'm essentially asking is, did the American Century

20  fund perform within the range of the alternatives that

21  Dr. Pomerantz contends could have resulted from a loyal and

22  prudent process.  In this case, the fund did in -- for two of

23  the options, options Model 1 and Model 3, the American Century

24  fund underperformed the benchmarks.  But in two of the models,

25  Model 2 and Model 4, the American Century fund outperformed

1    the index.  So if I'm asking the question did the American

2    Century fund perform within the range, what I'm really asking

3    is did it perform better than a minimum performing fund out of

4    the four reasonable alternatives.  And in this case, the

5    answer is yes, it performed better -- well, actually in this

6    case, better than two.  I guess I put that mark on there.

7    Q.   So -- so on Model 4, that one, the American Century

8    Disciplined Growth outperformed Dr. Pomerantz's comparator,

9    the American Century Growth Fund, by $114,000, right?

10   A.   That's -- that's correct.

11   Q.   And so that puts it in the range among these four, in the

12   sense that it was -- it was better than at least one, and, in

13   fact, it was really better than two, right?

14   A.   Yes.  Exactly.  In this case, it fell within the range,

15   that is to say -- an alternate way of saying that is it

16   performed better than the minimum performing of the three

17   alternatives.

18   Q.   Okay.

19   A.   Just -- just as an aside, I'll volunteer here that I'm

20   ignoring statistical significance because in this example,

21   there's no statistically significant difference between the

22   Disciplined Growth Fund and any of these four funds.  So I'm

23   sort of adopting Dr. Pomerantz' practice of not considering

24   that, but I think properly, we should just sort of eliminate

25   this Disciplined Growth Fund from consideration for damages

1   because it's not statistically significantly different than

2   any of the benchmarks that Dr. Pomerantz identified.  But

3   that's an aside.

4   Q.  And by the way, and sort of in the same vein, when you're

5   using the comparators that Dr. Pomerantz came up with were

6   Models 1, 2, 3 and 4, are you endorsing those as good

7   comparators?

8   A.  That -- that's a good point.  I think there's two points

9   to be made here.  I'm just accepting these at face value.  As

10  we'll talk about later, I think there are many instances where

11  the comparator fund is not an appropriate fund to compare to.

12  But for the time being, I'm ignoring that.  And then I'll just

13  say secondly that this model is -- is really overly

14  restrictive because I'm only looking at the four alternatives

15  that Dr. Pomerantz explicitly endorses.  And he himself

16  acknowledges that there's lots of other funds out there that

17  could be prudent funds.  So this model, by its nature, is

18  overly restrictive.  But we're just going to take it as it is

19  and just look at these four -- four options.

20  Q.  Okay.  Let's see where we are here.  So let's go back to

21  the DX 798 now where we're looking at -- this is pages 1 of 3.

22  So it goes on for three pages.  You pick up all the at-issue

23  funds, right?

24  A.  That's correct.

25  Q.  Okay.  So what is going on in these right-hand columns of

1    this DX 798?

2    A.  So in the right-hand column, I'm -- I'm testing just what

3    I -- what we were talking about.  I'm asking the question, did

4    the at-issue fund perform within the range of these four

5    options?  And in particular, did it perform better than the

6    minimum of the four options that I'm seeing here?  And if

7    it -- and so I -- I -- in the second to the right-hand column

8    where I say minimum damage amounts, I answered that question.

9    And if the answer is it's performing worse than the minimum

10   alternative, then I pick up the damage number for the -- the

11   minimum performing model.  And if it's performing better, then

12   I pick up the -- the difference in green on the right-hand

13   column.

14        So maybe an example would be helpful.  We were just

15   looking at the American Century Disciplined Growth Fund, which

16   is the second row in this column.  And we saw that the minimum

17   performing model for Dr. Pomerantz is the one that generates

18   either the largest green number or the smallest red number, is

19   the way I think about it.  So the largest green number is

20   Model 3 -- Model 4.  That's the minimum performing of the

21   alternatives, and that's the difference between how the actual

22   fund performed and that minimum performing alternative that

23   Dr. Pomerantz identifies.

24        So I take that value.  And in that case, it's

25   $114,000 positive.  And I report that in this column labeled

1   minimum damage amount.  So that says if we use this minimum of

2   the range as the -- as the point at which we say the -- if the

3   process had been loyal and prudent, the fund could have

4   performed like that fourth fund.  And we're reporting it here

5   in the minimum damage amount column.  So that's what I'm doing

6   across this line.

7           If you look at the first row, that's an instance

8   where all of the alternatives in Dr. Pomerantz' outperformed

9   the American Century option.  So in that case, I pick up

10  the -- the minimum performing alternatives in Model 3.  That's

11  $21,000 of damages.  That's a positive damage number.  So

12  that's an example of how -- how this table works.  And I -- I

13  do this for every at-issue fund and determine what the implied

14  damages are.

15  Q.  And so I want to come back to this issue about the

16  minimum.  But before we -- we go there, I just want to talk

17  about totals.  And if we could go to page 3.  What do you

18  find?

19  A.  Well, when I -- in the second to the right-hand column, if

20  I sum up all of those -- those calculations of damages,

21  positive and negative, I arrive at the conclusion that there

22  are no damages when you compare the at-issue fund against this

23  range of four alternatives.  And that's because the bottom

24  right-hand number, 18,000 there, is negative.  So that means

25  there's negative 18,000 -- or, excuse me, $18 million in

1    damages, using this range of comparators as opposed to just a

2    single individual comparator.  And you can see -- if I just

3    stay along that line, you can see the damages that Dr.

4    Pomerantz calculated in each of his four models by looking

5    just at a single comparator.  And those, as we know, are

6    between 8 million and 29 or so million dollars when you're

7    looking just at a single alternative rather than all of the

8    alternatives that he's identified.

9    Q.  So why is it -- well, let's go back to page 1, just so we

10   can focus back on disciplined growth as just an example.  Why

11   does it make any sense to use this minimum?  Why do you get to

12   pick the lower one?

13   A.  Well, because the -- the question is, if the -- if it

14   had -- if the process had been loyal and prudent, and there

15   was a range of alternatives that may have been selected, and

16   if the at-issue fund performed within that range, then it

17   performed within the range that we could have experienced in

18   the but-for world without the breach.  And consequently, as

19   long as it's in that range, we can't -- we can't assume there

20   are any damages because that's an outcome that we could have

21   experienced with a loyal and prudent process.

22   Q.  So -- so here, on this Disciplined Growth, when you're

23   looking at the Model 4 one, the at-issue fund there,

24   Disciplined Growth, performed $114,000 better than another

25   fund, which Dr. Pomerantz says came out of the prudent and

1    loyal process?

2    A.   That's correct.  That's right.

3    Q.   And so -- and similarly, when you look at the previous

4    line, you would say that, well, the -- the Capital

5    Preservation Fund, I think it is, performed $21,000 worse than

6    the -- the one which could -- would have resulted from a

7    prudent process as well?

8    A.   That's right.  If we -- if we take the sort of restrictive

9    view and just for the moment, say, okay, well, let's assume

10   that a prudent process -- there's only alternatives that would

11   have produced, that could have come from a loyal and prudent

12   process, and the four that Dr. Pomerantz identified, then the

13   Plan members would have been better off with one of those four

14   alternatives than -- actually, all of those four alternatives

15   than with the at-issue fund.  And, therefore, there are

16   damages in this -- in this model if -- if you make that

17   assumption.

18            And you can see in the right-hand column, the second

19   to the right-hand column there, you know, there are a number

20   of those that fall below the -- the minimum.  I'll just

21   volunteer, there are also a number that fall above the maximum

22   where the American Century outperformed all of the funds that

23   Dr. Pomerantz identified.  So they're on both sides.

24   Q.   And just to -- to -- I don't want to have to call this

25   back again in a few minutes, and so I will just ask, if you

1    look across a row here, for -- for many of these rows, you see

2    green and red --

3    A.   Yes.

4    Q.   -- in the same row?

5    A.   Yes.

6    Q.   That's what happened in Disciplined Growth, but that

7    wasn't unusual, right?

8    A.   That's right.  There were many of these lines where you

9    see if you look at the different models, some of the models

10   show damage associated with an at-issue fund, and other of

11   Dr. Pomerantz', for the same fund, show no damages or positive

12   damages.  So this is the inconsistency that I --

13   Q.   And we'll come back to that in a second.  I just wanted to

14   be sure that the Court had a chance to see what this thing

15   really looks like.  And we can obviously call it back if we

16   need to, but I'd prefer to -- for timesaving to skip it.

17            MR. NEMSER:  So at this point, I would move DX 798

18   into evidence.

19            THE COURT:  Any --

20            MR. ENGSTROM:  No objection.

21            THE COURT:  798 is admitted.

22            MR. ENGSTROM:  Oh, I'm sorry, Your Honor.  I do have

23   an objection.

24            THE COURT:  Sure.

25            MR. ENGSTROM:  In that this analysis is only from

1    April 2011 to June 30, 2017.  And Models 1 through 3 of

2    Dr. Pomerantz's analysis, at least what's in evidence and been

3    offered as testimony, only start from July 1st, 2010.  So I

4    would actually object on the grounds that it's misleading in

5    light of which models have actually been introduced into

6    evidence.

7              MR. NEMSER:  Well, I was just about to offer --

8              THE COURT:  Hold on.

9              MR. NEMSER:  I'm sorry, Your Honor.

10             THE COURT:  That's all right.  You agree that he did

11   it -- had a different time frame for Model 4, right?

12             MR. ENGSTROM:  Sure.  And in his report, he did a

13   version of Models 1 through 3 starting from April 2011, but

14   they have not been offered into evidence in this case.

15             THE COURT:  Okay.

16             MR. ENGSTROM:  And so, I mean, with the caveat that

17   these are looking at models that are not actually even in

18   evidence in this case, at least as to Models 1 through 3, I'm

19   fine with it being admitted.

20             THE COURT:  This is in his expert report, though,

21   right?  You agree with that?  That you reviewed.

22             MR. ENGSTROM:  Dr. Pomerantz's original expert

23   report contains two calculations for every model, one with a

24   start date of July 1, 2010, and one April 1, 2011.  But that's

25   not what's been offered into evidence is all I'm saying.

1          THE COURT:  And -- but your -- my question is, you

2     reviewed this report before you came here today?

3          MR. ENGSTROM:  Sure.

4          THE COURT:  Because this is what this witness came

5     up with.  And is this -- I mean, is this leading me to a place

6     that's not accurate?  Is that the problem?  Or it's just the

7     time frame we're talking about?

8          MR. ENGSTROM:  It's leading you to a place that's

9     not accurate because it gives -- it gives a measurement as to

10    the minimum damages, or at least using the worst performing

11    funds as to four models.  And three of those four models are

12    not models that they introduced into evidence in this case.

13         THE COURT:  So he -- this witness has just testified

14    that if we add the right-hand columns, that the number we get

15    is on I think page 3 of this, $18,161,259 to the good under

16    his version of this.  You're saying that that -- would it be

17    completely different number in favor of the plaintiffs?

18         MR. ENGSTROM:  Well, I'm sure -- I believe

19    Mr. Nemser is probably going to get to it, but this exhibit

20    itself, three -- I don't have any qualms with his math.  The

21    issue is that models -- the columns in Models 1, 2 and 3,

22    those are not models that have been introduced into evidence

23    in this case because they use different start dates than any

24    model that Dr. Pomerantz testified about or any exhibit that's

25    been given.  So it's just --

1          MR. NEMSER:  May I -- may I -- I'm sorry.

2          THE COURT:  Go ahead, Mr. Nemser.

3          MR. NEMSER:  May I -- yeah.  Please.

4          THE COURT:  Yes, sir.

5          MR. NEMSER:  Your Honor, I started with this one

6     because it's got all four.  And as Mr. Engstrom is correctly

7     saying, the other one, the shorter one -- or, I'm sorry, the

8     longer time period has only Models 1 through 3.  So it seemed

9     like the less informative example.  My next thing to do is to

10    offer the one that covers the longer time period in which the

11    result is exactly the same.  So I -- that's where I am.

12          MR. ENGSTROM:  Your Honor, with the understanding

13    that this uses -- that Exhibit 798 uses a version of Models 1

14    through 3 that are not in evidence, I'll withdraw my

15    objection.

16          THE COURT:  798 is admitted.  Thank you.

17       (Defendants' Exhibit 798 admitted in evidence.)

18          MR. NEMSER:  Thank you.

19    Q.  So you -- did you repeat the analysis that you did in 798

20    for the longer time period, which began in June 30th, 2010?

21    A.  Yes.

22    Q.  Okay.  And if -- Chris, if we could call up DX 797,

23    please.

24          And so briefly, you know, what are we seeing here?

25    A.  This is the exact same type of analysis.  It's for the

1   longer time period.  Dr. Pomerantz's model for Model 4 doesn't

2   extend back to the beginning of this period.  So in this case,

3   there's really -- there's only three models that I'm comparing

4   against because he only calculates damages back to June of

5   2010 for these three.

6           So this is an even more kind of restrictive set.

7   Instead of four potential funds that Dr. Pomerantz identifies,

8   we're only looking at three potential alternative funds that

9   he -- that he calculates.  But the logic and the -- and the

10  conclusion is the same for this longer time period.

11  Q.  So even for the Models 1, 2 and 3 results, which

12  plaintiffs have chosen to offer in evidence, to the exclusion

13  of the shorter period results for those models, what did you

14  find in total?

15  A.  If we can go to page 3 of this --

16  Q.  Sure.

17  A.  -- exhibit.  For this model, the result is no indication

18  of harm or economic loss to the -- to the Plan members.

19  Essentially, they're to the good about a little over $11

20  million.

21          MR. NEMSER:  Okay.  I move to admit DX 797.

22          THE COURT:  All right.  797 is admitted.  Thank you.

23      (Defendants' Exhibit 797 admitted in evidence.)

24  Q.  Okay.  So that was your -- the first multiple comparator

25  set that you talked about.  And then the next one involved the

1    top five funds, the most popular, most widely used funds in --

2    in plans with more than $250 million in assets, right?

3    A.   Correct.

4    Q.   Okay.  So I think we've already had explanation of what

5    these top five are.  So I'm -- we'll just propose to move

6    right to the demonstrative that shows what you -- your

7    analysis was for the top five.  But let me just ask before

8    that, was your analysis for the top five essentially similar

9    to your analysis for the Pomerantz comparators in the model?

10   A.   Yes.  I'm -- again, I'm -- I'm asking the question if we

11   compare against a range of logical alternatives, do we get a

12   different answer than if we just pick one of the funds

13   arbitrarily and say we're going to compare against that one.

14   So I use the same methodology, but instead of looking at the

15   four alternatives that Dr. Pomerantz identifies in his four

16   models, I'm now looking at the set of five most popular funds.

17   The logic, the math is all the same.

18   Q.   Okay.  And so, Chris, if we could call up DX 804, please.

19          And is 804 another exhibit from your report?

20   A.   Yes, it is.

21   Q.   Okay.  And so are we looking here -- so column 1 shows the

22   relationship between the at-issue fund and one of the five

23   funds?

24   A.   That's correct.

25   Q.   And then you have a similar thing across the row for each

1    of the five funds in the top five, right?

2    A.   That's correct.

3    Q.   And then you show on -- on the theory that a prudent and

4    loyal process could have yielded any of those top five funds

5    on that assumption, you reasoned that you would pick the

6    minimum damage amount?

7    A.   Yes.  For the same reason.  Because the question is, did

8    the actual fund performance fall within the range that we

9    would expect from a loyal and prudent process.  And the way we

10   test that is to say was -- was it more, did it perform better

11   than the minimum performing of the five that we're identifying

12   here.

13   Q.   And so if you take the second line on this one for

14   Disciplined Growth, if we look across, we see there's --

15   there's one red, I guess, and the rest are green.  And the one

16   on the -- Fund 5, the Disciplined Growth Fund outperformed

17   the -- this popular fund by about $228,000?

18   A.   That's correct.

19   Q.   And so that's the -- the -- the range of potentially

20   prudent outcomes?

21   A.   That's right.  That option -- that -- in this case, Fund

22   No. 5 established the minimum of the range.  And so that's the

23   one we're comparing against.

