# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| STEVE WILDMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-00737-DGK |
| | ) | |
| AMERICAN CENTURY SERVICES, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves claims for breach of fiduciary duty and prohibited transactions pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Plaintiffs Steve Wildman ("Wildman") and Jon Borcherding ("Borcherding"), participants in the American Century Retirement Plan (the "Plan"), brought this suit on their own behalf and on behalf of a class of participants in the Plan, against Defendants American Century Services, LLC ("ACS"), American Century Investment Management ("ACIM"), American Century Companies, Inc. ("ACC") (ACS, ACIM, and ACC collectively "American Century"), the American Century Retirement Plan Retirement Committee (the "Committee"), and past and present members of the Committee,[1] seeking damages and declaratory and injunctive relief related to allegations that Defendants breached their fiduciary duties to the Plan.

---

[1] The members named include Christopher Bouffard, Bradley C. Cloverdyke, John A. Leis, Tina S. Ussery-Franklin, Margaret E. Van Wagoner, Gudrun S. Neumann, Julie A. Smith, Margie A. Morrison, Chat Cowherd, Diane Gallagher (collectively "Committee Members"). All Committee members testified at trial except for Ms. Ussery-Franklin and Ms. Neumann.

Plaintiffs tried three claims[2] to the Court over eleven days, from September 4 to 20, 2018.[3] All of Plaintiffs' claims rest on Defendants committing a breach of fiduciary duty. After carefully considering all of the evidence presented at trial, the Court finds Plaintiffs failed to prove Defendants breached any fiduciary duty to the Plan participants. Accordingly, the Court finds in Defendants' favor on all counts and claims.

## Findings of Fact

### A.    The Parties

Wildman is a former employee of American Century. He began participating in the Plan in 2005 and continues to participate, though he is in the process of removing his funds from the Plan. Borcherding is also a former employee of American Century and participated in the Plan from 1996 to 2012.

Defendant ACIM is a financial services company offering mutual funds and other investments to retirement plans and other investors. ACIM manages the American Century-branded mutual funds within the Plan. During the relevant time, ACIM offered 106 mutual fund products to its customers, and as of year-end 2016, ACIM had approximately $11.7 billion in assets under its management.

Defendant ACS is the Plan sponsor,[4] and is primarily responsible for administering the Plan. Administration of the Plan includes controlling and managing the Plan's operations by

---

[2] The Complaint contains five counts. The Court granted Defendants' motion for summary judgment on Plaintiffs' prohibited transaction claims (Counts Three and Four), leaving Count One (breach of fiduciary duty), Count Two (failure to monitor fiduciaries), and Count Five (equitable disgorgement of ill-gotten proceeds).

[3] After the close of Plaintiffs' evidence, the Defendants filed a Motion for Judgment on Partial Findings (Doc. 267). The Court DENIES the motion, rendering its decision in light of all the evidence.

[4] Plan sponsor is defined as: "the employer in the case of an employee benefit plan established or maintained by a single employer." 29 U.S.C. § 1002(16)(B).

selecting and monitoring investment options and third-party service providers. ACS outsources this administration to the Committee, which is responsible for supervising, monitoring, and evaluating the performance of the Plan. The Committee is composed of American Century employees appointed by the American Century senior management team.

Mark Gilstrap, a senior management committee member, testified that members of the senior management committee did not involve themselves with the inner workings of the Committee and provided no oversight or review of the Committee's decisions because the Committee members had significant expertise in investment products, retirement plans, and financial markets. In fact, three of the Committee members hold Chartered Financial Analyst (CFA) designations, a designation which measures the competence and ethics of a financial analyst. The other Committee members were familiar with the inner workings of American Century and knew the product and services well. The Court finds the Committee members' testimony credible.

### B.  The Plan

The Plan is a defined-contribution "401(k)" plan, as defined by ERISA, 29 U.S.C. § 1002(2)(A), (34), that allows participants to contribute a percentage of their pre-tax earnings and invest their contributions in one or more investment options. The Plan is open to all employees of the American Century companies, and also former employees and their beneficiaries. The record shows most chose to participate in the Plan. From 2011 to 2015, the participation rate in the Plan ranged from 93.5 to 96.0 percent. During that same time period, the plans (approximately 1,900) recordkept[5] by Vanguard had average participation rates of between 74 and 78 percent. The Plan's participation rate was also higher than the average participation rate of other defined contribution

---

[5] This is a term commonly used in the financial industry and denotes that the history of a fund's financials is maintained by a financial recordkeeper, like Vanguard.

plans with automatic enrollment recordkept by Vanguard, which was between 88 and 92 percent.

Since 2010, the Plan's investment options were a selection of American Century mutual funds, American Century collective investment trusts ("CIT"),[6] American Century Companies Inc. Class C common stock, and a self-directed brokerage account ("SDBA").[7] The SDBA includes American Century and non-American Century investment options including index mutual funds, exchange traded funds, and individual stocks and bonds.

The class period runs from June 30, 2010, to the present. At the beginning of the class period, American Century offered Plan participants mostly institutional share class funds, but in July 2013, American Century made the retirement share class ("R6") available for twenty-three funds in the Plan.[8] Although there was some delay, the Committee converted all twenty-three funds to the R6 share class in August 2014.

During the class period, the Plan offered between thirty-three and forty-six investment options. Committee members testified they purposefully offered a large number of investment options because the majority of American Century's employees are sophisticated investors (holding various financial advisor certifications and financial industry regulatory licenses), who preferred the ability to invest their retirement savings more precisely. In fact, by the end of 2016, 404 out of the approximately 1,300 Plan participants were active employees of American Century who had passed exams allowing them to buy and sell securities.

---

[6] A CIT is a pooled investment product maintained by a bank or trust company and used exclusively for qualified retirement plans.

[7] A SDBA is an option offered in some qualified retirement plans that allows the participant to invest in a wider selection of investments other than what is provided for within the Plan.

[8] The only difference between these two share classes is the cost; the R6 share class has a lower cost than the institutional share class.

Even though the Plan consisted of only American Century funds, it contained a diverse array of asset classes and investment styles covering the entire risk/reward spectrum. For example, the Plan offered funds from money market accounts on the low end of the spectrum to several specialty funds and common stock funds at the higher end. The Plan also offered a significant number of large cap equity funds, and many small and mid-cap equity funds as well. The Plan did not offer a stable value fund, which consists of a bundle of high-quality, relatively conservative securities that are wrapped by an insurance contract.

Up until 2013, the Plan included a sub-advised index fund (a passive fund), offered by Barclays but branded American Century. When American Century decided to discontinue its relationship with Barclays, the fund was removed from the Plan. The Committee discussed adding index funds to the Plan on and off after 2010. On September 12, 2016, the Committee added five Vanguard passively managed index funds to the Plan's investment lineup.

The Committee members testified they preferred actively managed funds—the only type of fund American Century offered—because they believed actively managed funds were more responsive to market fluctuations. Active funds tend to have higher fees than passive funds, and the fees for the funds within the Plan ranged from 4 to 158 basis points. While the Committee members were aware of the fee differential between passively and actively managed funds, they believed the benefits outweighed those costs. They also believed Plan participants preferred actively managed funds, given the employees' enthusiasm in American Century, their investment in American Century products outside of the Plan, and the fact the Committee only once—after this lawsuit—received a question about the lack of passive options in the Plan.

No other 401(k) plan offers exclusively American Century funds, but a report ("the Hewitt Report") presented to the Committee by Hewitt/Hewitt EnnisKnupp ("Hewitt Company")

indicated that 41 percent of plans used an all-proprietary lineup. The Committee also preferred American Century funds because the fund managers were readily accessible to the Committee. On several occasions, the Committee heard reports from American Century fund managers about new funds, strategies to combat changes in the market, or about management changes in funds suffering from poor performance. The Committee felt the closeness with the fund managers was advantageous because the Committee (and participants) had an "insiders' view" into the inner-workings of the fund's investment management team.