24   Q.   And so you then inserted that $228,000 in your farthest

25   right column?

1   A.  I did.

2   Q.  Okay.

3           THE COURT:  Can I ask you a question?

4           MR. NEMSER:  Sure.

5           THE COURT:  So these top five funds -- never mind.

6   I understand.  I've just -- thank you.  I withdraw my

7   question.  It hasn't been asked yet, but go ahead.  Sorry.

8           MR. NEMSER:  Okay.

9   Q.  So what did you get for a total?

10  A.  If we can go to the bottom here.  So comparing against

11  these most popular funds, I find that the -- the at-issue

12  funds the American Century options outperformed the minimum of

13  the range by about $39 million.  So the Plan members were $39

14  million to the good relative to the -- the range that these

15  funds represent.

16  Q.  So when you compare to the Pomerantz comparators, it ends

17  up with negative damages?  And when you compare to the top

18  five, Dr. Pomerantz's top five, you also end up with negative

19  damages?

20  A.  Yes.

21  Q.  Okay.  So let's -- let's look at the last category that

22  you talked about, and that had to do with those marketplace

23  alternatives?

24  A.  Yes.  These are the 8 to 12 marketplace alternatives that

25  Dr. Pomerantz identifies for 18 of the at-issue funds.

1          MR. NEMSER:  All right.  I guess I should -- if I

2     haven't already, I should move this one on -- with the top

3     five into evidence.  Chris, could you flip to the first page?

4     It's DX 804.

5          THE COURT:  Any objection to DX 804?

6          MR. ENGSTROM:  No objection.

7          THE COURT:  DX 804 is admitted.  And we're moving

8     now to number 5 of his first DX 867 basically, right?  So I

9     can track?  Okay.

10         (Defendants' Exhibit 867 admitted in evidence.)

11    A.  And I should say we also did this analysis of the five for

12    the -- for the longer time period as well.

13    Q.  Right.  I think this is DX 803.  Let's pull that one.  See

14    if that's the -- yeah.

15         So this is -- is this the one for the other time

16    period?

17    A.  Yes.  This starts in June 30, 2010.

18    Q.  Okay.  And what did you get on this one?

19    A.  If we go to the bottom of the slide, we can see it's --

20    again, it's negative damages, in this case, $46 million to the

21    good --

22    Q.  Okay.

23    A.  -- with the American Century options.

24    Q.  All right.  So --

25         THE COURT:  Could you go back?  I'm sorry.  Could

1    you go back to that last page again, sir?  I was writing that

2    down.

3              MR. NEMSER:  Absolutely.

4              THE COURT:  Thank you.  One moment, please.

5              MR. NEMSER:  Sorry, Judge.

6              THE COURT:  You're fine.  Please proceed.  We have

7    about 50 until the next recess.

8              MR. NEMSER:  Okay.

9              THE COURT:  I'll just give you a heads up there.

10   Q.  And just to be clear, what -- we're still in the realm of

11   the single but-for alternative, right?

12   A.  Yes.  We're talking about if you expand a single but-for

13   alternative to a range, do you get the same answer as

14   Dr. Pomerantz got in terms of damages.

15   Q.  But if you -- you get -- you don't get the same answer as

16   Dr. Pomerantz?

17   A.  Yeah.  The question is do you.  And the answer is, no, you

18   don't.  You conclude that there is no -- there is no economic

19   loss suffered by the Plan members as a result of having the

20   American Century Plan -- actual Plan menu.

21   Q.  And you did take a look at the -- a third kind of range,

22   right?  That's these marketplace alternatives?

23   A.  Yes.

24   Q.  All right.  And these are the ones that I asked

25   Dr. Pomerantz about on cross-examination from his Exhibit 5 in

1   his report?

2   A.   Yes.

3   Q.   And just to kind of put it up there, if we could go to

4   page 77A of the Pomerantz report, Chris.

5            So this is something that we looked at during the

6   cross-examination.  And it's a piece of Dr. Pomerantz's

7   Exhibit 5.  It's actually one page running on to another,

8   which is why it's divided that way.  But this is a -- a chunk

9   of that exhibit, right?

10  A.   Correct.  It's the lines that correspond to the

11  marketplace alternatives for the American Century Heritage

12  Fund.

13  Q.   And so when you were looking for marketplace alternatives

14  to the American Century Heritage Fund, you looked in this one

15  to the list below, where it talks about Heritage, right?

16  A.   That's correct.  I think there were 11 alternative --

17  marketplace alternatives that Dr. Pomerantz identified in this

18  instance.

19  Q.   Okay.  And then you're going to compare Heritage to each

20  of those 11 in a way -- is that in a way similar to the way

21  that you did it the previous two times?

22  A.   Yes.  Exactly the same way.  I'm just now comparing to

23  this group of -- of alternatives.

24  Q.   Okay.  So in your report, is there a demonstrative to show

25  that analysis?

1    A.   Yes, there is.

2    Q.   Okay.  Let's pull up DX 805, please.

3              Tell us about DX 805.  It doesn't look like the

4    same.  It's not a Christmas tree chart.

5    A.   That's right.  There's just -- there's too many columns to

6    display it the same way I displayed the other ones.  So in

7    this case, there's between 8 and 12 columns.  So the

8    calculation is the same, but here I just report the minimum

9    alternatives.  So for each of the 18 at-issue funds, I

10   identify what the return was for the at-issue option.  And

11   then I identified the range for the 8 to 12 marketplace

12   alternatives that Dr. Pomerantz identified.  And in those

13   columns with the check mark, I asked the question, did the

14   at-issue fund perform within the range that was observed for

15   these marketplace alternatives.  And I find that in all 18

16   cases, the answer is yes.

17   Q.   In all 18 cases?

18   A.   In all 18 cases, the at-issue fund performed within the

19   range of the marketplace alternatives.

20   Q.   And when you looked at the minimum returns in aggregate,

21   is that down at the bottom of the page?

22   A.   That's right.  So that's the same calculation that I did

23   for the other groups of -- the other two ranges.  And I find

24   damages of negative $38 million or $39 million.  So the

25   American Century Plan participants were $39 million to the

1    good relative to the minimum of these alternatives.

2    Q.  And so this -- this was -- this exhibit -- or not quite

3    yet an exhibit -- DX 805 is from your report?

4    A.  Correct.

5    Q.  And did you convert the information that's contained in DX

6    805 into a -- a visual representation of it?

7    A.  Yes, I did.  I took this data, and I displayed it in a

8    graphic form rather than a tabular form.

9    Q.  Did you do anything different by way of analysis?

10   A.  No.  The values were taken right off this page.

11   Q.  And did you essentially use a piece of software that just

12   converts the tabular display to a -- a graph?

13   A.  Yes.

14              MR. NEMSER:  Well, let me actually move the Exhibit

15   805 into evidence, please.

16              THE COURT:  Any objection?

17              MR. ENGSTROM:  None.

18              THE COURT:  805 is admitted.

19        (Defendants' Exhibit 805 admitted in evidence.)

20   Q.  So now, if we can call up DX 891, please.

21              What is this?

22   A.  This is just a -- a graphical display of the data that was

23   on the exhibit we were just looking at.  So I've listed on the

24   left-hand side the 18 at-issue funds that Dr. Pomerantz

25   identified.  Then for each of those, you can see the two gray

1    dots and the line connecting them, that's the range of

2    performance of those marketplace alternatives.  And then the

3    blue, I guess it's a rectangle or diamond, identifies where

4    the American Century fund performed within that range or, in

5    some cases, it was beyond the range.

6           So you can see, for example, the Ultra Fund, the

7    range of cumulative annualized returns was somewhere around 13

8    to 19 percent for those alternatives.  And the American

9    Century Ultra Fund fell a little bit above the midpoint for

10   that range.

11          THE COURT:  So the ranges -- if we go down to the

12   bottom, Disciplined Growth --

13          THE WITNESS:  Yes.

14          THE COURT:  -- your blue diamond represents where

15   the American Century fund was in comparison to the range of

16   the alternatives, plural, or one alternative?

17          THE WITNESS:  To the alternatives.  So in that case,

18   there were, I think, 10 or 11 marketplace alternatives.  And

19   so all of those 10 alternatives fall between that left-hand

20   gray dot and the right-hand gray dot.  So that's the range

21   that's established by -- by those marketplace alternatives.

22   And as you can see, they -- they kind of move around similarly

23   and because they're -- they're in the same Morningstar

24   category.  They have kind of similar returns.  But this is --

25   just allows you to eyeball where the -- the American Century

1  fund fell within the range of all of those marketplace

2  alternatives.

3  Q.  And if you look at real estate, which is about five down

4  from the top --

5  A.  Yes.

6  Q.  -- that one looks a little different because the blue is

7  over to the right of --

8  A.  Yeah.

9  Q.  -- the -- of the interval?

10  A.  Yes.  That's right.  So the -- all of the -- I'll say it

11  the other way around.  The American Century option

12  outperformed all of the marketplace alternatives that

13  Dr. Pomerantz identified for the American Century real estate

14  fund.  And that's why the -- the blue diamond is outside

15  the -- the bar for the competitive -- the alternative plans.

16  Q.  All right.  So -- so the -- the upshot with respect to the

17  marketplace alternatives was that the performance of the

18  American Century fund was within the range for all 18 of the

19  marketplace alternatives, right?

20  A.  That's correct.

21  Q.  And that if the damages had been totaled up just for those

22  18, which were the only ones we had information about in terms

23  of marketplace alternatives, the total damages for those would

24  have been negative?

25  A.  That's correct.

1          MR. NEMSER:  I move admission of DX 891.

2          THE COURT:  I think we admitted that already.

3          MR. NEMSER:  Oh, I think we admitted the underlying

4    tabular one.  This is the graph.

5          THE COURT:  Okay.  I'm sorry.  891.  Any objection?

6          MR. ENGSTROM:  No objection.

7          THE COURT:  Thank you.  It's admitted.

8          (Defendants' Exhibit 891 admitted in evidence.)

9          MR. NEMSER:  So I'm -- if we're getting close, Your

10   Honor, it might be a place to stop, or I could just --

11         THE COURT:  Well, we weren't going to take a recess

12   until 3:00.  I think -- I meant to say 50, and I may have said

13   15.  I'm sorry, Mr. Nemser.

14         MR. NEMSER:  Oh, okay.

15         THE COURT:  So we've got until three o'clock.  That

16   gives us another 40 minutes.  Thank you, sir.

17         MR. NEMSER:  Oh, great.  Happy to go on.

18   Q.  So after -- after doing these three comparisons across the

19   range of comparators, the three different ranges that you did,

20   what's your conclusion?

21   A.  My conclusion is that if we relaxed this what I think is

22   an inappropriate assumption that there's just a one-to-one

23   comparison, and we actually consider the -- the real world

24   alternative, that there's a range of prudent and loyal

25   alternatives, then we have to conclude that there's no

1  evidence that the Plan or its participants was harmed by the

2  American Century options that were actually on the menu.

3  Q.  Okay.  And just for completeness, could you pull up DX

4  806, please, Chris?

5            And so is this a calculation similar to the one we

6  were looking at for the other time period?

7  A.  That's right.  This is for the shorter time period.

8  Q.  And does this too show that the total damages for these

9  were negative and that all of them were -- all of the American

10 Century funds were within the range?

11 A.  Yes.  That's right.  And it shows negative damages of 34.4

12 million.  So 34.4 million to the good relative to the minimum

13 of the range.

14            MR. NEMSER:  Okay.  So I move to admit DX 806,

15 please.

16            THE COURT:  Any objection?

17            MR. ENGSTROM:  Your Honor, same objection as before,

18 that again this uses a start point that is inconsistent with

19 Dr. Pomerantz's models.

20            THE COURT:  Same ruling as before.  This will be

21 admitted.  Thank you.

22       (Defendants' Exhibit 806 admitted in evidence.)

23 Q.  So the next of your flaws that you talked about, Doctor,

24 was inconsistent damages across models.  And, Chris, if you

25 could bring up DX 873, please.

1         So inconsistent results across models.  What's that

2    about?

3    A.  Well, this is -- my conclusion here is based on looking at

4    Dr. Pomerantz's estimate of damages for a particular at-issue

5    fund across his four models.  And as we saw in the Christmas

6    tree chart, there are many instances where a couple of the

7    models indicate damages, a couple of the models indicate no

8    damages or, you know, any combination of all four indicate

9    damages or not.  But there's -- there's -- if you look across

10   those -- those rows, you'll see combinations of red and green,

11   which indicate that he's getting an inconsistent measure of

12   whether there are damages or not, depending on which

13   particular alternative he looks at.

14        And then, in addition to that, even when, for

15   example, there happen to be all the -- say they're all the

16   same color, so there's all damages in a particular row, many

17   times they're -- they're significantly different estimates of

18   damages.  So it may be a small value and a very large value,

19   even though they're both measures of damages.  But that's an

20   artifact of just comparing to a single alternative.  And it --

21   it represents an inconsistency, or it shows an inconsistency

22   across the models, which is, to a damaging expert, that's a

23   troubling conclusion.

24   Q.  So -- so do you have an example -- well, a troubling

25   conclusion why?

1  A.  Well, because it indicates that what you're measuring in

2  your damage model is probably not the conduct that you're

3  trying to -- to measure.  Because if you're measuring the same

4  thing across all of those models, you should get a similar

5  result, or at least you should ask the question, well, why am

6  I getting a different result here?  Does this make sense?  And

7  there's not a good explanation for many of those instances.

8  And so it's just a -- a symptom of the various other problems

9  that -- that I think Dr. Pomerantz's models have.

10 Q.  And so do you have an example you can give?

11 A.  I do.

12 Q.  What -- what's an example?

13 A.  Well, let's see.  I mean, gold is -- is a great example

14 where we have a couple of models where there are negative

15 damages associated with gold and a couple of models where

16 there are damages from 9 to $14 million or so.  That's a big

17 inconsistency across models.  In terms of the magnitude, I

18 think that might be the biggest example.  But it's not the

19 only example.  There are many examples.

20 Q.  So let's pull up DX 874, please.

21      Does this illustrate the point that you were just

22 making --

23 A.  Yes.

24 Q.  -- about gold?

25 A.  Yes, it does.

1     Q.   How -- how does it illustrate it?

2     A.   So Dr. Pomerantz for the -- the American Century Gold Fund

3     chooses -- across his models, he actually chooses four

4     different benchmarks to calculate damages.   In three of those,

5     Models 2, 3 and 4, he finds damages, but in Models 3 and 4,

6     those damages are, you know, on the order of 9 to $14 plus

7     million.   In Models 1 and 2, he finds in one case, Model 1,

8     there's negative damages, in Model 2, there's small positive

9     damages.   And it's -- it's just an inconsistency of -- of what

10     he's estimating as damages for the gold fund across the four

11     models.

12     Q.   And is the information in DX 874, is that -- that table in

13     your report?

14     A.   Yes, it is.

15     Q.   And did you -- well, so what -- what do these large swings

16     tell you?

17     A.   Well, in this case, what they tell me is there's an

18     inconsistency across models.   It's pretty clear what's going

19     on here.   In Model 1 and 3, Dr. Pomerantz has chosen a

20     comparator that actually has something to do with gold.   And

21     so when you compare the gold fund against something that has

22     to do with gold, you see that it performed, you know, about

23     like those other gold indexes.

24            In Models 2 and 4, he compares in Model 2 to the

25     Vanguard Total International Stock Fund, and in Model 4 to the

1  American Century Global Growth Fund.  So these -- these as

2  we've -- I think we've talked about don't -- don't have

3  anything to do with gold.  These are just general equity

4  indices.  So what he's measuring in those two is just the

5  difference in performance between these broad equity indices

6  and gold.

7  Q.  And did you make a graph demonstrative that -- that

8  illustrates the point over the class period of -- of how

9  different the Model 1 and Model 3 comparator were from the

10  Model 2 and Model 4 comparators?

11  A.  Yes.  For the comparators that Dr. Pomerantz identified,

12  the ones that are listed here in the top row of this table.