### C. Recordkeeping & Revenue Sharing

At the beginning of the class period, JPMorgan Retirement Plan Services, LLC, ("JPMorgan RPS") was the Plan's recordkeeper, but in December 2013, JPMorgan RPS was replaced by Schwab Retirement Plan Services ("Schwab RPS"). This switch was made after an independent consultant conducted a request for proposal ("RFP") to determine the recordkeeping needs of the Plan and its participants. After the RFP, American Century considered three recordkeepers but ultimately chose Schwab RPS. Throughout the class period, American Century, not the Plan or Plan participants, paid the Plan's recordkeeping costs regardless of the fee arrangement or the recordkeeper.

In 2018, Schwab RPS told American Century that it was possible to rebate revenue sharing back to the participants, and the Committee elected to do so. The Committee members testified they were excited about this opportunity since it is uncommon for retirement plans to rebate revenue sharing paid by fund managers to recordkeepers back to participants; only five to ten

percent of retirements plans did so as of 2015.  No evidence was presented that the Plan was able to receive revenue sharing rebates prior to that time.

**D.      Plan Process**

Upon being appointed to the Committee, Committee members received training and information about their fiduciary duties, including a "Fiduciary Toolkit," which outlined their duties as fiduciaries, as well as a summary plan document, and articles regarding fiduciary duties in general.  The materials also included a copy of the current Investment Policy Statement ("IPS") (the governing document for the Plan's administration).  The Committee members read these materials and took their responsibilities as fiduciaries seriously.

The Committee met regularly three times a year.  It also had special meetings if something arose that needed to be discussed before the regularly scheduled meetings.  The meetings were productive and lasted as long as was needed to fully address each issue on the agenda.  On average, the meetings lasted an hour to an hour and a half.

In determining what funds should be included in the Plan, the Committee looked to the IPS first.  The IPS provides that the Plan invest in affiliated funds only "to the extent that mutual funds and other investment products offered by American Century Investment Management and American Century Global Investment Management[] meet the criteria for investment selection." Specifically, the selection criteria provided the following:

1. Performance should be equal to or greater than the median return for an appropriate, style-specific benchmark or peer group over a specified time period.

2. It should demonstrate adherence to the stated investment objective.

3. Fees should be competitive compared to similar investments.

4. The investment manager should be able to provide all performance, holding, and other relevant information in a timely fashion, with specified frequency.

5. It should have the potential to occupy a defined role within a well diversified asset allocation plan. It should fill a need in giving participants the opportunity to construct a suitable, well diversified investment portfolio with regard to diverse asset class exposure, market capitalization, style orientation, growth, income needs and risk management.

6. It should complement, not copy, existing Core Investment Options.

The Committee considered these criteria, along with the performance history of the fund, whether the fund assisted in diversification efforts, whether the fund was redundant to the current offerings, and the expense ratio of the fund each time it evaluated a fund's inclusion in the Plan.

The Committee received this information from a set of meeting materials that were assembled and distributed to Committee members. These materials were thorough and included a copy of the IPS; a list of the funds on the Watch List; a performance report for the investment options in the core lineup; a Plan update regarding the Plan's assets, participation rates, and deferral rates; and information about each fund's fees.

From 2010 until 2013, the Committee received and reviewed a document titled "Expenses by Investment Option" that compared each fund in the core lineup against the fees of funds within its Lipper peer group. The Committee obtained similar material from Schwab starting in 2014; the material reported each fund's expense ratio and compared that expense ratio to mutual funds in the same category. From 2017 on, the Committee received and studied Locksmart reports prepared by Lockton Retirement Services ("Lockton"), which compared each fund's expense ratio to the median expense ratio of the funds within the fund's Morningstar category.

Additionally, Committee members received a "Benchmark Summary," which showed each fund's gross returns against a benchmark, as well as each fund's information ratio. The Committee also reviewed reports showing each fund's net-of-fee performance. Throughout the class period, the Committee received several charts that reflected each fund's Morningstar rating, which is

based in part on net-of-fee performance, along with the amount of Plan assets in the fund and the fund's asset style. Starting in 2014, the Committee received data from Schwab RPS, which contained a comparison of the net-of-fees performance of each fund in the Plan to that of a similar fund within its category. Finally, beginning in 2017, the Committee started receiving and reviewing Locksmart reports, which score each fund in the core lineup based in part on its net-of-fees performance compared to funds in its Morningstar category.

From the beginning of the class period until 2013, Mr. Bouffard attended the Committee meetings and made presentations regarding the investment options available under the Plan's core lineup and potential core investment options. After Mr. Bouffard left the Committee, David Ledgerwood, a Portfolio Research Analyst, attended the meetings and made presentations on these same issues. Ms. Morrison later took on this role after joining the Committee.

The Committee sometimes heard presentations at meetings from consultants who presented findings from their research and lawyers providing information relevant to the Committee's work. The Committee also asked investment professionals to present information on a fund, especially when a fund was underperforming.

The meeting materials also included information about underperforming funds, which were and still are monitored by the use of a "Watch List," as outlined in the IPS. During the class period, the Watch List consisted of a list of funds whose performance met (or rather, did not meet) certain criterion over a defined timeframe. At the beginning of the class period, the Committee placed an investment option on the Watch List if its one and three-year performance rankings were in the fourth quartile. For the majority of the class period, however, the Watch List criterion was driven by a fund's information ratio, which measures a fund's risk adjusted return. To determine the information ratio of a fund, the benchmark performance is subtracted from a fund's overall

performance; that sum is then divided by the standard deviation of the difference between the fund and the benchmark.  If a fund's one-year and three-year information ratios were less than -0.5, a fund was placed on the Watch List.  To be removed from the Watch List, a fund needed to perform better than the bottom quartile for two quarters in the one-year category.

The IPS guidelines did not require removal of a fund from the Plan for failure to attain certain metrics.  Instead, the guidelines provided the Committee with broad discretion, which allowed them to use their investment expertise to determine whether a fund's long-term performance goals could still be achieved despite its underperformance over a specified period. Committee members believed this was preferable because an IPS that mandated removal of investments that underperformed their benchmarks would be undesirable in that it would always require removing a fund at its low point, incurring a loss, and preventing participants from taking advantage of any subsequent improved performance.  For example, the American Century Equity Income Fund ("Equity Income Fund") remained on the Watch List for eight quarters between September 2013 and September 2015, before significantly outperforming its benchmark index.

In 2011, the Committee removed American Century Veedot Fund from the Plan due to its underperformance.  Similarly, the Committee considered "fund underperformance" when it removed six funds from the Plan in 2017.  No other funds were ever removed from the Plan for underperformance, though some funds were removed because they were no longer offered at American Century.

The Committee meetings were documented through a set of meeting minutes.  The meeting minutes were thorough, capturing the topic of discussion, who initiated questioning, and then the outcome of the vote or the Committee's ultimate decision.

Lisa Lattan, an ERISA attorney since 1994, served as the Committee's secretary from 2006 to 2012 and advised the Committee through the end of her tenure on the Committee. She testified that the Committee's processes were "very good" and amounted to a "best practice set of procedures." Kathleen Mann, Defendants' expert on fiduciary processes, also testified that the Committee members understood their fiduciary responsibilities and complied with their fiduciary obligations. The Court finds this testimony persuasive and credible.