13  Q.  And so, Chris, if you could bring up DX 877, please.

14          So what does this show, Doctor?

15  A.  This shows -- from the longer period starting in June of

16  2010, it shows the relative performance of -- there's

17  actually -- it's hard to see, but there are five -- five

18  options here.  The American Century Gold Fund is in blue, and

19  that tracks, as you can see, these other two gold-related

20  index -- indices, the New York Stock Exchange Gold Miners

21  Index and the Fidelity Select Gold Fund.  So you can see if

22  you're comparing the American Century Gold Fund against

23  gold-related indices or another gold mutual fund, it's

24  tracking very closely over time to the -- to the actual

25  performance of the -- of the gold index.  And that's why we

1    saw on the prior slide the damages amounts are small.  One is

2    positive, one is negative.  But these are essentially

3    performing similarly.

4            In contrast, if you -- the upper two lines

5    reflect -- I think the top one is the American Century Global

6    Growth Fund, and the second to the top, the one that ends at

7    $1.62 is the Vanguard International Stock Index Fund.  Those

8    don't have anything to do with gold.  They track a broad index

9    of equities.  And equities did pretty well over this period.

10   So those are going up and to the right.  And the vertical

11   distance between the American Century Gold Fund here and each

12   of these alternatives is -- is equivalent to the damages that

13   Dr. Pomerantz estimates.  So this just demonstrates the

14   importance of -- of what fund you're comparing against if

15   you're looking only at one option.  And that's what's driving

16   the difference here for gold.

17   Q.  And so you have -- you have three lines down toward the

18   bottom that tightly track each other?

19   A.  That's right.  In fact, sometimes you can't really tell

20   them apart.

21   Q.  And then you have two others that seem to be off on their

22   own detour?

23   A.  That's correct.

24           MR. NEMSER:  Okay.  I move to admit eight -- DX 877.

25           MR. ENGSTROM:  No objection.

1        THE COURT:  Thank you.  877 is admitted.

2        (Defendants' Exhibit 877 admitted in evidence.)

3    Q.  And did you come up with just one other illustrative

4    example with respect to this inconsistency point?

5    A.  I think I did.

6    Q.  Related to U.S. Value Yield Equity Trust?

7    A.  Oh, yes, that's right.

8    Q.  Okay.

9        MR. ENGSTROM:  Objection, leading.

10        THE COURT:  Overruled.

11   Q.  DX 875, please.

12        So what does this one show?

13   A.  So this is a similar comparison.  This is taken from the

14   Christmas tree chart that just shows for the U.S. Value Yield

15   Equity Trust, the American Century fund, the four comparators

16   that Dr. Pomerantz uses in his four models.  So in Model 1,

17   it's a Vanguard Value Index; Model 2, the Vanguard

18   Institutional Index; in Model 3, it's the Dodge & Cox Stock

19   Fund; and in Model 4, he maps it into the American Century

20   Equity Income Fund.  So in Model 4, there's no calculation of

21   damages here because this is for the longer period, or let's

22   see --

23   Q.  It's both periods I think.

24   A.  Whoops.  Excuse me.  I hope somebody knows how to erase

25   those marks.

1          THE COURT:  You have control of that, Mr. Nemser.

2          MR. NEMSER:  Oh, do I?

3          THE COURT:  Yes, sir.  Okay.  There you go.

4          MR. NEMSER:  Great.

5    A.   But this illustrates -- this is just another example of --

6    it's the same at-issue fund, and depending on which particular

7    comparator you choose, you either find damages of $1.8 million

8    or negative damages of $1.4 million.  So it's -- it's a big

9    range.  And it's -- it's just dependent upon which particular

10   index you happen to choose.

11         MR. NEMSER:  All right.  I move to admit DX 875,

12   please.

13         THE COURT:  Any objection to 875?

14         MR. ENGSTROM:  No objection.

15         THE COURT:  Thank you.  It's admitted.

16      (Defendants' Exhibit 875 admitted in evidence.)

17   Q.   And did you look at the differences in damages across the

18   models for the other at-issue funds?

19   A.   Yes, I did.

20   Q.   And overall, what did you find?

21   A.   I found that these examples are -- are -- are -- there are

22   many examples of this type across the various at-issue funds.

23   Q.   And so given the inconsistency that you get, let's say --

24   we can look at the one that's up on the screen now for -- for

25   U.S. Value Yield Equity Trust, if you wanted to figure out

1    what the damages are that Dr. Pomerantz would choose or that

2    you would choose if there's a way for this particular fund,

3    how would you pick?

4    A.  Well, I don't think there is any -- any basis for picking.

5    I think it's essentially an arbitrary choice.  If -- if we --

6    as this -- Dr. Pomerantz's sort of assumption is that if the

7    Retirement Committee had performed in the loyal and prudent

8    process, they could have selected any one of these options.

9    There's really no guidance or no basis for choosing one over

10   the other.  Yet the damage number varies significantly,

11   depending on which fund, which alternative fund you choose.

12   So -- and to the extent that that's an arbitrary choice,

13   you're not measuring damages.  You're -- you're measuring the

14   difference between your fund and the one that you happened to

15   choose.

16   Q.  So if the models, Models 1 through 4, were valid and

17   reliable, what would you expect to see in terms of consistency

18   across the rows of the chart?

19   A.  I would expect to see similar values across the charts and

20   not large swings of multimillions of dollars, depending on

21   which particular comparator I chose.

22   Q.  And what does that tell you about the models?

23   A.  It tells me that we're -- that Dr. Pomerantz is likely not

24   measuring the impact of the alleged misconduct, that he's

25   actually capturing other things in his estimate of damages.

1  Q.  And by the way, you -- you see these inconsistencies in

2  both time periods, in the April time period and in the longer

3  time period?

4  A.  Yes.  They're -- they're omnipresent across the whole

5  period.

6  Q.  And is that further evidence that there's a problem with

7  the reliability of these models?

8  A.  I believe it -- it is.

9          MR. NEMSER:  I so move to admit DX 875.  And I also

10  forgot to move the admission of the gold chart, which was DX

11  874.  So I move both.

12          MR. ENGSTROM:  No objections.

13          THE COURT:  Thank you.  874.  I have 877 is the gold

14  fund analysis.

15          MR. NEMSER:  Oh.

16          THE COURT:  But I may --

17          MR. NEMSER:  There may have been another.  Oh, yeah.

18  877 was the graph, I guess, and 874 was the table.

19          THE COURT:  Would you put 874 back up just so I can

20  get oriented to that?

21          MR. NEMSER:  Sure.  Chris, could you do 874?

22          THE COURT:  Please.  That's 874?

23          MR. NEMSER:  Yeah.

24          THE COURT:  Hold on here just a second.

25          MR. ENGSTROM:  I believe 877 has already been

1    admitted.

2            THE COURT:  Okay.

3            MR. NEMSER:  Right.

4            THE COURT:  Okay.  So -- and there's no objection.

5    874 will be admitted.

6            MR. NEMSER:  And 875, please.

7            THE COURT:  Yes, sir.  875 as well.

8        (Defendants' Exhibits 874 and 875 admitted in evidence.)

9            MR. NEMSER:  Thank you, Your Honor.

10   Q.  So the next of your items in terms of the overall flaws

11   involve different risk profiles.  Chris, could you pull up DX

12   876, please?

13           So let's talk about this flaw.  What is the flaw,

14   and how do you analyze it?

15   A.  So the -- the problem I'm identifying here is that in many

16   instances, the at-issue fund and the replacement fund have

17   different what I call risk profiles, have different risk

18   characteristics.

19   Q.  So what are those, risk profiles?  Sorry to interrupt so

20   early.

21   A.  Sure.  The risk profile -- I use that term just to mean

22   that they have different exposures to different risks.  You

23   can think about many dimensions that affect risk.  We talked

24   about like the size of whether you're investing in small

25   stocks or large stocks.  Are you investing in domestic stocks

1   or emerging market stocks?  Are you investing in a growth

2   strategy versus a value strategy?  Typically, analysts will

3   breakdown an alternative into various dimensions that

4   characterize risk.  And to the extent that there are

5   differences between the at-issue fund and the replacement fund

6   in the risk profiles of those two alternatives, we're going to

7   see differences in returns over the damage period that -- that

8   are a result of these different risk profiles that don't

9   necessarily have any relationship to the alleged misconduct.

10          So if we replace one fund with a certain risk

11   profile -- let's say it's an emerging market fund and you map

12   that into a more general global fund, you know those -- it's

13   likely that those funds are going to perform differently.  And

14   if -- if that difference isn't a breach that you're trying to

15   cure, if it's just because you happen to chose a -- choose a

16   fund that has a different risk profile, then any difference

17   that you're measuring is -- is a result of that risk profile

18   difference.  It's not a result necessarily of a breach that

19   you're trying to address.  And so that's the general idea

20   that -- that I'm identifying here.  And I think it creates

21   problems for Dr. Pomerantz in his damages models.

22   Q.   So did you evaluate specific alternatives in

23   Dr. Pomerantz's models and look at their respective risk

24   profiles?

25   A.   I did.

1    Q.  And what did you find?

2    A.  I found that there were instances where there were

3    differences in -- in risk profiles between the at-issue fund

4    and the alternative fund that -- that didn't address an

5    underlying alleged breach.

6    Q.  So let's look at an example, please.  Did you make a

7    demonstrative relating to the Heritage Fund?

8    A.  I did.

9    Q.  Can we pull up DX 878, please?

10           And so what does this show?

11   A.  So this shows the -- for the American Century Heritage

12   Fund on the top line, and then it shows the -- the four models

13   that Dr. Pomerantz estimated damages under.  In Model 1, he

14   chose the Vanguard Mid Cap Growth Index Fund.  And in Models 2

15   and 4, he chose the Vanguard Extended Market Index Fund.  And

16   in Model 3, he chose the T. Rowe Price Mid Cap Growth Fund.

17           So the Heritage Fund is categorized as a Mid Cap

18   Growth Fund.  It -- it has a particular investment strategy

19   that's implemented.  And when it's implemented, it results in

20   a certain distribution of stocks in the different risk

21   categories.  So I'm looking here at one particular one.  This

22   is the -- focuses on market capitalization.  So for the

23   American Heritage Fund -- American Century Heritage Fund, for

24   example, you can see that 36 percent of its holdings are

25   categorized as large stocks, 57 percent are categorized as mid

1   size stocks, and 7 percent are categorized as small stocks.

2          If we look at the alternatives against which

3   Dr. Pomerantz is comparing the American Century fund -- and I

4   think focus for the moment on Models 2 and 4, the Vanguard

5   Extended Market Index Fund, you'll see that those funds are --

6   or that fund is much more weighted towards small stocks, has

7   much less assets in large stocks, and actually less in the mid

8   cap category as well.  But to the extent that the market for

9   large stocks is performing differently than the market for

10  small stocks, we will see -- or we would expect to see a

11  difference in the performance of these two investments that

12  relates to that different risk exposure to market

13  capitalization.

14         And the question is, is -- is there any reason why

15  the alternative fund should have a different exposure to

16  market capitalization based upon the alleged breach?  There's

17  not.  There's no -- there's no reason why this difference --

18  or this difference in the resulting calculation of damages

19  that arises from it doesn't have anything to do with a breach

20  related to the American Heritage fund.  It just has to do with

21  the particular alternative fund that Dr. Pomerantz happened to

22  choose.  And there --

23  Q.  Well, Dr. Pomerantz himself in Models 2 and 4, I believe,

24  was mapped all of the small cap funds and all of the mid cap

25  funds in the American Century menu into this one extended

1    market fund; is that right?

2    A.  That's right.  He mapped several.  I forget -- it might

3    have been six, something on that order.

4    Q.  It might have been eight I think.

5    A.  Six or eight of the American Century funds into this

6    Vanguard Extended Market Index Fund.  And the logic was that,

7    if you'll remember, I think there was an exhibit that was

8    called like the tic-tac-toe exhibit that had -- it was market

9    capitalization across the top, mid -- large, mid, small.  And

10   then it had value, blend or growth, value -- growth, blend and

11   value, and that creates a three by three matrix.  And the

12   extended market index fund covered, I think, six of those

13   boxes.  So it -- it invests in a range of different types of

14   stock.

15            And so Dr. Pomerantz maps a lot of American Century

16   funds into that extended market index fund because it does

17   cover a broad range of -- of styles.  But the problem is if --

18   if the fund that you're mapping in there is in only one of

19   those boxes, it's say a blend -- large cap blend, you're

20   mapping it into the extended market fund that actually covers

21   a much broader set of -- of types of strategies, there's going

22   to be a difference in performance between those two that

23   Dr. Pomerantz calls damages that just result from the fact

24   that he's mapping one type of risk profile into a -- an

25   alternative fund with a different type of risk profile.

1    That's not damages.  That's -- that's an artifact of the

2    particular alternative that he's chosen as -- as the

3    alternative so --

4    Q.  Is there another part of Dr. Pomerantz's reasoning that

5    that implicates, which is that as a result of mapping, let's

6    say American Heritage -- I'm sorry, American Century Heritage

7    Fund, which is the mid cap growth fund, into this fund that

8    takes up six boxes on the tic-tac-toe board, that -- along

9    with these other funds, which he also maps into this, is that

10   going to reduce people's choice in terms of their ability to

11   pursue specific strategies?

12   A.  Well, there's a -- there is an implication across --

13   really, across all of Dr. Pomerantz' models about this -- the

14   fact that his -- his menus are restrictive.  They change

15   the -- the types of strategies that participants are able to

16   pursue.  And he -- he sort of forces people from a choice that

17   they've made into some alternative that may or may not look at

18   all like the alternative that they've chosen.  And there's --

19   there's two aspects to that.  One, is that going to dissuade

20   people from investing, or are they going to invest differently

21   if the option that they've chosen and prefer is no longer

22   available and now they're -- they're forced into some other

23   alternative.

24   Q.  So this demonstrative, DX 878, focuses on market

25   capitalization, right?

1    A.   Yes.

2    Q.   And we've just been talking a bit about style or strategy,

3    which involved growth and blend and value and things of that

4    kind, right?

5    A.   Yes.

6    Q.   So are those also factors that drive results?  Do they

7    affect risk profile?

8    A.   Yes.  This is just really an example that's focused on

9    market capitalization, which was one of those dimensions.

10   There -- there are several other dimensions, you know,

11   geographic concentration, investment style.  So this is just

12   meant as an example, really.

13   Q.   On the style side, am I remembering right that

14   Dr. Pomerantz testified that if -- if a fund that you bought

15   as a growth fund drifted into becoming a value fund, turned

16   into a value fund, that that would be dangerous?

17   A.   Yes.  I think -- I don't know which way he -- he said --

18   Q.   It might have been the other way.  I don't know.

19   A.   Growth to value or value to growth.  But he said -- yeah,

20   when that happens, that can be dangerous.  And, I mean, I

21   think that's -- I wouldn't disagree with that.  I think that

22   just exemplifies the fact that it matters whether you're

23   mapping a growth fund into a value fund or into a blend fund.

24   And the performance is going to be different, and it doesn't

25   necessarily relate to damages at all.

1          MR. NEMSER:  So I move to admit DX 878, please.

2          THE COURT:  Any objection?

3          MR. ENGSTROM:  No objection.

4          THE COURT:  Thank you.  878 is admitted

5      (Defendants' Exhibit 878 admitted in evidence.)

6  Q.  And did you do another analysis in which you evaluated

7  different risk profiles related to Morningstar categories --

8  A.  Yes, I --

9  Q.  -- for Exhibit 2?

10  A.  Yes, I did.

11  Q.  Now we've looked at a similar one for Exhibit 4 --

12  A.  Yes.

13  Q.  -- for Model 4 I mean?

14  A.  For Model 4, yes.

15  Q.  I'm sorry.  I said exhibit, but I meant model.  Let's pull

16  up DX 800, please.

17          So this is from your report?

18  A.  Yes.

19  Q.  And it's similar to the one we looked at for Model 4, but

20  this one is focused on Model 2?

21  A.  Correct.

22  Q.  And it shows that there are differences in the Morningstar

23  categories between the fund that is the American Century

24  Plan's actual fund and then the Model 2 fund that

25  Dr. Pomerantz chose and mapped things into, right?

1    A.   Yes.

2    Q.   Okay.   And as before, the right-hand column with all the

3    Xs shows a mismatch?

4    A.   That's correct.   Where the at-issue fund is in a different

5    Morningstar category than the -- the alternative that

6    Dr. Pomerantz replaces the American Century fund with.

7    Q.   So let's -- let's take Disciplined Growth, which we've

8    used a bunch of times, and talk about that one.