The Court gives no weight to the testimony of Plaintiffs' process expert, Roger Levy. Mr. Levy testified the Defendants failed to employ a prudent process when adding and retaining funds in the Plan. For example, Mr. Levy opined a fund that remained on the Watch List for more than five quarters should be removed absent a compelling, documented reason. Mr. Levy also opined that the Committee members should have conducted a winnowing process for each fund in the core lineup and should have taken more detailed minutes. By failing to do these things, Mr. Levy testified the Committee failed to adhere to a set of standards he promotes for fiduciary conduct. He acknowledged that his approach has not won wide acceptance in the retirement plan industry, with only fourteen to sixteen retirement plans out of approximately 500,000 conforming to these standards. While the Court agrees with Mr. Levy that fiduciaries should strive to attain the standards he champions, they are not the standards ERISA requires.

The Court also gives no weight to Plaintiffs' expert on damages, Steve Pomerantz, Ph.D. Dr. Pomerantz is a mathematician with thirty years' experience in the investment field including working as a portfolio manager and providing investment management services to mutual funds as both an investment advisor and as a sub-advisor. He has testified in numerous 401(k) cases in federal court, primarily for plaintiffs.

Dr. Pomerantz testified that the Committee's process was fraudulent and resulted in a breach of fiduciary duty. The Court finds that Dr. Pomerantz's testimony regarding the propriety of the Committee's process not credible. Many of Dr. Pomerantz's opinions were not tethered to the law, and Dr. Pomerantz, a mathematician, has never had a role with respect to a 401(k) plan at any of his places of employment, has never been hired as a consultant to design a 401(k) plan, has never been hired to draft or review plan documents for a 401(k) plan, and has never been hired to design a watch list procedure for a 401(k) plan. The Court details its rejection of Dr. Pomerantz's damages models in section F below.

### E. The Hewitt Report

In 2010, the Committee hired Hewitt Company to prepare a report for the Committee regarding the Plan's core lineup and recordkeeping fees. Hewitt Company presented its findings to the Committee on November 1, 2010. The Hewitt Report advised that the Plan "offers more proprietary funds than many of its peers," and that there is a "shift away from utilizing exclusively proprietary funds for a majority of financial service organizations." It recommended the Committee "[i]nvestigate potential usage of lower cost investment vehicles," "[c]onsider adding passive investment options" where they are not currently offered, and "[c]onsider eliminating underutilized funds." It also provided a risk/reward spectrum of the Plan, which showed the Plan had at least one fund in each broad investment category. It compared the Plan to other 401(k) plans that Hewitt Company surveyed, revealing that the Plan was consistent with other 401(k) plans, except that 26 percent of other plans had a stable value fund, while the Plan had no stable value fund, and only 1 percent of plans had specialty bond funds, while the Plan had several specialty bond funds.

Following the Hewitt Report presentation, the Committee convened a special meeting that lasted an hour and a half. The meeting was dedicated to discussing the Hewitt Report's findings and recommendations, and the members engaged in substantive discussions regarding the Hewitt Report's findings and recommendations.

The Committee discussed specifically whether to add a stable value fund and whether to continue offering specialty bond funds, though it decided against both initiatives. The Committee did decide, however, to reduce the investment options in the Plan. Initially, the Committee proposed removing eleven funds but ultimately removed only five funds and added a new fund, the Strategic Inflation Opportunities Fund ("the SIOP Fund"). Of the five funds removed, one fund was one of the ten large cap equity funds and one fund was from the Watch List. The Committee also replaced three mutual funds[9] with six American Century CITs, which have lower expense ratios than mutual funds.

In light of the testimony and the meeting minutes, the Court finds the Committee gave the Hewitt Report thorough consideration.

## F. Damages

Dr. Pomerantz also provided opinions as to loss and damages resulting from Defendants' alleged breaches of fiduciary duties. He developed four models of damages resulting from the Plan's lineup. For each of the first three models, Dr. Pomerantz conducted one analysis replacing the money market funds with a stable value fund and another without replacing the money market funds. He also calculated damages resulting from the delay in converting to R6 share class and from the Committee's failure to rebate revenue sharing fees back to the Plan.

---

[9] The three mutual funds included American Century U.S. Large Cap Growth Equity Fund, American Century U.S. Value Yield Equity Fund, and American Century U.S. Mid Cap Value Equity Fund.

In Model One, Dr. Pomerantz compared the net investment returns of each of the Plan's investments to an index fund in the same Morningstar category or, where no index fund was available, to a benchmark index subject to a ten basis point reduction to account for fees.  This model's purpose was to address what Dr. Pomerantz's called losses due to imprudent fund selection and monitoring but not due to imprudent asset class choices.  Dr. Pomerantz estimates that the damages to the Plan are $12,405,143 million. When he replaced the money market funds with stable value index funds, the loss increased to $16,397,959.

In Model Two, Dr. Pomerantz compared the net investment returns of the Plan's funds to a streamlined menu of Vanguard index funds modeled on the United States Government's Thrift Savings Plan ("TSP").  The TSP, and therefore Dr. Pomerantz's Model Two, consists of a large cap equity fund, small/mid cap equity fund, international equity fund, a bond fund, a capital preservation option, and a set of target date funds. This model, according to Dr. Pomerantz, included losses due to imprudent fund selection/monitoring and imprudent asset class choice. Based on Model Two, Dr. Pomerantz estimated a total loss of $27,755,215.  When he replaced the money market funds with a stable value fund, he calculated the losses at $31,748,030.

In Model Three, Dr. Pomerantz compared the net investment returns of each fund in the Plan to the most popular investment in the same Morningstar category among fiduciaries of similarly sized plans.  In order to choose his comparators, Dr. Pomerantz first identified the five most widely utilized funds among fiduciaries of similarly sized plans and then identified which of those fives funds had the most assets under management.  This model included actively managed funds as comparators.   Similar to Model One, Model Three addressed issues of fund selection/monitoring only and did not address asset class issues.  This model showed the Plan

suffered $11,736,759 in losses, and $15,989,786 in losses if the Plan's money market funds were compared to a stable value index fund.

Finally, Model Four compared the net investment returns of each of the investments in the Plan to a modified menu designed to address what Dr. Pomerantz believed were the considerations and recommendations of the Hewitt Report. Model Four included index funds and a stable value fund, eliminated specialty funds and funds Dr. Pomerantz thought were duplicative, and retained some existing funds in the Plan. Model Four, therefore, addressed what Dr. Pomerantz believed to be issues with both fund selection and asset allocation. According to this model, the Plan suffered $29,338,215 in losses from failure to implement all of Hewitt's recommendations.

On cross-examination, Dr. Pomerantz testified that some of the selections in Model Four were not based on "recommendations" made in the Hewitt Report, but rather were "considerations." These included removing a money market fund, removing American Century Global Gold Fund ("Global Gold"), and adding a stable value fund. Additionally, Dr. Pomerantz testified he could not state whether either Model Three or Four resulted in a prudent plan lineup. Dr. Pomerantz did not testify that any of his four models would have been utilized as a result of a prudent process. In fact, Dr. Pomerantz conceded that the purpose and performance of a fund are important factors in evaluating the prudence of a plan, yet his analysis did not consider the purposes for which the Committee added the funds to the Plan.

Defendants' expert on damages, Bruce Strombom, Ph.D., is an economist who spends about 80 percent of his consulting evaluating damages and economic loss. He has testified at trial or arbitration about thirty-five times and been deposed approximately eighty-five times. He has testified for defendants in 60 percent of cases and plaintiffs 40 percent of the time.

Dr. Strombom described in detail several flaws in Dr. Pomerantz's models. First, Dr. Strombom found Dr. Pomerantz did not perform the standard statistical tests necessary to rule out the fact that any of the differences in returns were caused by chance. According to Dr. Strombom, sound economic practice requires treating any apparent difference in returns that are not statistically significant as nonexistent because it may have resulted from chance. Dr. Strombom opined that 90 percent of the differences in returns found by Dr. Pomerantz were not statistically significant.