9    A.   So Disciplined Growth has a Morningstar -- the American

10   Century Disciplined Growth Fund has a Morningstar category of

11   large growth.   And the -- Dr. Pomerantz maps that into the

12   Vanguard Institutional Index I Fund, which is a large blend

13   strategy.   That's the Morningstar category.   So this -- as you

14   can see, this is pretty common in Model 2 where there's a

15   mismatch because, as you'll recall, Model 2 is where we have

16   that slimmed down menu of only six or seven Vanguard options.

17           So because there's such a limited number of options,

18   there's a lot of quite diverse funds being mapped into just

19   this small number.   And that creates this kind of mismatch.

20   And it creates the -- the illusion, or I call them phantom

21   damages where what we're really measuring is, hey, we're going

22   from a -- in this case, a large growth to a large blend, and

23   there's going to be a -- there's going to be a difference in

24   performance.   But is that really measuring any consequence of

25   the alleged misconduct?   And I think the answer is there's no

1    reason to believe it does.

2    Q.   And my memory at least was that there were five distinct

3    funds in Model 2 and then there are target date funds?

4    A.   That's right.  So they're the five plus the target date,

5    which are some combination of those.

6    Q.   And was there evidence that Dr. Pomerantz accepted when he

7    was testifying that according to the Hewitt report about 10

8    percent of plans had seven or fewer options?

9    A.   That's right.  I think, you know, he acknowledged that a

10   plan that is this restrictive is really sort of an outlier

11   among plans, that most plans have many more options than five

12   plus a target date option.

13   Q.   So returning to the chart that we -- the Morningstar

14   chart.  Let's go to the end of it, please.

15              What do you find in terms of the amount of

16   mismatches?

17   A.   Well, I find that out of the 65 at-issue funds, that's

18   counting the target date funds separately, I find 36 instances

19   where he's mapping from one Morningstar category into a

20   different Morningstar category, which is about 55 percent of

21   the cases where there's this mismatch problem.

22   Q.   Okay.  So we've been talking about Morningstar categories

23   in terms of risk profiles.  But in your report, you talk about

24   something called prospectus benchmarks as another way to think

25   about it.  So what's a prospectus benchmark?

1    A.  Every fund, by SEC regulation, has to identify a

2    benchmark.  And it's reported in the prospectus.  Sometimes

3    there are more than one benchmark.  There's a primary and a

4    secondary benchmark.  And it's designed to provide investors

5    with sort of a comparator against which they can judge the

6    performance of the -- the fund.  And it gives you an

7    indication of the style and the investment strategy of the

8    mutual fund.  And so it's -- it's a -- I think of it as a

9    complement to the Morningstar category.

10   Q.  And did you examine the prospectus benchmarks that -- of

11   the alternatives that Dr. Pomerantz used and compare them to

12   the American Century ones?

13   A.  I did.

14   Q.  In general, what opinion did you form?

15   A.  I found many instances where they -- as we would expect,

16   there are different prospectus benchmarks between the at-issue

17   fund and the alternative into which Dr. Pomerantz maps

18   these -- these -- these investment funds.  And that's I think

19   a further indication, consistent with what I found in the

20   Morningstar categories, that -- that there's a potential shift

21   in the risk profile between the at-issue fund and the

22   alternative fund.

23   Q.  Did you make a demonstrative showing the example?

24   A.  I did.

25   Q.  Could we call up DX 879, please?

1          So this is showing a comparison with respect to the

2   American Century Real Estate Fund, right?

3   A.   That's correct.

4   Q.   Okay.  So what do you see here?

5   A.   So here I've listed the -- the four models and the -- and

6   there are actually just three alternatives that Dr. Pomerantz

7   uses as the benchmark alternatives, Models 1 and 3.  So the

8   prospectus benchmark for the American Century Real Estate Fund

9   as shown in the top in the brackets there, it's MSCI US REIT

10  Gross Return Index and -- or benchmark -- excuse me,

11  prospectus benchmark.  And you can see that the first

12  alternative Model 1 actually uses a fund that has the same

13  prospectus benchmark as the American Century Real Estate Fund.

14  And in that case, you can see the damages -- I guess they're

15  negative damages there.  But at any rate, those are small

16  value.  So they're tracking similarly.

17          In Models 2 and 4, the -- Dr. Pomerantz selects a --

18  a replacement fund that has a prospectus benchmark of the S&P

19  500 Total Return Index.

20  Q.   So that's a broad, large cap kind of index?

21  A.   That's right.  So the -- the -- those funds are -- are

22  tracking against this prospectus benchmark that indicates that

23  there's -- they're quite different in -- in nature.  It's a

24  large equity blend fund.  And you can see there are large

25  damages associated with those Models 2 and Models 4.  And

1    that's really an artifact of the fact that he's now comparing

2    this real estate fund to a broad market index.

3              And in Model 3, in contrast, that's another real

4    estate related prospectus benchmark, the FTSE All Equity REITs

5    Index.  And you can see there also, the American Century

6    Fund -- Real Estate Fund shows negative damages when compared

7    to a more comparable prospectus benchmark, even though it's

8    different.

9    Q.  Okay.  And did you look more broadly at the prospectus

10   benchmark issue with respect to the at-issue funds in

11   Dr. Pomerantz's comparators?

12   A.  Yes.

13   Q.  And in broad terms, what did you find?

14   A.  I found that there was -- there were many, many instances

15   where the prospectus benchmark of the at-issue fund was

16   different than the prospectus benchmark of the alternative

17   that Dr. Pomerantz uses.

18   Q.  Okay.  Let's move on to the next of your categories of

19   flaws.  And this is 881.  DX 881, please.

20             And this one is the models ignore nonperformance

21   attributes of at-issue funds?

22   A.  Yes.

23   Q.  And this is the last actually of the sequence because the

24   final one, which related to the reduced choice and the failure

25   to take into account participant preferences is something

1  we've been touching on throughout, right?

2  A.  That's correct.

3  Q.  Okay.  So we had a little discussion up at the beginning

4  about what a nonperformance attribute would be.  But what are

5  some examples of nonperformance attributes?

6  A.  So the -- just to recall, these four damages models

7  calculate, of Dr. Pomerantz', what I call underperformance

8  damages.  So they're just looking at the difference in asset

9  value between what actually happened and Dr. Pomerantz'

10  alternative investments.  The -- so returns are important

11  definitely for investors, but investors also choose options

12  for nonperformance related factors.  In particular, they

13  choose actively managed funds because those do things that you

14  can't accomplish with a passive fund.

15         So, for example, an investor may want a defensive

16  strategy that is not tracking a particular index but that's

17  part of an active management strategy that a fund manager

18  might employ.  Alternatively, there -- in addition to a

19  defensive strategy that allows the fund manager to reduce the

20  risk, there are also -- with actively managed funds, there's

21  the opportunity to outperform the prospectus benchmark, which

22  in a passive fund, that's never going to happen.  In fact,

23  they're always going to underperform the benchmark because

24  there's -- there are fees involved.  So a -- an investor may

25  value this ability to not track an index and be exposed to the

1   movement of index but to have either a defensive strategy or a

2   more aggressive strategy where they may be hoping to

3   outperform the index.

4           So what this results in is, for actively managed

5   funds, there's a bigger variation in expected returns for

6   actively managed funds because they can perform either above

7   or below the index at any particular -- you know, for any

8   particular period.  So, for example, in a -- in a bull market,

9   a defensive passive strategy may underperform the benchmark.

10  Whereas in a bear market, it may outperform the index.  So

11  essentially, by failing to consider these nonperformance

12  attributes, Dr. Pomerantz is failing to acknowledge that

13  investors and Plan participants may actually choose an active

14  strategy that performs differently than the benchmark by

15  design because that's what they would like to invest in as

16  opposed to investing in something that moves with the index.

17  Q.  And all -- as we talked about back at the beginning, all

18  he's looking at is net performance of the at-issue fund and

19  net performance of whichever comparator he's chosen for his

20  model, and he's not paying any attention to those

21  nonperformance attributes?

22  A.  That's correct.

23          THE COURT:  Okay.  We're about -- we're ready for a

24  break if you are, Mr. Nemser.

25          MR. NEMSER:  Yes, Your Honor.  Actually, I forgot to

1    offer two documents.  It might be a good moment to do it.  It

2    should take about a second.

3              THE COURT:  All right.  Yes, sir.

4              MR. NEMSER:  Okay.  I move to admit 879, which was

5    the chart on real estate.  Could we pull that one, Chris?  DX

6    879.

7              THE COURT:  Let me find it here.

8              MR. NEMSER:  We have it up now.

9              THE COURT:  I got you.  Okay.  And what else are you

10   going to offer?

11             MR. NEMSER:  And also offer DX 800, which is the

12   piece from the report on Model 2 and Morningstar.

13             THE COURT:  Okay.

14             MR. ENGSTROM:  No objection to either of those two.

15             THE COURT:  Thank you.  800 and 879 are admitted.

16        (Defendants' Exhibits 800 and 879 admitted in evidence.)

17             THE COURT:  Okay.  We'll take a 20-minute recess

18   since this is our evening recess.

19        (Recess at 3:00 until 3:23 p.m.)

20             THE COURT:  I'll just -- I was secretly hoping that

21   we'd be done today, but that's not the case I understand.  Do

22   you think you'll be done with direct today, Mr. Nemser?

23             MR. NEMSER:  Oh, I do.

24             THE COURT:  Okay.  Good.  Great.  Great.  I know

25   that Mr. Engstrom is chomping at the bit to get involved here.

1          MR. NEMSER:  No question.

2          THE COURT:  Yes, sir.

3  Q.  So we were talking about the -- this -- this area of flaw.

4  The models ignore the nonperformance attributes of at-issue

5  funds.  And we were talking about the issues about the taking

6  into account that active and passive funds are -- have

7  different attributes, and different things are valuable about

8  them.  Is that right, Doctor?

9  A.  Yes.

10  Q.  And that -- I don't know if I asked you this.  I think you

11  said it, but I'll just ask you now.  So it's your view that

12  Dr. Pomerantz did not give adequate consideration to the

13  nonperformance attributes of at-issue funds?

14  A.  Yes.

15          MR. NEMSER:  Chris, if we could have DX 1019,

16  please.  Next page, please.

17          And this is Dr. Pomerantz's declaration from the

18  Moreno case, which was offered as his direct testimony, which

19  we showed in -- in his dep- -- in his testimony the other day.

20  And if we could go to pages 28, 29.  The particular

21  sentence -- and I'm not sure where it falls on the page -- is

22  the one that begins, "If a fund was chosen in part because of

23  its more conservative approach..."

24          THE COURT:  Could you highlight that?  Thank you.

25  Q.  Let's see.

2469

1   A.  At the bottom of 27?  Is that where you're reading I

2   think.

3   Q.  It could be.

4           THE COURT:  Yeah.  The last -- the last sentence,

5   the very end of the last sentence, "Similarly, if a fund was

6   chosen in part..."

7   Q.  There we are.  And on to the next page down to "bull

8   market."  Great.

9           So Dr. Pomerantz said in his declaration, If a fund

10  was chosen in part because of its more conservative approach

11  to a particular asset class, a fiduciary should not be overly

12  concerned when the investment underperforms its peers during a

13  period in which the asset class is experiencing a bull market.

14          Do you recall that part of the cross-examination

15  here?

16  A.  Yes.

17  Q.  Does Dr. Pomerantz's statement in his declaration in

18  Moreno affect your opinions with respect to Dr. Pomerantz's

19  approach to nonperformance attributes?

20  A.  No.  I think it's -- it's consistent with my view and my

21  criticism.  And I think it only supports the conclusion.

22  Q.  And so one of the benefits of active management, as you've

23  said, is -- at least one way it can go is -- is a conservative

24  approach, the same toward downside risk?

25  A.  Yes.

1  Q.  And -- and so to evaluate the performance of such an

2  actively managed fund in a bull market without taking into

3  account its purpose is a problem; is that right?

4  A.  It is a problem.  I think it's -- it's -- if you're

5  measuring that and attributing that to damages, then I think

6  that's a mismeasurement of damages.

7  Q.  And so this overall -- that's an example, but overall,

8  this failure to take into account the nonperformance

9  attributes can -- can lead to attributing damages in a

10  situation where damages should not be properly attributed?

11  A.  That's correct.  This is just an example, but it's an

12  example of a general problem.

13  Q.  So let's talk specifically about Model 1.  What's your

14  opinion -- well, first briefly, what does Dr. Pomerantz do

15  with Model 1 in terms of the passive vehicles versus the

16  active?

17  A.  In Model 1, Dr. Pomerantz replaces the entire American

18  Century lineup of actively managed funds with what he

19  considers to be comparable Vanguard passive alternatives.

20  Q.  And so what's your opinion of the way he's chosen to use

21  these passive funds to replace the entire menu of the American

22  Century Plan?

23  A.  Well, I -- I don't believe that the alleged misconduct

24  requires the replacement of all actively managed funds with

25  passive funds.  So I think this is an instance where the

1    solution or the alternative that he's proposing goes well

2    beyond the -- the required action in order to address the

3    alleged breaches.

4           And as a consequence of that, he's -- he's mapping

5    active funds without regard to the nonperformance attributes

6    into passive funds and creating a lot of noise, creating a lot

7    of measured damages that don't really derive from the alleged

8    misconduct.

9    Q.   And what -- well, suppose the alleged misconduct -- we

10   talked about this earlier, and I don't want to repeat

11   extensively, but suppose the alleged misconduct were just a

12   failure to add passive funds rather than replace them all?

13   A.   Yeah.  I think that's a -- that's an example.  If the

14   issue is, for example, to control costs or to add index funds,

15   that's -- there's a solution short of completely eliminating

16   passive funds and substituting -- excuse me, completely

17   eliminating active funds and substituting passive funds that

18   would address that alleged breach that would have a very

19   different damage value associated with it, if any.

20          If passive funds were added to the menu and they

21   were adopted gradually over time, as we've actually seen in

22   the -- in the actual first American Century menu, that's quite

23   a different alternative than taking all the dollars that are

24   in passive -- actively managed funds and just on day one

25   moving them into passively managed funds.

1    Q.  All right.  What if the breach in question were a failure

2    to control costs, would Model 1 be an appropriate way to

3    measure whether there's an economic loss or damages from a

4    failure to control costs?

5    A.  I don't think so.  I think what a damage expert should do

6    in that circumstance is put themselves in the place of -- in

7    the but-for world.  So we have -- we know what happened.  We

8    know how the Retirement Committee evaluated the situation and

9    their actions.  And the question is, if that Retirement

10   Committee was attempting to control costs in a way that meets

11   the -- that satisfies the plaintiffs' complaint, what would

12   they have done?  I mean, that's really the question that we're

13   trying to simulate in the but-for world.

14           And I see no evidence that, you know, the expected

15   outcome of that sort of process would have been the

16   replacement of all American Century funds with Vanguard

17   passive options.  It just -- it doesn't ring true to the

18   circumstances and facts of the case to me as a plausible

19   alternative but-for world.

20   Q.  Another question.  So Dr. Pomerantz testified that his

21   passive lineup in Model 1 was the best unbiased approximation

22   of how the market performed.  Do you recall that?

23   A.  Yes.

24   Q.  And he talked about William Sharpe, and he talked about

25   using passive comparator to measure the performance of a

1   mutual fund.  So was Dr. Pomerantz wrong?

2   A.  Well, I -- I don't think -- well, first of all, I don't

3   think Bill Sharpe is wrong.  I think that may be a fine way to

4   evaluate the performance of an active manager.  But that's

5   something different than the question of is that the

6   appropriate way to measure damages in a case such as this.

7        In a case where the alternative funds are actively

8   managed, we know that those are going to have a wider range of

9   potential performance relative to passively managed funds

10  because they're -- they have active strategies, and sometimes

11  they're going to underperform the benchmarks.  And hopefully

12  sometimes they're going to overperform the benchmarks.  But

13  there's a wider range of expected performance than if you're

14  tracking strictly to a passive fund.