Of the other 10 percent which were statistically significant, Dr. Strombom testified that Dr. Pomerantz did not establish the following: the loss was attributable to misconduct; the comparator utilized in his models was appropriate; or the attributes of the fund were taken into account. He also opined that the inconsistencies in the models rendered them invalid. For example, Dr. Strombom found that there was a statistically significant difference between the money market funds and the stable value fund, but nevertheless concluded they were not accurate comparators because these two funds are in different Morningstar categories.

Dr. Strombom also testified that Model Four was inappropriate because there was little connection between the model and Hewitt's recommendations. He also criticized the fact that in each of Dr. Pomerantz's models, Dr. Pomerantz assumed all of the money invested in the at-issue fund would have been invested in his chosen comparator. Dr. Strombrom stated that a single but-for alternative fund is inappropriate to measure loss and damages; instead, a range of options should be utilized. When Dr. Strombom conducted such an analysis using Dr. Pomerantz's comparators from each of the first three models to define a range of returns, he found no economic harm.[10]

---

[10] In conducting his analysis using Dr. Pomerantz's comparators, Dr. Strombom ignored all of the other flaws he believed were inherent within Dr. Pomerantz's analysis.

While Plaintiffs quibble that Dr. Strombom used the low-end returns of the range of options and not the average to find there was no loss, Dr. Strombom articulated many reasons why using the average does not appropriately show loss: there is no guarantee of median performance across a range of options; the set of alternatives utilized was restrictive; and it is unreasonable to assume that damages occurred just because a fund performed below the mean of a restrictive group of comparators.

Dr. Strombom's testimony also expressed concern regarding the inconsistent results across Dr. Pomerantz's different models. For many funds, there were large damages fluctuations from one model to the next, including swings from positive to negative damage calculations. The fluctuations resulted in arbitrary damages calculations between models. Dr. Strombom also criticized Dr. Pomerantz's failure to consider the different risk profiles of the funds, the non-performance attributes of the funds, and the lack of concern for participant choice.

Dr. Strombom opined that the models were arbitrary because Dr. Pomerantz failed to isolate and address each of the alleged breaches, which resulted in fundamental flaws in his analysis. Dr. Pomerantz presented no calculation of loss caused by design of the Watch List, placement of a fund on the Watch List, or failure to remove a fund on the Watch List. Dr. Strombom also testified that if Dr. Pomerantz's models were imprudent, this was a "terminating flaw" in his damages calculations. Put simply, there was no basis for Dr. Pomerantz's assumption that the Plan would have resembled any of his models.

After carefully considering all of the evidence and testimony, the Court finds Dr. Strombrom credible and finds Dr. Pomerantz's four models not credible and assigns them no weight. The Court finds Dr. Pomerantz's models are the result of speculation and are untethered

to the facts of this case. Therefore, his four models cannot be relied on to determine what, if any, damages could have flowed from Defendants' alleged breaching conduct.

Aside from his four models, Dr. Pomerantz made some specific findings directly pertaining to certain breaches. First, Dr. Pomerantz calculated that offering a money market fund instead of a stable value fund resulted in $4.3 to $5 million in damages. This calculation was conducted in conjunction with his four models and thus suffers from the same deficiencies discussed above.

That said, not all of Dr. Pomerantz's calculations are flawed. He testified that delaying the conversion to a lower share class resulted in $472,193 in excess fees ($101,563 from the failure to convert the Short-Term Government Bond Fund and $370,630 in losses associated with the R6 share class). Dr. Strombom did not dispute this calculation. Dr. Pomerantz also calculated losses related to the lack of revenue sharing in the amount of $2.4 million. Dr. Strombom offered no critique of this methodology but opined the rebates might not have been passed back to participants. The Court finds these calculations credible.

## Conclusions of Law

Plaintiffs pursued three counts at trial: (1) breach of fiduciary duty, in violation of 29 U.S.C. § 1104(a)(1)(A)-(B), (2) failure to monitor fiduciaries, and (3) equitable disgorgement of ill-gotten profits, pursuant to 29 U.S.C. § 1132(a)(3). All three claims fail.

## I. Plaintiffs did not establish Defendants' conduct breached any fiduciary duty.

### A. Fiduciary duties under ERISA generally.

Section 1104 defines fiduciary duties under ERISA:

> (1) a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries and--
>> (A) for the *exclusive purpose* of:
>>> (i) *providing benefits* to participants and their beneficiaries; and

(ii) *defraying reasonable expenses* of administering the plan;

(B) with the *care, skill, prudence, and diligence* under the circumstances then prevailing that *a prudent man* acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104 (emphasis added). Part (A) is known as the "Duty of Loyalty" and part (B) is known as the "Duty of Prudence." *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014) ("*Tussey I*") (ERISA imposes the duties of loyalty and prudence on fiduciaries); *Braden v. Wal-Mart Stores Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

In the Eighth Circuit, a plaintiff bears the burden of showing the defendant breached its fiduciary duties, which results in a prima facie case of loss to the plan. *Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000); *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) ("*Roth I*"). "Once the plaintiff has satisfied these burdens, 'the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty.'" *Roth I*, 16 F.3d at 917 (quoting *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992)). In other words, the burden shifts to the defendant to show a prudent fiduciary would have made the same decision. *Id.* at 919 ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.").

Accordingly, Plaintiff must prove by a preponderance of evidence that: (1) the defendant is a fiduciary; (2) the defendant breached its fiduciary duty; and (3) that breach caused a loss to the Plan. It is undisputed Defendants are fiduciaries. At issue is whether Plaintiffs have proven Defendants breached their fiduciary duties, resulting in a loss and damages to the Plan.

**B. Plaintiffs failed to establish a breach of the duty of loyalty.**

Plaintiffs first argue Defendants breached their duty of loyalty by creating a plan with only American Century affiliated funds, a decision allegedly motivated by their desire to drive revenues and profits to American Century.

The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of … providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty is analyzed under a subjective standard where "what matters is why the defendant acted as he did." *In re: Wells Fargo ERISA 401(k) Litig.*, No. 16-CV-3405 (PJS/BRT), 2018 WL 3475485, at *4 (D. Minn. July 19, 2018). The test focuses on "the *reason*" a fiduciary took the challenged action, and whether it was motivated by "subjective good faith." *Id.* at *5 (emphasis in original). In other words, Plaintiffs' burden is to point to Defendants' subjective motivation behind specific disloyal conduct. Plaintiffs have not met their burden here, as they failed to establish a single instance in which the Committee members placed American Century's interests over those of the Plan participants.

Plaintiffs argue that the Committee members operated under a conflict of interest because they served as both employees of American Century and as Plan fiduciaries, and so the Court should infer impropriety. But ERISA does not prohibit an employer's corporate officer or employee from serving as a plan fiduciary. 29 U.S.C. § 1108(c)(3). It merely requires the officer "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. Certainly, "a conflict of interest alone is not a per se breach: 'nowhere in the statute does ERISA explicitly prohibit a trustee from holding positions of dual loyalties.'" *Tibble v. Edison Int'l*, No. CV 07-5359SVW(AGRX), 2010 WL 2757153, at *18 (C.D. Cal. July 8, 2010), *aff'd*, 711 F.3d 1061 (9th Cir. 2013), and *aff'd*, 729 F.3d 1110 (9th Cir. 2013), and *aff'd*, 820 F.3d 1041 (9th Cir. 2016), and

*vacated and remanded on other grounds*, 843 F.3d 1187 (9th Cir. 2016) (quoting *Friend v. Sanwa Bank of Cal.*, 35 F.3d 466, 468–69 (9th Cir. 1994)).  Although the Committee members wore two "hats," the evidence at trial did not show Defendants' decisions were motivated by a desire to place American Century's interests over those of Plan participants.