15       So I don't agree with -- I don't disagree with the

16  general concept that to evaluate an active manager over a --

17  over an entire market cycle, an up cycle and a down cycle, it

18  can be informative to compare that performance to a passively

19  managed index fund.  But that's -- that's a different question

20  than what's the right way to calculate damages in -- in this

21  circumstance.

22  Q.  And you just talked about over a whole market cycle, but

23  damages are calculated over some legally determined time

24  period.  Does that affect your answer?

25  A.  I think it -- yes, it does affect my answer.  The -- the

1    fact that -- that we're tracking -- or Dr. Pomerantz in the

2    case of Model 1 and Model 2 is tracking to -- to a passive

3    alternative or an index, in order for that to be a valid

4    comparison against actively managed funds, you need both an up

5    cycle and a down cycle.  You need to look at an entire market

6    cycle to evaluate whether an actively managed fund under or

7    outperformed a passive alternative.

8         So since we've been, during the damage period at

9    issue here, in a long bull market, this time period doesn't

10   allow you to make that sort of assessment just by comparing to

11   a passively managed fund.  You have to accommodate that

12   consideration in some other way.  And one of the ways you can

13   do it is to look at a range of alternatives instead of just a

14   single passively managed fund.

15   Q.   Now, by and large, over the class period, the American

16   Century Plan has consisted of actively managed funds, right?

17   A.   Yes.

18   Q.   And is it your view that the Plan participants preferred

19   American Century actively managed funds?

20   A.   Yes.  I think there's -- there's evidence that I talk

21   about in my report that -- that supports that view.

22   Q.   Okay.  And did you make a demonstrative relative to that?

23   A.   Yes.

24   Q.   Could we pull up DX 882, please.

25        So what is DX 882?

1  A.  So this just summarizes some points in my expert report,

2  some -- some features or -- or facts or events that indicate

3  that American Century Plan participants preferred American

4  Century funds.

5  Q.  Okay.  And could you explain the first one about

6  transferring outside account balances?

7  A.  Yes.  So first I looked at when someone first joins

8  American Century, if they've been employed somewhere else,

9  they may have a defined contribution plan.  And they have

10  options when they leave a former employer and come to work at

11  American Century.  They can typically leave their funds in

12  their old plan, they can move their funds to an independent

13  retirement account, or they can bring those funds into the

14  American Century Plan.

15       And so to the extent that Plan participants or new

16  employees are bringing funds from a prior plan into the

17  American Century Plan is an indication that they're satisfied

18  with or they are attracted to or they like the investment

19  lineup that's available in the American Century Plan.  So we

20  see over this period from 2010 to 2015 about $7.1 million in

21  assets were transferred into American Century Plan from --

22  from prior employers.

23  Q.  Okay.  And the next one talks about former employees.

24  A.  Yes.  This is just the -- the flip side of that.  When

25  somebody leaves American Century, they have the option of

1　leaving the -- their -- their Plan assets in the American

2　Century Plan.  If they're retiring, they could move those into

3　an IRA account or even if they're just moving to another

4　employer, they can move them into an IRA.  Or if they're going

5　to --

6　Q.  And you mean an individual retirement account, right?

7　A.  Yes.  An individual retirement account.  Or if they're

8　going to a new employer with a defined contribution plan, they

9　can move those American Century funds into their new

10　employer's defined contribution plan.  And so those -- those

11　people who leave the employ of American Century, decide to

12　leave their funds in the American Century Plan are indicating

13　that they are satisfied with the options on the American

14　Century menu, which were all American Century funds.

15　　　　　　I think actually the named plaintiff, Mr. Wildman,

16　is an example of this category.  He left American Century in

17　2008, decided to leave his funds in the American Century Plan.

18　At his deposition, he said that he did that because he wanted

19　to -- to remain in the American Century funds and wanted to

20　maintain a diversified portfolio.  So it's an example of -- of

21　the second category.

22　Q.  Okay.  And on the last item, here you have that the PCRA

23　was used to invest in American Century funds (and active

24　funds)?

25　A.  Yes.  I -- so I looked at the PCRA investments because

1    in -- in the PCRA, Plan participants have an option -- the

2    option to invest in a whole array of different types of plans.

3    And so I looked specifically at mutual fund investments in the

4    PCRA since those are the investments that are classified as to

5    active or passive.  And overwhelmingly in the -- in the PCRA

6    for investors who invested in mutual funds, there was a

7    preference for actively managed funds.  And within actively

8    managed funds, there was a preference for American Century

9    funds.  I think relative to the next largest fund family,

10   American Century had five times the assets in actively managed

11   American Century funds as compared to the next most frequently

12   subscribed actively managed fund family, which I think was

13   Schwab was the second one.  So there's a five to one

14   difference.

15   Q.  So we'll show a -- a graph in a second.  You made a bar

16   graph about that?

17   A.  I did.

18   Q.  Okay.  Before we do, let -- I'd like to move DX 882 into

19   evidence, please.

20            MR. ENGSTROM:  Yeah.  I object, Your Honor.  This

21   doesn't satisfy the criteria for a demonstrative.  It's not a

22   summary of voluminous exhibits or anything.  He's given

23   testimony to this effect, but I don't think that this is

24   necessary as an exhibit.

25            THE COURT:  Mr. Nemser?

1          MR. NEMSER:  Well, Your Honor, I suggest that it

2     identifies three areas that are the -- form the basis of the

3     expert's opinion and also supplies data.  The reason we used

4     it was because it supplies some data that he -- he relied on

5     in --

6          THE COURT:  It's in the report.  I think you

7     introduced this to me in this testimony that it's in the

8     report, and it's gleaned from that report.  And I suspect I

9     may have looked at his report.  I probably have.  I don't

10    recall the actual page length, but it's a lengthy report.

11    Given his testimony today, I suspect it's lengthy, right?  How

12    long is it?  A hundred pages?

13         MR. NEMSER:  I'm not sure I know the pages, Your

14    Honor.  It's a lot of pages.

15         THE COURT:  It's a lengthy report?

16         MR. NEMSER:  It's a lot of pages.

17         THE COURT:  And I'm going to -- go ahead.  You got

18    something else, Mr. Engstrom?

19         MR. ENGSTROM:  Yes.  For it to qualify as a

20    demonstrative as such, it would have to indicate what the

21    sources are of that data and provide notations as to the

22    origins of it.  And it doesn't have those to indicate the

23    underlying services.

24         MR. NEMSER:  Well, we can cite to pages in his

25    report, Your Honor.  You're right, they are in the report.

1          THE COURT:  Yeah.  Why don't you cite to pages in

2     the report.  And I'll admit it if you'll do that for us.

3          MR. NEMSER:  Thank you.

4          THE COURT:  DX 882 is admitted.

5          (Defendants' Exhibit 882 admitted in evidence.)

6          MR. NEMSER:  Thank you.

7     Q.   So going to the demonstrative, the graph that we were

8     talking about a second ago, that's DX 883.  And is this the

9     bar graph you were just talking about?

10    A.   That's right.  It is.

11    Q.   And what is it showing?  I know you were kind of almost

12    getting to describe what -- what the data showed?

13    A.   Yes.  So this is -- the set of data I'm looking at are the

14    investments of Plan participants in mutual funds in the PCRA.

15    So when you look at that set of investments, I'm showing there

16    in the green bar that participants invested $3.3 million

17    through the PCRA in American Century actively managed mutual

18    funds.  By comparison, if you look at the bar on the right,

19    that -- those are also investments in the PCRA mutual funds,

20    but those are to the next most frequently subscribed plan

21    sponsor.  In that case, it's Schwab.  And -- and that family

22    had about $600,000 invested.  So among PCRA participants who

23    invested in mutual funds, actively managed mutual funds, you

24    can see there was a -- you know, a dominance of dollars in the

25    American Century fund relative to the nearest competitor,

1    which was Schwab.

2         I also looked at -- within that same group, these

3    are PCRA investors in mutual funds -- the total amount that

4    was invested in index mutual funds through the PCRA.  And that

5    total was that blue bar in the center of $1.6 million.  So

6    those that invested in American Century actively managed

7    mutual funds in terms of the dollar investment was about twice

8    the amount that was invested in all index mutual funds through

9    the PCRA.

10         So this, to me, just confirms what the other two

11   observations were is that there appears to be data supporting

12   this idea that the American Century Plan participants

13   demonstrated a preference for American Century plans over

14   other actively managed -- excuse me -- funds.  They preferred

15   American Century actively managed funds over other actively

16   managed funds.  And this also shows a preference for -- for

17   actively managed funds over index funds.

18   Q.  And you looked at mutual funds here.  Why did you look --

19   why did you focus on mutual funds in this analysis?

20   A.  Because mutual funds are categorized as to active and

21   passive management.  There -- there's another group of -- of

22   investment options within the -- or investment alternatives

23   within the PCRA, exchange traded funds, or ETFs as they're

24   called.  But they're not categorized as to active or passive.

25   So I didn't include that in this analysis.  It's limited to

1    mutual funds through the PCRA window.

2    Q.  So in his Models 1 to 3 -- 1, 2 and 3 -- Dr. Pomerantz

3    does not keep any of the American Century funds in the Plan,

4    right?

5    A.  That's correct.  He --

6    Q.  And in Models 1 and 2, he replaces the American Century

7    funds with Vanguard funds, right?

8    A.  That's correct.  Passively managed Vanguard funds.

9    Q.  Is Dr. Pomerantz's way of constructing the models

10   consistent with the data that you found with respect to the

11   participant preferences in the American Century Plan?

12   A.  No.  I think it -- it ignores the -- the revealed

13   preferences of the Plan participants for -- for both actively

14   managed funds and American Century funds in particular.

15                MR. NEMSER:  I move admission of the bar graph, DX

16   883.

17                MR. ENGSTROM:  No objection.

18                THE COURT:  Thank you.  883 is admitted.

19       (Defendants' Exhibit 883 admitted in evidence.)

20   Q.  So, actually, if we could pull up DX 867 now, please.

21                I think we've now talked about each of these items,

22   except for the last, which is one which you've addressed

23   throughout, and even -- even on that, we were just talking

24   about participant preferences.  Is that fair, Doctor?

25   A.  Yes.  That's right.

1　Q.　And these critiques that you have lodged, most of them

2　apply to more than one of Dr. Pomerantz's models, and many of

3　them apply -- or all of them apply to some of the models; is

4　that fair?

5　A.　That's correct.

6　Q.　So do you also have some model specific critiques that

7　would only apply to one model?

8　A.　Yes.　I think they're -- each of the models has their own

9　kind of overarching issues.

10　Q.　So could you give us just a few examples of those model

11　specific critiques that you have?

12　A.　Sure.　I think -- we've just been talking about one, which

13　is the -- the complete replacement of American Century options

14　with Vanguard options.　And that -- that is the case in Models

15　1 and 2.　In Model 2, in addition, there's this extreme

16　limitation of the Plan menu to five options, which I think is

17　unrealistic in terms of the but-for outcome.　And it also

18　creates other problems with mappings that we've talked about.

19　So Model 2 suffers from that additional issue.

20　　　　　Model 3 -- I think a key issue with Model 3 is that

21　Dr. Pomerantz himself has testified that he doesn't think that

22　the Model 3 lineup would be the lineup from a loyal and

23　prudent process, which I think in itself sort of excludes

24　Model 3 as a valid potential measure of damages.

25　　　　　And then Model 4, we've talked about the disconnect

1  between the Hewitt recommendations and the -- and the lineup

2  that's in Model 4.  And I think that also makes Model 4

3  defective at a very fundamental level.

4  Q.  Okay.  So -- I'd like to -- put that down now, Chris.

5  Thank you.

6              One area which has -- we've already talked about in

7  the context of the Hewitt model, Model 4, but not so much in

8  the context of Models 1 through 3, is Dr. Pomerantz's position

9  that Plan participants were harmed by the lack of a stable

10  value fund?

11  A.  Yes.

12  Q.  And do you agree with Dr. Pomerantz's position?

13  A.  I don't think there's any evidence supporting that idea.

14  So, no, I don't agree with that.

15  Q.  The Court's already heard a lot of testimony about the

16  differences between a money market fund and a stable value

17  fund.  And I don't -- I don't want you to get into it at any

18  length.  But if you could for -- state so that everyone

19  understands what your position is, what briefly do you see as

20  the differences?

21  A.  Yeah.  Well, I -- there's a number of differences between

22  the two, as reflected in the Morningstar categorization of the

23  two assets.  So that's -- that's evidence.  But they're

24  fundamentally different products.  They have different

25  underlying assets that they're invested in.  They have

1   different risk and return characteristics.  And, in

2   particular, stable value funds are subject to restrictions in

3   trading and liquidity that money market funds are not subject

4   to.  So in my view -- and particularly in relation to damages,

5   to substitute -- take money from a money market fund, place it

6   into a stable value fund is an example of a mismatch of -- of

7   the at-issue fund to the alternative.  And it creates phantom

8   damages when, in fact, all you're measuring is the difference

9   between the performance of those two different asset classes.

10  Q.  So are there plans that offer both money market and stable

11  value funds?

12  A.  Yes.  There are many.

13  Q.  What's your basis for saying that?

14  A.  Well, the testimony I've read, but some -- a couple of

15  studies that I quote in my report.

16  Q.  Okay.  So if we could go to DX 864.

17          Is this a -- one of the documents that you quoted in

18  your report?

19  A.  Yes, it is.

20  Q.  And it's a -- it's published by Vanguard?

21  A.  It is.

22  Q.  And it's called Money Market Reform and Stable Value:

23  Considerations for Plan Fiduciaries?

24  A.  Yes.

25  Q.  So -- and it dates from August 2016?

1   A.  Yes, it does.

2   Q.  So if we could please go to page 7.  And, Chris, if you

3   could call up the conclusion paragraph at the -- paragraphs at

4   the top left of the page.

5            Doctor, is this material that you're relying on?

6   A.  Yes, it is.

7   Q.  And in what way are you relying on it?

8   A.  Well, it's a statement about the requirements for a

9   defined contribution plan in terms of whether one or the other

10  of these two capital preservation alternatives must be offered

11  on a -- by a fiduciary.

12  Q.  And what do they say?

13  A.  Well, it says, A plan's fiduciaries are not required to

14  offer any particular type of investment as the plan's

15  protected-principal option.  In reviewing money markets versus

16  stable value in this regard, fiduciaries should undertake a

17  prudent process to understand and evaluate the comparative

18  benefits and risks of each investment vehicle and then make a

19  reasoned choice.  As this paper has described, either vehicle

20  may be an appropriate investment option.

21            THE COURT:  Excuse me.

22  Q.  So is that consistent with your understanding of

23  Dr. Pomerantz's position vis-a-vis stable value funds?

24  A.  Well, it's -- that's sort of difficult to say.  I'm not

25  sure that Dr. Pomerantz -- well, I'll say it's inconsistent

1   with what he implements in Model 4, and I think it's

2   inconsistent with his calculation of damages for kind of this

3   supplemental calculation that he does for Models 1 through 3

4   where he calculates stable value damages.

5   Q.  Okay.  So did he -- did he -- did you also look at some

6   other sources with respect to plan's behavior in holding money

7   market funds versus stable value funds?

8   A.  Yes.  I tried to look at the prevalence of both types of

9   investments among --

10  Q.  And did you do a demonstrative on that?

11  A.  I did.

12          MR. NEMSER:  Can you please bring up DX 889, Chris?

13          And I would, by the way, move admission on the

14  Vanguard commentary, which is DX 864.

15          THE COURT:  Any objection to 864?

16          MR. ENGSTROM:  No objection.

17          THE COURT:  That will be admitted.

18      (Defendants' Exhibit 864 admitted in evidence.)

19  Q.  Okay.  So what is 889 showing?

20  A.  889 summarizes information in two research reports that I

21  relied on, the ICI report and a report by Met Life that are

22  referenced and discussed in my report.

23  Q.  And we discussed -- Dr. Pomerantz and I discussed the Met

24  Life study, right?

25  A.  I think you did, yes.

1  Q.  And it indicates that a little less than half of defined

2  contribution plans surveyed offered both a money market and a

3  stable value fund?