Plaintiffs repeatedly emphasize that Defendants only considered American Century funds in the Plan, which they argue evidences a motivation to benefit American Century.  But it is not disloyal as a matter of law to offer only proprietary funds.  *Brotherston v. Putnam Investments, LLC*, No. CV 15-13825-WGY, 2017 WL 2634361, at *8 (D. Mass. June 19, 2017), *aff'd in part, vacated in part, remanded*, 907 F.3d 17 (1st Cir. 2018).  In fact, it is common for financial service companies to offer their own investment funds in their retirement plans.  *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007).  And there is no duty to offer more than one investment company's funds.  *Hecker v. Deere & Co.*, 556 F.3d 575, 586-87 (7th Cir. 2009) (holding that limiting plan to funds from one management company did not violate ERISA; finding no statute or regulation prohibiting a fiduciary from selecting funds from one management company).

In support of their argument, Plaintiffs cite *Tussey v. ABB, Inc.*, 850 F.3d 951, 957 (8th Cir. 2017) ("*Tussey II*") and *Martin*, 965 F.2d at 671, but neither decision holds that considering only proprietary funds is per se a breach of the duty of loyalty, and each case is distinguishable.  In *Martin*, the court noted the importance of considering whether "fiduciaries investigated alternative actions and relied on outside advisors" in the context of an employee stock ownership plan ("ESOP").  956 F.2d 670-71.  But *Martin* dealt with reprehensible self-dealing in the ESOP context and fiduciaries who believed they were exempt from ERISA's fiduciary requirements altogether – facts unlike those here.  *Tussey II* held that the failure to consider alternative

investments could properly be considered as additional evidence of disloyalty where there was already "direct evidence of meetings about 'price implications'" and evidence the fiduciaries replaced a fund "not because they thought it was best for the plans, but because they wanted to get a better deal for themselves." 850 F.3d at 957.

Here, however, the record and testimony demonstrates Committee members made careful investigations of investment decisions and acted in the best interests of the Plan participants. Plaintiffs presented no emails, documents, or testimony suggesting that Committee members placed American Century's interests before Plan participants'. Not only did the Committee members truly believe in the quality of American Century's funds, but the Committee members believed having American Century funds was *more* beneficial to Plan participants because the participants were familiar with the funds offered by American Century, had the ability to more closely monitor their investments, and received direct access to fund managers for consultation.

Plan participants also continuously requested different American Century funds to be added to the lineup,[11] but the Committee did not act to add proprietary funds at every opportunity, something they would have done if they were motivated by acting in American Century's interests and not the Plan participants'. Instead, the Committee undertook a deliberate approach to adding and removing funds to the Plan and did so only when the Committee believed it was in the Plan participants' best interests.

Further, the Committee had no particular incentive to "push" American Century's funds since the Plan's investments in American Century funds are only 0.35 percent of all American

---

[11] The Committee members' belief that Plan participants preferred actively managed funds is supported by the fact that as of December 2015, participants who invested in mutual funds through the SBDA invested $11.9 million in actively managed funds and just $1.6 million in passively managed funds. Moreover, 27.5 percent of the amount invested in actively managed funds were invested in American Century mutual funds, making American Century the most popular actively managed fund asset manager in the SBDA.

Century's assets under management, a drop in the ocean of assets under American Century's management. Plaintiffs also presented no evidence that any of the Committee members benefited in their role as American Century employees based on the Plan's lineup or performance.

Accordingly, the Court finds the Committee believed that American Century funds would most benefit Plan participants. While, with the benefit of hindsight, such belief may or may not be unfounded, it cannot be said to be disloyal. *See In re: Wells Fargo ERISA 401(k) Litig.*, 2018 WL 3475485, at *5 ("Because the first fiduciary acted in subjective good faith, he could not be found to have breached the duty of loyalty. But because the second fiduciary did not act in subjective good faith, he could be found to have breached the duty of loyalty."). Given that Plaintiffs "point to no action of [Defendants] that can be explained *only* by a disloyal motivation," their duty of loyalty claim fails. *Brotherston*, 907 F.3d at 41 (emphasis added).

### C. Plaintiffs did not establish breach of the duty of prudence.

Plaintiffs also allege Defendants breached their fiduciary duties in a myriad of ways, each discussed in detail below. The duty of prudence is an ongoing duty, which includes an initial "duty to exercise prudence in selecting investments" and a "continuing duty to monitor [those] investments and remove imprudent ones." *Tibble v. Edison*, 135 S. Ct. 1823, 1928-29 (2015). ERISA's prudence requirements "are satisfied if the fiduciary: (i)[h]as given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved," and "(ii) [h]as acted accordingly." 29 C.F.R. § 2550.404a–1(b)(1). In *Braden*, the Eighth Circuit outlined the duty of prudence:

> The statute's "prudent person standard is an objective standard ... that focuses on the fiduciary's conduct preceding the challenged decision." In evaluating whether a fiduciary has acted prudently, we therefore focus on the process by which it makes its decisions rather than the results of those decisions.

588 F.3d at 595 (internal citations omitted).

The duty of prudence inquiry is context specific. *Fifth Third Bancorp v. Dudenhoeffer*, —— U.S. ——, 134 S.Ct. 2459, 2471 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)) (Because "the content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific."). Therefore, in looking at whether a fiduciary has breached its duty, "we examine the totality of the circumstances, including, but not limited to: the plan structure and aims, the disclosures made to participants regarding the general and specific risks associated with investment in company stock, and the nature and extent of challenges facing the company that would have an effect on stock price and viability." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 418 (4th Cir. 2007). The crucial question is "whether the defendants took into account all relevant information in performing its fiduciary duty under ERISA." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 288 (D. Mass. 2008). "[A]lthough the duty of procedural prudence requires more than a pure heart and an empty head, courts have readily determined that fiduciaries who act reasonably – *i.e.*, who appropriately investigate the merits of an investment decision prior to acting – easily clear this bar." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014) (internal quotations and citation omitted). But "[e]ven if a [fiduciary] failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." *Roth I*, 16 F.3d at 919 (citing *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985)).

1. **The Committee did not act imprudently by only considering American Century funds.**

First, Plaintiffs argue the Committee's process was flawed because up until September 2016, it considered only American Century funds. Under the facts presented here, the Court does

not find it was imprudent to do so.

In determining if a breach of fiduciary duty has occurred, the Court looks to what a prudent investor under similar circumstances would have done. *Hecker*, 556 F.3d at 586; *Whitfield v. Cohen*, 682 F. Supp. 188, 194 (S.D.N.Y. 1988) (quoting *Marshall v. Snyder,* 1 Empl. Ben. Cases (BNA) 1878, 1886 (E.D.N.Y.1979)) ("ERISA's prudence standard 'is not that of a prudent lay person but rather that of a prudent fiduciary with experience dealing with a similar enterprise.'").

A fiduciary of a plan sponsored by an asset manager is not required to consider competitors' funds if the proprietary funds chosen in the Plan are prudent options. *Hecker*, 556 F.3d at 586. There was significant evidence that other investment management companies administering retirement plans have lineups consisting solely of proprietary funds. The Hewitt Report showed that 41 percent of plans used an all-proprietary lineup. Ms. Mann also credibly testified it was common for investment management companies to consider only affiliated funds in their retirement plans and that it was not imprudent to do so if the lineup consists of prudent, diversified funds, as the Plan did. Although Mr. Levy testified that a prudent process would be to consider all funds from every investment manager and then winnow the funds down to the very best-performing one, the Court finds Mr. Levy's standard goes beyond what the law requires.