4  A.  That's correct.

5  Q.  And, indeed, that 62 percent of defined contribution plans

6  surveyed by Met Life offered a money market?

7  A.  That's correct.

8  Q.  And what did you find with respect to ICI?

9  A.  ICI reports that 30.5 percent of 401(k) plans did not

10  offer a guaranteed investment contract option, which is

11  essentially stable value.  That's primarily what makes up

12  guaranteed investment contracts these days.  And it also found

13  that over 50 percent, 51.5 percent of the 401(k) plans

14  surveyed offered a money market fund.

15  Q.  Do you remember what the ICI source was?

16  A.  I believe it was the Form 5500s.  I'm not certain about

17  that as I sit here, though.

18  Q.  I just meant the ICI publication that you looked at.

19  A.  Oh, it was an ICI publication from 2014.

20       MR. NEMSER:  So I move admission of DX 889.

21       MR. ENGSTROM:  Same objection, Your Honor.  There's

22  no citation to the underlying data within this.  I also think

23  that there's issues with it being misleading.  And the ICI

24  provides a lot of data for plans of different size.  And

25  absent any kind of citations, I don't think we have any way of

1    ascertaining the accuracy of this data.

2              MR. NEMSER:  I believe --

3    Q.  Are these cited in your report, Doctor?

4    A.  Yes.

5              THE COURT:  They're attached to your report?

6              THE WITNESS:  Well, they're cited in my report.

7              THE COURT:  Cited?

8              THE WITNESS:  Yes.

9              MR. NEMSER:  So, I mean, we can supply cites if that

10   would help -- or page references from the report.

11             THE COURT:  Would that help?

12             MR. ENGSTROM:  That would be our preference, Your

13   Honor.

14             THE COURT:  Okay.  Yeah.  I'll admit it with the

15   idea that they'll provide page references.  Thank you.

16             889 is admitted.

17        (Defendants' Exhibit 889 admitted in evidence.)

18             MR. NEMSER:  Actually, I have the cites here.  I

19   could read them into the record if that would be helpful, or

20   we could just confer and I could give them --

21             THE COURT:  Why don't you confer and give it to

22   them.

23             MR. NEMSER:  Sure.

24   Q.  So overall, what is your conclusion with respect to the

25   use of money markets and the use of money markets in

1    conjunction with stable value funds?

2    A.   I don't think there's any evidence supporting the

3    requirement that a fund not offer a money market fund and

4    instead offer a stable value fund.  And, consequently, I -- I

5    don't think there's any support for the calculation that

6    Dr. Pomerantz performs purported to be damages from failure to

7    offer a stable value fund.

8    Q.   And Dr. Pomerantz assumed as well that the money market

9    would be replaced by the stable value fund, right?

10   A.   That's right.  It's not strictly a damage calculation that

11   assumes that a new option, a stable value option is added to

12   the menu.  It's the elimination of the money market fund, the

13   replacement with the stable value option, and the implicit

14   assumption that people are going to invest in a stable value

15   fund in exactly the same way that they actually invested in

16   the money market fund, which I think is -- is not a reasonable

17   assumption, given that they're different investment vehicles

18   with different risk and return profiles.

19   Q.   Okay.  So -- so is it -- are you suggesting that it isn't

20   reasonable just to assume that -- that all of the money that

21   in reality was invested in money markets would flow directly

22   into the stable value fund and stay there?

23   A.   Yes.  I think there's -- there's neither a motivation or

24   requirement for that and -- but more specific to your

25   question, I think this is an example of the failure to

1    consider Plan participants' revealed preferences, and an

2    unreasonable assumption that people are going to behave in the

3    way that Dr. Pomerantz in his model assumes they will, that

4    they'll just accept the substitute alternative and not change

5    their behavior in any way.  I don't think there's a basis for

6    that assumption.

7    Q.  I want to change topics and go to Dr. Pomerantz's claim

8    that the Plan's funds had excessive fees.  Do you recall that?

9    A.  Yes.

10   Q.  And Dr. Pomerantz does not assert, I think he testified,

11   that the -- the underperformance damages essentially include

12   any calculation with respect to excessive fees, so you would

13   not add them; is that right?

14   A.  That's right.  I think he -- he acknowledges that the four

15   underperformance models incorporate excessive fees as part of

16   that calculation.  And so they're already accounted for in his

17   four underperformance models.

18   Q.  Okay.  So we'll put that aside.  At any rate, he presents

19   various calculations to accompany his claim that the Plan

20   charges excessive fees?

21   A.  Yes.

22   Q.  Okay.  And how did he go about doing these excessive fee

23   calculations?

24   A.  Well, he compared the American Century Plan fees to

25   several benchmarks that he constructed -- some that he

1    constructed and I think at least one that was reported in ICI.

2    Q.    Okay.  And so he has an ICI plan analysis he called it?

3    A.    Yes.  He has two.  He has an ICI plan analysis and an ICI

4    fund analysis.  And then he has -- he uses three of his

5    underperformance damages models to also construct -- I'll call

6    it a benchmark of fees.  And he -- he calculates damages by

7    comparing American Century's actual fees to each one of

8    these -- I guess there's five in total -- benchmarks.

9    Q.    And so in terms of the ones based on the damages models,

10   those are fairly simple to describe.  They're -- he's just

11   pairing off the at-issue fund, the fund that was the Plan's

12   real fund, and he's -- on the other side, he's looking at the

13   fee in whichever model it is that he mapped the at-issue fund

14   into.  And then he's -- he's calculating -- he's looking at

15   expense ratios for the two and comparing them.  Is that --

16   A.    That's essentially what he does.  He calculates a weighted

17   average fees for his model alternatives and compares that to

18   the -- what's the weighted average fees for the at-issue funds

19   and calculates the difference between those to be damages --

20   Q.    Okay.

21   A.    -- or excessive fees.

22   Q.    And then the ICI ones are a bit different -- and we'll

23   come to them in a second, but -- so did you make a

24   demonstrative related to your opinions regarding the fees

25   analysis that Dr. Pomerantz made?

1   A.   Yes.

2   Q.   Okay.  And overall, did you form an opinion about

3   Dr. Pomerantz's fee calculations?

4   A.   Yes, I did.

5   Q.   And what was your opinion --

6   A.   That --

7   Q.   -- briefly?

8   A.   That his analyses are flawed, and they don't provide any

9   evidence that Plan participants or the Plan paid excessive

10  fees.

11  Q.   Okay.  Chris, could you please call up DX 890?

12       And so DX 890, does that describe the flaws in fees

13  analysis that you identified?

14  A.   Yes.  I think it summarizes them, yes.

15  Q.   And please describe what you meant by these --

16  A.   Well --

17  Q.   -- just briefly, in a summary form.

18  A.   Yeah.  Very briefly.  So the fail -- fails to consider

19  fees in relation to the bundle of services.  The -- in order

20  to know whether you overpaid in fees, you have to know what it

21  is you're paying for.  So if it's a passively managed fund,

22  for example, versus an actively managed fund, that's a

23  different bundle of services that you're receiving from those

24  two options.  And so you wouldn't expect them to have the same

25  fees.  That's the essence of my first criticism.

1          Secondly, he fails to control for the fact that

2     different benchmarks have different proportions of active or

3     passively managed funds.  And consequently, essentially, what

4     he's measuring is just the -- the difference between the

5     amount of active funds in the -- in American Century Plan

6     versus the amount of active funds in the various benchmarks

7     that he looks at.  That -- that explains the difference.  And

8     then I find some additional flaws with the way he's

9     constructed his ICI analyses in addition to those first two.

10    Q.  Okay.  On the first one -- I know we've talked a lot now

11    about the difference between active and passive.  And you

12    don't have to repeat that.  But in broad terms, what -- what

13    are the types of services that you're talking about here?

14    A.  Well, in -- in an actively managed fund, there's -- there

15    are various fund management expenses as for research, for

16    development of the strategy and implementation of the actively

17    managed strategy.  So there's -- there's fund investment

18    analysis of fees and costs that are associated with actively

19    managed funds.  It's why actively managed funds have higher

20    fees than passively managed funds where -- because passively

21    managed funds are just replicating the performance of an

22    index, and there's no such analysis and other costs associated

23    with them.

24    Q.  Now, you also said that -- a point there on that first

25    bullet involved that you have to know what the person or what

1    the investor is paying for --

2    A.  Yes.

3    Q.  -- right?  And is performance of the investment relevant

4    to that determination?

5    A.  Yeah.  That's the ultimate thing you're hoping to gain by

6    paying higher fees in an actively managed fund is higher gross

7    performance that meets or offsets the fee -- the additional

8    fees that you're paying for active management.  So to evaluate

9    fees, you have to look at the underlying performance of the

10   fund that you're evaluating to determine whether you're

11   overpaying for what you're getting in relation to the -- the

12   active management returns.

13   Q.  And did Dr. Pomerantz do that?

14   A.  He did not do any sort of performance analysis in his fee

15   analysis.

16   Q.  Okay.  Now, what about the use of Vanguard as his

17   comparator when he's comparing active and passive fees, is --

18   we've talked about passive in general, but is there anything

19   to be concerned about with the use of Vanguard as a

20   comparator?

21   A.  Well, Vanguard is a fund that operates at cost, so it's

22   not a profit-making enterprise.  So among the passively

23   managed alternatives, Vanguard has lower fees because it's --

24   it's a fund that operates at -- or a family that operates at

25   cost.  So it's a particularly low active management -- or

1  passive management alternative in the sense that it has lower

2  fees because it's -- it's not a profit-making enterprise.

3  Q.  So let's turn now to these ICI analyses.  Could you

4  explain briefly what the ICI plan piece is and what the ICI

5  fund piece is?

6  A.  Yeah.  So the -- we'll do the plan first.  So basically,

7  what ICI does is collect information on the fees paid by

8  plans, 401(k) plans.  And then it groups those into categories

9  depending on asset size and I think other characteristics too.

10 So, you know, as a -- as a plan gets larger, the fees tend to

11 be smaller.  So the idea is that they want to try to control

12 for the plan size.  And they group the -- they put funds of a

13 similar size in a group and then calculate the average fees

14 for a plan of that size and report those out separately.  So

15 that's essentially what's being done in the ICI plan analysis.

16 Q.  And do you -- do you think that's an acceptable way to

17 approach the analysis, to use that -- that plan average?

18 A.  I think it's a good idea as far as it goes, but it's not

19 sufficient because with -- let's imagine that we have funds of

20 a similar size.  That's one thing you want to control for.

21 Another thing you may want to control for is --

22 Q.  Did you mean plans of a similar size?

23 A.  I meant plans of a similar size, yes.

24 Q.  Okay.

25 A.  So with plans of a similar size, that's certainly one

1   thing you'd like to control for.  But even plans with a

2   similar size, if two plans are invested -- if one plan is

3   invested heavily in bonds and another plan is invested heavily

4   in equities, equities tend to have higher fees -- Equity funds

5   tend to have higher fees than bond funds.  So if I'm comparing

6   a plan that has a lot of equities relative to the average in

7   the size category, I'm going to have a higher fee in that plan

8   for a very good reason, because the participants have elected

9   to invest in equities, which have higher fees.

10          To calculate the average difference between -- the

11  difference between the average fees in that category and that

12  plan's fees are going to, according to Dr. Pomerantz's

13  methodology, are going to show up as damages.  But it's not

14  really damages.  It's a result of just the investment choices

15  of plan participants.

16  Q.   Okay.  And then there's this ICI fund approach.  What's

17  that?

18  A.   All right.  This is -- so this is an attempt to address

19  that -- that issue.  It's a bit complicated.  The -- they --

20  the ICI categorizes funds into a range of categories and then

21  calculates average fees for these categories of funds.  What

22  Dr. Pomerantz does is take the asset weighting of the American

23  Century Plan -- so let's imagine there are eight -- I think

24  there might be eight categories.  And if American Century's

25  investments were weighted equally across those eight

1    categories, he would weight the -- the fees in those eight

2    categories that might run from 80 basis points to 20 basis

3    points.  He'll weight each of those categories in accordance

4    with the assets in the American Century Plan.

5            And that's an attempt to correct for this problem

6    of -- for example, one fund might invest in a lot of equities,

7    another fund might invest in a lot of bonds or bond funds.  So

8    it's -- it's a better measure than the fund measure, but,

9    again, as far as it goes, it doesn't go far enough to actually

10   be a legitimate comparator.  So I'll stop there because --

11   Q.  Okay.  Well, you have right here the -- the sub-bullet

12   under additional flaws, you have broad ICI categories?

13   A.  That's right.

14   Q.  So it sounds like you have an issue with respect to

15   these -- the use of these ICI categories, or at least the way

16   Dr. Pomerantz used them?

17   A.  Well, the -- any category of eight is going to have a lot

18   of variation within that category.  So, for example, if it's a

19   large cap equity, there's going to be variation depending on

20   whether that's a domestic fund or whether it happens to be a

21   emerging market fund.  The fees are going to be different.

22   And so any time you're comparing to an average like that, it's

23   not going to reflect the specific types of funds that in this

24   case American Century is invested in.  So there's -- there's

25   at best kind of a band that you should be able to construct

1    around the number because it is based upon an average where

2    there's a lot of still variation within a category.

3    Q.  And so, for example, one of the categories is

4    international; is that right?

5    A.  That's right.

6    Q.  And Dr. Pomerantz, he -- he sorts the American Century

7    funds into these eight categories.  And so he sorts a group of

8    them into international, correct?

9    A.  That's correct.  Yes.

10   Q.  And he does so in a way which mixes a variety of

11   different -- for example, risk profile characteristics, such

12   as capitalization, and small cap, mid cap, large cap, and

13   style, like growth or value and so forth, sorts them all into

14   the same bucket?

15   A.  Yes, he does.  And importantly, those different attributes

16   will have different types of fee -- levels of fees associated

17   with them.  So he's -- he may be comparing a high fee fund in

18   the sense that it's invested in a segment that has a strategy

19   where you would expect a high fee against an average that

20   includes other strategies that have lower fees.

21   Q.  Okay.  And then here, you say that the ICI fee averages

22   include index funds.  What's the problem there?

23   A.  Well, this -- this is a problem, I think as probably folks

24   know by now, the -- an index fund or a passive investment will

25   tend to have lower fees, an actively managed fund will have --

1   tend to have higher fees, just by the nature of the services

2   that they're providing.  So when he's looking at these

3   averages, whether they're the plan averages or the fund

4   averages, or the fund category averages, that's a mix of

5   active and passively managed funds.  So to the extent that

6   American Century is more heavily invested in actively managed

7   funds than the average he's comparing to, we're going to see

8   higher fees for American Century -- the American Century Plan

9   than the benchmarks he's comparing to, strictly because

10  they're more invested in actively managed funds.

11          And I think -- actually, in Dr. Pomerantz'

12  testimony, he, as sort of an aside, said the difference we're

13  looking at here is due to the underrepresentation of passively

14  managed funds in the American Century menu, which to me it

15  just implicates the whole analysis.  If you haven't controlled

16  for that difference, then you're not measuring excess fees.

17  You're measuring something different.  So I think that's

18  revealing, and I would agree with his comment.

19  Q.   Okay.  And do you have any other criticisms of

20  Dr. Pomerantz's fees analysis beyond those which are on DX

21  890?

22  A.   None that I can think of as I sit here.

23  Q.   Well, did you -- in evaluating Dr. Pomerantz's approach to

24  fees, did you take into account participation rates -- and --

25  I'm sorry, take into account contributions from the company to

1    employee retirement accounts?

2    A.  Well, I did sort of a benchmarking of the fee damage

3    calculated by Dr. Pomerantz, the alleged excessive fees, to

4    the levels of contributions or the amount of contributions

5    made by American Century to the -- to the fund --

6    Q.  Okay.

7    A.  -- or the Plan, excuse me.

8    Q.  Okay.  And did you do a demonstrative on it?

9    A.  I did.

10   Q.  Could we have DX 808, please.

11             What does this show?

12   A.  Well, this shows -- the blue bars are Dr. Pomerantz'

13   calculation of excessive fees under his five different methods

14   of calculating those.  So the ICI Fund and ICI Plan excessive

15   fees calculations are shown on the left there.  And then he --

16   the three models that he also uses to calculate excessive

17   fees, the Hewitt model, the Largest model and then the

18   Vanguard model.

19             So you can see there the -- the range of excessive

20   fees that he calculates is between 6.3 million and 22.5

21   million.  And I compared that just to the bar on the right,

22   which is the level of plan contributions between 2010 and

23   2015.  So it's actually a little bit shorter period than he

24   calculates excessive fees.  But as you can see, the Plan

25   contributions by American Century just dwarfed the alleged

1    excess fee damages calculated by Dr. Pomerantz.