The Plan's core lineup included a wide variety of investment options across different asset classes, resulting in a diverse set of investment options within each asset class but with varying investment strategies. Moreover, before and at each meeting, the Committee thoroughly monitored the independent merits of each fund *in relation to funds from other asset management companies* to determine whether it was a prudent investment and should remain in the lineup. Given the totality of the circumstances, the Court cannot say that limiting the selection of funds to only American Century funds was imprudent.

**2. Defendants did not imprudently fail to offer certain funds in the Plan.**

Plaintiffs also allege Defendants acted imprudently by failing to offer passive options (*i.e.* index funds) and stable value funds in the Plan. This argument is unavailing.

ERISA does not require a retirement plan to offer an index fund or a stable value fund, and the failure to include either in the Plan, standing alone, does not violate the duty of prudence. *See Hecker*, 556 F.3d at 586 ("[N]othing in [ERISA] requires plan fiduciaries to include any particular mix of investment vehicles in their plan."). Rather, the issue is whether the Defendants considered these options and came to a reasoned decision for omitting them from the Plan. The evidence shows the Committee did so.

The record shows the Committee considered adding a stable value fund after the Hewitt Report but ultimately decided against it given the economic environment at the time. Mr. Bouffard testified that stable value funds are reliable, like money markets, but are more risky and also less liquid given the insurance wrapper. He emphasized that a stable value fund was not needed in the Plan and would have led to duplication. Hence, the money market funds, along with the other investment options in the Plan's core lineup, covered the entire risk/return spectrum and allowed a participant looking for a stable value fund to imitate that fund with another fund or mix of funds.

Mr. Leis echoed Mr. Bouffard's testimony regarding adding a stable value option to the Plan. He testified that after the Hewitt Report, the Committee discussed stable value options but decided against them, largely because after the financial crisis, no one wanted risk of any level. Mr. Leis also testified money market funds were favored because they have more transparency and fewer restrictions when they need to be transferred to another fund. He stated the Committee believed that Plan participants could replicate the underlying positions in the stable value fund with other funds in the Plan. Other Committee members testified similarly.

The Committee also appropriately considered adding passive options to the Plan after the Hewitt Report but ultimately decided against it due to the instability in the marketplace. The Committee preferred active management coming out of the financial crisis because financial experts in an actively managed fund could review the actual prospects of the securities being held, and therefore, had a greater ability to manage risk and lessen the effect of downturns in the market.

The Committee also believed that active management's added costs were justified by its performance, and the human element of active management provided value to the Plan's funds. In this case, the Committee monitored the expense ratios of each fund and verified whether their expenses were justified based on performance. While Plaintiffs' complain about the metrics used to make such determinations, as discussed further below, such metrics were not improper.

The record also shows that far from being diametrically opposed to passively managed funds, the Committee had constant conversations about adding passive options to the Plan. In 2016, the Committee decided to add Vanguard index funds to the Plan.

The evidence overwhelmingly shows that the Committee gave "appropriate consideration" to adding stable value funds and index funds, taking into account the benefits and detriments of adding these funds, before ultimately deciding not to do so. 29 C.F.R. § 2550.404a–1(b)(1). The Plan contained numerous funds along the risk/reward continuum, and Defendants cannot be said to have acted imprudently by thoroughly deliberating but then choosing not to add a stable value fund or an index fund (prior to 2016) to the Plan. *See Loomis v. Exelon*, 658 F.3d 667, 673-74 (7th Cir. 2011) (finding no claim where Defendants "offered participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense, low-risk, modest-return bond funds"). Although one could argue the benefits of including a stable value

funds in the Plan and adding passive funds earlier, the Court cannot find the Committee was imprudent in failing to offer those options. The decision was made after careful consideration.

### 3. Defendants did not act imprudently by including funds used to hedge inflation.

Plaintiffs also complain about the inclusion of two funds, Global Gold and the Strategic Inflation Opportunities Fund ("the SIOP Fund"), in the Plan. First, Plaintiffs argue the inclusion of Global Gold, a sector fund, in the Plan's core lineup was imprudent because sector funds are not diversified across multiple industries in the same asset class. But merely because sector funds carry with them an inherent risk does not mean that offering them in the lineup was imprudent. *See Tibble*, 639 F. Supp. 2d at 1117 (C.D. Cal. 2009) (holding the inclusion of sector funds is not per se imprudent). The Committee discussed the Plan's use of sector funds and determined that offering those funds served Plan participants' best interests. Mr. Bouffard credibly testified the Committee and participants were concerned that the flood of liquidity by all major banks across the globe would cause inflation. Gold, however, is often used to hedge against inflation; it stores value by serving as an alternative to fight or mitigate monetary debasement, so the Committee decided to include the fund as an option. Given the totality of the circumstances, the Committee's decision to include sector funds in the Plan was not imprudent.

Second, Plaintiffs allege Defendants imprudently added the SIOP Fund, which consisted of three American Century funds, to the Plan without an established record of performance. Plaintiffs' cite no authority holding that the implementation of a fund without a long performance history is per se imprudent. Nevertheless, as Ms. Mann testified, this information would have been available to the Committee because the SIOP Fund consisted of three funds, two of which had been in the lineup for some time and one which the same portfolio manager as the Gold Fund managed. Therefore, the information on the standalone strategies would have been available for

the Committee to look at in their meeting materials before deciding to add the fund. The meeting minutes show that the Committee had "extended discussions" about adding the SIOP fund, specifically with regard to the unique niche the fund fills within the Plan. *Hecker*, 556 F.3d at 586; *Loomis*, 658 F.3d at 673-74. Thus, the Court cannot find the Committee acted imprudently by adding the SIOP fund to the Plan.

### 4. Defendants did not imprudently maintain too many options in the Plan.

Plaintiffs' allegation that the Committee imprudently retained too many funds in the Plan, resulting in duplication of funds, is also without merit. The evidence shows the Committee thoroughly discussed the composition of the Plan's lineup to ensure it covered the entire risk/reward spectrum without duplication. While the Plan offered a large number of investment options to participants, it was certainly not imprudent to do so given the sophisticated investor base of the Plan participants. Ms. Morrison convincingly testified that while a lay person might believe certain funds belonged to the same asset class or style box, the funds within each of those categories were actually very different.

For example, although three of the Plan's funds were listed in the domestic equity large value style box, each fund had a different investment strategy. All three funds were managed by different investment teams. Two of the funds had fundamentally driven strategies, while the third fund had quantitatively driven strategy.[12] Even the two funds utilizing the same strategy had differences regarding what types of securities the fund invested in. Ms. Morrison credibly testified she could perform this same analysis with each fund in the Plan's lineup.

---

[12] A fundamentally driven strategy is a method of analyzing a security to measure its intrinsic value; it uses qualitative and quantitative information of a company's financial and economic position to determine whether a security is overvalued or undervalued. In contrast, a quantitatively driven investment strategy relies on mathematical and statistical measures to value a security.

It is clear that the number of options in the Plan did not result in confusion or lead to non-participation in the Plan. Not only was the participation rate of the Plan much higher than other plans, but the Committee regularly received and considered information regarding the rate at which its employees were participating in the Plan to make sure that the number of options in the Plan was not causing confusion among its participants. Just as Defendants cannot shield themselves from liability by simply offering a large number of investment options through the SDBA, so too Defendants cannot be held liable simply because of their decision to include a large variety of funds in the Plan. *Hecker*, 556 F.3d at 581. Defendants provided reasonable options and then left the "choice to the people who have the most interest in the outcome." *Loomis*, 658 F.3d at 673-74. They cannot be faulted for doing so.