2    Q.   And this DX 808 is -- it's in your report, right?

3    A.   It is.

4              MR. NEMSER:  I move to admit it.

5              MR. ENGSTROM:  No objection.

6              THE COURT:  Thank you.  808 is admitted.

7         (Defendants' Exhibit 808 admitted in evidence.)

8    Q.   So last section.  Did you evaluate Dr. Pomerantz's

9    assertion that the Plan suffered damages based on foregone

10   revenue sharing?

11   A.   Yes.

12   Q.   And so what did Dr. Pomerantz do?

13   A.   Dr. Pomerantz calculated a value for revenue sharing that

14   he contends should have been available to First American --

15   to, excuse me, American Century that was not collected and

16   essentially assumes that those revenue sharing dollars would

17   have been credited to Plan participants.

18   Q.   And did you form an opinion regarding the calculation that

19   Dr. Pomerantz did?

20   A.   Yes.

21   Q.   What's your opinion?

22   A.   Well, my -- my opinion is that there's -- there's really

23   no basis for the underlying assumption that the -- that any

24   revenue sharing that had been foregone, assuming there was any

25   revenue sharing foregone, that it would have accrued to the

1   benefit of Plan participants.  That's a -- that's contrary to

2   practice in the industry.  It's quite uncommon for revenue

3   sharing to be credited to Plan participants' accounts.  And,

4   you know, Dr. Pomerantz chose his words very carefully, as I

5   heard him -- appeared to choose them very carefully as he

6   testified that those funds could be made available to Plan

7   participants.  But based upon my research, I think that's a

8   pretty uncommon outcome and an assumption that I don't think

9   there's any basis for.

10  Q.  And what research are you talking about?

11  A.  I looked at a -- I believe it was a Deloitte study that

12  investigated this question about revenue sharing and in the

13  case where there is revenue sharing, what happens to those

14  dollars.

15  Q.  And what -- what did it show in terms of the frequency of

16  these kinds of -- of rebates to plan participants?

17  A.  It showed that only in the neighborhood of 5 to 10 percent

18  of plans actually receive revenue sharing and share those --

19  or credit those revenue sharing dollars to plan participants'

20  accounts.  It's much more common that any revenue sharing

21  dollars are used to play -- pay for plan expenses, like, you

22  know, audit fees or investment management services or

23  consulting services or what have you.

24  Q.  And Dr. Pomerantz just assumed that this plan, the

25  American Century Plan, would behave as the 5 to 10 percent of

1   401(k) plans that Deloitte looked at would have behaved?

2   A.  That's correct.  That's -- that's one of those implicit

3   assumptions that's in his calculation of revenue sharing

4   damages, which I don't think is supported by -- by the

5   evidence.

6   Q.  So did he provide any reasonable basis for his assumption

7   that he made, that foregone revenue sharing would have been

8   rebated?

9   A.  No.

10          MR. NEMSER:  That's all I have, Your Honor.

11          THE COURT:  All right.  Mr. Engstrom, sir.

12                   CROSS-EXAMINATION

13  BY MR. ENGSTROM:

14  Q.  Good afternoon, Dr. Strombom.

15  A.  Good afternoon.

16  Q.  Dr. Strombom, have you ever served as the fiduciary of a

17  retirement plan?

18  A.  No.

19  Q.  Have you ever acted as a consultant to a retirement plan?

20  A.  No.

21  Q.  Have you ever participated in designing the investment

22  menu of a retirement plan?

23  A.  No.

24  Q.  Have you ever worked for an asset management company?

25  A.  No.

1    Q.   Have you ever been paid a fee to manage investments?

2    A.   No.

3    Q.   Have you ever authored a publication about retirement

4    plans?

5    A.   No.

6    Q.   Have you ever authored a publication about asset

7    management?

8    A.   No.

9    Q.   And that would include -- you haven't authored any

10   publications relating to stable value?

11   A.   Authored publications relate to stable value?  No.

12   Q.   Correct.

13   A.   No.

14   Q.   Have you ever authored a publication about the asset

15   management industry?

16   A.   No.

17   Q.   Have you ever worked in the administration of a retirement

18   plan in any capacity?

19   A.   No.  I'm an economist who does expert testimony on -- on

20   loss causation and damages.  So, no, I don't work in the

21   investment industry.

22   Q.   So you have no firsthand experience working with revenue

23   sharing between a retirement plan and an investment manager?

24   A.   You mean by working with it?

25   Q.   In any capacity?

1    A.   No.

2    Q.   Do you consider yourself an expert on the topic of

3    retirement plans?

4    A.   Well, I'm an economist, and I have a specialization in

5    finance.  So I understand the underlying concepts, but I

6    wouldn't call myself out as an expert on retirement plans, per

7    se.  I'm an expert on economic damages.

8    Q.   Uh-huh.  And do you consider yourself an expert in the

9    area of asset management?

10   A.   Again, I -- I have training as a Ph.D. with a

11   concentration in finance, investment analysis and portfolio

12   management.  That's not, in general, what I spend my time

13   doing.  I spend my time involved primarily with damage

14   analysis and economic loss analysis.

15   Q.   And do you consider yourself an expert on the subject of

16   the asset management industry?

17   A.   No, not per se.

18   Q.   And, Dr. Strombom, your opinion is limited to the issue of

19   whether the plaintiffs suffered an economic loss in this case,

20   correct?

21   A.   I think in general, that's true.  I was -- I was retained

22   to address economic loss and damages, correct.

23   Q.   So you're not offering an opinion regarding whether the

24   defendants in this case breached their fiduciary duties,

25   correct?

1 A. That's correct.

2 Q. And you're not offering any opinion regarding whether a

3 hypothetical prudent fiduciary would have retained any of the

4 investments in the Plan, correct?

5 A. I believe that's true.

6 Q. Because you're not a fiduciary expert, nor are you an

7 investment expert -- oh, I'm sorry.  Withdrawn.

8     Dr. Strombom, I'd like to start with some principles

9 regarding the measurement of damages.  So in your report, when

10 you were discussing general principles, you quoted multiple

11 passages from a book chapter titled "Reference Guide on

12 Estimation of Economic Damages."  Do you recall that?

13 A. I believe.  Yes, I do recall that.

14 Q. Okay.  So you're familiar with that source?

15 A. Yes.

16 Q. Am I correct in inferring from your citations that this is

17 considered a learned treatise on the subject of measuring

18 economic damages in litigation?

19 A. I think that specific paper has appeared in various forms.

20 So, yes, I think it's one that's often referenced and -- both

21 in -- in litigation, like in court opinions, and also in

22 expert reports.  So I consider it to be an authoritative

23 source.

24 Q. Could we go to Exhibit PX 1109, page 1.  And this is the

25 cover of the overall book that contains that chapter.  So if

1   we could go to page 4.  And do you recognize this as being the

2   first page of the chapter that was cited within your article?

3   A.  I don't frankly recognize it, but it very well may be.

4   Q.  Sure.  Let's go -- start on page 11 of the exhibit.

5           First principle I want to talk about is the

6   presumption of liability.  And in particular, it states, In

7   almost all cases, the damages expert proceeds on the

8   hypothesis that the defendant committed the harmful act and

9   that the act was unlawful.

10          Is that the assumption with which you proceeded in

11  your -- in conducting your analysis?

12  A.  Yes.  I believe I'm assuming liability and proceeding to

13  evaluate Dr. Pomerantz' method of calculating damages.

14  Q.  The second principle I want to discuss -- if we could go

15  to page 19.  And that is regarding the necessity of comporting

16  with existing legal authority.  It states here, Assessment of

17  damages will depend greatly on the substantive law governing

18  the injury.  The proper characterization of Copier Service's

19  permissible conduct usually is an economic issue.  However,

20  the expert must also have legal guidance as to the proper

21  legal framework for damages.  Counsel for plaintiff may

22  instruct plaintiff's damages expert to use a different legal

23  framework from that of counsel for the defendant.

24          Dr. Strombom, would you agree with the general

25  proposition that it's necessary to comport your analysis with

1  governing law in the area of inquiry?

2  A.  Well, in my experience, there may be dispute among

3  attorneys about what the governing law indicates.  I always

4  approach my assignments from the level of my expertise, which

5  is in economics.  So I apply economic principles that I think

6  apply in the situation and render an opinion with respect to

7  economics as opposed to a legal opinion or an interpretation

8  thereof.

9  Q.  But it's oftentimes the case, correct, where the

10  particular tools of the economics field that you employ are

11  governed by legal authority within a particular area, correct?

12  A.  I don't exactly know what that question means.  I mean,

13  good economics is good economics, regardless of different

14  legal views of -- of the case.

15  Q.  But you cited a -- a legal opinion within your report,

16  correct?

17  A.  You'll have to refresh my memory about that.

18  Q.  Didn't you, in fact, include a citation to a district

19  court opinion from the District of Massachusetts in the case

20  *Brotherston versus Putnam Investments*?

21  A.  I believe I did.

22  Q.  Okay.  So then what guidance were you given by -- by

23  defendants' counsel in this matter as to the law governing the

24  measurement of damages in an ERISA case?

25          MR. NEMSER:  Objection.  It sounds like a request

1    for an attorney/expert communication.

2            THE COURT:  Well, I mean, I'll sustain on that.

3            I think the witness has testified that he's applied

4    the law of economics and -- but he doesn't -- he hasn't made

5    any -- he's not testifying about prudence or fiduciary.  He's

6    basically attacking the economic -- economic applications of

7    Dr. Pomerantz.  So I don't think he needs to be a lawyer to

8    testify about damages or an expert in the law.  But he's not

9    being offered in any respect in that way; is that right,

10   Mr. Nemser?  You're not offering him up as an expert to

11   testify about prudential conduct or fiduciary conduct, right?

12           MR. NEMSER:  No, Your Honor.

13           THE COURT:  It's just the laws of economics.  That's

14   all you're offering him for?

15           MR. NEMSER:  That's right, Your Honor.

16           MR. ENGSTROM:  Yeah, Your Honor, the questions are

17   not asking for a legal opinion.  I'm simply trying to

18   determine what his assumptions were for his analysis and what

19   the foundation was for those, so -- but I can -- I can ask a

20   different question.

21           THE COURT:  I appreciate it.  I appreciate it.

22           MR. ENGSTROM:  Okay.

23   Q.  Dr. Strombom, in developing the framework for your

24   analysis, did you either review or rely upon any legal

25   authority within the Eighth Circuit?

1    A.   No.  Not to my knowledge, no.

2    Q.   Okay.  And going back --

3              THE COURT:  Did you even know you were in the Eighth

4    Circuit?

5              THE WITNESS:  I did.  Somewhere along --

6              THE COURT:  Okay.

7              THE WITNESS:  -- in the engagement, I figured that

8    out.

9              THE COURT:  Okay.

10             THE WITNESS:  But not right away.

11   Q.   And going back to -- on page 440 of the article, the

12   circled passage, do you agree with what's written in that

13   paragraph?

14   A.   I -- I wouldn't disagree with that, no.

15   Q.   Now, the next underlying assumption I wanted to ask about

16   is the mechanism for measuring damages.  Would you agree that,

17   generally speaking, setting aside the notion of how you select

18   those comparators, that the measure of damages is a comparison

19   between what actually happened and what would have happened

20   had assets been in a prudently managed portfolio?

21   A.   No.  I -- I would agree with that.

22   Q.   Okay.  And would you agree with -- with this quote?  Where

23   several alternative investment strategies were equally

24   plausible, the Court should presume that the funds would have

25   been used in the most profitable of these.  The burden of

1    proving that the funds would have earned less than that amount

2    is on the fiduciaries found to be in breach of this duty?

3              MR. NEMSER:  Objection.  Calls for legal opinion.

4              THE COURT:  Yeah.  I got to back up and read that

5    very lengthy question.

6              MR. ENGSTROM:  I'm simply asking if that's the

7    methodology that he followed, not for his legal opinion

8    regarding the passage in question.

9              THE COURT:  Well, you are asking for -- I agree.

10   You're asking for him to talk about a burden of proof, and

11   that's not his job.  He's not proffered that.  He's not --

12   he's not said anything about that.  And that's -- that's

13   really up to me how all this is going to work as far as

14   burdens and burden shifting and whatnot.  So that's -- I'm

15   going to sustain the objection.

16   Q.  So, Dr. Strombom, where there were several potential

17   alternative investments, did you use the most profitable of

18   those in measuring loss?

19   A.  Well, I don't -- I included the most profitable among

20   those in my evaluation.  And so I'm not sure whether that's a

21   yes or no to your question because I don't exactly know what

22   you're asking me.

23   Q.  Okay.  And, in fact, you performed a peer group analysis

24   in your original report for purposes purporting to measure

25   performance of the American Century funds, correct?

1          MR. NEMSER:  Objection.  Beyond the scope of the

2     direct.

3          THE COURT:  Was that --

4          MR. NEMSER:  I didn't say a word about peer group

5     analysis.

6          THE COURT:  I don't have anything in my notes that

7     he did that in his peer -- direct.  We talked about his peer

8     group analysis.

9          MR. ENGSTROM:  His reported deviation -- deviations

10    from -- and decisions not to testify regarded -- relate to

11    the -- the -- are for impeachment purposes impact his

12    potential credibility.  So simply asking about his --

13         THE COURT:  Well, everything -- everything outside

14    the scope of direct affects his credibility, right?  I mean,

15    that's the argument we can make if -- yeah, I'm going to

16    sustain the objection.

17    Q.  So --

18         THE COURT:  If it wasn't in covered in direct.  I

19    want you to cover direct.

20    Q.  So in the testimony that you've just offered, have you

21    measured the performance of American Century funds against an

22    average of peer mutual funds?

23    A.  I don't think so.

24    Q.  And have you offered a comparison of the performance of

25    American Century funds to the performance of other similarly

1   sized retirement plans?

2   A.  Can I have the question back again?  I'm sorry.

3   Q.  Does your testimony -- did your testimony today include a

4   comparison of the returns of the American Century funds to the

5   returns experienced by investors in similarly sized retirement

6   plans in comparable investments?

7   A.  Well, I think the second -- my use of -- I guess I'm not

8   certain that I understand your question.  I'll tell you what I

9   did, and you -- you can help me decide if that's a yes or no

10  to your question.

11          In my second model, I used Dr. Pomerantz' funds that

12  were selected based upon their prevalence in 401(k) plans.

13  And so that sounds like what you're asking me --

14  Q.  Okay.  And --

15  A.  -- if I understand your question.

16  Q.  Excuse me.  And you compared the performance of the

17  American Century funds to the worst performing of those funds

18  identified in Dr. Pomerantz's analysis, correct?

19  A.  Well, I -- I asked the question did the at-issue fund

20  perform within the range of the five largest funds

21  identified -- or the five most frequently subscribed funds

22  that Dr. Pomerantz identified.  And that -- to ask that --

23  answer the question was it in the range, the way you do that

24  is -- is see if it exceeded the minimum.  So that's correct.

25  I mean, that's what I did.

1          THE COURT:  Now, the -- the line of questions --
2     questioning related to did you testify today, we're all
3     here -- I -- I'm uncomfortable with the line -- that
4     particular type of question.  Did you testify about this
5     today.  Since you were here, and I note, Mr. Engstrom, you
6     were taking good notes and making good direction.  Some of
7     them were sustained I think maybe.  So could you rephrase --
8     reform your question?
9          MR. ENGSTROM:  We're moving on, Your Honor.
10         THE COURT:  Okay.  Thank you.
11    Q.  Now, you were hired for purposes of responding to
12    Dr. Pomerantz's report and testimony, correct?
13    A.  Yes.
14    Q.  So one aspect of his testimony related to the use of more
15    expensive share classes than the lowest cost available,
16    including a transition to R6 shares as well as a switch to
17    institutional shares.  Do you recall that testimony?
18    A.  Yes.
19    Q.  And so I didn't -- I understand you're not a liability
20    expert, but I didn't hear any testimony related to that
21    specific calculation.  Can I infer from that that you do not
22    have any dispute with the methodology used to calculating
23    damages for that loss?
24    A.  Well, I don't have an opinion on those damages.  I -- I
25    don't have a dispute with the calculation.  I think the

1   question really is more a liability question.