**5. The Committee prudently monitored funds on the Watch List.**

Plaintiffs also complain that certain funds remained on the Watch List for many quarters despite their poor performance compared to similar funds. But a fund's rate of return is only relevant in so far as it suggests the Committee's decision-making process was flawed. *See Meiners v. Wells Fargo & Co., No.* 16-CV-3981(DSD/FLN), 2017 WL 2303968, at *2 (D. Minn. May 25, 2017) (finding plaintiff failed to state a claim when it alleged the defendants acted imprudently in composing the plan's lineup because Wells Fargo funds consistently underperformed Vanguard funds).

The evidence shows the Committee followed a prudent process in monitoring and retaining funds in the Plan. Committee members explained that removing funds from the Plan was very disruptive to Plan participants, and the Committee was hesitant to remove a fund simply because it had not performed well in the short term. "Indeed, a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy."

*White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016).   Were the Committee to adopt a strategy of removing funds based on short-term underperformance, Plan participants would be forced to sell their shares at a lower price and miss out on any subsequent improved performance.   Therefore, in deciding whether an underperforming fund should remain in the Plan, the Committee members received and reviewed numerous pages of analysis on funds which had been placed on the Watch List, including the funds' rolling performance and information ratio data.   Mr. Bouffard, and later Mr. Ledgerwood and Ms. Morrison, walked the Committee through the funds on the Watch List to discuss whether there were reasons inherent in a fund's strategy that would explain its underperformance.   Oftentimes, portfolio managers of Watch List funds would present to the Committee about the underperforming fund's strategy and the prospects for future performance.

Although this long-range strategy worked in some instances, it did not work for every fund.   It worked for the American Century Equity Fund, which remained on the Watch List for eight quarters but then went on to outperform its benchmark index for the next year, obtaining a 23.25 percent annualized returned compared to a 16.38 percent annualized return for the benchmark index.   Granted, this strategy did not prove as effective for the American Century Vista Fund, American Century Growth CIT, and International Bond Fund.   But this Court does not review the Committee's decisions in hindsight, *Roth I*, 16 F.3d at 917–18, and the record shows the Committee continually monitored the funds on the Watch List and came to a reasoned decision to allow them to remain in the Plan.   Viewing the decision in light of the information and reports the Committee reviewed, thorough discussions of each fund, macroeconomic environment at the time, and long-term investment strategy utilized, the Court finds the decision to not remove certain funds from the Plan was not imprudent.

Plaintiffs' related argument that measuring a fund's performance by its gross return was improper is unpersuasive. Using gross performance gives a better comparison of a fund relative to the fund's benchmark because a benchmark does not have fees. Also, the testimony was that gross performance was the industry standard metric. That said, the Committee did consider net performance. Ms. Morrison testified the Committee obtained this information from Morningstar, which in part charted the net returns of the Plan's funds, and the Committee reviewed other performance rankings on a net basis. In light of the totality of the circumstances, Plaintiffs failed to prove Defendants imprudently monitored or failed to remove funds on the Watch List.

### 6. Defendants did not fail to prudently monitor or control costs.

Further, Plaintiffs aver that Defendants acted imprudently by retaining funds with excessive fees in the Plan. But "[f]ees, like performance, cannot be analyzed in a vacuum." *Meiners*, 2017 WL 2303968, at *3 (citing *Dudenhoeffer*, 134 S. Ct. at 2471). As an initial matter, the Plan's fees ranged from 4 to 158 basis points, similar to those approved of by other courts,[13] which suggests the fees were not excessive. The diverse selection of funds available to Plan participants also contradicts Plaintiffs' claim that Defendants acted imprudently simply because cheaper funds were available. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) ("[W]e hold the range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured"). This is because, like a fund's rate of return, a fund's fee is only relevant in so far as it demonstrates the Committee's

---

[13] *Tibble*, 729 F.3d at 1135 (rejecting excessive fee arguments where expense ratios varied from .03 percent to 2.00 percent); *Renfro*, 671 F.3d at 327-28 (rejecting excessive fee claims where expense ratios ranged from 1 to 121 basis points).

decision-making process was imprudent.  *Meiners*, 2017 WL 2303968, at *2.

Here, the Committee reviewed relevant information to ensure the fees were reasonable in light of the fund's performance and level of risk.  From the beginning of the class period until 2013, the Committee received a report listing each fund's expense ratio alongside the percentile ranking for the expense ratio in the fund's peer group.  A majority of the time, the expense ratios for the funds were below the 50th percentile of the funds in their peer groups.  Many had expense ratios much lower than that.  From 2014 on, the Committee received and reviewed a report containing each fund's expense ratio compared to mutual funds in the same category.  From 2017 on, the Committee also received and reviewed information regarding the funds in the Plan with the median expense ratio of fund within the same Morningstar category.  None of this demonstrates an imprudent process.

Again, Plaintiffs try to discredit the Committee's process by arguing the metric used to review the funds' fees was flawed because the peer group contained every share class for a particular mutual fund.  But the reports reviewed by the Committee were standard reports provided by JPMorgan RPS and Schwab RPS to their recordkeeping clients, and Plaintiffs submitted no evidence that any fiduciary obtains customized reporting that compares the fees of a plan's funds to that of funds within the same share class.  In fact, Ms. VanWagoner testified it is common practice for retirement committees to look at multiple share classes for different mutual funds as a comparison to a peer group, and Ms. Mann credibly testified the use of this data was consistent with the Committee's duty to monitor the fees.  In short, the Court finds Plaintiffs' claims that the Committee imprudently monitored fees and that the fees were excessive are without merit.

**7. The delayed conversion to low-cost shares was not imprudent.**

Plaintiffs also complain about a year delay in converting twenty-three funds to a lower share class. But the record shows that the Committee converted the shares as soon as practicable. The Committee members testified that at the time the R6 shares became available, they were juggling multiple items, including changing the recordkeeper from JPMorgan to Schwab. They wanted to make all changes to the Plan – including changing recordkeepers, switching share classes, and adding new funds – at the same time so as to minimize the disruption to participants. Mr. Leis testified that changing recordkeepers was a significant change for the participants, and the Committee believed that making the change as seamless as possible, without creating disruption or confusion, was paramount. Further, Julie Smith testified she did not believe JPMorgan would have done the conversion because around the same time the R6 share classes became available in July 2013, JPMorgan told American Century it no longer wanted to be its recordkeeper.

The Court also notes the change of the recordkeeper and the change to different share classes is not something that occurs instantaneously. Ms. Smith testified JPMorgan had already started deconversion of the Plan, which was required to switch recordkeepers, and Schwab estimated this deconversion to take approximately four months. It takes about ninety days to put a fund on the Schwab platform, and it takes around seventy-five to ninety days to integrate the new share class into the Plan. There is also a thirty-day required notice to participants, and American Century would not make changes to the Plan without a communication campaign to participants, which required an additional sixty days. American Century also conducted site visits, which required additional time.

It is clear the Committee thoroughly discussed when the change to the R6 shares would occur and took into account all reasonable information, including the other changes to the Plan at the time. Based on the totality of circumstances, the Court holds the delay in converting the funds to R6 shares did not breach the duty of prudence.

Plaintiffs also complain that the Committee imprudently failed to convert the Short-Term Government Bond Fund from the investor share class to the institutional share class. But Plaintiffs produced no evidence that the institutional share class was available *to the Plan* in 2010.[14] Accordingly, Plaintiffs failed to meet their burden of proving the Committee imprudently failed to convert the fund to the institutional share class.