2   Q.  Okay.  So you don't have any dispute with the --

3   Dr. Pomerantz's calculation that retaining the investor shares

4   of the short-term government fund rather than the cheaper

5   institutional shares from 2010 to 2015 cost participants about

6   101,000, you didn't -- that calculation was not addressed or

7   not disputed?

8   A.  Can I have the question back, please?

9   Q.  I'll withdraw it.

10          Now, you mentioned several criticisms related to

11  Model 1.  One of the comparisons in Dr. Pomerantz's model is

12  between the American Century Equity Index Fund and the

13  Vanguard Institutional Index Fund.  Do any of your criticisms

14  apply to that particular measurement of damages related to

15  that fund?

16  A.  You know, I'd have to look at my report.  I don't -- I

17  don't remember each of the at-issue funds.

18          THE COURT:  Do you want him to look at his report?

19  Q.  No.  There's -- you've -- have you heard testimony

20  regarding the American Century Equity Index Fund and that it

21  was an S&P 500 tracking fund?

22  A.  I don't recall.

23  Q.  Okay.  And so you -- and would you agree that the Vanguard

24  Institutional Index Fund is an S&P 500 tracking fund?

25  A.  You're talking about the fund that was in place in the

1    first two and a half years of the damage period?

2    Q.  That's correct.

3    A.  Yeah.  That's my understanding, yes.

4    Q.  And so you don't have any criticism of either the

5    comparator used by Dr. Pomerantz to calculate those damages or

6    with his calculation, do you?

7    A.  I'd have to look at my --

8             THE COURT:  Yeah.  Why don't you look at your

9    report.

10   A.  -- report.

11            THE COURT:  Let's get to the bottom of this.  Do you

12   have your report handy?  Why don't you look at that.

13   A.  Do we have my report here somewhere?  I don't know.

14   Q.  Sure.

15            THE COURT:  We just happen to have 20 copies of your

16   report.

17            MS. PATHMANN:  I like making copies.

18            THE COURT:  Karla, has killed some trees before she

19   came here today.  Is there a particular page you can orient us

20   to, Mr. Engstrom?

21            MR. ENGSTROM:  I really don't.  I was asking just a

22   general question regarding Dr. Pomerantz's report and whether

23   any of the criticisms applied to that comparator.  So whatever

24   the witness needs to review in order to answer the question,

25   I'm comfortable with.

1   A.   So based upon reviewing the Exhibit 10A and 10B, I see

2   Dr. Pomerantz made a calculation against a single but-for

3   alternative.  And so to that extent, I think I do have a -- an

4   issue with Dr. Pomerantz' calculation.

5           THE COURT:  And so the record is clear, 10A and 10B

6   are listed -- they're referenced inside of this expert report.

7   And do we have a number for that expert -- I know it's not

8   admitted.  Do we have a number to call it?  We could just call

9   it Strombom -- Strombom expert report if we don't have a

10  number.  I'm just trying to identify it for the record.

11  That's my only goal here.

12          MR. ENGSTROM:  No.  I agree.  Should we just assign

13  it a number?  Should we call it --

14          THE COURT:  What's your next number?  Do you all

15  have a next number?

16          MS. PATHMANN:  Ours is PX -- oh, sorry.

17          THE COURT:  You've used all your numbers, haven't

18  you, Karla?

19          MR. ENGSTROM:  We're in the 1100s now, so --

20          MS. PATHMANN:  It would be 11 --

21          MR. ENGSTROM:  25?

22          MS. PATHMANN:  -- 15.

23          THE COURT:  Let's make sure before we give it that

24  for our record because this would provide a lot of confusion

25  otherwise.  We'll get back to it.  We'll get back to it.

1  Just -- we'll do our best.  It's easier to get it right on the

2  front end because --

3          MR. ENGSTROM:  We'll call it 1115.

4          THE COURT:  1115.  Plaintiffs' Exhibit.

5  Q.  Because he used a single index fund?

6  A.  Yes.

7  Q.  Is that your -- the reason you say?  And did you do an

8  analysis of what -- of any other index funds that would have

9  been plausible alternatives?

10 A.  No.  My methodology uses the funds that Dr. Pomerantz

11 identified.  I'm thinking within my first analysis, the

12 analysis comparing his four models.  He uses the same

13 comparator across all of those.  So it's -- but the fact is,

14 he's using a single comparator across those.  So I didn't

15 independently attempt to identify other index funds.

16 Q.  So was it your opinion that because he used a single

17 comparator for that fund that participants in the Plan

18 suffered no loss as a result of retention of the American

19 Century Equity Index Fund as opposed to a lower cost identical

20 index fund?

21 A.  Can -- I'm going to have to have that question back again.

22 I'm sorry.

23         THE COURT:  Yeah.  Could you -- could you -- I'm

24 really, really trying to write this down too, Mr. Engstrom.

25 And it is hard for me to follow, sir.  If you could --

1    Q.  Sure.  So is it your testimony that because -- or is it

2    your opinion that because Dr. Pomerantz used only a single

3    comparator for -- to measure damages against the American

4    Century Equity Index Fund that Plan participants suffered no

5    loss as a result of retention of that fund compared to a lower

6    cost marketplace alternative?

7    A.  No.  It's my contention that his methodology is deficient

8    and that we can't assess damages based on the methodology that

9    he's used.

10   Q.  And I understand you've taken issue obviously with his

11   comparators.  But just strictly in terms of the calculations,

12   did you believe that there were any -- do you believe that

13   there were any computational errors within Dr. Pomerantz's

14   report in terms of the numerical conclusions he reached?

15   A.  Well, I'll say there -- there weren't any material errors

16   that I would identify.  We did find some calculation errors,

17   but they -- they weren't material to my opinions.

18   Q.  So I'd like to walk through some of the various issues you

19   have with Dr. Pomerantz's comparators.  First I'd like to talk

20   about is his use of passive funds to measure damages for

21   active funds.  Now, you would admit that measuring -- that

22   actively managed funds' performance is routinely measured

23   against a benchmark index, correct?

24   A.  It's often measured against a -- in terms of evaluating

25   the performance of a fund manager, I think I testified that

1    that's something that is done and can be informative for that

2    purpose.

3    Q.   And aren't index funds simply a proxy for the returns

4    experienced within a particular asset class minus a management

5    fee?

6    A.   They can be viewed -- they can be viewed that way.  I

7    don't think they're the appropriate index to use in

8    calculating damages, but I know some people consider them to

9    be that.

10   Q.   When selecting investments within a particular asset

11   class, would you agree that fiduciaries frequently select

12   between a passive and an active option?

13   A.   So within an asset class?  That was the question?

14   Q.   Right.  After fiduciaries have selected that they want an

15   investment within a particular asset class in the Plan, isn't

16   it quite common for fiduciaries to then decide between a

17   passive and an active option to fill that asset class?

18   A.   To my understanding, that certainly is an option that they

19   may consider.

20   Q.   And, in fact, didn't you testify at your deposition that

21   they do consider both active and passive alternatives quite

22   often?

23   A.   I may have testified to that.  I think -- I think that's

24   true.  Which I'd just say is a different question than whether

25   it's an appropriate comparison for calculating damages.

1  Q.  So then you would agree that for each -- for any given

2  active fund in the Plan, it's plausible that another fiduciary

3  or hypothetical fiduciary would have selected a passive

4  option?

5          THE COURT:  Mr. -- Mr. Engstrom, you just have

6  walked him through that he doesn't have -- he's not a

7  fiduciary.  He doesn't act as fiduciary.  You just laid that

8  foundation.  And now you're asking him, I believe, to testify

9  about fiduciary decision making.  Even though he said it in

10  the deposition, that doesn't make it pertinent here because

11  you've just basically proved -- proved here that he's not an

12  expert in being a fiduciary.  He's denied he is.  And -- but

13  we're going into the fiduciary decision making process.

14          MR. ENGSTROM:  Well, I believe he's offered

15  significant testimony about how realistic it is to use -- you

16  know, to use particular comparators.  At least my

17  interpretation of that is that he was offering opinions

18  regarding, you know, the funds used by fiduciaries.  But if

19  I'm mistaken, I can withdraw the question.

20          THE COURT:  Well -- here.  The first part of this --

21  at 4:20 p.m., you started a direct examination, and you began

22  asking -- by asking him about he's ever served as a fiduciary

23  or consultant, if he considers himself to -- to give opinions

24  about fiduciaries or consultants.  You asked like four

25  questions that were related to that is what I wrote down at

1    4:20 today.

2            And now we're going back asking him to opine about

3    fiduciary decision making.  And I'm -- I'm struggling with

4    this.  I know he's given -- yeah.  I don't know.  Mr. Nemser,

5    do you have a problem with any of this?  Maybe I'm --

6            MR. NEMSER:  No, Your Honor.  I do have a problem

7    with it.  I certainly do.  He did begin -- I mean, first of

8    all, Dr. Strombom has said he's not a fiduciary, he hasn't

9    been a fiduciary and isn't testifying about fiduciary conduct.

10   But these questions seem to presume a foundation based on

11   knowledge of how fiduciaries are going to behave.

12           THE COURT:  Well, it -- and, you know, clearly, I

13   think if we've learned anything from this trial, there are

14   options.  There's passive options, there's active options.

15   And I don't think you need him to testify about that.

16   Clearly, the plaintiffs have done a good job about that, and

17   the defense hasn't fought them on that.  There's many options

18   for fiduciaries.  But I really don't think he should be

19   testifying in that regard.

20   Q.  Would you agree that the Committee, the Retirement

21   Committee was primarily focused on the performance of the

22   funds compared with underlying benchmark indices?

23   A.  That's not an area that I investigated, the behavior of

24   the Retirement Committee.  I'm focused on Dr. Pomerantz'

25   damage analysis and whether it's a valid economic study of

1    economic loss or damages.  So that's not an area that I

2    investigated.

3    Q.  Can we go to Exhibit JX 006, page 19?

4            Dr. Strombom, these are Committee materials from

5    2010.  The page I've shown here was discussed by Mr. Bouffard

6    during this.  Could you take a moment to familiarize yourself?

7    I -- I -- did you review this particular document in

8    preparation of your report?

9    A.  I don't recall reviewing this.  I may have seen it, but I

10   have no recollection of it.

11           THE COURT:  Could you give us the cover page so I

12   can orient to this too?

13           MR. ENGSTROM:  Sure.  Can we go to 1?

14           THE COURT:  Because it has the date of the meeting,

15   right?  This is a meeting.

16           MR. ENGSTROM:  I believe so.  It might -- it might

17   be that cover page that just said 2010.  Nope.  There it is.

18           THE COURT:  June 30th, 2010.  Okay.  Thank you.

19           MR. ENGSTROM:  Now can we go to 19?

20   Q.  Now --

21   A.  Did you want me to -- did you want me to look --

22   Q.  Well, I'll ask my questions, and if you have time to

23   review it, feel free.

24   A.  Okay.

25   Q.  I don't know if this -- this particular exhibit indicates

1    that the team -- excuse me, the Retirement Committee is going

2    to follow the Investment Team, who was changing its outlook to

3    be benchmark oriented and peer group aware in their approach.

4            And my question is, if the Retirement Committee was

5    benchmark oriented in their review of American Century funds'

6    performance, isn't it apt to compare the performance of those

7    funds against a benchmark --

8            THE COURT:  Hold on.

9            MR. NEMSER:  Objection.

10   Q.  -- being tracked by index fund?

11           THE COURT:  Mr. Nemser.

12           MR. NEMSER:  Yes, Your Honor.  I -- the witness has

13   said he doesn't know whether he's even seen this document.

14   And it's being -- the question is framed as if he knows what

15   this document is about.

16           THE COURT:  Here's what I'll -- here's what we're

17   going to do.  We're going to take a recess in five minutes.

18   And, Mr. Engstrom, when you come back here, I would like you

19   to work with shorter questions because I'm having -- I'm

20   having trouble following all the twists and turns of these

21   questions in this cross-examination.  But let's go back to

22   that last question that had about 14 twists and turns.  Did

23   you get all that?

24           THE WITNESS:  No.  I didn't understand the question.

25           THE COURT:  Okay.

1  Q.  So if the -- assuming that the Retirement Committee was

2  benchmark focused in their measurement of funds --

3  A.  I'm not even sure what that means, "benchmark focused."

4  Q.  If the primary means by which the Retirement Committee was

5  measuring performance was comparison to a benchmark index,

6  isn't it appropriate to measure the performance of the subject

7  funds the same way, by using a benchmark index as tracked by

8  an index fund?

9  A.  Not for damages purposes, I don't believe.

10  Q.  Could we go to PX 1112?

11      You discussed this article in your examination with

12  Mr. Nemser, correct?  This is William Sharpe's article from

13  1991, "The Arithmetic of Active Management"?

14  A.  Yes.

15  Q.  And Mr. Sharpe is as a Nobel Prize winner, correct?

16  A.  That's my understanding, yes.

17  Q.  And can we go to page 2?

18      THE COURT:  Could you blow it up?  It's a little bit

19  fuzzy.

20      MR. ENGSTROM:  Yeah.  The second to the last

21  paragraph.  Oh, I was wrong.  The last paragraph.

22      MS. PATHMANN:  Okay.

23      THE COURT:  And this will be our last question

24  before our recess.  So please proceed.

25  Q.  Okay.  It states, The best way to measure a manager's

1    performance is to compare his or her return with that of a

2    comparable passive alternative.  The latter -- often termed a

3    benchmark or normal portfolio -- should be a feasible

4    alternative identified in advance of the period over which

5    performance is measured.  Only when this type of measurement

6    is in place can an active manager (or one who hires active

7    managers) know whether he or she is in the minority of those

8    who have beaten viable passive alternatives.

9           Dr. Strombom, do you agree with Professor Sharpe's

10   opinion relating to measurement of active managers as stated

11   here?

12   A.  I think I testified on direct that I -- I don't dispute

13   Dr. Sharpe's opinion that is stated here.  And -- but I did

14   say that I don't think it's an appropriate measure.  And it's

15   a different question as to how one should measure damages and

16   against what alternatives one should measure damages in a case

17   like this.

18          THE COURT:  We're getting ready to take a recess

19   unless you got one --

20          MR. ENGSTROM:  I've got one last --

21          THE COURT:  -- short --

22          MR. ENGSTROM:  One last question just relating --

23          THE COURT:  Short question.

24          MR. ENGSTROM:  It's a short question.  Yeah.

25          THE COURT:  All right.

1          MR. ENGSTROM:  Relating to this document.

2          Could you -- could we zoom out and go to the first

3     page?  Could we zoom in on that paragraph that I circled,

4     Karla?

5     Q.  And here, Professor Sharpe states, Because active and

6     passive returns are equal before cost, and because active

7     managers bear greater costs, it follows that the after-cost

8     return from active management must be lower than that from

9     passive management.

10          Would you agree with that?

11    A.  I don't really know the context for this assertion that

12    because active and passive returns are equal before costs -- I

13    mean, that's not the case in every instance.  I'm not sure if

14    he's talking about based on his research on average or --

15    because clearly, some active managers' returns before cost are

16    in excess of passive returns.  So I don't know the context of

17    this.

18          MR. ENGSTROM:  I'll give you a chance to review it,

19    and we can talk about it on Thursday.

20          THE COURT:  All right.  We'll see you Thursday.  All

21    right.  Everybody work hard to be prepared for our last day of

22    trial on Thursday.  Okay.  Thank you.

23          (Proceedings concluded at 5:00 p.m.)

24

25

1               C E R T I F I C A T E

2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5    /s/Regina A. Lambrecht            October 4, 2018
     REGINA A. LAMBRECHT, RDR, CRR        DATE
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25