### 8. Defendants were not imprudent in failing to gain revenue sharing rebates.

Finally, Plaintiffs complain that the Plan did not offer revenue sharing rebates[15] that were provided to other Plans with American Century funds. Plaintiffs argue *Tussey v. ABB, Inc.*, No. 2:06-CV-04305-NKL, 2012 WL 1113291, at *13-15 (W.D. Mo. Mar. 31, 2012), makes it imprudent per se to fail to negotiate a rebate back to the Plan participants. That is not so. In this case, American Century paid the recordkeeping costs, and Plaintiffs produced no evidence that such rebates were available and would have been offered to the Plan prior to 2018.

### D. Plaintiffs failed to prove a loss to the Plan.

The Court need not reach the issue of loss given its holding that there was no breach of fiduciary duty, but the Court will do so to aid in any appellate review. In sum, the Court holds

---

[14] The only evidence presented at trial on this issue was Dr. Pomerantz's testimony that such shares were available to the Plan. But he provided no basis for so finding. And Plaintiffs' cite to a single document in the record only proves that the institutional share class was generally available at American Century, not to the Plan. No Committee member testified the institutional share class was available for the Short-Term Government Bond Fund, and Ms. Mann also testified she was unaware that the institutional share class was available.

[15] Revenue sharing involves a tripartite agreement between a mutual fund company, recordkeeper, and retirement plan whereby a portion of the investment management fee paid to the mutual fund company is refunded to the recordkeeper in exchange for the services provided by the recordkeeper.

Dr. Pomerantz's four models of loss and damages did not prove that any alleged breach resulted in a prima facie loss to the Plan.

"Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan *resulting from each such breach.*" 29 U.S.C. § 1109 (emphasis added). The plaintiff bears the burden of establishing a prima facie loss to the Plan. *Roth I*, 16 F.3d at 921 (noting that "the plaintiffs must establish a prima facie case of loss to the plan to prevail"). A prima facie loss may be demonstrated "by comparing the [Plan's] actual profit to potential profit that could have been realized in the absence of breach." *Roth v. Sawyer-Cleater Lumber Co.*, 61 F.3d 599, 604 (8th Cir. 1995) ("Roth II").

Plaintiffs argue they have met their burden of proving loss through Dr. Pomerantz's testimony. Plaintiffs cite another case where he testified, *Brotherson*, 907 F.3d at 31-34, for support. In that case, Dr. Pomerantz conducted an identical analysis to the one in this case, comparing "the total return for each Putnam fund to the total return for … a Vanguard index fund that belonged to the same Morningstar category as the Putnam fund … for every quarter from the beginning of the class period through [the end of the analysis period], and then adding together each quarterly differential." *Id.* at 32. The First Circuit found the district court erroneously concluded this evidence was insufficient to make out a prima facie case of loss as a matter of law, noting one possible "comparator" for challenged funds may be "return rates of one or more … suitable index mutual funds or market indexes (with such adjustments as may be appropriate). *Id.* at 33. The court cautioned, however, that its holding did not mean "that Pomerantz necessarily picked suitable benchmarks, or calculated the returns correctly, or focused on the correct time period" because each were questions of fact to be decided by the district court. *Id.* at 34.

That is where Plaintiffs' claim of suffering a loss unravels. Unlike the court in *Brotherston*, this Court has heard Dr. Pomerantz's testimony and the Defendants' cross-examination, along with the Defendants' expert testimony, all which were contrary and undermined Dr. Pomerantz's models. After hearing the evidence, the Court finds Dr. Pomerantz's models did not use suitable benchmarks and relied on unfounded assumptions. In this case, where the Plan's philosophy and investment strategy was so dissimilar to the indexes Dr. Pomerantz chose, his choice of indexes is fatal to his analysis, and by extension, Plaintiffs' prima facie case of loss. Moreover, nothing in *Brotherston* supports that a loss may be shown by comparing alleged imprudent investments to funds that cannot be said to be prudent. *Id*. at 34 (citing *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) ("Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a *prudently* invested portfolio.")) (emphasis added). Finally, *Brotherston* did not concern a scenario where the defendants argued that different models reached inconsistent results on a fund-by-fund basis, as is the case here.

Accordingly, the Court finds Plaintiffs have failed to prove a prima facie case of loss based on Dr. Pomerantz's models. The Court discredits these models because not only did Dr. Pomerantz perform only a one-to-one, rather than a range, comparison of funds, he also failed to isolate the effect of the alleged breach; failed to account for statistical significance between the performance of the at-issue fund and the alternative; failed to opine on the prudence of any of the alternatives that he used; mis-mapped risk profiles between the at-issue fund and the alternative; ignored the nonperformance attributes of funds; and ignored Plan participants' preferences. Thus, Plaintiffs' have failed to meet their burden of proving a prima facie case of loss for the alleged breaches as calculated by Dr. Pomerantz's four models.

## II. The duty to monitor claim fails because it is derivative of the breach of fiduciary duty claim.

The Court now turns to Plaintiffs' second claim presented at trial: that ACS breached its duty to monitor fiduciaries. Plaintiffs allege that ACS breached its duty to appropriately monitor its appointed fiduciaries, including the members of the Committee and the Plan Administrator. "[T]he power to appoint and remove plan fiduciaries implies the duty to monitor appointees to ensure that their performance is in compliance with the terms of the plan and statutory standards." *Krueger v. Ameriprise Fin., Inc.*, 2012 WL 5873825, at *18 (D. Minn. Nov. 20, 2012). To prove a breach of the duty to monitor, the Plaintiff had to prove that ACS "had knowledge of or participated in [underlying] fiduciary breaches." *Crocker v. KV Pharm. Co.*, 782 F. Supp. 2d 760, 787 (E.D. Mo. 2010) (citation omitted). Accordingly, the duty to monitor is wholly derivative of Count One, and a "derivative claim, such as a claim alleging a breach of the duty to monitor [fiduciaries], cannot survive without . . . an underlying breach." *Roe v. Arch Coal, Inc.*, No. 4:15-CV-910 (CEJ), 2017 WL 3333928, at *5 (E.D. Mo. Aug. 4, 2017) (citing *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010)). Because the Court found no breach of fiduciary duty, the Court finds Defendants are not liable under Count Two.

## III. Plaintiffs' equitable disgorgement claim fails because it requires an underlying breach of fiduciary duty.

Finally, the Court turns to Plaintiffs' third claim. Plaintiffs seek any ill-gotten profits resulting from Defendants' breaching conduct. Plaintiffs claim that any profits Defendants earned from their alleged breaches must be returned to the Plan. Under 29 U.S.C. § 1109(a), a breaching fiduciary must not only "make good … any losses to the plan," but it also must "restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." "The plaintiffs cannot prevail unless *the breach of fiduciary duty* either imposed a loss

on the plan or generated a profit for [Defendants]." *Wsol v. Fiduciary Mgmt. Assocs., Inc*., 266 F.3d 654, 656 (7th Cir. 2001) (citing 29 U.S.C. § 1109(a)) (emphasis added); *see also Felber v. Estate of Regan*, 117 F.3d 1084, 1087 (8th Cir. 1997).

Like Plaintiffs' duty to monitor claim, this claim is contingent on the Court finding Defendants breached their fiduciary duties to the Plan. Because the Court finds Defendants did not breach any fiduciary duty, Defendants also prevail on Count Three.

## Conclusion

The Court finds Plaintiffs have not proven by a preponderance of the evidence that Defendants breached their fiduciary duties to the Plan. The Court finds in favor of Defendants on all remaining counts.

**IT IS SO ORDERED.**

Date:   January 23, 2019                    /s/ Greg Kays
                                            GREG KAYS, CHIEF JUDGE
                                            UNITED STATES DISTRICT COURT